**Nos. 23-1882, -1883 (consolidated)**

# United States Court of Appeals for the Federal Circuit

GLOBAL TUBING LLC,
*Plaintiff-Cross-Appellant*,
v.
TENARIS COILED TUBES LLC, TENARIS S.A.,
*Defendants-Appellants.*

Appeal from the United States District Court for the Southern District of Texas, Judge Keith P. Ellison, Case No. 4:17-CV-3299

## APPELLANTS' OPENING BRIEF

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

John C. O'Quinn
Nathan S. Mammen
William H. Burgess
Ashley Cade
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000

September 22, 2023

**U.S. Patent No. 9,803,256, claim 1 (Appx1090)**

1. A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled tube, the coiled steel tube comprising:

a plurality of strips welded together end to end by a bias weld and formed into a coiled steel tube, each of the plurality of strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints, each of the plurality of welded strips comprising:

a yield strength greater than about 80 ksi;

a composition comprising iron and:

0.17-0.35 wt. % carbon;

0.30-2.00 wt. % manganese;

0.10-0.30 wt. % silicon;

0.010-0.040 wt. % aluminum;

up to 0.010 wt. % sulfur; and

up to 0.015 wt. % phosphorus; and

wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube;

wherein the final microstructure comprises a mixture of tempered martensite and bainite;

wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite in the base metal regions, the bias weld joints, and the heat affected zones;

wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogeneous; and

wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the bias weld joints, and the heat affected zones.

## CERTIFICATE OF INTEREST

1. **Represented Entities (Fed. Cir. R. 47.4(a)(1)):** Tenaris Coiled Tubes LLC; Tenaris, S.A.

2. **Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):** N/A

3. **Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)):** Tenaris, S.A.; Techint Holdings S.àr.l.

4. **Legal Representatives (Fed. Cir. R. 47.4(a)(4)):**

   Kirkland & Ellis LLP: Erin Cady, Kylie Feger, Daniel P. Gross, Alanna R. Horan, Neil A. Joseph, Gregg F. LoCascio, Megan McGlynn, Drew Morrill, Matthew S. Owen, Aaron D. Resetarits (no longer with firm), Anna Rotman

   Liskow Lewis: Jillian M. Marullo, Alma Shields

   Fish & Richardson P.C.: Bailey K. Benedict, Caitlin Dean, Danielle Joy Healey, Jayme Partridge, Karrie E. Wheatley

5. **Related Cases (Fed. Cir. R. 47.5(a)).** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? **No.**

6. **Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 26.1(b)-(c)):** N/A

# TABLE OF CONTENTS

Table of Authorities ........ iv

Statement of Related Cases ........ viii

Jurisdictional Statement ........ viii

Introduction ........ 1

Statement of the Issues ........ 5

Statement of the Case ........ 5

I. Background ........ 6

A. Tenaris's '256, '074, and '075 Patents and BlueCoil Product ........ 6

B. Southwestern Pipe's Failed Quench-and-Temper Product from the 1990s, Described in the "Chitwood" Reference and "CYMAX Brochure" ........ 11

1. Chitwood ........ 12

2. The "CYMAX Brochure" ........ 14

C. Prosecution of the Tenaris Patents ........ 17

1. Prosecution of the '256 (Parent) Patent, and Dr. Valdez's Declaration (2014-2017) ........ 17

2. After an Investigation with New Prosecution Counsel, Tenaris Discloses Portions of the CYMAX Brochure During Prosecution of the '074 and '075 (Children) Patents (2017-2019). ........ 21

3. Tenaris Discloses the Full CYMAX Brochure In Prosecution of the Grandchildren Applications, and Those Patents are Granted, With Terminal Disclaimers (2019-2022). ........ 25

II. District Court Proceedings ........ 26

A. Tenaris is Compelled to Produce Privileged Documents Concerning Prosecution of its Patents. ........ 27

B. The Magistrate Judge Strikes Tenaris's Expert's Opinion Addressing the Grandchildren Applications. ........ 29

C. The District Court Enters Summary Judgment That the ’256, ’074, and ’075 Patents Are Unenforceable for Inequitable Conduct. .......... 30

1. The District Court Finds That the CYMAX Brochure was Material and Not Cumulative. .......... 31

2. The District Court Finds That Tenaris Intended to Deceive the Patent Office When It Did Not Submit the CYMAX Brochure in Connection With the ’256 Patent. .......... 33

3. The District Court Finds That the ’074 and ’075 Patents Are Also Unenforceable for Inequitable Conduct. .......... 34

Summary of the Argument .......... 35

Standard of Review .......... 38

Argument .......... 39

I. Summary Judgment of Unenforceability of the ’256 Patent Was Improper. .......... 39

A. Inequitable Conduct Requires a Fact-Intensive Analysis of Intent and Materiality, Under a Heightened Standard of Proof, and Is Rarely Appropriate for Resolution Against the Patentee at Summary Judgment. .......... 39

B. The District Court Erred by Resolving the Disputed Factual Question of Dr. Valdez’s Intent Against Tenaris at Summary Judgment. .......... 44

C. The District Court Erred by Finding the CYMAX Brochure Material and Not Cumulative of Chitwood at Summary Judgment. .......... 50

1. The District Court’s Materiality Finding is Unsupported by Evidence or Argument from Global, and at a Minimum Resolves Disputed Facts at Summary Judgment. .......... 52

2. The Grandchildren Applications Further Underscore That a Reasonable Factfinder Could Have Concluded the CYMAX Brochure is Not Material. ........ 55

3. A Reasonable Factfinder Could Conclude That the CYMAX Brochure is Cumulative of Chitwood. ........... 59

II. The ’074 and ’075 Patents are Not Unenforceable. ........................ 66

Conclusion ........ 72

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. TorPharm, Inc.*,
300 F.3d 1367 (Fed. Cir. 2002) .......... 42

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 42, 44, 50, 64

*Arctic Cat, Inc. v. Polaris Indus. Inc.*, Nos. 13-3579, 13-3595,
2014 WL 5325361 (D. Minn. Oct. 20, 2014) .......... 56

*Belcher Pharms., LLC v. Hospira, Inc.*,
11 F.4th 1345 (Fed. Cir. 2021) .......... 50

*Bellard v. Gautreaux*, 675 F.3d 454 (5th Cir. 2012) .......... 38

*Burlington Indus., Inc. v. Dayco Corp.*,
849 F.2d 1418 (Fed. Cir. 1988) .......... 39

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 42

*Citizens Bank of Clearwater v. Hunt*,
927 F.2d 707 (2d Cir. 1991) .......... 43

*Copelands Enters., Inc. v. CNV, Inc.*,
945 F.2d 1563 (Fed. Cir. 1991) .......... 43

*Corona Cord Tire Co. v. Dovan Chem. Corp.*,
276 U.S. 358 (1928) .......... 41

*Digital Control, Inc. v. Charles Machine Works*,
437 F.3d 1309 (Fed. Cir. 2006) .......... 41, 63, 64

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332 (Fed. Cir. 2018) .......... 38

*Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378 (Fed. Cir. 2002) .......... 38

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) .......... 45

*Hay Grp. Mgmt, Inc. v. Schneider*,
965 F.3d 244 (3d Cir. 2020) .......... 43

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .................................... 45, 50, 64

*In re Cyclobenzaprine Hydrochloride Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ........................................................... 45

*In re Metoprolol Succinate Pat. Litig.*,
494 F.3d 1011 (Fed. Cir. 2007) ........................................................... 38

*In re Omeprazole Pat. Litig.*, 483 F.3d 1364 (Fed. Cir. 2007) ................. 66

*In re Sang-Su Lee*, 277 F.3d 1338 (Fed. Cir. 2002) ................................ 60

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
939 F.2d 1257 (5th Cir. 1991) .............................................................. 43

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*,
869 F.3d 1336 (Fed. Cir. 2017) ........................................................... 41

*Ironburg Inventions Ltd. v. Valve Corp.*,
418 F. Supp.3d 622 (W.D. Wash. 2019) ............................................... 56

*J&M Indus. v. Raven Indus.*,
574 F.Supp.3d 941 (D. Kan. 2021) ...................................................... 50

*Kimberly-Clark Corp. v. Johnson & Johnson*,
745 F.2d 1437 (Fed. Cir. 1984) ........................................................... 39

*Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*,
559 F.3d 1317 (Fed. Cir. 2009) ........................................................... 51

*Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903 (7th Cir. 2022) ........................ 53

*Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*,
606 F.3d 1353 (Fed. Cir. 2010) ...................................................... 41, 47

*Luv n' care, Ltd. v. Laurain*,
606 F.Supp.3d 337 (W.D. La. 2022) .................................................... 49

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*,
439 F.3d 1335 (Fed. Cir. 2006) ........................................................... 41

*Metallurgical Indus. v. Fourtek, Inc.*,
790 F.2d 1195 (5th Cir. 1986) .............................................................. 58

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995) .................. 57

*Monsanto Co. v. Bayer BioSci. N.V.*,
363 F.3d 1235 (Fed. Cir. 2004) .................................................. 41

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998) .................................................. 39

*OddzOn Prods., Inc. v. Just Toys, Inc.*,
122 F.3d 1396 (Fed. Cir. 1997) .............................................. 70, 71

*Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147 (10th Cir. 2017) ............... 52

*Optium Corp. v. Emcore Corp.*,
603 F.3d 1313 (Fed. Cir. 2010) .................................................. 42

*Pfizer, Inc. v. Int'l Rectifier Corp.*,
538 F.2d 180 (8th Cir. 1976) ..................................................... 40

*Pharmacia Corp. v. Par Pharm., Inc.*,
417 F.3d 1369 (Fed. Cir. 2005) .................................................. 72

*Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962) ............................ 42

*Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*,
732 F.2d 903 (Fed. Cir. 1984) .................................................... 39

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997) .............................................. 51, 60

*Shervin v. Partners Healthcare Sys., Inc.*,
804 F.3d 23 (1st Cir. 2015) ....................................................... 58

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
537 F.3d 1357 (Fed. Cir. 2008) .............................................. 44, 65

*SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*,
33 F.4th 872 (6th Cir. 2022) ...................................................... 43

*Tegal Corp. v. Tokyo Electron Am., Inc.*,
257 F.3d 1331 (Fed. Cir. 2001) .................................................. 65

*Terves, LLC v. Yueyang Aerospace New Materials Co.*,
No. 1:19-CV-1611, 2022 WL 1092658
(N.D. Ohio Apr. 12, 2022) .......... 56

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276
(Fed. Cir. 2011) (*en banc*) .......... passim

*U.S. Water Servs., Inc. v. Novozymes A/S*,
843 F.3d 1345 (Fed. Cir. 2016) .......... 41

**Statutes**

15 U.S.C. §4 .......... viii

28 U.S.C. §1295(a)(1) .......... viii

28 U.S.C. §1331 .......... viii

28 U.S.C. §1338 .......... viii

28 U.S.C. §2107 .......... viii

28 U.S.C. §2201 .......... viii

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... viii

Fed. R. Civ. P. 56(c)(1)(A) .......... 65

**Other Authorities**

37 C.F.R. §1.132 .......... 18

37 C.F.R. §1.56 .......... 51, 71

MPEP §716.01(a) .......... 45

MPEP §724 .......... 70

WRIGHT & MILLER, FED. PRACTICE & PROC. (4th ed. 2023) .......... 43

## STATEMENT OF RELATED CASES

No other appeal from the proceedings below was previously before this or any other appellate court. Counsel for appellant are unaware of other pending proceedings that would directly affect or be directly affected by the Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 15 U.S.C. §4 and 28 U.S.C. §§1331, 1338(a), 2201. This Court has jurisdiction because this is an appeal of a final district court judgment in a "civil action arising under … any Act of Congress relating to patents." 28 U.S.C. §1295(a)(1); *see* Appx2018-2019; Appx2057-2058; Appx2060-2062 (Second Amended Complaint).

Final judgment was entered April 6, 2023 (amended May 18, 2023). Appx1-6. The judgment ruled that Tenaris's '256, '074, and '075 patents were unenforceable for inequitable conduct, that Global Tubing's antitrust claims failed as a matter of law, and that all other pending claims were dismissed without prejudice. Appx1-2. Tenaris timely appealed on April 14, 2023 (amended May 19, 2023). Appx8696-8702. *See* 28 U.S.C. §2107; Fed. R. App. P. 4(a)(1)(A).

## INTRODUCTION

In this case, the district court improperly found inequitable conduct at summary judgment. The court ruled as a matter of law that Tenaris withheld material prior art during prosecution of its ’256 patent, that Tenaris’s inventor Valdez specifically intended to deceive the Patent Office, and that as a consequence Tenaris should lose its ’256 patent and two other patents in the same family. The court’s ruling relies on impermissible fact-finding and credibility determinations at summary judgment, and fails to apply *Therasense*’s heightened standards for both prongs of inequitable conduct. This Court should reverse.

Under *Therasense*, “should have known” is not the standard for intent, and “should have disclosed” is not the standard for materiality. Specific intent to deceive the PTO must be shown by clear and convincing evidence, and materiality requires proof that the PTO would not have issued the patent had it known of the undisclosed reference. Under *Therasense*, inequitable accusations should be rare. And *summary judgment* of inequitable conduct should be rarer still. Precedent of this Court, the Supreme Court, and others holds—in a variety of contexts—that it is rarely appropriate to decide scienter and credibility at summary judgment, especially

in favor of the party with the burden of proof, and especially where the burden is higher than a preponderance.

This case is hardly the rare exception to that precedent. If anything, it exemplifies the "plague" of dubious inequitable conduct accusations this Court tried to stamp out in *Therasense*. Following a familiar pre-*Therasense* pattern, the accused infringer (Global) devised an inequitable conduct claim by focusing on a reference that the patentee (Tenaris) possessed but did not disclose in prosecution, quoting internal communications divorced from context, and telling a tale of nefarious intent, all to try to extinguish three Tenaris patents while avoiding technical questions of infringement or validity. Whatever might be said for Global's view of the facts, at a minimum, it was not *compelled* as a matter of law at summary judgment.

As to materiality, the reference (the "CYMAX brochure") is a collection of documents, some with dates and some without, that were apparently "found in a notebook" at Tenaris and that concerned a failed product ("CYMAX") from the 1990s. It is cumulative of the "Chitwood" reference—which describes the same CYMAX product and which Tenaris disclosed in its *very first* IDS in prosecution. Global has emphasized that Chitwood re-

fers to "low-carbon 4100 series steel," while the CYMAX brochure spells out the chemistry of that steel. But the evidence shows (and Global agrees in its invalidity contentions) that ordinarily-skilled artisans view that as a distinction without a difference, akin to disclosing "$H_2O$" versus "water." And further evidence of immateriality comes from the PTO's later decisions—with full knowledge of the "CYMAX brochure"—to issue other patents in the same family while requiring terminal disclaimers because those claims were patentably indistinct from the '256 patent. At the very least, the relevant facts were genuinely disputed and inappropriate for summary judgment.

As to intent, Global offered a misleading spin on an exchange between a Tenaris inventor and patent attorney. Years into prosecution, after Chitwood had already been disclosed, Tenaris faced an obviousness rejection, and Tenaris's prosecution counsel asked Tenaris inventor Valdez for secondary-considerations-type "evidence of people struggling to achieve the claimed coiled tube." Valdez, an Argentinian metallurgist, responded (in a comment balloon on a draft document) that the CYMAX brochure came to mind, and sent the brochure to prosecution counsel. Valdez also shared his view that the CYMAX brochure was probably not responsive

because its chemistry was "outside our carbon range." Appx7721 (comment VMT11) In conveying that point, Valdez's comment included the phrase "I am not sure it is a good idea to disclose this document." *Id.* Global Tubing has seized on that phrase, removed it from context, and treated it as smoking-gun evidence of deceptive intent rather than an unremarkable query by an inventor to his attorney about a potential secondary-considerations argument.

The district court accepted Global's view of Valdez's mental state—dismissing context, dismissing Valdez's testimony, and dismissing evidence showing Valdez was aware CYMAX differed in critical ways from the claimed invention—and concluded that this evidence did "not present an equally reasonable inference to Global's intent to deceive argument." Appx14. On this record, deceptive intent cannot be the single most reasonable inference by clear and convincing evidence. And at the very least, it was inappropriate for the district court to draw inferences against Tenaris and decide Valdez's credibility at summary judgment.

Finally, the district court relied on the same errors and more when it ruled that two related patents were unenforceable. It relied on the same credibility rulings and fact findings, and failed to give non-movant Tenaris

the benefit of reasonable inferences, when it rejected Tenaris's explanation for why its incomplete disclosure of the CYMAX brochure in connection with those patents was done without deceptive intent. The unenforceability judgment should be reversed, or at minimum, vacated and remanded for trial.

## STATEMENT OF THE ISSUES

**I.** Did the district court err in granting summary judgment of unenforceability for the '256 patent: **(a)** by resolving the disputed issue of whether Dr. Valdez intended to deceive the PTO against Tenaris where he provided a reasonable explanation for his statements to prosecution counsel, and/or **(b)** by resolving the disputed issue of but-for materiality against Tenaris where reasonable inferences drawn from the evidence establish CYMAX brochure was cumulative over Chitwood?

**II.** Did the district court err in granting summary judgment of unenforceability for the '074 and '075 patents by resolving the disputed issue of intent against Tenaris where portions of the CYMAX brochure were provided to the PTO during prosecution?

## STATEMENT OF THE CASE

Global Tubing, LLC sued Tenaris Coiled Tubes, LLC and Tenaris, S.A. in district court, initially pleading claims for unfair competition, and

noninfringement of one of Tenaris's patents. Appx2001-2011. The operative Second Amended Complaint includes antitrust claims, as well as declaratory-judgment claims for unenforceability (for alleged inequitable conduct), noninfringement, and invalidity of three Tenaris patents: U.S. Patent Nos. 9,803,256, 10,378,074, and 10,378,075. Appx2057-2062.

The parties cross-moved for summary judgment on Global's inequitable conduct claims, *see* Appx5106-5136; Appx6258-6290, and Tenaris moved for summary judgment on Global's antitrust claims. *See* Appx5766-5798. The district court entered summary judgment against Tenaris on Global's inequitable conduct claim, and in Tenaris' favor on Global's antitrust claims. *See* Appx7-16; Appx1-3. Tenaris appealed, and Global cross-appealed. This opening brief addresses only those issues relevant to Tenaris's appeal.

## I. Background

### A. Tenaris's '256, '074, and '075 Patents and BlueCoil Product

Tenaris and Global each manufacture coiled tubing, which is used in operations on oil and gas wells. A coiled tube is a long, flexible steel tube—often miles long—that can be wound around a spool and then unwound and fed into a well. *See* Appx5824-5826.

Coiled tubing technology has been used for decades. Appx4027-4028. "Conventional" coiled tubing was made by welding together lengths of hot-rolled steel to create a long tube that was then coiled and uncoiled for operations. Appx1081(5:35-41, 6:30-33); Appx5882(¶6b). Hot rolling under appropriate conditions could refine the steel microstructure (typically ferrite), which allows for high strength (measured as "yield strength") and toughness (measured as "fatigue life"). *E.g.*, Appx1079(1:34-2:17); Appx1087(18:33-51). The welding process, however, would destroy that microstructural refinement in the welds and near the welds ("heat affected zones" or "HAZ"), resulting in a tube with a mix of hard and soft microstructures (*e.g.*, ferrite, bainite, and pearlite). Appx1081(6:41-50). That heterogeneity of microstructures reduced yield strength, which in turn led to tube failures. Appx1081(6:37-41). Certain post-weld treatments could restore a tube's yield strength, but not its fatigue life. Appx1079(1:60-64).

The Tenaris patents in this case—U.S. Nos. 9,803,256 (Appx1057-1090), 10,378,074 (Appx1091-1125), and 10,378,075 (Appx1126-1161)—are based on applications filed in 2013 and 2014, and describe and claim high-strength coiled tubes with improved fatigue life that overcome the foregoing shortcomings of conventional tubing. *See* Appx1079(1:28-33). The pa-

tented tubes are made using a "quench and temper" process where the steel is heated, then rapidly cooled, so that the microstructure is uniform throughout the tube (including across the weld joints and HAZ). *See* Appx1079(2:41-63); Appx1080(3:31-50); Appx5909(¶75); Appx5836(¶¶45-46); Appx5843-5844(¶61). The patented tubes have greater yield strength and fatigue life than conventional coiled tubes—meaning the tubing can be repeatedly spooled and unspooled to perform more operations before needing to be replaced. *See* Appx5809(76:5-7); Appx5947(25:2-10).

Tenaris's patented tubes also have more than 90% *tempered martensite* in the base metal, the HAZ, and the bias welds.[1] Appx7344; *e.g.*, Appx1090(cl.1); Appx1125(cl.1); Appx1160(cl.1). Tempered martensite is a steel microstructure that is better suited for ultra-high yield strength coiled tubing, as compared to conventional coiled-tube microstructures (*e.g.*, ferrite, pearlite, and bainite). Appx1081(6:63-67). The patents refer to the ability to achieve the tempered-martensite microstructure as "hardenability," and recognize that steel composition and heat treatment conditions are important variables to that end. *E.g.*, Appx1088(19:19-25).

---

[1] A "bias weld" is a "microstructural region corresponding to the strip-to-strip joint." Appx1087(18:22-27).

Claim 1 of the ’256 patent recites a coiled steel tube having the foregoing features, and specifies the chemical composition of the steel (Appx1090):

> **1**. A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled tube, the coiled steel tube comprising:
>
> a plurality of strips welded together end to end by a bias weld and formed into a coiled steel tube, each of the plurality of strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints, each of the plurality of welded strips comprising:
>
> a yield strength greater than about 80 ksi;
>
> a composition comprising iron and:
>
> 0.17-0.35 wt. % carbon;
>
> 0.30-2.00 wt. % manganese;
>
> 0.10-0.30 wt. % silicon;
>
> 0.010-0.040 wt. % aluminum;
>
> up to 0.010 wt. % sulfur; and
>
> up to 0.015 wt. % phosphorus; and
>
> wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube;
>
> wherein the final microstructure comprises a mixture of tempered martensite and bainite;
>
> wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite in the

base metal regions, the bias weld joints, and the heat affected zones;

wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogeneous; and

wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the bias weld joints, and the heat affected zones.

The ’075 patent is a divisional of the ’074 patent, which is a continuation of the ’256 patent. The ’074 and ’075 patents likewise claim coiled tubes, but recite the chemical composition of the steel only in dependent claims. Claim 1 of the ’074 patent, for example, recites the following (Appx1125):

**1.** A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled steel tube, the coiled steel tube comprising:

a plurality of strips welded together end to end by a bias weld to form a plurality of bias welded strips and formed into the coiled steel tube, each of the plurality of bias welded strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints;

wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube; wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite and 0 volume % to less than about 10 volume % bainite in the base metal regions, the bias weld joints, and the heat affected zones;

> wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogeneous;
>
> wherein the yield strength following manufacture of the coiled steel tube is substantially uniform along substantially all of a length of the coiled steel tube; and
>
> wherein a yield strength of the coiled steel tube is greater than about 80 ksi.

Tenaris invested over $30 million over five years to develop its patented coiled tubing. Appx4064. It was the first to launch a successful product using the quench-and-temper process in 2015, which it branded as BlueCoil. Appx5843-5844(¶61).

### B. Southwestern Pipe's Failed Quench-and-Temper Product from the 1990s, Described in the "Chitwood" Reference and "CYMAX Brochure"

With its patents and its BlueCoil coiled tubing, Tenaris succeeded after others had failed to make improved tubes using quench-and-temper processing. In the early 1990s, Southwestern Pipe Inc. tried and failed. Appx4027-4029. It made a product called "CYMAX," with two grades: "CYMAX 80" and "CYMAX 100." CYMAX not only "did not work," Appx7382(56:6-11), it "was a disaster." Appx7408. CYMAX "had hard spots in the microstructure" (*i.e.*, was not homogeneous) and "did not have an increased fatigue life." Appx7382(46:6-11); Appx7403(127:7-13); Appx7408; Appx4029. An industry study in the mid-1990s ("DEA-97," which the in-

ventors were aware of by 2013) confirmed that CYMAX's fatigue life was actually *worse* than conventional coiled tubing. Appx7429; Appx7438. Tenaris's technical expert Steve Tipton, professor and director of the University of Tulsa, explained that the DEA-97 study's results demonstrated that CYMAX lacked a homogenous microstructure of at least 90% tempered martensite. Appx7643-7644(¶320).

Southwestern discontinued CYMAX in the mid-1990s, after issuing credits to customers because CYMAX did not last as long as advertised. Appx9; Appx4029; Appx7404-7405(128:9-129:25); Appx7424 (No.19). Southwestern's assets were later acquired by Tenaris, and Southwestern no longer exists as a going concern.

Southwestern's CYMAX product is described in the "Chitwood" prior art reference and the "CYMAX brochure."

#### 1. Chitwood

"Chitwood" is an article presented at an industry conference in 1992. Appx3462-3476. Its authors include two Southwestern engineers. Appx3462. Chitwood describes Southwestern's product, including manufacturing and testing processes, test results, and photographs of the microstructure. Appx3462-3476. Although Chitwood does not use the word

"CYMAX," the parties agree that Chitwood describes CYMAX. *See* Appx7129 (Global brief stating "Chitwood describes CYMAX 100," but "never names the product it describes as 'CYMAX 100'"); Appx7792-7793(25:17-26:18) (inventor Valdez testimony, similar). Although Chitwood does not spell out the chemical composition of CYMAX steel, it states "the material chosen [is] *a low-carbon 4100 series steel*"—and claims the material "has sufficient hardenability to achieve the uniform, martensitic microstructure from heat treatment … and … low enough carbon to be field repair welded." Appx3463 (emphasis added).

The parties agree that "low-carbon 4100 series steel" refers to SAE steel grades that have known chemistries. Global's preliminary invalidity contentions contended a skilled artisan would have "appreciate[d] that the '4100 series steel' refers to the SAE steel grades" with known chemistries. Appx6801-6802. Global submitted a publicly available reference showing that "low-carbon 4100 series steel" refers to steel with specific chemistries (Appx6802):

| UNS No. | SAE No. | Ladle Chemical Composition Limits, % | | | | | | | | | Corre-sponding AISI No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C | Mn | P | S | Si | Ni | Cr | Mo | V | |
| G41180 | 4118 | 0.18-0.23 | 0.70-0.90 | 0.035 | 0.040 | 0.15-0.35 | — | 0.40-0.60 | 0.08-0.15 | — | 4118 |
| G41200 | 4120* | 0.18-0.23 | 0.90-1.20 | 0.035 | 0.040 | 0.15-0.35 | — | 0.40-0.60 | 0.13-0.20 | — | 4120* |
| G41210 | 4121** | 0.18-0.23 | 0.75-1.00 | 0.035 | 0.040 | 0.15-0.35 | — | 0.45-0.65 | 0.20-0.30 | — | 4121** |
| G41300 | 4130 | 0.28-0.33 | 0.40-0.60 | 0.035 | 0.040 | 0.15-0.35 | — | 0.80-1.10 | 0.15-0.25 | — | 4130 |
| G41310 | 4131 | 0.28-0.33 | 0.50-0.70 | 0.035 | 0.040 | 0.15-0.35 | — | 0.90-1.20 | 0.15-0.25 | — | 4131 |
| G41370 | 4137 | 0.35-0.40 | 0.70-0.90 | 0.035 | 0.040 | 0.15-0.35 | — | 0.80-1.10 | 0.15-0.25 | — | 4137 |
| G41400 | 4140 | 0.38-0.43 | 0.75-1.00 | 0.035 | 0.040 | 0.15-0.35 | — | 0.80-1.10 | 0.15-0.25 | — | 4140 |

Other evidence confirmed that the chemical composition of low-carbon 4100 series steel was publicly available. *E.g.*, Appx6978(142:18-23); Appx6980(144:3-9); Appx6984 ("low carbon 4100 series has a published chemistry range"); Appx7100-7101. The carbon ranges of several of the SAE 4100 steels substantially overlap with the carbon ranges claimed in the '256 patent.

### 2. The "CYMAX Brochure"

The "CYMAX brochure," Appx6888-6947, is a 60-page collection of documents, "found in a notebook," Appx5545, whose nature, provenance, and relation to each other are disputed. *See infra* §I.C.2-3.

On its face, the collection includes: **(1)** a document titled *Full Body Quenched and Tempered Coil Tubing Theory vs. Field Experience*, dated March 1, 1994 (Appx6888-6907), **(2)** a document titled *Southwestern Pipe, Inc. CYMAX Division Coiled Tubing Specifications Technical Data*, dated January 1, 1993 (Appx6908-6909), followed by a series of data sheets and

specifications that may be separate documents or parts of the same document (Appx6910-6918), **(3)** a page labeled "Technical Papers" (Appx6919), followed by a document titled *The Development and Testing of CYMAX 100 Coiled Tubing*, dated January 1992 (Appx6920-6934), and **(4)** a document titled *ORBITAL TIG WELDING CYMAX COILED TUBING*, dated November 1992 (Appx6935-6940), followed by another document titled *Orbital Tig Welding CYMAX Coiled Tubing APPENDIX* (Appx6941-6947); *see also* Appx7972 ("apparently four separate documents with different dates printed on them"); Appx5545-5546 (analyzing "[t]he six CYMAX documents"); Appx5549 (same).

The CYMAX brochure's specifications include the chemical composition of "CYMAX 100," stating "[t]he steel sheet *shall be 4100 series*, chrome-moly alloy per ASTM A607, modified" and listing chemical ranges (Appx6917, emphasis added):

2. **STEEL SPECIFICATION**

2.1 The steel sheet shall be 4100 series, chrome-moly alloy per ASTM A-607, modified.

2.2 Chemistry:

| C | Mn | P | S | Si | Cr | Mo | Ni | Cb-V |
|---|---|---|---|---|---|---|---|---|
| .13-.17 | .60-.90 | .025 Mx | .005 Mx | .30-.45 | .55-.75 | .10-.15 | .10 Mx | .02-.04 |

In 2010, Tenaris located the CYMAX furnace in an old Southwestern facility it owned. Appx9. In 2013, Tenaris's inventors obtained the "CY-

MAX brochure" documents. Inventor Reichert e-mailed the scanned documents in a single PDF to co-inventor Valdez in June 2013—months after Tenaris had filed a provisional application for the '256 patent. Reichert's full e-mail to Valdez states the following (Appx7656, emphasis added):

> I sent a report to you this weekend on CYMAX 80 and CYMAX 100, the world's first Q&T coiled tubing. Please look at the chemistries (page 30 for instance for CYMAX 100). This is *essentially our chemistry for HS90 (A606HS)*. I would not think there is enough carbon to be hardenable.

Global has quoted the italicized text above, usually omitting the words "*for HS90 (A606HS)*," to imply that the CYMAX brochure's specification discloses Tenaris's patented tubes. HS90, however, is one of Tenaris's conventional coiled tubing products, which has a different steel chemistry than the '256 patent's claims. Appx7652-7654(272:4-274:16); Appx7659; Appx5776. And, as the e-mail states, Reichert did "not think there [was] enough carbon to be hardenable," *i.e.*, to form over 90% tempered martensite. Appx7656.

Valdez agreed and noted he had "Gonzalo [Gomez] going over it." *Id.* Gomez analyzed CYMAX 100 using computer simulations and concluded that it had poor hardenability and that "bainite fractions higher than 30% would be expected." Appx7666; Appx1082(7:38-42) ("[c]onventional coiled

tubing microstructures present large fractions of bainite that impair toughness [and] fatigue life”). With a bainite fraction of over 30%, CYMAX could have, at most 70% tempered martensite, which is well outside the range claimed in the ‘256 patent.

## C. Prosecution of the Tenaris Patents

### 1. Prosecution of the ’256 (Parent) Patent, and Dr. Valdez’s Declaration (2014-2017)

Tenaris filed the ’256 patent’s nonprovisional application on February 26, 2014. Appx1057. Chitwood was among the first prior art references Tenaris disclosed to the PTO less than a month later. Appx6503; Appx6505.

In early 2017, the examiner rejected pending claims as obvious in light of the “Valdez 2010” and “DuBois” references. Appx7679-7683. The examiner concluded that Valdez 2010 disclosed every limitation except the use of a bias weld, which DuBois disclosed. Appx7679-7680. The then-pending claims recited the same steel chemistries that ultimately appeared in claim 1 of the ’256 patent as issued. *See* Appx7680-7681; Appx7693; Appx1090(cl.1). According to the examiner, “all of the concentrations of elements of the steel [in Valdez 2010] are exactly within the ranges of claims 1-2.” Appx7681.

Tenaris's prosecution counsel initiated an examiner interview to discuss the rejection. Appx7691. According to the interview summary, it was "the Examiner's position that the arguments provided by applicant regarding the alleged difference in properties or microstructures must be supported by a declaration or affidavit." Appx7691.

To overcome the obviousness rejection, Tenaris's prosecution counsel submitted a declaration from inventor Valdez under 37 C.F.R. §1.132. Appx7702-7708. In preparing the declaration, prosecution counsel and Valdez's discussions included an exchange about available secondary-considerations evidence and whether the CYMAX brochure was evidence of failure of others.

Prosecution counsel first sent Valdez a draft declaration. The draft discussed the references underlying the obviousness rejection, and also discussed secondary considerations, such as the commercial success of Tenaris' BlueCoil product. Appx7709-7718. Within the draft were in-line questions (highlighted and typed in all-caps) to Valdez, Appx7716-7718, including whether Valdez had "any evidence of people struggling to achieve the claimed coiled tube." Appx7717(¶11) (capitalization normalized).

Valdez responded with an e-mail, Appx7784-7785, stating as follows:

> There is no patent on a Coiled Tubing with this chemistries [sic] nor this process, the results of the heat treatment produced increase in properties beyond expectation and the world recognize this as an innovation (many awards, many orders and our main competitor claiming it will follow us).

Appx7785. The e-mail attached the draft declaration, where Valdez had given his answers to prosecution counsel's questions in comments, Appx7720-7721, as shown below at Appx7721:

> 11. DO YOU HAVE ANY EVIDENCE OF PEOPLE STRUGGLING TO ACHIEVE THE CLAIMED COILED TUBE?
>
> 12. In addition, the BlueCoil® coiled tubes, and thus the claimed invention, have won a number of industry awards, clearly showing praise by others.
>
> 13. In March of 2017, during the International Coiled Tubing Association (ICOTA) conference, the latest customer BlueCoil® field results and the sour service properties of the tubes were presented in a paper. This paper was selected as the Most Outstanding Paper of the
>
> ) showing the problems we were seeing with the standard technology I will add the paper to my email response The problem was that the movement into high pressure, long lateral wells for shales, increase the weight of the string and hence the YS Increasing the YS with conventional product resulted in failures in the Bias Welds
>
> **Commented [VMT11]:** The claimed coiled tubing on the range of properties we are claiming (specially the one we are selling 110-125-140 ksi) was not explore before There was an attempt called Cymax (I include a paper/document for your reference) The intention was to go to higher than 70 ksi, they produce 100 ksi but the chemistry was C:0 13-0 17 (which is outside our carbon range) In page 30 of the Cymax pdf doc you can see the spec of the CYmax 100 which was 0 13-0 17 Carbon I am not sure it is a good idea to disclose this document

Valdez answered the "evidence of people struggling to achieve the claimed coiled tube" question as follows:

> The claimed coiled tubing on the range of properties we are claiming (specially the one we are selling 110-125-140 ksi) was not explore before There was an attempt called Cymax (*I include a paper/document for your reference*) The intention was to go to higher than 70 ksi, they produce 100 ksi but the chemistry was C:0 13-0 17 (*which is outside our carbon range*) In page 30 of the Cymax pdf doc you can see the spec of the CYmax 100 which was 0 13-0 17 Carbon *I am not sure it is a good idea to disclose this document*

Appx7721 (VMT 11, emphases added). As Valdez's comment indicated, his e-mail to prosecution counsel also attached the CYMAX brochure.

Appx7722-7782; Appx7784 (listing attachments). In connection with the CYMAX discussion, prosecution counsel added the following to the draft document after receiving Valdez's email: "PROJECT DID NOT WORK; OUTSIDE OF OUR CARBON[.]" Appx7788(VMT11).

Prosecution counsel submitted Valdez's declaration to the PTO on April 25, 2017. Appx7702-7708. The as-filed declaration discussed various categories of secondary-considerations evidence, *see* Appx7704-7708(¶¶7-16), but did not argue that CYMAX was evidence of failure of others, or otherwise mention CYMAX or the CYMAX brochure.

In this litigation, Valdez was asked about his response to prosecution counsel's inquiry, and why his final declaration did not mention CYMAX. He responded that he was answering prosecution counsel's question about evidence of others "struggling," that CYMAX came to mind, but that CYMAX had "a different range of properties than the one we are producing," and "different chemical composition. So maybe it's not useful[]" (Appx7799(98:15-25)):

> Q. But you make no mention of CYMAX in your final declaration, correct?
>
> A. Well, the -- here [counsel] is asking me a question and I gave him my comments on the question. When he asked about evidence of people struggling to achieve the claimed coiled tubing,

> I mention -- as struggling, would come to my mind is CYMAX. It was a different range of properties than the one we are producing. It's a different chemical composition. So maybe it's not useful, no? So I had the idea it wasn't.

*See also* Appx7798-7799(96:6-99:25). He added that it would be "confusing" because the CYMAX brochure was not "aligned with the claimed coiled tubing." Appx7799(101:3-12); Appx5584(101:3-12) (same).

Valdez also testified that Chitwood was disclosed, and that in his view, Chitwood was closer to the claimed invention than CYMAX because it disclosed a broader range of chemistry that overlapped with what was claimed in the '256 patent. Appx7792-7793(25:17-26:8, 27:8-28:3, 28:8-18). As discussed above, Chitwood discloses Southwestern Pipe's CYMAX product, and was disclosed at the very beginning of the '256 patent's prosecution. The CYMAX brochure was not disclosed to the PTO during prosecution of the '256 patent. The examiner issued a notice of allowance on June 12, 2017, Appx5498-5505, and the '256 patent issued on October 31, 2017. Appx1057.

#### 2. After an Investigation with New Prosecution Counsel, Tenaris Discloses Portions of the CYMAX Brochure During Prosecution of the '074 and '075 (Children) Patents (2017-2019).

The '074 patent's application was filed July 31, 2017, as a continuation of the '256 patent. Appx1091. The '075 patent's application was filed

April 2, 2018, as a divisional of the ’074 patent. Appx1126. The ’074 and ’075 patents were prosecuted with new prosecution counsel, largely while this case was pending—as Global filed its initial complaint on October 30, 2017, the day before the ’256 patent issued, Appx2001-2011. The ’074 and ’075 patents later became part of the case.

Chitwood was disclosed to the PTO in connection with both applications. Appx6630; Appx6654; Appx6697; Appx6721. Some, but not all, documents in the CYMAX brochure were disclosed after Tenaris’s new prosecution counsel investigated and concluded that the chemistry specifications were not “printed publications” for prior-art purposes. Appx5542-5543; Appx5545-5549; Appx7349-7350; Appx5122; Appx7979.

In a January 2019 e-mail, a Tenaris European patent attorney sent the CYMAX brochure documents to prosecution counsel. The e-mail stated that the brochure “contain[ed] apparently four separate documents with different dates printed on them,” and database searches had yielded “no record of “publication of any of the four documents,” and requested that new prosecution counsel “advise on the prior art status of the respective documents in accordance with US patent law.” Appx7972. Tenaris’s then-litigation counsel provided a memorandum on caselaw describing the duty

to disclose, and summarized its application to the CYMAX brochure. Appx7980-7985.

Tenaris's prosecution counsel then investigated, including examining the documents themselves, requesting library research, discussing with a Tenaris European patent attorney (who in turn spoke with inventor Reichert), and discussing with prior prosecution counsel. Prosecution counsel ultimately confirmed that the first 20 pages of the CYMAX brochure were likely presented at a conference in March 1994. Appx7974-7976. Nobody could confirm, however, the chemistry specifications had been publicly disclosed or disseminated to customers. Appx7987; Appx8003; Appx7967-7968(63:14-64:9). Prosecution counsel concluded those specifications "were 'proprietary' and [that] surrounding related evidence … supports that those pages would have been considered confidential and not disclosed." Appx7978. Counsel concluded that the rest of the documents in the CYMAX brochure should be disclosed. The two papers that were disclosed at industry conferences would be "disclosed … individually" in an IDS. Appx7978. The other documents not believed to be proprietary would be disclosed with an "indicat[ion that] those documents

were located in internal company files and we do not know if they were disclosed publicly or not." Appx7978.

During prosecution, counsel drew the examiner's attention to Chitwood and the disclosed portions of the CYMAX brochure, and successfully distinguished them by arguing that none of those documents disclosed four claimed features: **(1)** a plurality of strips welded together end to end by a bias weld to form a plurality of bias welded strips; **(2)** the final microstructure of the coiled steel tube, in the base metal regions, the bias weld joints and heat affected zones, comprises more than 90 volume % tempered martensite and 0 volume % to less than about 10 volume % bainite; **(3)** the final microstructure across all base metal regions, bias weld joints and heat affected zones is homogenous; and **(4)** the yield strength following manufacture of the coiled steel tube is substantially uniform along substantially all of the length of the coiled steel tube. Appx6665; Appx6673. The examiner included those bases in the Reasons for Allowance. Appx6665; Appx6673.

The '074 and '075 patents issued on August 13, 2019. The independent claims do not recite chemistry limitations; only certain dependent claims do. Appx1125(cls. 20-23, 27-30); Appx1160-1161(cls.20-23, 27-30).

### 3. Tenaris Discloses the Full CYMAX Brochure In Prosecution of the Grandchildren Applications, and Those Patents are Granted, With Terminal Disclaimers (2019-2022).

On August 12, 2019, Tenaris filed two continuation applications from the '074 and '075 patents—U.S. Patent Application Nos. 16/538,326 and 16/538,407 (the "Grandchildren Applications"). *See* Appx6348; Appx6433. At that point, this litigation had been pending for nearly two years.

In connection with the Grandchildren Applications, Tenaris disclosed the *full* CYMAX brochure (including the chemistry specifications). Tenaris disclosed the brochure as a single document, Appx6352(ID#4); Appx6437(ID#4), and separately disclosed each individual document within the brochure. Appx6352(ID#1-3); Appx6378-6379; Appx6437(ID#1-3); Appx6463-6465. Tenaris also disclosed Global's invalidity contentions for the '256, '074, and '075 patents from this litigation, as well the prior-art references Global relied on. Appx6378-6379; Appx6463-6465. Global's contentions included arguments that Chitwood and the CYMAX brochure each independently rendered Tenaris's claims invalid. *See* Appx8029-8062; Appx8065; Appx8068-8071; Appx8030-8032; Appx8462-8463. Global's contentions argued that Chitwood's teaching of a "low-carbon 4100 series steel" rendered the claimed chemistry limitations obvious because—

according to Global—a skilled artisan would understand "4100 series steel" to mean SAE steel grades that had known chemistries. Appx6801-6802.

The PTO examiner considered all of this—Chitwood, the full CYMAX brochure, Global's invalidity contentions, and other prior art—and issued notices allowance for both applications. The Reasons for Allowance stated the claims "are allowable over the cited prior art at least because none of the cited prior art show or fairly suggest a method of treating coiled tubing of the recited compositions in the recited manner including the instantly required heat treatments resulting in the claimed tubing microstructures." Appx6415; Appx6500 (similar). The examiner also found the claims of the Grandchildren Applications were patentably indistinct from the '256 patent claims and required terminal disclaimers. Appx6348-6349; Appx6433-6434.

## II. District Court Proceedings

Global filed its original complaint in 2017. Appx2001-2011. Global's now-operative Second Amended Complaint pled nine causes of action, including antitrust claims, and claims for declaratory judgments that the '256, '074, and '075 patents are unenforceable, invalid, and not infringed.

Appx2014-2063. Tenaris filed counterclaims for infringement. Appx2064-2211.

The district court resolved the patent claims by ruling, on summary judgment, that all three Tenaris patents were unenforceable for inequitable conduct, based on Tenaris's non-disclosure of the CYMAX brochure with the '256 patent, and its incomplete disclosure of the CYMAX brochure with the '074 and '075 patents.

### A. Tenaris is Compelled to Produce Privileged Documents Concerning Prosecution of its Patents.

During discovery, Tenaris inadvertently produced Dr. Valdez's privileged draft declaration. Global then moved to compel production of the declaration and other privileged documents concerning the CYMAX brochure, arguing they evidenced inequitable conduct. Global's motion relied in part on the "crime-fraud" exception to the attorney-client privilege. The centerpiece of Global's motion was Valdez's comment on his draft declaration, which Global took out of context and reframed it as "Tenaris [telling] its prosecuting attorney *not* to disclose the materials." Appx2388. And although Tenaris submitted Chitwood as one of 18 references in its very first Information Disclosure, Global's motion made no mention of Chitwood and

pointed to later disclosures to suggest that Tenaris sought to inundate the PTO with irrelevant information. Appx2387-2388.

For the ’074 and ’075 patents, Global characterized Tenaris’s disclosure of the CYMAX documents it believed were prior-art printed publications as Tenaris “dissect[ing] the CYMAX Brochure into five parts and … submitt[ing] the references out of order from the way they are kept.” Appx2389.

The magistrate judge issued an order largely accepting Global’s narrative. Appx4026-4055. The order agreed that the draft declaration and related documents were privileged, but ordered production based on the crime-fraud exception to attorney-client privilege. Appx4036-4050. The order emphasized that it was only ruling on “a discovery motion, and not a determination on the merits.” Appx4049. “[T]he sole question” the magistrate judge considered was “whether Plaintiff’s evidence is sufficient to make a *prima facie* case of fraud such that the Court can consider the affidavit.” Appx4049. The order acknowledged that Tenaris might rebut Global’s evidence “at trial,” but “for the purposes of the motion to compel,” the magistrate judge was satisfied that “there are issues of fact that will be resolved at trial.” Appx4049. Tenaris filed objections, but the district court

sustained the magistrate judge's ruling. Appx30749(92:2-9); Appx1030 (8/25/2021 minute entry).

### B. The Magistrate Judge Strikes Tenaris's Expert's Opinion Addressing the Grandchildren Applications.

After the order granting Global's motion to compel, Global took discovery of Tenaris's privileged documents and communications, deposing four attorneys and three employees (some multiple times)—though Global declined to re-depose prosecution counsel for the '256 patent. The parties then exchanged expert reports.

Tenaris's PTO expert, former Patent Commissioner Robert Stoll, gave expert testimony including that the grandchildren applications provided "strong evidence that CYMAX [was] not but-for material" to the '256, '074, and '075 patents. Appx5099-5104 (¶¶148-167, 294-296). Global initially moved to strike that portion of Stoll's report or, alternatively, for production of additional privileged communications related to the grandchildren applications' prosecutions. Appx4339-4340. After a hearing, Global "*withdr[ew]* its letter motion to strike," instead "request[ing] leave to supplement" its expert's report to respond to Stoll's opinions. Appx4400 (emphasis added).

Tenaris did not oppose Global's request for supplementation, Appx4363-4364, which should have resolved the dispute. *See* Appx4399 ("Global's objection now is largely resolved."). Nonetheless, the magistrate judge excluded Stoll's opinion concerning the grandchildren applications. Appx18-20. The order reasoned that prosecution of the grandchildren applications (and Stoll's related opinions) were irrelevant to materiality anyway. *Id.* Tenaris promptly filed objections, *see* Appx8248-8273; Appx8582-8612; Appx8661-8676, which the district court never specifically addressed.

### C. The District Court Enters Summary Judgment That the '256, '074, and '075 Patents Are Unenforceable for Inequitable Conduct.

The parties ultimately filed cross-motions for summary judgment on Global's inequitable conduct claims. Tenaris's affirmative motion and opposition to Global's motion contended that the CYMAX brochure was cumulative of Chitwood and thus not "material" under the *Therasense* standard, Appx6278-6282; Appx7362-7365, and that Global's allegations of deceptive intent were insufficient as a matter of law, or least presented factual disputes inappropriate for resolution at summary judgment. Appx7353-7358. Tenaris also contended that Global's "infectious unen-

forceability" theory (for the '074 and '075 patents) failed as a matter of law because it relied solely on the existence of terminal disclaimers. Appx7366.

Tenaris's moving papers attached evidence supporting its view of the facts, including deposition testimony by inventors, Tenaris employees and Tenaris attorneys; e-mails and internal documents; excerpts of the relevant prosecution histories; and expert testimony. *See* Appx7339-7342 (listing exhibits to Tenaris's opposition). The district court resolved each issue in Global's favor. Appx13-15.

#### 1. The District Court Finds That the CYMAX Brochure was Material and Not Cumulative.

The district court found the CYMAX brochure was material based on three findings.

*First*, it found the CYMAX brochure was "recognized by one of the inventors … as containing 'essentially our chemistry.'" Appx13 (citing Appx2397 (Global's motion to compel)). As explained above, that quotation crops part of what the inventor actually said ("essentially our chemistry *for HS90 (A606HS)*") by removing the context indicating that "our chemistry" meant a conventional tubing product rather than the invention. HS90 has a different steel chemistry from the invention. Appx7652-7654(272:4-274:16); Appx7659.

*Second*, the court found the CYMAX brochure was not cumulative over Chitwood because Chitwood did not "include[] the precise chemical specification that the CYMAX brochure included." Appx13. The court criticized Tenaris's references to Global's invalidity contentions discussing Chitwood as making an improper "estop[pel]" argument. Appx14. The court did not acknowledge that Chitwood concerned the same CYMAX product, nor that both parties agreed a person of ordinary skill would understand Chitwood's disclosure of "4100 series steel" to refer to SAE steel grades with known chemistries that substantially overlapped with the claimed ranges.

*Third*, the court inferred materiality based on Tenaris's later disclosure of the CYMAX brochure during prosecution of the '074 and '075 applications, which the court found Tenaris "would not have done if the brochure was not material." Appx13. The court did not acknowledge Tenaris's intervening investigation, nor that the standard for finding a nondisclosure "material" for inequitable conduct purposes is far more stringent than the duty under PTO regulations to disclose "material" information. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1293-95 (Fed.

Cir. 2011) (*en banc*) (declining to adopt PTO's Rule 56 as the materiality standard for inequitable conduct).

#### 2. The District Court Finds That Tenaris Intended to Deceive the Patent Office When It Did Not Submit the CYMAX Brochure in Connection With the '256 Patent.

The district court also made findings on intent. Relying on Dr. Valdez's statement in his draft declaration that he was "not sure it is a good idea to disclose" the CYMAX brochure, the court found that there was "no other reasonable inference that can be drawn from Tenaris's withholding the CYMAX [brochure] from the Patent Office, other than intent to deceive." Appx14. The court came to this conclusion even though (as the court recognized) Tenaris presented contrary factual evidence. Appx14. It rejected Valdez's testimony that "the actual intent of the question was whether the information 'would be relevant as evidence of failure of others.'" Appx14 (quoting Appx7355); *see* Appx7798-7799(96:6-101:12). The court did not explain why it rejected that testimony, nor did it otherwise acknowledge the context in which Valdez's comment arose, nor other evidence demonstrating that Valdez was aware of CYMAX's critical differences with the claimed invention. The Court simply found that Tenaris's

argument did "not present an equally reasonable inference to Global's intent to deceive argument." Appx14.

#### 3. The District Court Finds That the '074 and '075 Patents Are Also Unenforceable for Inequitable Conduct.

The district court further found the '074 and '075 patents were unenforceable, concluding that "Tenaris's misconduct was infectious, rendering the children of the '256 patent, '074 and '075 Patents, unenforceable." Appx15. The court's opinion credited Global's narrative that the CYMAX brochure was a single document, and faulted Tenaris for not disclosing the brochure "as it had been originally maintained," and for not "provid[ing] the pages detailing the steel chemistry." Appx15. The court did not acknowledge Tenaris's intervening investigation or its belief that the CYMAX brochure was multiple separate documents or that the chemistry specifications were not prior art. And without acknowledging the procedural differences between summary judgment and an order compelling discovery, the court relied on the magistrate judge having "found fraud in the prosecution of the '256 patent" and "found that Tenaris's fraud continued through its prosecution of the '074 and '075 patents." Appx15. The

court also noted a change of inventorship during prosecution (which Global did not rely on). Appx15.

The court entered summary judgment that the Tenaris patents are unenforceable due to inequitable conduct. Appx1-6. Tenaris now appeals.

## SUMMARY OF THE ARGUMENT

**I.** The district court's summary judgment of unenforceability should be vacated because, the district court resolved disputed issues of material fact against Tenaris, the non-movant.

**Intent.** For the '256 patent, the district court erroneously found intent to deceive from Dr. Valdez's statement that he did not think it was a "good idea" to disclose the CYMAX brochure. That ruling misapplies the standards for summary judgment and the inequitable conduct. Valdez's statement appears in a comment balloon on a draft declaration, in the context of a discussion of *secondary considerations*. To bolster a declaration responding to a pending obviousness rejection, prosecution counsel had specifically asked whether Valdez was aware of evidence of "people struggling to achieve" the claimed invention. In that context, Valdez—who is not an attorney—sent his attorney the CYMAX brochure and responded that it "was an attempt," but was "outside our carbon range," and thus he

was "not sure it is a good idea to disclose this document." By adopting Global's interpretation of the phrase "not sure it is a good idea to disclose," the district court resolved disputed issues of fact against Tenaris on summary judgment. Indeed, the court admitted as much, saying that it did not believe Tenaris's evidence presented "an equally reasonable inference." At most, Global might argue as a factual matter that the discussion should have alerted Valdez to the need to disclose CYMAX. But *Therasense* rejected a "should have known" standard for intent, and Tenaris presented evidence corroborating Valdez's testimony that CYMAX was different in critical respects to his invention. It was inappropriate at summary judgment to disregard that evidence favoring Tenaris, to resolve Valdez's credibility at summary judgment, and to conclude as a matter of law on this record that intent to deceive was the *single most reasonable inference* to be drawn. At minimum, a reasonable factfinder could have concluded otherwise.

**Materiality.** The district court also erroneously found the withheld CYMAX brochure was "but-for" material to patentability because it discloses specific steel chemistries not found in Chitwood (which was disclosed). But even *Global* argued—in invalidity contentions, with citations

to evidence, that a skilled artisan would have understood that Chitwood did disclose specific steel chemistries based on its disclosure of low-carbon 4100 series steel that overlap the claimed chemistry limitations. That presents at least a genuine dispute of fact, which should not have been resolved at summary judgment.

Regardless, under this Court's precedent, the CYMAX brochure is cumulative over Chitwood, and thus not but-for material. This fact is underscored by the PTO's later consideration of the CYMAX brochure during prosecution of related patent applications that have since issued.

**II.** The district court's findings of materiality and intent infected its determination that the '074 and '075 patents are also unenforceable. The CYMAX brochure was provided in part to the PTO, and Tenaris successfully distinguished both the CYMAX brochure and Chitwood on four bases unrelated to the steel chemistries, as noted in the examiner's reasons for allowance. The district court acknowledged that the CYMAX brochure was provided in part to the PTO but gives this fact little weight because the chemistry specifications were withheld. From this, the district court appears to have erroneously inferred continued fraud on the PTO under a theory of infectious unenforceability, even though Tenaris came

forward with evidence showing the reason why the specifications were withheld is nobody thought the specifications had been publicly disclosed (and thus were not prior art). At a minimum, the district court ignored the genuine issues of material fact surrounding the partial disclosure of the CYMAX brochure during prosecution of the ’074 and ’075 patents.

## STANDARD OF REVIEW

Federal Circuit law applies “to substantive and procedural issues pertaining to patent law,” and regional-circuit law to other issues. *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1347 (Fed. Cir. 2018); *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1381 (Fed. Cir. 2002). Summary judgment rulings are reviewed *de novo*. *In re Metoprolol Succinate Pat. Litig.*, 494 F.3d 1011, 1015 (Fed. Cir. 2007); *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

# ARGUMENT

## I. Summary Judgment of Unenforceability of the ’256 Patent Was Improper.

### A. Inequitable Conduct Requires a Fact-Intensive Analysis of Intent and Materiality, Under a Heightened Standard of Proof, and Is Rarely Appropriate for Resolution Against the Patentee at Summary Judgment.

Inequitable conduct is the “‘atomic bomb’ of patent law” that can render an entire patent family unenforceable. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (*en banc*). For decades, this Court observed that dubious inequitable conduct accusations had become a “plague,” on “not only the courts but also the entire patent system.” *Id.* at 1289.[2] Indeed, years before this Court’s creation, the Eighth Circuit’s chief judge observed that inequitable conduct charges are not difficult to manufacture: “A patentee’s oversights are easily magnified out of

[2] *See also, e.g.*, *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed. Cir. 1998) (Inequitable conduct allegations “had come to be attached to every patent prosecution, diverting the court from genuine issues and simply spawning satellite litigation.”); *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988) (“[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague.”); *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984) (“overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system”); *Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 732 F.2d 903, 908 (Fed. Cir. 1984) (a “much-abused and too often last-resort allegation”).

proportion by one accused of infringement seeking to escape the reach of the patent by hostilely combing the inventor's files in liberal pretrial discovery proceedings." *Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 196 (8th Cir. 1976). And by accusing the patentee of inequitable conduct, defendants in complex litigation could "sidestep [the] main issues" by "trying the patentee personally, rather than the patent." *Id.*

In *Therasense*, this Court responded to the plague by sitting en banc and "tighten[ing] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." 649 F.3d at 1290. For cases of non-disclosure of references to the PTO,[3] intent to deceive (not merely "gross negligence") must be the "single most reasonable inference," and must be proved by clear and convincing evidence. *Id.* at 1290-91. It is not enough to prove "that the applicant knew of a reference, *should have known* of its materiality, and decided not to submit it to the PTO." *Id.* at 1290.

[3] *Therasense* "recognize[d] an exception" to the materiality standard "in cases of affirmative egregious misconduct… such as the filing of an unmistakably false affidavit." 649 F.3d at 1292. That exception is not at issue in this appeal. *See* Appx15 ("The Court does not reach the affirmative egregious misconduct arguments as they are mooted by the Court's finding of but-for materiality.").

Materiality requires proof by a preponderance that the withheld reference was "but-for" material to patentability—*i.e.*, that the PTO *would not have allowed* the claims had it known of the reference. *Id.* at 1291-92. Citing *Corona Cord Tire Co. v. Dovan Chem. Corp.*, 276 U.S. 358 (1928), the Court in *Therasense* emphasized that the "severe remedy of unenforceability" does not apply to "misrepresentations to the PTO that did not affect the issuance of the patent." *Id.* at 1291.

Considering the heightened standard of proof for intent, and the fact-intensive nature of inequitable conduct, this Court has cautioned that *summary judgment* of inequitable conduct is rarely appropriate.[4] Summary judgment of *no* inequitable conduct is more common,[5] as the accuser

---

[4] *E.g.*, *Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1363 (Fed. Cir. 2010) ("We rarely affirm a grant of summary judgment of inequitable conduct…"); *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006) (vacating summary judgment of inequitable conduct, observing "[a]lthough it is not impermissible… this court urges caution in making an inequitable conduct determination at the summary judgment stage"); *Digital Control*, 437 F.3d at 1317 (vacating summary judgment, observing "a grant of summary judgment on … inequitable conduct is permissible, but uncommon"); *Monsanto Co. v. Bayer BioSci. N.V.*, 363 F.3d 1235, 1240-42 (Fed. Cir. 2004) (vacating summary judgment of inequitable conduct because intent was genuinely disputed).

[5] *E.g.*, *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1351-52 (Fed. Cir. 2017) (affirming summary judgment of no inequitable conduct); *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345,

bears the burden of proof, and "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This Court's decisions cautioning against granting summary judgment of inequitable conduct are consistent with precedent of the Supreme Court and other courts of appeals on the summary judgment standard more generally. In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, … all justifiable inferences are to be drawn in his favor," and summary judgment is inappropriate if a reasonable trier of fact could find in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must "view the evidence … through the prism of the substantive evidentiary burden," considering whether—as here—the movant would bear a heightened burden of proof at trial. *Id.* at 254. The Supreme Court has cautioned that "summary procedures should be used sparingly" in complex matters "where motive and intent play leading roles." *Poller v. Columbia Broad. Sys.*, 368 U.S.

1354 (Fed. Cir. 2016) (same); *Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1320-22 (Fed. Cir. 2010) (same); *Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367, 1379 (Fed. Cir. 2002) (same).

464, 473 (1962). And numerous courts, including this Court,[6] have cautioned, in a wide variety of contexts, that credibility and mental states are rarely susceptible to resolution at summary judgment. 10B WRIGHT & MILLER, FED. PRACTICE & PROCEDURE §2730 & nn.21-30 (4th ed. 2023).[7]

The district court's ruling does not properly apply the summary judgment standard or *Therasense*'s "tightened" standards for intent and materiality. The court erroneously resolved factual questions of Dr. Valdez's intent and the CYMAX brochure's materiality against Tenaris in the face of contrary evidence and by crediting arguments that relied on

---

[6] *Copelands Enters., Inc. v. CNV, Inc.*, 945 F.2d 1563, 1567 (Fed. Cir. 1991) (trademark case, reversing summary judgment: "[a]s a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment").

[7] *See also, e.g.*, *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872, 883 (6th Cir. 2022) (contract case, reversing summary judgment, observing "summary judgment is generally not appropriate when resolving a dispositive issue requires a determination of intent or state of mind"); *Hay Grp. Mgmt, Inc. v. Schneider*, 965 F.3d 244, 251 (3d Cir. 2020) ("There are sufficient disputes of fact to make an award of summary judgment inappropriate on the question of Schneider's bad faith."); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265-66 (5th Cir. 1991) (unfair competition case, vacating summary judgment, observing: "we have emphasized repeatedly that cases which turn on the moving party's state of mind are not well-suited for summary judgment," citing cases); *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711-12 (2d Cir. 1991) (fraudulent conveyance case, reversing summary judgment).

pre-*Therasense* standards of intent and materiality. The summary judgment should be reversed or vacated.

### B. The District Court Erred by Resolving the Disputed Factual Question of Dr. Valdez's Intent Against Tenaris at Summary Judgment.

As in cases like *Leviton*, *Copelands*, *Monsanto*, and others, the district court erred by resolving factual questions of intent and credibility at summary judgment. The district court's finding of deceptive intent relies entirely on the exchange between Valdez and prosecution counsel, where Valdez stated "I am not sure it is a good idea to disclose this document," after which "the prosecuting attorney did not submit the CYMAX brochure to the examiner." Appx14. This, according to the district court, is "[r]arely" found "stark evidence of the intent fork of inequitable conduct." Appx14.

That was error. Under *Therasense*'s heightened standard, intent to deceive the PTO must be "*single most reasonable inference* able to be drawn from the evidence." 649 F.3d at 1290 (emphasis added) (quoting *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). And under familiar summary judgment standards, the district court was required to construe the evidence in the light most favorable to Tenaris. *Anderson*, 477 U.S. at 255. "Summary judgment in favor of the

party with the burden of persuasion … is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). At minimum, a reasonable factfinder could conclude that Global's evidence was less than clear and convincing, and that intent to deceive the PTO was not the single most reasonable inference to be drawn from the record.

Valdez gave an innocent explanation for his comments that was consistent with the evidence—especially the context surrounding the exchange the district court focused on. As explained above, *supra* pp.17-21, the exchange was in the context of prosecution counsel preparing a declaration to respond to a pending obviousness rejection. The draft declaration was under PTO Rule 132, which is typically used to present "secondary considerations" evidence of nonobviousness to the examiner. *See* MPEP §716.01(a). "Failure of others" is a category of secondary considerations evidence. *Id.; Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *In re Cyclobenzaprine Hydrochloride Patent Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012) ("that skilled artisans struggled to attain" the claimed invention is "classic evidence of nonobviousness").

Prosecution counsel's questions in the draft declaration included "do you have any evidence of people struggling to achieve the claimed coiled tube?" Appx7721(¶11). Valdez's answer—in a comment bubble in the draft document—was directed to that question. He pointed to the CYMAX brochure as possibly responsive, but noted that the carbon specification was "outside our carbon range." Appx7721(VMT11). *Because* the carbon specification was "outside our range," Valdez questioned whether it was "a good idea to disclose this document"—*i.e.* whether it was a good idea to offer that document *as "evidence of people struggling to achieve the claimed coiled tube*" when the document was directed to tubes with different carbon chemistry. Valdez reaffirmed as much at his deposition: the CYMAX brochure "was a different range of properties than the one we are producing. It's a different chemical composition. So maybe it's not useful, no? So I had the idea it wasn't." Appx7798-7799(96:6-99:25); Appx7799(101:3-12) (explaining the CYMAX brochure would be "confusing" because it was not "aligned with the claimed coiled tubing").

After reading the moving papers, the district court may have been inclined not to credit Valdez's explanation. But Valdez's explanation is consistent with context and with other evidence—he **(1)** thought CYMAX

was sufficiently different from the claimed invention,[8] as corroborated by prosecution counsel's notes, Appx7788 ("PROJECT DID NOT WORK; OUTSIDE OUR CARBON"), and expert testimony,[9] and **(2)** understood he had a duty to disclose material information, but knew Chitwood, with its broader chemistry disclosure that substantially overlapped with the claims, had been disclosed. Appx7792-7793(25:17-26:8, 27:8-28:3, 28:8-18). A reasonable factfinder *could* have credited Valdez's explanation.

Valdez's credibility is central to the intent prong of inequitable conduct. The district court's ruling finding deceptive intent as a matter of law is a classic example of a credibility issue that should not be resolved at summary judgment. *See, e.g.*, *Leviton*, 606 F.3d at 1363-64 (concluding prosecution counsel's "plausible explanation for why he did not disclose" a related application to the PTO precluded summary judgment); *cases cited supra* p.43, nn.6-7.

Nothing in the district court's opinion explains why it was appropriate to reject Valdez's explanation at summary judgment. The opinion

---

[8] Appx7656; Appx7658; Appx7666; Appx7721(VMT11); Appx7798-7799(96:6-101:12).

[9] Appx7666 (Gomez testing); Appx7429 (DEA-97 industry report); Appx7438 (same); Appx7643-7644(¶320) (Tipton expert report).

acknowledges Tenaris's argument that "the actual intent of the question was whether the information 'would be relevant as evidence of failure of others,'" but dismisses that point only as "not present[ing] an equally reasonable inference to Global's intent to deceive argument." Appx14. Why not? The opinion does not explain, and no satisfactory explanation is possible on this record. Perhaps the district court or Global believed that, once Valdez and his prosecution counsel began discussing whether to offer the CYMAX brochure as secondary-considerations evidence, they *should have known* that the brochure should have been disclosed to the PTO regardless. But that is not the court's reasoning, and in all events *Therasense* specifically rejects "a 'should have known' standard."

At Appx13, the court states that its "conclusion as to inequitable conduct is strengthened by the untenable rationale Tenaris offers in explanation of non-disclosure." The full paragraph is the following (Appx13):

> The Court's conclusion as to inequitable conduct is strengthened by the untenable rationale Tenaris offers in explanation of non-disclosure. For instance, Tenaris claims that the CYMAX documents were confidential without any evidence to support its theory. ECF No. 499 at 17 [Appx7350]. Tenaris's argument also ignores the fact that the PTO regularly deals with confidential materials on inequitable conduct. The same could be said with respect to Tenaris's suggestions that the submission of the CYMAX brochure would cause unnecessary complications.

That reasoning **(1)** discredits an argument Tenaris did not make; and **(2)** discredits Valdez's testimony. Tenaris did not argue that Valdez did not disclose CYMAX to the PTO because he believed it was confidential.[10] Indeed, Valdez testified that he had no concerns disclosing CYMAX to the PTO, but believed that Chitwood included any relevant information in CYMAX *and* had a broader chemistry disclosure that was closer to the claimed invention. Appx7792-7793(25:17-26:8, 27:8-28:3, 28:8-18). The court's reference to "unnecessary complications" appears to reiterate its view that Valdez's explanation is not credible and to ignore that there is no obligation to disclose cumulative information, which Valdez believed CYMAX to be (at most). The court's intent finding is also inconsistent with Valdez's actions. Valdez did not keep the CYMAX brochure to himself; he *sent* it to prosecution counsel, and asked whether it would be useful evidence of failure of others. Appx7721(VMT11); Appx7722-7782; Appx7383-7401(82:16-84:8, 88:2-102:2, 125:2-7); *Luv n' care, Ltd. v. Laurain*, 606 F.Supp.3d 337, 378 (W.D. La. 2022) (where inventor provided patent search documents to prosecution counsel, "the single most reasonable in-

---

[10] As explained in §II, *infra*, the confidentiality of CYMAX came up in connection with the prosecution of the '074 and '075 patents, but this has no bearing on Dr. Valdez's intent.

ference is *not* that [inventor] specifically intended to deceive the USPTO by failing to disclose" the prior art listed on the search documents).[11]

The credibility of Valdez's explanation is a fact that is at least subject to reasonable dispute. Under *Therasense*'s heightened standard, Global was required to prove intent to deceive by clear and convincing evidence. And under the summary judgment standard, the court was required to construe the evidence in the light most favorable to Tenaris. *Anderson*, 477 U.S. at 255; *Hunt*, 526 U.S. at 553. The court's finding of intent cannot be reconciled with either standard, and must be reversed.

### C. The District Court Erred by Finding the CYMAX Brochure Material and Not Cumulative of Chitwood at Summary Judgment.

The district court's error of resolving Dr. Valdez's intent at summary judgment is reason enough to vacate its judgment. The court also erred by resolving materiality of the CYMAX brochure at summary judgment.

Materiality is a question of fact. *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1352 (Fed. Cir. 2021). An undisclosed prior-art reference is only material for inequitable conduct purposes if it is "but-for" ma-

[11] *See also J&M Indus. v. Raven Indus.*, 574 F.Supp.3d 941, 951-53 (D. Kan. 2021) (similar; intent to deceive PTO not proved where inventor disclosed prior art to patent attorney).

terial—*i.e.*, "if the PTO would not have allowed a claim had it been aware of [it]." *Therasense*, 649 F.3d at 1292. It is not enough to show that an applicant *should have* disclosed the reference under the PTO's rule requiring disclosure of "material" information. 37 C.F.R. §1.56; *see Therasense*, 649 F.3d at 1293-95.

An undisclosed reference is also not material if it is cumulative of disclosed material—*i.e.*, if it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997); *see Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1327-32 (Fed. Cir. 2009) (vacating inequitable conduct finding where undisclosed references were cumulative of disclosed references).

The district court's finding that the CYMAX brochure is "but-for" material fails to apply *Therasense*'s heightened standard and fails to view the record evidence in the light most favorable to Tenaris. A reasonable factfinder could have found that the CYMAX brochure is not material because **(1)** a reasonable factfinder could conclude that disclosure of the CYMAX brochure would not have led the PTO examiners to reject claims; and

**(2)** the CYMAX brochure is cumulative of Chitwood's disclosure of the same CYMAX product. The district court's contrary ruling should be reversed.

### 1. The District Court's Materiality Finding is Unsupported by Evidence or Argument from Global, and at a Minimum Resolves Disputed Facts at Summary Judgment.

Global's motion for summary judgment of inequitable conduct contended that the CYMAX brochure was not cumulative of Chitwood, but it made no separate affirmative argument that the CYMAX brochure met *Therasense*'s but-for materiality standard. Appx5129. Global appears to have tried to meet the but-for materiality standard by contending that the Valdez affidavit contained false or misleading statements. Appx5129-5130. But Tenaris's opposition rebutted Global's allegations of false or misleading statements. Appx7358-7366. And the district court's summary judgment order did not address Global's allegations because it found "the affirmative egregious misconduct arguments … mooted by the Court's finding of but-for materiality." Appx15.

The court should not have granted summary judgment based on an argument Global did not actually make. *See Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150-51 (10th Cir. 2017) (reversing summary judgment);

*Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 914-15 (7th Cir. 2022) ("[A] party opposing a motion for summary judgment needs to respond only to arguments the moving party actually made, not others that the moving party might have made but did not."). Although the court states "there can be little doubt that the CYMAX brochure satisfies even the strictest criteria," nowhere does it explain why or how the CYMAX brochure would have led the examiner to deny claims of the '256 patent. The district court's reasons for finding the CYMAX brochure material fail to apply *Therasense*'s materiality standard.

*First*, the district court contends that the CYMAX brochure is material because it "was correctly recognized by one of the inventors of what became the '256 patent as containing 'essentially our chemistry.'" Appx13. As explained above, however, the "essentially our chemistry" quotation undisputedly refers to Tenaris's conventional tubing, not the claimed invention or the BlueCoil product embodying it. Again, the full sentence is the following: "This is essentially our chemistry *for HS90 (A606HS).*" Appx7656 (emphasis added). "HS90" is undisputedly one of Tenaris's conventional coiled tubing products, which has *lower* carbon content than the

improved tubing described and claimed in the '256 patent. Appx7652-7654(272:4-274:16); Appx7659; Appx5776.

*Second*, the district court's discussion of Chitwood, Appx13, concerns cumulativeness, and is discussed below. §I.C.2, *infra*. Even if the district court were correct to find on summary judgment that the CYMAX brochure is not cumulative of Chitwood, that does not answer the question whether the CYMAX brochure is but-for material. In other words, a reference that is cumulative of disclosed information is not material, but the reverse is not true.

*Third*, the district court contends that "Tenaris subsequently submitted the CYMAX brochure—with page 30 omitted—in support of its applications for the children ['074 and '075] patents, which it would not have done if the brochure was not material." Appx13. To the extent the court means that Tenaris would not have continued to withhold page 30 if it were not material, there are at least two problems with that reasoning. One is that Tenaris had a good-faith reason for omitting page 30 in connection with the Children Patents, which the district court should not have rejected at summary judgment. *See supra* pp.21-24; *infra* pp.68-72. The other is that the district court effectively conflates materiality with intent,

which *Therasense* specifically instructs not to do. 649 F.3d at 1290. *Therasense* specifically abolished the "sliding scale" concept, "where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.* On that point, the en banc Court was unanimous. *See id.* at 1297 (O'Malley, J., concurring); *id.* at 1302 (Bryson, J., concurring and dissenting). "Intent and materiality are separate elements," *id.* at 1290, and rigorous adherence to the burdens of proof for each was essential to the Court's opinion in *Therasense*. *Id.* at 1291.

**2. The Grandchildren Applications Further Underscore That a Reasonable Factfinder Could Have Concluded the CYMAX Brochure is Not Material.**

If more is needed to reverse the district court's grant of summary judgment as to materiality, Tenaris presented evidence from which a reasonable factfinder could conclude that the CYMAX brochure was not material. As discussed above, the Grandchildren Applications are continuations of the Children Applications. The PTO issued notices of allowance for the Grandchildren Applications, but required *terminal disclaimers* because the claims were *patentably indistinct from the '256 patent*. Appx6348-6349; Appx6433-6434. For materiality purposes, there is thus no need to speculate on whether disclosing the full CYMAX brochure would have led the

PTO to reject claims. With the Grandchildren Applications, Tenaris disclosed not only the full CYMAX brochure, but also *Global's invalidity contentions* in this case, and Chitwood. Faced with patentably indistinct claims from the '256 patent, the Examiner *allowed the claims*, with detailed reasoning.

That is powerful evidence refuting any claim of but-for materiality. District courts have granted summary judgment of *no* materiality in precisely these circumstances.[12] This Court has similarly observed that in the context of reexamination proceedings, "the result of a PTO proceeding that assesses patentability in light of information not originally disclosed can be of strong probative value in determining whether the undisclosed in-

[12] *E.g.*, *Arctic Cat, Inc. v. Polaris Indus. Inc.*, Civil Nos. 13-3579 (JRT/FLN), 13-3595 (JRT/FLN), 2014 WL 5325361, at *23 (D. Minn. Oct. 20, 2014) (granting motion to dismiss inequitable conduct claim for failing to plead materiality because the PTO issued two continuation applications after the withheld reference was disclosed during prosecution); *Terves, LLC v. Yueyang Aerospace New Materials Co.*, No. 1:19-CV-1611, 2022 WL 1092658, at *7 (N.D. Ohio Apr. 12, 2022) (granting summary judgment of no inequitable conduct where PTO confirmed patentability during reexamination over allegedly material prior art that was withheld during initial examination); *Ironburg Inventions Ltd. v. Valve Corp.*, 418 F. Supp.3d 622, 632-35 (W.D. Wash. 2019) (granting summary judgment of no inequitable conduct where PTO declined to institute IPR based on prior art patent challenger alleged was material).

formation was material." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179 (Fed. Cir. 1995).

Yet, the district court did not mention that evidence, let alone explain why the evidence did not at least raise a triable issue of fact as to the materiality of the CYMAX brochure. Global has emphasized that the magistrate judge struck Tenaris's experts' opinions regarding the Grandchildren Applications, Appx7121 (citing Appx25), but that is not responsive. Tenaris filed objections to that order, *see* Appx8248-8273; Appx8582-8612; Appx8661-8676, but the district court never ruled on them. And in any event, the foregoing points do not depend on expert testimony. It is undisputed that for the Grandchildren Applications, the Examiner had the CYMAX brochure and Global's invalidity contentions, but nonetheless allowed claims that the Examiner regarded as patentably indistinct from the '256 patent. Summary judgment of materiality was improper on this record.

*Finally*, it is not necessary to review the magistrate judge's order excluding Stoll's opinion with respect to the grandchildren application, but should the Court choose to reach it, it should either remand with instruc-

tions to address Tenaris's objections, or find that the exclusion of Stoll's opinion was an abuse of discretion.

As just explained, *supra* §I.C.1, the record of the grandchildren applications was undisputedly relevant to the inequitable conduct claim. Global presumably disagrees with the weight a factfinder should give that evidence, *e.g.*, Appx8605 n.8, but it is undoubtedly important to the sole issue on which the district court disposed of all of the parties' patent claims. It is no answer to note that patents issuing from the grandchildren applications were not directly at issue in the case. *Cf. Metallurgical Indus. v. Fourtek, Inc.*, 790 F.2d 1195, 1205-08 (5th Cir. 1986) (reversing exclusion of evidence).

Moreover, the magistrate judge should not have granted a request that Global had explicitly withdrawn. Global's letter, and Tenaris's consent to Global supplementing its report, rendered the dispute moot. *See Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 41 (1st Cir. 2015) ("[A] party who identifies an issue, and then explicitly withdraws it, has waived the issue." (quoting case)).

With or without the grandchildren applications, the district court erred in finding materiality on summary judgment. The grandchildren ap-

plications underscore the district court's error, and should be before the factfinder in the event of a remand.

### 3. A Reasonable Factfinder Could Conclude That the CYMAX Brochure is Cumulative of Chitwood.

Summary judgment of materiality was improper for the additional reason that a reasonable factfinder could conclude that the CYMAX brochure is cumulative of Chitwood. As explained above, *supra* pp.12-13, the parties agree that Chitwood describes the CYMAX product. *See* Appx7129; Appx7792-7793(25:17-26:18). The only substantive difference the district court identified is that the CYMAX brochure's chemical specifications use numerical ranges to describe the chemical composition of the steel, Appx6917, while Chitwood refers to "low-carbon 4100 series steel" and adds that the material "has sufficient hardenability to achieve the uniform, martensitic microstructure from heat treatment… and … low enough carbon to be field repair welded." Appx3463. Thus, the district court emphasizes that "Tenaris fails to identify any part of the Chitwood [reference] that includes the *precise chemical specification* that the CYMAX brochure included at page 30." Appx13.

That reasoning fails to consider the perspective of a person of ordinary skill in the art. A reference is cumulative if it "teaches no more than

what a reasonable examiner would consider to be taught by the prior art already before the PTO," *Regents*, 119 F.3d at 1574-75, and examiners are deemed "to have experience in the field of the invention," *In re Sang-Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002). The parties agree that an ordinarily-skilled artisan would understand that "low-carbon 4100 series steel" refers to SAE steel grades with known chemistries. Global's invalidity contentions included the following publicly-available reference table of 4100-series steel chemistries, which an ordinarily-skilled artisan would have known to consult (Appx6802):

| UNS No. | SAE No. | Ladle Chemical Composition Limits, % | | | | | | | | | Corre-sponding AISI No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C | Mn | P | S | Si | Ni | Cr | Mo | V | |
| G41180 | 4118 | 0.18-0.23 | 0.70-0.90 | 0.035 | 0.040 | 0.15-0.35 | — | 0.40-0.60 | 0.08-0.15 | — | 4118 |
| G41200 | 4120* | 0.18-0.23 | 0.90-1.20 | 0.035 | 0.040 | 0.15-0.35 | — | 0.40-0.60 | 0.13-0.20 | — | 4120* |
| G41210 | 4121** | 0.18-0.23 | 0.75-1.00 | 0.035 | 0.040 | 0.15-0.35 | — | 0.45-0.65 | 0.20-0.30 | — | 4121** |
| G41300 | 4130 | 0.28-0.33 | 0.40-0.60 | 0.035 | 0.040 | 0.15-0.35 | — | 0.80-1.10 | 0.15-0.25 | — | 4130 |
| G41310 | 4131 | 0.28-0.33 | 0.50-0.70 | 0.035 | 0.040 | 0.15-0.35 | — | 0.90-1.20 | 0.15-0.25 | — | 4131 |
| G41370 | 4137 | 0.35-0.40 | 0.70-0.90 | 0.035 | 0.040 | 0.15-0.35 | — | 0.80-1.10 | 0.15-0.25 | — | 4137 |
| G41400 | 4140 | 0.38-0.43 | 0.75-1.00 | 0.035 | 0.040 | 0.15-0.35 | — | 0.80-1.10 | 0.15-0.25 | — | 4140 |

Just like the CYMAX brochure's chemical specification (below), the publicly-available reference shows percentage ranges of carbon, manganese, phosphorus, sulfur, silicon, nickel, chromium, molybdenum, and vanadium.

2. **STEEL SPECIFICATION**

2.1 The steel sheet shall be 4100 series, chrome-moly alloy per ASTM A-607, modified.

2.2 Chemistry:

| C | Mn | P | S | Si | Cr | Mo | Ni | Cb-V |
|---|---|---|---|---|---|---|---|---|
| .13-.17 | .60-.90 | .025 Mx | .005 Mx | .30-.45 | .55-.75 | .10-.15 | .10 Mx | .02-.04 |

Appx6917. Global's invalidity contentions did not stand alone. Global witnesses testified that the chemical composition of low-carbon 4100 series steel that "cover[ed] the chemistry ranges identified by [the '256] patent" was publicly available for free on the internet. (Appx6978(142:18-23); Appx6980(144:3-9); Appx6983-6984 (Global's 2015 analysis of the Chitwood reference, noting "low carbon 4100 series has a published chemistry range"). And Tenaris provided expert testimony explaining that the CYMAX brochure was cumulative of Chitwood. Appx5129 n.6 (Global motion, acknowledging Stoll and Tipton testimony).

To be sure, Global offered other evidence to try downplay or contradict its invalidity contentions. But the other evidence is, at most, Global's own view of disputed facts, and the district court did not rely on it anyway. Global's inequitable conduct expert, Skiff, opined "the CYMAX 80 and 100 specifications in the CYMAX [Brochure] are missing in Chitwood." Appx7025(¶301). That is irrelevant as Skiff testified that he was not offering technical opinions and was not a person of ordinary skill in the art.

Appx8227-8228(53:8-14, 55:20-23); Appx5130 n.7. His testimony thus meant that the specifications were "missing" from Chitwood only in the literal sense that the same words and numbers did not appear in both references.

Global pointed to Tenaris's expert Lasseigne's testimony that Chitwood does not disclose "specifically the chemical composition of CYMAX coiled tubing." Appx5627(90:23-91:2) But Lasseigne also testified that the CYMAX brochure's chemistry specifications were "not necessarily more specific" than Chitwood "because with the 4100 series steel, you're given a range[] as well." Appx5627(91:25-92:18). That testimony is, of course, consistent with Global's invalidity contentions that a person of ordinary skill in the art would understand Chitwood's disclosure of low-carbon 4100 series steel to refer to SAE steel grades with publicly-available chemistries.

Global also pointed to notes of a call between a prosecuting attorney and a Tenaris attorney who, in turn, was recounting a conversation with Tenaris's vice president of research and development. Appx5129 (quoting Appx5646-5647). Global's interpretation of these multi-layered hearsay notes is that the CYMAX brochure "would give 90%+ tempered martensite" but Chitwood would not. Appx5129. Other evidence, however, shows

the opposite. Inventors Gomez performed an analysis and concluded for CYMAX 100 that "bainite fractions higher than 30% would be expected." Appx7666. That is, Gomez concluded that CYMAX 100 would produce, at most, 70% martensite, which is outside the claims. Tenaris's expert Tipton likewise opined that CYMAX's poor performance in the DEA-97 study demonstrated that CYMAX lacked a homogenous microstructure of at least 90% tempered martensite. Appx7643-7644(¶320). The district court did not mention that evidence, which at least raises additional disputes of fact—not only of CYMAX's relevance, but also of whether an ordinarily-skilled artisan would have regarded Chitwood as cumulative of the CYMAX brochure, including whether the different ways of referring to low-carbon steel are a distinction without a difference—not unlike "$H_2O$" versus "water."

Disputes over a withheld reference's cumulativeness present a genuine issue of material fact that precludes summary judgment. In *Digital Control, Inc. v. Charles Machine Works*, 437 F.3d 1309 (Fed. Cir. 2006), the district court rejected a cumulativeness argument at summary judgment, because the withheld reference (Rorden) and the disclosed reference (Geller) had different focuses. *Id.* at 1319. This Court vacated and remanded,

where the patentee had identified overlapping disclosures. *Id.* This Court explained that "what the prior art teaches" is a factual question and, because there were "genuine issues of material fact as to what the Geller reference teaches, and thus whether the Rorden patent is cumulative of the Geller patent, the issue of whether the failure to disclose the Rorden patent was a material omission was not properly decided at summary judgment." *Id.*

This case is no different. The evidence in Global's invalidity contentions, testimony of Global's fact witnesses, and Global's 2015 analysis of the Chitwood reference shows there is at least a genuine issue of fact about what Chitwood discloses vis-à-vis the CYMAX brochure. That in turn makes the CYMAX brochure's cumulativeness (and materiality) a disputed and material question of fact precluding summary judgment. Had the district court viewed the evidence in the light most favorable to Tenaris, it could not have granted summary judgment for Global. *Anderson*, 477 U.S. at 255; *Hunt*, 526 U.S. at 553.

The district court dismissed Global's invalidity contentions because it would be "nonsensical" if arguments made in invalidity contentions "estop[ped] a party from later taking a different position." Appx14. That is er-

roneous because Tenaris cited Global's invalidity contentions in precisely the way Rule 56 directs, not for estoppel. Under Fed. R. Civ. P. 56(c)(1)(A), a party who asserts that a fact is or is not genuinely disputed "must support the assertion by … citing to particular parts of the record, including depositions, documents, … stipulations … admissions, interrogatory answers, or other materials…" Following the Rule's explicit text, Tenaris cited Global's contentions (both in its own summary judgment in opposing Global's motion) to show that the parties agreed that a skilled artisan would have "appreciate[d] that the '4100 series steel' refers to the SAE steel grades," which specify "carbon, manganese, silicon, sulfur, and phosphorus in the specified ranges." Appx6801-6802. And, as explained, Global's contentions do not stand alone in any event. Summary judgment in *Tenaris's* favor would have been appropriate, because Global bears the burden of proof on whether Chitwood is cumulative. *See Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365-66 (Fed. Cir. 2008); *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1350 (Fed. Cir. 2001). But at a minimum, the district court should not have granted summary judgment in Global's favor.

## II. The ’074 and ’075 Patents are Not Unenforceable.

If the Court vacates summary judgment of unenforceability for the ’256 patent, it must also vacate summary judgment of unenforceability for the ’074 and ’075 patents because the district court’s findings are premised on a finding of inequitable conduct during prosecution of the ’256 patent. *See* Appx15 (“The Court’s finding of inequitable conduct can affect not just the ’256 patent, but also the ’074 and ’075 children patents.... [T]he Court finds that Tenaris’s conduct was infectious, rendering the children of the ’256 Patent, ’074 and ’075 Patents, unenforceable.”); *see In re Omeprazole Pat. Litig.*, 483 F.3d 1364, 1375 (Fed. Cir. 2007) (“Without a finding of inequitable conduct in the first instance, [accused infringers] cannot possibly prevail with its new contentions of ‘infectious unenforceability’ against all patents in suit ....”).

But even if the Court affirms summary judgment of inequitable conduct for the ’256 patent, the judgment for the ’074 and ’075 patents rests on additional errors. As noted, Tenaris submitted portions of the CYMAX brochure during prosecution of the ’074 and ’075 patents, but not the portion reciting chemistry specifications. *See supra* pp.21-24. The district

court's reasoning for extending unenforceability to those patents consists of the following paragraph (Appx15):

> Just as [Magistrate] Judge Palermo found fraud in the prosecution of the '256 patent, she found that Tenaris's fraud continued through its prosecution of the '074 and '075 patents. In prosecuting the children patents, Defendants did not submit the CYMAX material as it had been originally maintained nor did they provide pages detailing the steel chemistry to the PTO. Moreover, Defendants changed the inventors so that available prior art were no longer considered, as the prior art had previously rendered the patents obvious. In addition to the terminal disclaimers, these acts clearly show the relation between the '256 patent and the '074 and '075 children patents.

As an initial matter, the magistrate judge did not "f[i]nd" inequitable conduct, let alone that inequitable conduct was compelled as a matter of law on a summary judgment record that did not yet exist. The magistrate judge's crime-fraud order was entered approximately a year before summary judgment, and before any privileged discovery occurred. The order, moreover, explicitly ruled only on "a discovery motion, and not a determination on the merits." Appx4049. The order "found" only that Global's motion to compel would be granted. And it stated explicitly that "there are issues of fact that will be resolved at trial." Appx4049. That order cannot reasonably be repurposed as compelling summary judgment on the ultimate issue of inequitable conduct.

The district court's comment that "Defendants did not submit the CYMAX material as it had been originally maintained nor did they provide pages detailing the steel chemistry to the PTO," Appx15, does not compel a finding against Tenaris on materiality or intent. A reasonable factfinder could conclude that the chemical specification was not material for the same reasons explained above, *supra* §I.C, or the additional reason that Tenaris successfully distinguished both Chitwood and the disclosed portions of the CYMAX brochure during prosecution on four bases, each of which was included in the examiner's reasons for allowance. Appx6665; Appx6673. A reasonable factfinder could conclude from this evidence that non-disclosure of the CYMAX brochure's chemistry specifications was not material to the '074 and '075 patents, or that the '074 and '075 patent claims did not have a sufficient relation to the '256 patent to warrant "infectious" consequences.

Moreover, Tenaris had a reason—which a reasonable factfinder could credit—for disclosing parts of the CYMAX brochure in the way it did. As explained, Tenaris's prosecution counsel concluded the portions disclosed to the PTO were likely presented at a conference. Appx7974-7976; *see* Appx7981-7982, but the steel specifications were "proprietary" and had

"not [been] disclosed to the public," Appx7978-7979; Appx7949-7950(330:4-9, 334:21-336:2). Tenaris's expert Commissioner Stoll explained that "[l]isting publications that have different or unconfirmed publication dates, titles, and authors"—like the CYMAX brochure—"as separate items is consistent with the Patent Office practice and procedure." Appx8027(¶ 349). Prosecution counsel also did not believe the specifications were relevant because the '074 and '075 patent independent claims did not recite the chemistry limitations. Appx7958-7959(477:11-478:10).

The district court elsewhere dismissed prosecution counsel's explanation because it believed Tenaris lacked "any evidence" that the chemical specification was confidential. Appx11. But Tenaris made good-faith efforts to determine which documents had been disclosed publicly and which had not. Initial database searches had turned up empty, Appx7972, and prosecution counsel ultimately concluded—in good faith and after an investigation—that the chemistry specifications "would have been considered confidential and not disclosed." Appx7978; *see also* Appx7987; Appx8003; Appx7967-7968(63:14-64:9). Tenaris's attorneys analyzed the duty to disclose portions of the CYMAX brochure under the "printed publication" framework—because "the patent laws have not generally recognized as

prior art that which is not accessible to the public." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997).

Global or the district court may believe (though the court's opinion does not say so) that that analysis asked the wrong question, or that the investigation was insufficient. But if that was the court's view, the most that would follow is that that someone with a duty to disclose (the court never said who) *should have known* it needed to disclose all the documents in the "CYMAX brochure" in connection with the '074 and '075 patents.[13] Again, "should have known" is insufficient for a finding of inequitable conduct. *Therasense*, 649 F.3d at 1290.

The district court's comment that "the PTO regularly deals with confidential materials on inequitable conduct" is likewise inapt. Appx13. That comment appears to recall the magistrate judge's earlier statements (in deciding a motion to compel) that "[a]s experience[d] patent counsel would know, the PTO deals with confidential information daily and has procedures in place for the proper handling of confidential or proprietary information." Appx4046-4047 (citing MPEP §724). But as applied to Global's

[13] Neither the district court nor Global's motion relied on any testimony, communications, or documents involving Valdez for the '074 and '075 patents.

summary judgment motion, that reasoning is unsound. *First*, it does not follow from the PTO's ability to handle confidential information that a reference's confidential status has *no relevance* to whether it should be disclosed. Secret prior art generally does not count for anticipation or obviousness. *OddzOn*, 122 F.3d at 1402. And *second*, the magistrate judge's statement was in the context of ruling on a discovery motion—not deciding whether to grant summary judgment of inequitable conduct. The reference to what "experience[d] counsel would know" invokes both the "should have known" standard for intent and the PTO's 37 C.F.R. §1.56 standard for materiality—both of which *Therasense* squarely rejected. 649 F.3d at 1290 (rejecting "'should have known' standard"), 1294-95 (rejecting PTO's rule as the standard for materiality).

That leaves the district court's references to change of inventorship and terminal disclaimers. Appx15. But the court does not explain or suggest why the change of inventorship suggests culpable conduct. The change in inventorship was not the basis for the magistrate judge's crime-fraud finding. The magistrate judge found privilege waiver because Tenaris affirmatively offered testimony about attorney-client communications. Appx4051-4055. And while Global also alleged "improper inventor-

ship" as a separate ground for inequitable conduct, the district court denied the parties cross-motions on inventorship because there were "genuine issue[s] of material fact," "for the jury" to resolve. Appx31228(36:3-7).

Finally, inequitable conduct in one application does not infect related applications solely by virtue of a terminal disclaimer where there is no culpable conduct associated with the second application. *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("[T]his court's inequitable conduct cases do not extend inequitable conduct in one patent to another patent that was not acquired through culpable conduct.").

## CONCLUSION

Summary judgment of unenforceability of the '256, '074, and '075 patents should be reversed or vacated.

September 22, 2023

Respectfully submitted,

*/s/ John C. O'Quinn*

John C. O'Quinn
Nathan S. Mammen
William H. Burgess
Ashley Cade
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

# ADDENDUM

Amended Final Judgment
(Dkt. 586, May 18, 2023) ........................................................ Appx1

Final Judgment
(Dkt. 571, Apr. 6, 2023) .......................................................... Appx4

Opinion Granting Global Tubing LLC's Motion for Summary Judgment of Unenforceability (Dkt. 567, Mar. 17, 2023) ...... Appx7

Magistrate Judge's Memorandum Order re: Motion to Strike
(Dkt. 471, Sept. 9, 2022) ....................................................... Appx17

U.S. Patent No. 9,803,256 ....................................................... Appx1057

U.S. Patent No. 10,378,074 ..................................................... Appx1091

U.S. Patent No. 10,378,075 ..................................................... Appx1126

United States District Court
Southern District of Texas
**ENTERED**
May 18, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLOBAL TUBING, LLC,<br><br>Plaintiff,<br>v.<br><br>TENARIS COILED TUBES, LLC and TENARIS, S.A.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:17-cv-03299 |

**AMENDED FINAL JUDGMENT**

On October 30, 2017, plaintiff Global Tubing LLC ("Global") sued defendants Tenaris Coiled Tubes, LLC and Tenaris, S.A.("Tenaris") for, among other things, declaratory relief. Since then, the parties have added certain claims and counterclaims. Global currently asserts claims for declaratory judgments of non-infringement, inequitable conduct, invalidity, and unclean hands as to U.S. Patent No. 9,803,256 ("'256 Patent"), U.S. Patent No. 10,378,074 ("'074 Patent"), U.S. Patent No. 10,378,075 ("'075 Patent"), as well as a claim for attempted monopolization under the Sherman Act, 15 U.S.C. §2. ECF 80. Tenaris currently asserts counterclaims against Global for infringement of the '074 Patent, and '075 Patent. ECF 119.

On August 5, 2022, the Court dismissed the Tenaris counterclaim of infringement of the '256 Patent with prejudice. 8/5/2022 Minute Entry. In addition, the Court dismissed Global's declaratory judgment claim 1 of inequitable conduct, claim 3 of inequitable conduct, claim 7 of non-infringement, and claim 9 of invalidity, all as to the '256 Patent, all without prejudice. *Id.*

On October 7, 2022, the Court granted summary judgment in favor of Tenaris as to Global's Sherman Act claim. 10/7/2022 Minute Entry.

On March 17, 2023, the Court granted summary judgment in favor of Global based on the unenforceability of the ’256, ’074 Patent, and ’075 Patent. ECF 567. In addition, the Court dismissed all other pending motions of the parties without prejudice.

All pending issues before the Court have been resolved or are now moot.

Therefore, pursuant to Fed. R. Civ. P. 58, the Court Orders and enters Final Judgment as follows:

- Judgment is entered that the ’256 Patent, ’074 Patent, and ’075 Patent are unenforceable due to inequitable conduct for the reasons stated in the Court’s Order dated March 17, 2023, ECF 567; and
- Judgment is entered for Tenaris and against Global on Global’s claim for attempted monopolization under the Sherman Act, 15 U.S.C. §2, as to which Global shall take nothing.

Considering these judgments, all other pending claims and requests for relief of the parties are moot and dismissed without prejudice. Nothing in this Judgment limits or impacts the rights of the parties, if any, to seek an award of attorney fees and costs in this matter. Issues of cost and fees will be determined after any appeals are concluded.

All other relief not provided above is Denied. This is a Final Judgment.

**SIGNED** at Houston, Texas, on this the 17th day of May, 2023.

KEITH ELLISON
UNITED STATES DISTRICT JUDGE

United States District Court
Southern District of Texas

**ENTERED**

April 06, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLOBAL TUBING, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Civil Action No. 4:17-cv-03299 |
| TENARIS COILED TUBES, LLC and TENARIS, S.A., | § | |
| | § | |
| | § | |
| Defendants. | § | |

**FINAL JUDGMENT**

On October 30, 2017, plaintiff Global Tubing LLC ("Global") sued defendants Tenaris Coiled Tubes, LLC and Tenaris, S.A.("Tenaris") for, among other things, declaratory relief. Since then, the parties have added certain claims and counterclaims. Global currently asserts claims for declaratory judgments of non-infringement, inequitable conduct, invalidity, and unclean hands as to U.S. Patent No. 9,803,256 ("'256 Patent"), U.S. Patent No. 10,378,074 ("'074 Patent"), U.S. Patent No. 10,378,075 ("'075 Patent"), as well as a claim for attempted monopolization under the Sherman Act, 15 U.S.C. §2. ECF 80. Tenaris currently asserts counterclaims against Global for infringement of the '074 Patent, and '075 Patent. ECF 119.

On August 5, 2022, the Court dismissed the Tenaris counterclaim of infringement of the '256 Patent with prejudice. 8/5/2022 Minute Entry. In addition, the Court dismissed Global's declaratory judgment claim 1 of inequitable conduct, claim 3 of inequitable conduct, claim 7 of non-infringement, and claim 9 of invalidity, all as to the '256 Patent, all without prejudice. *Id.*

On October 7, 2022, the Court granted summary judgment in favor of Tenaris as to Global's Sherman Act claim. 10/7/2022 Minute Entry.

On March 17, 2023, the Court granted summary judgment in favor of Global based on the unenforceability of the ’256, ’074 Patent, and ’075 Patent. ECF 567. In addition, the Court dismissed all other pending motions of the parties without prejudice.

All pending issues before the Court have been resolved or are now moot.

Therefore, pursuant to Fed. R. Civ. P. 58, the Court Orders and enters Final Judgment as follows:

- Judgment is entered that the ’256 Patent, ’074 Patent, and ’075 Patent are unenforceable due to inequitable conduct for the reasons stated in the Court’s Order dated March 17, 2023, ECF 567;
- Judgment is entered for Tenaris and against Global on Global’s claim for attempted monopolization under the Sherman Act, 15 U.S.C. §2, as to which Global shall take nothing; and
- Judgment is entered for Global and against Tenaris on Tenaris’s counterclaims for infringement of the ’256 Patent,’074 Patent, and’075 Patent, as to which Tenaris shall take nothing.

Considering these judgments, all other pending claims and requests for relief of the parties are moot and dismissed without prejudice. Nothing in this Judgment limits or impacts the rights of the parties, if any, to seek an award of attorney fees and costs in this matter. Issues of cost and fees will be determined after any appeals are concluded.

All other relief not provided above is Denied. This is a Final Judgment.

**SIGNED** at Houston, Texas, on this the 6th day of April, 2023.

KEITH ELLISON
UNITED STATES DISTRICT JUDGE

United States District Court
Southern District of Texas
**ENTERED**
March 20, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **GLOBAL TUBING LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:17-CV-03299** |
| | § | |
| **TENARIS COILED TUBES LLC, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

This case was brought by Plaintiff Global Tubing, LLC ("Global") seeking, among other things, declaratory judgment that it was not infringing on patents held by Tenaris Coiled Tubes, LLC. and Tenaris, S.A. (collectively, "Tenaris"). Tenaris has counterclaimed for infringement. This case has been pending more than five years.

The parties have, between them, filed eleven motions for summary judgment. In one such motion (ECF No. 446), Plaintiff asks that the Court hold that U.S. Patent No. 9,803,256 Patent ("'256 patent"), U.S. Patent No. 10,378,074 ("'074 patent"), and U.S. Patent No. 10,378,075 ("'075 patent") (collectively the '074 and '075 patents are the "Children Patents") are unenforceable because of Defendants' misconduct. The Court held a hearing on Plaintiff's Motion for Summary Judgment of Unenforceability of the Patents-in-Suit (ECF No. 446) and Defendants' Motion for Summary Judgment of No Inequitable Conduct on All Non-Inventorship Grounds (ECF No. 458) on November 15, 2022. At that hearing, the Court took the Motions under advisement. The Court now **GRANTS** Plaintiff's Motion for Summary Judgment of

Unenforceability of the Patents-in-Suit and provides this Memorandum & Order to document its rulings and reasoning.

## I. BACKGROUND

The factual background of the dispute and a description of the general subject matter of the patents are set forth in the Memorandum Order (ECF No. 222) issued by the Magistrate Judge, Honorable Dena Hanovice Palermo, on March 26, 2021 (the "March 2021 Order"). The extensive discussion in the March 2021 Order will not be repeated here, but is incorporated by reference. The March 2021 Order originated as a ruling on discovery issues. It included, however, a comprehensive discussion and analysis that anticipate the issues presented by Global's pending Motion for Summary Judgment (ECF No. 446). Still, in the March 2021 Order, Judge Palermo was careful to note that, "Since this is a discovery motion, and not a determination on the merits, the sole question is whether Plaintiff's evidence is sufficient to make a prima facie case of fraud. Defendant's evidence is insufficient to conclusively rebut Plaintiff's evidence, it simply evidences that there are issues of fact that will be resolved at trial." ECF No. 222 at 24.

Almost two years have passed since Judge Palermo's opinion. Defendants have not, however, come forward with evidence that introduces a genuine issue as to any material fact with respect to any of the issues before Judge Palermo.

## II. INEQUITABLE CONDUCT ASSERTIONS

The patents in question are for coiled tubing which is used in the oil and gas industry for downhole drilling. There is great value attached to having tubing that is durable, strong, and safe. A process known as "quench and temper" enhances these qualities in tubing. The first quench and temper tubing was produced by Southwestern Pipe, Inc. ("Southwestern") and was known as

CYMAX. ECF No. 446 at 13. In connection with its production, in the 1990s, Southwestern created and distributed to its customers a sales brochure. ECF No. 446-5 at 28:7-21. On page 30 of the brochure, the chemistry of the carbon content of CYMAX 100 is stated to be .13 - .17% wt. ECF No. 466 at 14. That carbon content overlaps with the carbon context in Tenaris's '256 patent for its BlueCoil coiled tubing of .17-.35 wt. ECF No. 133 at 10.

Southwestern's product was not a commercial success and Southwestern left the market for coiled tubing. In 2010, Tenaris discovered the CYMAX furnace in an old facility it owned. On February 26, 2014, Tenaris filed its application for the patent that subsequently issued as the '256 on October 31, 2017. *Id.* at 13. Soon after Tenaris filed its patent application, it obtained a copy of the CYMAX brochure. *Id.* The brochure was distributed to those at Tenaris working on the '256 patent. *Id.* One member of the Tenaris team wrote to the lead inventor, Martin Valdez, "look at the chemistries (Page 30 for instance for CYMAX 100). This is essentially our chemistry for H5590 (A606HS)." ECF No. 133 at 9; ECF No. 133-132 at 12. Valdez sent the brochure to Tenaris's in-house counsel, who forwarded it to outside patent prosecution counsel. No one provided the CYMAX brochure to the Patent and Trademark Office during the application for the '256 patent.

Plaintiff contends that Defendants' omission of the CYMAX brochure in its application for the '256 patent is a classic example of inequitable conduct. ECF No. 466 at 13. The parties do not dispute that inequitable conduct is an equitable defense to patent infringement that bars enforcement of a patent. Both parties rely heavily on the Federal Circuit's authoritative en banc decision in *Therasense, Inc. v. Becton, Dickenson & Co.*, 649 F. 3d 1276, 1285 (Fed. Cir. 2011)(en banc).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.' " *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)). "[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

### B. The Standard for Inequitable Conduct and Infectiousness

Patent applicants have a duty to prosecute patent applications in the PTO with candor, good faith, and honesty. As a result, applicants are expected to disclose to the PTO information that they are aware of that would have a material impact on the examination of the application. *Li*

*Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed. Cir. 2000). A breach of this duty, coupled with intent to deceive, constitutes inequitable conduct. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995). In determining whether inequitable conduct occurred, Global must demonstrate by clear and convincing evidence that Tenaris "(1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013).

The question whether Defendants can justifiably be held to have committed inequitable conduct is the heart of the parties' competing motions for summary judgment. Plaintiff's Motion for Summary Judgment of Unenforceability of the Patents-in-Suit (ECF No. 446); and Defendants' Motion for Summary Judgment of No Inequitable Conduct on all Non-Inventorship Grounds (ECF No. 458). The consequences are significant: "Perhaps most importantly, the remedy for inequitable conduct is the 'atomic bomb' of patent law. Unlike validity defenses, which are claim specific, *see* 35 U.S.C. § 288, inequitable conduct regarding any single claim renders the entire patent unenforceable." *Therasense*, 649 F.3d at 1288.

Because inequitable conduct is the atomic bomb of patent law, the doctrine requires a showing of both intent and materiality. *Id* at 1289. In *Therasense*, the Federal Circuit said that it "now tightens the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1290. "A district court should not use a sliding scale where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.*

The Federal Circuit reviews a trial court's finding of inequitable conduct in a two-prong process: (1) analyzing the "underlying factual determinations of materiality and intent for clear error" and (2) reviewing the "ultimate decision as to inequitable conduct for an abuse of discretion." *1st Media, LLC v. Electronic Arts, Inc.*, 694 F. 3d 1367, 1372 (Fed. Cir. 2012). Information is material to patentability when

> it is not cumulative to information already of record or being made of record in the application, and
>
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> a. Opposing an argument of unpatentability relied on by the Office, or
> b. Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2005).

Additionally, to satisfy the clear and convincing evidence standard for the intent prong, the specific intent to deceive must be "the single most reasonable inference able to draw from the evidence." *Therasense*, 649 F.3d at 1290. If there are multiple conclusions that can be drawn from the evidence, intent to deceive cannot be found. *Id.* at 1293-93. "Unlike other deficiencies, inequitable conduct cannot be cured by reissue or reexamination. Moreover, the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family. Thus, a finding of inequitable conduct may endanger a substantial portion of a company's patent portfolio." *Id.* at 1288.

For inequitable conduct related to a parent patent to render a child patent unenforceable, the inequitable conduct at issue needs to have an "immediate and necessary relation" to the children patents. *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990). Courts that have found infectious unenforceability at issue have "made no mention of any direct

linkage between (1) the inequitable conduct that occurred during prosecution of the infectious patent and (2) what happened during the prosecution of the patent(s)-at-issue." *Guardant Health Inc. v. Foundation Med. Inc.*, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020).

**C. '256 Patent**

With these principles in mind, the Court turns to the evidence in this case. As to materiality, there can be little doubt that the CYMAX brochure satisfies even the strictest criteria. The brochure was correctly recognized by one of the inventors of what became the '256 patent as containing "essentially our chemistry." ECF No. 133 at 9. Tenaris argues that the omission of the CYMAX brochure was of no matter because the brochure discloses the same claim limitations as another reference, called Chitwood. But Tenaris fails to identify any part of the Chitwood that includes the precise chemical specification that the CYMAX brochure included at page 30. Moreover, Tenaris subsequently submitted the CYMAX brochure – with page 30 omitted – in support of its applications for the children patents which it would not have done if the brochure was not material.

The Court's conclusion as to inequitable conduct is strengthened by the untenable rationale Tenaris offers in explanation of non-disclosure. For instance, Tenaris claims that the CYMAX documents were confidential without any evidence to support its theory. ECF No. 499 at 17. Tenaris's argument also ignores the fact that the PTO regularly deals with confidential materials on inequitable conduct. The same could be said with respect to Tenaris's suggestions that the submission of the CYMAX brochure would cause unnecessary complications.

Just as the evidence amply demonstrates the materiality criteria of the doctrine of inequitable conduct, so too does the evidence establish intent. After the PTO rejected the application for the '256 patent on obviousness grounds, it asked for an affidavit supporting

Tenaris's position on non-obviousness. Tenaris overcame the rejection with a declaration from Valdez. In preparation for his declaration, Valdez wrote to prosecuting counsel about the CYMAX brochure stating, "In page 30 of the CYMAX.pdf doc you can see the spec of the CYMAX 100 which was 0.13 - 0.17 Carbon. I am not sure it is a good idea to disclose this document." ECF No. 446 at 14. After Valdez expressed this concern, the prosecuting attorney did not submit the CYMAX brochure to the examiner. Rarely do courts come across such stark evidence of the intent fork of inequitable conduct. *GFI, Inc. v. Franklin Corp.* 265 F.3d 1268, 1274 (Fed Cir. 2001) ("facts in inequitable conduct cases rarely include direct evidence of admitted deceitful conduct").

Moreover, there is no other reasonable inference that can be drawn from Tenaris's withholding the CYMAX document from the Patent Office, other than intent to deceive. Tenaris alleges that Valdez's intent is a material dispute of fact with regards to the comment he made to the prosecuting attorney. Tenaris argues that the actual intent of the question was whether the information "would be relevant as evidence of failure of others." ECF No. 499 at 22. However, this does not present an equally reasonable inference to Global's intent to deceive argument. Tenaris also argues that Global should not now be able to advance arguments that are in some degree inconsistent with assertions in Global's invalidity contention. But, Tenaris cites no authority suggesting that invalidity contentions estop a party from later taking a different position. Such a rule would be especially nonsensical in a case in which so much has been revealed in discovery.

For the above reasons, the Court finds Tenaris's actions constituted inequitable conduct, rendering the '256 Patent unenforceable.

**D. '074 and '075 Children Patents**

The Court's finding of inequitable conduct can affect not just the '256 patent, but also the '074 and '075 children patents. Global argues that the immediate and necessary relation between the '256 patent and the '074 and '075 children patents can be established by "showing that the patentee filed a terminal disclaimer in the later applications, to surmount a double-patenting rejection over the earlier, infectious patent." ECF No. 446 at 27. Tenaris rejects Global's argument on the grounds that terminal disclaimers alone "[do] not bind the enforceability of the '074 and '075 patents to the alleged inequitable conduct during the prosecution of the '256 patent." ECF No. 499 at 33. However, the Court finds that the patents are related by more than just the patentee's terminal disclaimer.

Just as Judge Palermo found fraud in the prosecution of the '256 patent, she found that Tenaris's fraud continued through its prosecution of the '074 and '075 patents. In prosecuting the children patents, Defendants did not submit the CYMAX material as it had been originally maintained nor did they provide pages detailing the steel chemistry to the PTO. Moreover, Defendants changed the inventors so that available prior art were no longer considered, as the prior art had previously rendered the patents obvious. In addition to the terminal disclaimers, these acts clearly show the relation between the '256 patent and the '074 and '075 children patents.

For the above reasons, the Court finds that Tenaris's misconduct was infectious, rendering the children of the '256 Patent, '074 and '075 Patents, unenforceable.

**E. Affirmative Egregious Misconduct**

The Court does not reach the affirmative egregious misconduct arguments as they are mooted by the Court's finding of but-for materiality.

**F. Liability**

The Court wishes to emphasize that none of the counsel who have participated in the argument of the subject motion before this Court is implicated in any of the inequitable conduct discussed.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Global Tubing's Motion for Summary Judgment of Unenforceability of the Patents-in-Suit is **GRANTED**. All other motions are **DISMISSED** without prejudice. The parties may refile to address any remaining issues.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 17th day of March, 2023.

Keith P. Ellison
United States District Judge

United States District Court
Southern District of Texas

**ENTERED**

September 09, 2022

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLOBAL TUBING, LLC, | § | |
| *Plaintiff*, | § | |
| v. | § | Case No. 4:17-CV-3299 |
| TENARIS COILED TUBES, LLC and TENARIES, S.A., | § | |
| *Defendants.* | § | |

**Order**

This is a patent infringement dispute involving two patents for coiled tubing used in the oil and gas industry to conduct and service wellbore operations.[1] Pending before the Court are two of Global Tubing, LLC's ("Plaintiff") discovery motions regarding experts. Pl.'s Mots., ECF No. 391, 408.[2] On August 22, 2022, the Court held a hearing on the motions. Counsel requested and were permitted to file more extensive briefs addressing the issues raised.[3] The dispute is a product of the agreed scheduling order that set expert rebuttal report deadlines and the discovery cut off in

[1] The district judge before whom this case is pending referred all discovery motions for resolution pursuant to 28 U.S.C. § 636 (b)(1)(A).

[2] Defendants filed responses to Plaintiff's motions. ECF Nos. 400, 413.

[3] Both sides filed briefs in support of their positions. Defs.' Br., ECF No. 427; Pl.'s Br., ECF No. 428.

close proximity to the November 28, 2022 trial date. Sch. Order, ECF No. 359. The Court will address each motion in turn.

## I. THE GRANDCHILDREN PATENTS ARE NOT RELEVANT.

This Court previously found that Tenaris Coiled Tubes, LLC ("Tenaris") fraudulently withheld the CYMAX brochure from the PTO in prosecution of the '256 patent[4] and withheld portions of the brochure in prosecution of the Children patents and that the brochure was but-for material.[5] In the first motion, Plaintiff seeks to strike Tenaris' and Tenaris, S.A.'s (collectively, "Defendants") expert Robert Stoll's opinion[6] that the CYMAX brochure was not material based on the PTO's treatment of those materials in relation to the Grandchildren patents.[7] ECF No. 391. Plaintiff notes that Defendants' invalidity expert (Steven Tipton) now also incorporates this treatment of the CYMAX materials into his analysis. ECF No. 428

---

[4] Tenaris is the owner of U.S. Patent No. 9,803,256 (the "'256 patent"), U.S. Patent No. 10,378,074 (the "'074 patent"), and U.S. Patent No. 10,378,075 (the "'075 patent") (collectively the '074 and '075 patents are referred to as the "Children patents"). Plaintiff sued Defendants for, *inter alia*, declaratory judgment of inequitable conduct, non-infringement, and antitrust violations. Pl.'s 2d Am. Compl., ECF No. 80. Tenaris has counterclaimed for infringement. Def.'s Am. Ans. and Counterclaims, ECF No. 119. The '256 patent is no longer at issue in this case. Minute Entry Order, Aug. 5, 2022. The Children patents are the only patents at issue in this litigation.

[5] Memorandum Order, ECF No. 222 at 24, affirmed, Minute Entry Order, Aug. 25, 2021; Hr'g Tr. Aug. 25, 2021, ECF No. 273 at 92:5-8.

[6] Stoll Rept., ECF No. 429 at 3-10. On July 28, 2022, Defendants produced Robert Stoll's expert report containing his opinion that the United States Patent Trademark Office's ("PTO") treatment of Tenaris' U.S. Patent Application Nos. 16/538,326 and 16/538,407 (together, the "Grandchildren patents") "is strong evidence that CYMAX is not but-for material." *Id.* ¶ 294.

[7] The Grandchildren patents were never at issue in this litigation. ECF No. 428 at 6.

at 6.[8] Thus, Plaintiff modified its motion seeking only to allow its expert to address the Grandchildren patents to respond to Defendants' expert's opinion. *Id.* Defendants do not oppose Plaintiff supplementing its expert report. ECF No. 427 at 8.

The only patents at issue in this case are the Children patents. The Grandchildren patents are not at issue in this case and have not until the last couple of weeks been a part of any discovery. ECF No. 391 at 1-2; ECF No. 428 at 6. Without the parties showing what those claims involve and how they compare to the '256 patent and the Children patents, which would likely require reopening discovery, there is no basis to conclude that Tenaris' prosecution of the Grandchildren patents or the PTO's determinations regarding those patents are relevant to the issues in this dispute, particularly the materiality of the CYMAX brochure to the '256 patent or Children patents. FED. R. CIV. P. 26(b)(1); *see Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 358 (5th Cir. 1995) (affirming district court's exclusion of evidence with a "tenuous relationship" to the claims at issue).

Therefore, Plaintiff's motion to supplement its expert's report to respond to the CYMAX opinions of Defendants' expert is **DENIED**. Stoll and Tipton's expert opinions, to the extent they rely on the PTO's actions with respect to the Grandchildren patents, shall be **STRICKEN**. *United States v. Masat*, 948 F.2d 923,

[8] *See* Tipton Rept., ECF No. 428-6.

933 (5th Cir. 1991) (the court has "wide discretion in determining the relevance and materiality of evidence").

In addition, Plaintiff seeks an order compelling Defendants to produce all privileged communications relating to the CYMAX materials and prosecution of the Grandchildren patents on the basis that Tenaris' actions before the PTO amounted to a continuation of the fraud this Court previously found. ECF Nos. 391, 428 at 6-9. Defendants oppose the motion asserting that they fully disclosed the CYMAX materials to the PTO in connection with the prosecution of the Grandchildren patents so it cannot be a continuation of the fraud. ECF No. 427 at 14.

While the Court finds that Tenaris' failure to produce this Court's crime-fraud opinion to the PTO is astounding, the prosecution of the Grandchildren patents before the PTO is not before this Court and is therefore irrelevant.[9] Accordingly, Plaintiff's motion to compel production of Defendants' privileged documents regarding the prosecution of the Grandchildren patents is **DENIED**.

## II. PLAINTIFF'S MAY RELY ON THEIR EXPERT'S REBUTTAL OPINION.

In the second motion, Plaintiff seeks to allow its expert Dr. Alexander Hudgins' rebuttal opinion that the accused product (Plaintiff's DURACOIL tubing) has less martensite than the patented product, proving a defense to infringement.

[9] The record is not sufficient to establish a continuing fraud, even if the patents were relevant.

ECF No. 408. Defendants oppose the motion, asserting that this defense represents a complete change of position that prejudices Defendants. ECF Nos. 413, 427 at 1. In support, Defendants argue that this position is contrary to Plaintiff's invalidity contentions, answers to Defendants' contention interrogatory and requests for production, and further the samples were never produced in discovery. ECF No. 427 at 10. Defendants argue that Plaintiff's expert report from Dr. Hudgins regarding the martensite composition of DURACOIL should be stricken because Plaintiff improperly failed to disclose its contention that DURACOIL's composition is less than 90% martensite.

Defendants point to Interrogatory No. 6 and RFP No. 58 in support of their argument that Plaintiff improperly failed to disclose its contention. Regarding Interrogatory No. 6, Defendants claim that Plaintiff's response to its contention interrogatory was misleading because it "expressly incorporate[d] its non-infringement contentions," which state that DURACOIL "does not comprise a mixture of tempered martensite and bainite," *i.e.*, DURACOIL was more than 90% martensite. *Id*. at 9. Defendants further argue that Plaintiff's response to RFP No. 58 that it would only produce documents "demonstrated that [Plaintiff] had no intention to rely on samples." *Id*. at 10.[10]

[10] Dr. Hudgins tested an "as-quenched" coil tubing sample in formulating his opinion. ECF No. 427 at 10.

Plaintiff responds that Interrogatory No. 6 did not obligate it to disclose its contention that DURACOIL is composed of less than ninety percent martensite. ECF No. 428 at 17. Interrogatory No. 6 was not a contention interrogatory, but rather, sought information related to Plaintiff's efforts to avoid infringement. *Id*. at 18. Although Plaintiff admits that it "fail[ed] to [] disavow" the preliminary noninfringement contentions expressly incorporated in its response to Interrogatory No. 6, it points out that those contentions were "mooted once Tenaris made claims of infringement." *Id*. Plaintiff further states that Defendants should not have been misled because information consistent with Dr. Hudgins' report was repeatedly disclosed. *Id.* at 18-19. Plaintiff also asserts that in response to RFP No. 58 it produced documents reflecting "attempts to find the martensite content of as-quenched DURACOIL samples, as well as difficulties with the analyses." *Id.* at 14. Finally, Plaintiff asserts that it produced a sample of as-quenched coil tubing that was identical to the sample Dr. Hudgins tested. *Id.* at 18.

The Court finds that Plaintiff's argument that its noninfringement contentions were mooted and therefore did not have to be updated is meritless given that Plaintiff continued to reference them in response to Interrogatory No. 6, keeping them relevant to the case. *See* ECF No. 428-23 at 43-45. Plaintiff should have removed that reference no later than when it supplemented to include Dr. Hudgins' opinion. At this point, Plaintiff has removed that reference from its most recent interrogatory

answers. *Id.* at 45-46; ECF No. 427-3 at 3-4.

Defendants' position that Plaintiff failed to meet its obligation to disclose its contention that DURACOIL's composition is less than 90% martensite is unsupported. A party "has a duty to supplement discovery responses only if the additional information has not otherwise been made known to the other parties during the discovery process." *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 84-85 (5th Cir. 1994); *see also* Fed. R. Civ. P. 26(e)(1)(A) ("if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.").

Here, it cannot be said that Plaintiff did not otherwise make known to Defendants that DURACOIL might have less than 90% martensite. In fact, Plaintiff repeatedly disclosed this information to Defendants. ECF No. 428 at 14 (Plaintiff "produced documents both about its selection of low-carbon steel and about its attempts to find the martensite content of as quenched DURACOIL samples, as well as difficulties with the analyses."), 18 (Plaintiff's "President testified that DURACOIL's microstructure is a mixture of martensite and bainite."), 19 (counsel and executives referenced the composition); *see* ECF No. 428-23 at 46 (Plaintiff's supplemental interrogatory answer identifying various disclosures to Defendants regarding the martensitic and bainitic microstructure of DURACOIL).

Furthermore, Defendants' reliance on *Asia Vital* is misplaced. In that case, unlike here, the defendant propounded a contention interrogatory "requesting the factual and legal bases for [plaintiff's] non-infringement contentions." *Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1003 (N.D. Cal. 2019). The plaintiff in *Asia Vital* failed to disclose one of its non-infringement contentions in response to the contention interrogatory and only did so in its expert rebuttal report. *Id.* The court struck the new non-infringement theories on the basis that it impeded the patentee from obtaining discovery. *Id.* at 1003-05. In contrast, Defendants in this case did not propound a contention interrogatory, but instead asked Plaintiff to describe the efforts it took to avoid infringement of the '256 patent.[11] Plaintiff's incorporation of its contentions in its response to Interrogatory No. 6 and failure to delete them when they no longer applied did not convert Interrogatory No. 6 into a contention interrogatory. Because Defendants failed to propound a contention interrogatory, Plaintiff was not subject to the same obligations as the *Asia Vital* plaintiff. *Id*. (striking expert report because "[a] rule that an accused infringer may wait until its expert rebuttal report to set forth theories of non-infringement for the first time would forfeit the benefits of contention

[11] Interrogatory No. 6 stated: "For each claim of the '256 patent, describe in complete detail any effort taken by You to avoid infringement of the claim, including the development of any prototype, testing, experimentation, upcoming products, or other analysis." Pl.'s Supp. Resp. To Defs.' Interrog., ECF No. 428-23 at 43.

interrogatories.”).

Therefore, subject to a ruling on any *Daubert* motion Defendants may file, Plaintiff’s motion is **GRANTED** and it may rely on Dr. Hudgins’ expert report. Plaintiff produced the sample in response to Defendants’ RFP requiring the production of samples, which was heavily litigated before this Court.[12] Nonetheless, Plaintiff is **ORDERED** to make Dr. Hudgins available for deposition, and to provide Defendants with another as-quenched sample of the material Dr. Hudgins tested.

Accordingly, the Court **ORDERS** the following:

1. The amended expert report of Steven Tipton and rebuttal report of Robert Stoll are **STRICKEN** to the extent they refer to or rely on the PTO’s treatment of the CYMAX materials regarding the prosecution of the Grandchildren patents.

2. Plaintiff’s motion to supplement its expert report responding to Tipton’s report or Stoll’s report regarding the PTO’s treatment of the CYMAX materials regarding the prosecution of the Grandchildren patents, ECF No. 391, is **DENIED.**

[12] *See* M&R, ECF No. 241 (regarding production of samples), affirmed, Minute Entry Order, Aug. 25, 2021; Hr’g Tr. Aug. 25, 2021, ECF No. 273 at 117:8-9. Defendants’ experts have indicated that they do not need to test samples to arrive at their opinions, but may desire to test samples to respond to Dr. Hudgins’ opinions.

3. Plaintiff's motion to rely on its expert Dr. Alex Hudgins' rebuttal report regarding the chemical composition of its DURACOIL, ECF No. 408, is **GRANTED**.

4. Plaintiff shall produce Dr. Hudgins for deposition and produce another sample of the as-quenched coil tubing he tested.

Signed at Houston, Texas, on September 9, 2022.

Dena Palermo

**Dena Hanovice Palermo**
**United States Magistrate Judge**

US009803256B2

(12) **United States Patent**
**Valdez et al.**

(10) **Patent No.: US 9,803,256 B2**
(45) **Date of Patent: Oct. 31, 2017**

(54) **HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME**

(71) Applicant: **Tenaris Coiled Tubes, LLC**, Houston, TX (US)

(72) Inventors: **Martin Valdez**, Buenos Aires (AR); **Gonzalo Gomez**, Buenos Aires (AR); **Jorge Mitre**, Houston, TX (US); **Bruce A. Reichert**, Houston, TX (US)

(73) Assignee: **TENARIS COILED TUBES, LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/190,886**

(22) Filed: **Feb. 26, 2014**

(65) **Prior Publication Data**

US 2014/0272448 A1 Sep. 18, 2014

**Related U.S. Application Data**

(60) Provisional application No. 61/783,701, filed on Mar. 14, 2013.

(51) **Int. Cl.**

| | |
|---|---|
| ***C21D 8/10*** | (2006.01) |
| ***C21D 9/08*** | (2006.01) |
| ***C21D 9/14*** | (2006.01) |
| ***C21D 9/50*** | (2006.01) |
| ***C21D 1/22*** | (2006.01) |
| *B21C 37/08* | (2006.01) |

(52) **U.S. Cl.**

CPC ............... ***C21D 8/105*** (2013.01); ***C21D 1/22*** (2013.01); ***C21D 8/10*** (2013.01); ***C21D 9/08*** (2013.01); ***C21D 9/085*** (2013.01); ***C21D 9/14*** (2013.01); ***C21D 9/50*** (2013.01); ***C21D 9/505*** (2013.01); *B21C 37/08* (2013.01); *C21D 2211/008* (2013.01); *Y10T 428/12333* (2015.01)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,316,395 A 4/1967 Lavin
3,316,396 A 4/1967 Trott et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AR 0050159 A1 10/2006
AT 388791 B 8/1989

(Continued)

OTHER PUBLICATIONS

Savatori et. al. European Commision Report, Eur 2006, EUR2207, 3 pp. Stn_Abstract.*

(Continued)

*Primary Examiner* — Vera Katz

(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson and Bear LLP

(57) **ABSTRACT**

Embodiments of the present disclosure are directed to coiled steel tubes and methods of manufacturing coiled steel tubes. In some embodiments, the final microstructures of the coiled steel tubes across all base metal regions, weld joints, and heat affected zones can be homogeneous. Further, the final microstructure of the coiled steel tube can be a mixture of tempered martensite and bainite.

**15 Claims, 16 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

3,325,174 A 6/1967 Weaver
3,362,731 A 1/1968 Gasche et al.
3,366,392 A 1/1968 Kennel
3,413,166 A 11/1968 Zackay et al.
3,489,437 A 1/1970 Duret
3,512,789 A 5/1970 Tanner
3,552,781 A 1/1971 Helland
3,572,777 A 3/1971 Blose et al.
3,575,430 A 4/1971 Alpine
3,592,491 A 7/1971 Glover
3,599,931 A 8/1971 Hanson
3,655,465 A 4/1972 Snape et al.
3,733,093 A 5/1973 Seiler
3,810,793 A 5/1974 Heller
3,854,760 A 12/1974 Duret
3,889,989 A 6/1975 Legris et al.
3,891,224 A 6/1975 Ditcher
3,893,919 A 7/1975 Flegel et al.
3,915,697 A 10/1975 Giuliani et al.
3,918,726 A 11/1975 Kramer
3,986,731 A 10/1976 DeHoff
4,014,568 A 3/1977 Carter et al.
4,147,368 A 4/1979 Baker et al.
4,163,290 A 7/1979 Sutherlin et al.
4,219,204 A 8/1980 Pippert
4,231,555 A 11/1980 Saito
4,299,412 A 11/1981 Parmann
4,305,059 A 12/1981 Benton
4,310,163 A 1/1982 Pippert
4,336,081 A 6/1982 Hijikata et al.
4,345,739 A 8/1982 Wheatley
4,354,882 A 10/1982 Greer
4,366,971 A 1/1983 Lula
4,368,894 A 1/1983 Parmann
4,373,750 A 2/1983 Mantelle et al.
4,376,528 A 3/1983 Ohshimatani et al.
4,379,482 A 4/1983 Suzuki et al.
4,384,737 A 5/1983 Reusser
4,406,561 A 9/1983 Ewing
4,407,681 A 10/1983 Ina et al.
4,426,095 A 1/1984 Buttner
4,445,265 A 5/1984 Olson et al.
4,473,471 A 9/1984 Robichaud et al.
4,475,839 A 10/1984 Strandberg
4,491,725 A 1/1985 Pritchard
4,506,432 A 3/1985 Smith
4,526,628 A 7/1985 Ohno et al.
4,527,815 A 7/1985 Frick
4,564,392 A 1/1986 Ohhashi et al.
4,570,982 A 2/1986 Blose et al.
4,591,195 A 5/1986 Chelette et al.
4,592,558 A 6/1986 Hopkins
4,601,491 A 7/1986 Bell, Jr. et al.
4,602,807 A 7/1986 Bowers
4,623,173 A 11/1986 Handa et al.
4,629,218 A 12/1986 Dubois
4,662,659 A 5/1987 Blose et al.
4,674,756 A 6/1987 Fallon et al.
4,688,832 A 8/1987 Ortloff et al.
4,706,997 A 11/1987 Carstensen
4,710,245 A 12/1987 Roether
4,721,536 A 1/1988 Koch et al.
4,758,025 A 7/1988 Frick
4,762,344 A 8/1988 Perkins et al.
4,812,182 A 3/1989 Fang et al.
4,814,141 A 3/1989 Imai et al.
4,844,517 A 7/1989 Beiley et al.
4,856,828 A 8/1989 Kessler et al.
4,955,645 A 9/1990 Weems
4,958,862 A 9/1990 Cappelli et al.
4,988,127 A 1/1991 Cartensen
5,007,665 A 4/1991 Bovisio et al.
5,067,874 A 11/1991 Foote
5,137,310 A 8/1992 Noel et al.
5,143,381 A 9/1992 Temple
5,154,534 A 10/1992 Guerin et al.
5,180,008 A 1/1993 Aldridge et al.
5,191,911 A 3/1993 Dubois
5,242,199 A 9/1993 Hann et al.
5,328,158 A 7/1994 Lewis et al.
5,348,350 A 9/1994 Blose et al.
5,352,406 A 10/1994 Barteri et al.
5,360,239 A 11/1994 Klementich
5,449,420 A 9/1995 Okada et al.
5,454,883 A 10/1995 Yoshie et al.
5,456,405 A * 10/1995 Stagg ................. B21C 37/0826
228/125
5,505,502 A 4/1996 Smith et al.
5,515,707 A 5/1996 Smith
5,538,566 A 7/1996 Gallagher
5,592,988 A 1/1997 Meroni et al.
5,598,735 A 2/1997 Saito et al.
5,653,452 A 8/1997 Järvenkylä
5,712,706 A 1/1998 Castore et al.
5,794,985 A 8/1998 Mallis
5,810,401 A 9/1998 Mosing et al.
5,860,680 A 1/1999 Drijver et al.
5,879,030 A 3/1999 Clayson et al.
5,879,474 A 3/1999 Bhadeshia et al.
5,944,921 A 8/1999 Cumino et al.
5,993,570 A 11/1999 Gray
6,006,789 A 12/1999 Toyooka et al.
6,030,470 A 2/2000 Hensger et al.
6,044,539 A 4/2000 Guzowski
6,045,165 A 4/2000 Sugino et al.
6,056,324 A 5/2000 Reimert et al.
6,070,912 A 6/2000 Latham
6,173,968 B1 1/2001 Nelson et al.
6,188,037 B1 2/2001 Hamada et al.
6,196,530 B1 3/2001 Muhr et al.
6,217,676 B1 4/2001 Takabe et al.
6,248,187 B1 6/2001 Asahi et al.
6,267,828 B1 7/2001 Kushida et al.
6,311,965 B1 11/2001 Muhr et al.
6,331,216 B1 12/2001 Toyooka et al.
6,347,814 B1 2/2002 Cerruti
6,349,979 B1 2/2002 Noel et al.
6,358,336 B1 3/2002 Miyata
6,384,388 B1 5/2002 Anderson et al.
6,412,831 B1 7/2002 Noel et al.
6,447,025 B1 9/2002 Smith
6,478,344 B2 11/2002 Pallini, Jr. et al.
6,481,760 B1 11/2002 Noel et al.
6,494,499 B1 12/2002 Galle, Sr. et al.
6,514,359 B2 2/2003 Kawano
6,527,056 B2 3/2003 Newman
6,540,848 B2 4/2003 Miyata et al.
6,550,822 B2 4/2003 Mannella et al.
6,557,906 B1 5/2003 Carcagno
6,558,484 B1 5/2003 Onoe et al.
6,581,940 B2 6/2003 Dittel
6,632,296 B2 10/2003 Yoshinaga et al.
6,648,991 B2 11/2003 Turconi et al.
6,669,285 B1 12/2003 Park et al.
6,669,789 B1 12/2003 Edelman et al.
6,682,610 B1 1/2004 Inoue
6,683,834 B2 1/2004 Ohara et al.
6,709,534 B2 3/2004 Kusinski et al.
6,752,436 B1 6/2004 Verdillon
6,755,447 B2 6/2004 Galle, Jr. et al.
6,764,108 B2 7/2004 Ernst et al.
6,767,417 B2 7/2004 Fujita et al.
6,814,358 B2 11/2004 Keck
6,851,727 B2 2/2005 Carcagno et al.
6,857,668 B2 2/2005 Otten et al.
6,883,804 B2 4/2005 Cobb
6,905,150 B2 6/2005 Carcagno et al.
6,921,110 B2 7/2005 Morotti et al.
6,958,099 B2 10/2005 Nakamura et al.
6,971,681 B2 12/2005 Dell'Erba et al.
6,991,267 B2 1/2006 Ernst et al.
7,014,223 B2 3/2006 Della Pina et al.
7,066,499 B2 6/2006 Della Pina et al.
7,074,283 B2 7/2006 Omura

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,083,686 | B2 | 8/2006 | Itou | |
| 7,108,063 | B2 | 9/2006 | Carstensen | |
| 7,118,637 | B2 | 10/2006 | Kusinski et al. | |
| 7,182,140 | B2 | 2/2007 | Wood | |
| 7,214,278 | B2 | 5/2007 | Kusinski et al. | |
| 7,255,374 | B2 | 8/2007 | Carcagno et al. | |
| 7,264,684 | B2 | 9/2007 | Numata et al. | |
| 7,284,770 | B2 | 10/2007 | Dell'erba et al. | |
| 7,310,867 | B2 | 12/2007 | Corbett, Jr. | |
| 7,431,347 | B2 | 10/2008 | Ernst et al. | |
| 7,464,449 | B2 | 12/2008 | Santi et al. | |
| 7,475,476 | B2 | 1/2009 | Roussie | |
| 7,478,842 | B2 | 1/2009 | Reynolds, Jr. et al. | |
| 7,506,900 | B2 | 3/2009 | Carcagno et al. | |
| 7,621,034 | B2 | 11/2009 | Roussie | |
| 7,635,406 | B2 | 12/2009 | Numata et al. | |
| 7,735,879 | B2 | 6/2010 | Toscano et al. | |
| 7,744,708 | B2 | 6/2010 | López et al. | |
| 7,753,416 | B2 | 7/2010 | Mazzaferro et al. | |
| 7,862,667 | B2 | 1/2011 | Turconi et al. | |
| 8,002,910 | B2 | 8/2011 | Tivelli et al. | |
| 8,007,601 | B2 | 8/2011 | López et al. | |
| 8,007,603 | B2 | 8/2011 | Garcia et al. | |
| 8,016,362 | B2 | 9/2011 | Itoga | |
| 8,262,094 | B2 | 9/2012 | Beele | |
| 8,262,140 | B2 | 9/2012 | Santi et al. | |
| 8,317,946 | B2 | 11/2012 | Arai et al. | |
| 8,328,958 | B2 | 12/2012 | Turconi et al. | |
| 8,328,960 | B2 | 12/2012 | Gomez et al. | |
| 8,333,409 | B2 | 12/2012 | Santi et al. | |
| 8,414,715 | B2 | 4/2013 | Altschuler et al. | |
| 8,544,304 | B2 | 10/2013 | Santi | |
| 8,636,856 | B2 | 1/2014 | Altschuler et al. | |
| 8,821,653 | B2 | 9/2014 | Anelli et al. | |
| 8,840,152 | B2 | 9/2014 | Carcagno et al. | |
| 8,926,771 | B2 | 1/2015 | Agazzi | |
| 9,004,544 | B2 | 4/2015 | Carcagno et al. | |
| 9,163,296 | B2 * | 10/2015 | Valdez | C21D 8/105 |
| 9,187,811 | B2 | 11/2015 | Gomez et al. | |
| 9,222,156 | B2 | 12/2015 | Altschuler et al. | |
| 9,234,612 | B2 | 1/2016 | Santi et al. | |
| 9,340,847 | B2 | 5/2016 | Altschuler et al. | |
| 9,383,045 | B2 | 7/2016 | Santi et al. | |
| 9,598,746 | B2 | 3/2017 | Anellie et al. | |
| 2001/0035235 | A1 | 11/2001 | Kawano | |
| 2002/0011284 | A1 | 1/2002 | Von Hagen et al. | |
| 2002/0153671 | A1 | 10/2002 | Raymond et al. | |
| 2002/0158469 | A1 | 10/2002 | Mannella et al. | |
| 2003/0019549 | A1 | 1/2003 | Turconi et al. | |
| 2003/0111146 | A1 | 6/2003 | Kusinski et al. | |
| 2003/0116238 | A1 | 6/2003 | Fujita | |
| 2003/0155052 | A1 | 8/2003 | Kondo et al. | |
| 2003/0165098 | A1 | 9/2003 | Ohara et al. | |
| 2003/0168859 | A1 | 9/2003 | Watts | |
| 2004/0118490 | A1 | 6/2004 | Klueh et al. | |
| 2004/0118569 | A1 | 6/2004 | Brill et al. | |
| 2004/0131876 | A1 | 7/2004 | Ohgami et al. | |
| 2004/0139780 | A1 | 7/2004 | Cai et al. | |
| 2004/0187971 | A1 | 9/2004 | Omura | |
| 2004/0195835 | A1 | 10/2004 | Noel et al. | |
| 2004/0262919 | A1 | 12/2004 | Dutilleul et al. | |
| 2005/0012278 | A1 | 1/2005 | Delange | |
| 2005/0076975 | A1 | 4/2005 | Lopez | |
| 2005/0087269 | A1 | 4/2005 | Merwin | |
| 2005/0093250 | A1 | 5/2005 | Santi et al. | |
| 2005/0166986 | A1 | 8/2005 | Dell'erba et al. | |
| 2006/0006600 | A1 | 1/2006 | Roussie | |
| 2006/0124211 | A1 | 6/2006 | Takano et al. | |
| 2006/0137781 | A1 | 6/2006 | Kusinski et al. | |
| 2006/0157539 | A1 | 7/2006 | Dubois | |
| 2006/0169368 | A1 | 8/2006 | Lopez et al. | |
| 2006/0231168 | A1 | 10/2006 | Nakamura et al. | |
| 2006/0243355 | A1 | 11/2006 | Haiderer et al. | |
| 2006/0273586 | A1 | 12/2006 | Reynolds, Jr. et al. | |
| 2007/0039149 | A1 | 2/2007 | Roussie | |
| 2007/0089813 | A1 | 4/2007 | Tivelli | |
| 2007/0137736 | A1 | 6/2007 | Omura et al. | |
| 2007/0216126 | A1 | 9/2007 | Lopez et al. | |
| 2007/0246219 | A1 | 10/2007 | Manella et al. | |
| 2008/0047635 | A1 | 2/2008 | Kondo et al. | |
| 2008/0115863 | A1 | 5/2008 | McCrink et al. | |
| 2008/0129044 | A1 | 6/2008 | Carcagno et al. | |
| 2008/0219878 | A1 | 9/2008 | Kondo et al. | |
| 2008/0226396 | A1 | 9/2008 | Garcia et al. | |
| 2008/0226491 | A1 | 9/2008 | Satou et al. | |
| 2008/0257459 | A1 | 10/2008 | Arai et al. | |
| 2008/0264129 | A1 | 10/2008 | Cheppe et al. | |
| 2008/0303274 | A1 | 12/2008 | Mazzaferro et al. | |
| 2008/0314481 | A1 | 12/2008 | Garcia et al. | |
| 2009/0010794 | A1 | 1/2009 | Turconi et al. | |
| 2009/0033087 | A1 | 2/2009 | Carcagno et al. | |
| 2009/0047166 | A1 | 2/2009 | Tomomatsu et al. | |
| 2009/0101242 | A1 | 4/2009 | Lopez et al. | |
| 2009/0114318 | A1 | 5/2009 | Arai et al. | |
| 2009/0226988 | A1 | 9/2009 | Satou et al. | |
| 2010/0136363 | A1 | 6/2010 | Valdez et al. | |
| 2010/0187808 | A1 | 7/2010 | Santi | |
| 2010/0193085 | A1 | 8/2010 | Garcia | |
| 2010/0206553 | A1 | 8/2010 | Bailey et al. | |
| 2010/0294401 | A1 | 11/2010 | Gomez | |
| 2010/0319814 | A1 | 12/2010 | Perez | |
| 2010/0327550 | A1 | 12/2010 | Lopez | |
| 2011/0042946 | A1 | 2/2011 | Santi | |
| 2011/0077089 | A1 | 3/2011 | Hirai et al. | |
| 2011/0097235 | A1 | 4/2011 | Turconi et al. | |
| 2011/0133449 | A1 | 6/2011 | Mazzaferro | |
| 2011/0233925 | A1 | 9/2011 | Pina | |
| 2011/0247733 | A1 | 10/2011 | Arai et al. | |
| 2011/0259482 | A1 | 10/2011 | Peters et al. | |
| 2011/0284137 | A1 * | 11/2011 | Kami et al. | 148/504 |
| 2012/0018056 | A1 | 1/2012 | Nakagawa et al. | |
| 2012/0186686 | A1 | 7/2012 | Valdez | |
| 2012/0199255 | A1 | 8/2012 | Anelli | |
| 2012/0267014 | A1 | 10/2012 | Hitoshio et al. | |
| 2013/0000790 | A1 | 1/2013 | Arai et al. | |
| 2013/0004787 | A1 | 1/2013 | Ishiyama et al. | |
| 2013/0199674 | A1 * | 8/2013 | Altschuler et al. | 148/328 |
| 2013/0264123 | A1 * | 10/2013 | Altschuler et al. | 175/325.2 |
| 2014/0021244 | A1 | 1/2014 | DuBois | |
| 2014/0027497 | A1 | 1/2014 | Rowland et al. | |
| 2014/0057121 | A1 * | 2/2014 | Altschuler et al. | 428/544 |
| 2014/0137992 | A1 | 5/2014 | Ishiguro et al. | |
| 2014/0251512 | A1 | 9/2014 | Gomez | |
| 2014/0299235 | A1 | 10/2014 | Anelli | |
| 2014/0299236 | A1 | 10/2014 | Anelli | |
| 2015/0368986 | A1 | 12/2015 | Narikawa et al. | |
| 2016/0024625 | A1 | 1/2016 | Valdez | |
| 2016/0102856 | A1 | 4/2016 | Minami | |
| 2016/0305192 | A1 | 10/2016 | Buhler | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2319926 | | 7/2008 |
| CN | 1401809 | | 3/2003 |
| CN | 1487112 | | 4/2004 |
| CN | 1292429 | | 12/2006 |
| CN | 101480671 | | 7/2009 |
| CN | 101542002 | | 9/2009 |
| CN | 101613829 | A | 12/2009 |
| CN | 101413089 | | 11/2010 |
| DE | 3310226 | A1 | 10/1984 |
| DE | 4446806 | | 5/1996 |
| EA | 010037 | | 6/2008 |
| EA | 012256 | | 8/2009 |
| EP | 0 032 265 | | 7/1981 |
| EP | 0 092 815 | | 11/1983 |
| EP | 0 104 720 | | 4/1984 |
| EP | 0 159 385 | | 10/1985 |
| EP | 0 309 179 | | 3/1989 |
| EP | 0 340 385 | | 11/1989 |
| EP | 0 329 990 | | 11/1992 |
| EP | 0 658 632 | | 6/1995 |
| EP | 0 753 595 | | 1/1997 |
| EP | 0788850 | | 8/1997 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 828 007 | A | 3/1998 |
| EP | 0 989 196 | | 3/2000 |
| EP | 1 008 660 | | 6/2000 |
| EP | 0 1 027 944 | | 8/2000 |
| EP | 1 065 423 | | 1/2001 |
| EP | 828 007 | | 11/2001 |
| EP | 1 269 059 | | 1/2003 |
| EP | 1 277 848 | | 1/2003 |
| EP | 1 288 316 | | 3/2003 |
| EP | 1 296 088 | | 3/2003 |
| EP | 1 362977 | | 11/2003 |
| EP | 1 413 639 | | 4/2004 |
| EP | 1 182 268 | | 9/2004 |
| EP | 1 705 415 | | 9/2006 |
| EP | 1 717 324 | | 11/2006 |
| EP | 1 726 861 | | 11/2006 |
| EP | 1 876 254 | | 1/2008 |
| EP | 1 914 324 | | 4/2008 |
| EP | 2 000 629 | | 12/2008 |
| EP | 1 554 518 | | 1/2009 |
| EP | 2 028 284 | | 2/2009 |
| EP | 2 133 442 | | 12/2009 |
| EP | 2 216 576 | | 8/2010 |
| EP | 2 239 343 | | 10/2010 |
| FR | 1 149 513 | A | 12/1957 |
| FR | 1489013 | | 7/1967 |
| FR | 2 704 042 | A | 10/1994 |
| FR | 2 848 282 | A1 | 6/2004 |
| FR | 2855587 | | 12/2004 |
| GB | 498 472 | | 1/1939 |
| GB | 1 398 214 | | 6/1973 |
| GB | 1 428 433 | | 3/1976 |
| GB | 2 104 919 | A | 3/1983 |
| GB | 2 234 308 | A | 1/1991 |
| GB | 2 276 647 | | 10/1994 |
| GB | 2 388 169 | A | 11/2003 |
| JP | 58-187684 | | 12/1983 |
| JP | 60-086209 | | 5/1985 |
| JP | S60 116796 | A | 6/1985 |
| JP | 60-215719 | A | 10/1985 |
| JP | 36025719 | | 10/1985 |
| JP | S61-103061 | | 5/1986 |
| JP | 61 270355 | | 11/1986 |
| JP | 63 004046 | A2 | 1/1988 |
| JP | 63 004047 | A2 | 1/1988 |
| JP | 63-230847 | A2 | 9/1988 |
| JP | 63230851 | A2 | 9/1988 |
| JP | 01-242761 | A | 9/1989 |
| JP | 01 259124 | A2 | 10/1989 |
| JP | 01 259125 | A2 | 10/1989 |
| JP | 01 283322 | A2 | 11/1989 |
| JP | 05-098350 | | 12/1990 |
| JP | 403006329 | A | 1/1991 |
| JP | 04 021718 | A2 | 1/1992 |
| JP | 04 107214 | | 4/1992 |
| JP | 04 231414 | A2 | 8/1992 |
| JP | 05 287381 | A2 | 11/1993 |
| JP | H06-042645 | | 2/1994 |
| JP | 06-093339 | | 4/1994 |
| JP | 06 172859 | A2 | 6/1994 |
| JP | 06-220536 | | 8/1994 |
| JP | 07-003330 | | 1/1995 |
| JP | 07 041856 | A2 | 2/1995 |
| JP | 07-139666 | | 5/1995 |
| JP | 07 197125 | A2 | 8/1995 |
| JP | 08 311551 | | 11/1996 |
| JP | 09 067624 | A2 | 3/1997 |
| JP | 09-235617 | | 9/1997 |
| JP | 2704042 | | 10/1997 |
| JP | 10 140250 | | 5/1998 |
| JP | 10 176239 | | 6/1998 |
| JP | 10 280037 | A | 10/1998 |
| JP | 11 050148 | A | 2/1999 |
| JP | 11 140580 | | 5/1999 |
| JP | 11 229079 | | 8/1999 |
| JP | 2000-063940 | | 2/2000 |
| JP | 2000-178645 | | 6/2000 |
| JP | 2000-248337 | A | 9/2000 |
| JP | 2000-313919 | A2 | 11/2000 |
| JP | 2001-131698 | | 5/2001 |
| JP | 2001-164338 | | 6/2001 |
| JP | 2001-172739 | A2 | 6/2001 |
| JP | 2001-271134 | | 10/2001 |
| JP | 2002-096105 | A2 | 4/2002 |
| JP | 2002-130554 | | 5/2002 |
| JP | 2004-011009 | | 1/2004 |
| JP | 2007-031769 | | 7/2005 |
| JP | 60 174822 | | 9/2005 |
| KR | 0245031 | | 3/2000 |
| UA | 51138 | A | 11/2002 |
| WO | WO 84/02947 | | 8/1984 |
| WO | WO 94/29627 | | 12/1994 |
| WO | WO 96/22396 | | 7/1996 |
| WO | WO 00/06931 | | 2/2000 |
| WO | WO 00/70107 | | 11/2000 |
| WO | WO 01/75345 | | 10/2001 |
| WO | WO 01/88210 | | 11/2001 |
| WO | WO 02/29290 | | 4/2002 |
| WO | WO 02/35128 | | 5/2002 |
| WO | WO 02/068854 | | 9/2002 |
| WO | WO 02/086369 | | 10/2002 |
| WO | WO 02/093045 | | 11/2002 |
| WO | WO 03/033856 | | 4/2003 |
| WO | WO 03/048623 | | 6/2003 |
| WO | WO 03/087646 | | 10/2003 |
| WO | WO 2004/023020 | | 3/2004 |
| WO | WO 2004/031420 | | 4/2004 |
| WO | WO 2004/033951 | | 4/2004 |
| WO | WO 2004/053376 | | 6/2004 |
| WO | WO 2004/097059 | | 11/2004 |
| WO | WO 2004/109173 | | 12/2004 |
| WO | WO 2006/003775 | | 6/2005 |
| WO | WO 2006/009142 | | 1/2006 |
| WO | WO 2006/087361 | | 4/2006 |
| WO | WO 2006/078768 | | 7/2006 |
| WO | WO 2007/002576 | | 1/2007 |
| WO | WO 2007/017082 | | 2/2007 |
| WO | WO 2007/017161 | | 2/2007 |
| WO | WO 2007/023806 | | 3/2007 |
| WO | WO 2007/028443 | | 3/2007 |
| WO | WO 2007/034063 | | 3/2007 |
| WO | WO 2007/063079 | | 6/2007 |
| WO | WO 2008/003000 | | 1/2008 |
| WO | WO 2008/007737 | | 1/2008 |
| WO | WO 2008/090411 | | 7/2008 |
| WO | WO 2008/110494 | | 9/2008 |
| WO | WO 2008/127084 | | 10/2008 |
| WO | WO 2009/000851 | | 12/2008 |
| WO | WO 2009/000766 | | 1/2009 |
| WO | WO 2009/010507 | | 1/2009 |
| WO | WO 2009/027308 | | 3/2009 |
| WO | WO 2009/027309 | | 3/2009 |
| WO | WO 2009/044297 | | 4/2009 |
| WO | WO 2009/065432 | | 5/2009 |
| WO | WO 2009/106623 | | 9/2009 |
| WO | WO 2010/061882 | | 6/2010 |
| WO | WO 2010/122431 | | 10/2010 |
| WO | WO 2011/152240 | | 12/2011 |
| WO | WO 2013/007729 | | 1/2013 |

OTHER PUBLICATIONS

European Search Report and Opinion, re EPO Application No. EP 14159174.3, dated Jul. 3, 2014.

Chitwood, G. B., et al.: "High-Strength Coiled Tubing Expands Service Capabilities", as presented at the 24th Annual OTC in Houston, Texas, May 4-7, 1992, in 15 pages.

European Extended Search Report re EPO Application No. 12152516.6, dated Jun. 25, 2012.

Hollomon, J.H., et al., Time-tempered Relations in Tempering Steel. New York Meeting, pp. 223-249, 1945.

(56) **References Cited**

OTHER PUBLICATIONS

International Standard Publication. Petroleum and natural gas industries—Materials for use in H2Scontaining environments in oil and gas production. ANSI/NACE ISO, 145 pages, 2009.
Pollack, Herman, W., Materials Science and Metallurgy, Fourth Edition, pp. 96 and 97, 1988.
Tenaris brochure. Coiled Tubes HS80CRA, 2 pages, 2008.
Tenaris brochure. Coiled Tubes Suggested Field Welding Procedure (GTAW) for Coiled Tubing Grads HS70, HS80, HS90, HS11 0, 3 pages, 2007.
Tenaris brochure. Coiled Tubing for Downhole Applications, 10 pages, 2007.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 1: Non-alloy Steel Tubes with Specified Room Temperature Properties" British Standard BS EN 10216-1:2002 E:1-26, published May 2002.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 2: Non-alloy and Alloy Steel Tubes with Specified Elevated Temperature Properties" British Standard BS EN 10216-2:2002+A2:2007:E:1-45, published Aug. 2007.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 3: Alloy Fine Grain Steel Tubes" British Standard BS EN 10216-3:2002 +A1:2004 E:1-34, published Mar. 2004.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 4: Non-alloy and Alloy Steel Tubes with Specified Low Temperature Properties" British Standard BS EN 10216-4:2002 + A1:2004 E:1-30, published Mar. 2004.
Aggarwal, R. K., et al.: "Qualification of Solutions for Improving Fatigue Life at SCR Touch Down Zone", Deep Offshore Technology Conference, Nov. 8-10, 2005, Vitoria, Espirito Santo, Brazil, in 12 pages.
Anelli, E., D. Colleluori, M. Pontremoli, G. Cumino, A. Izquierdo, H. Quintanilla, "Metallurgical design of advanced heavy wall seamless pipes for deep-water applications", 4th International Conference on Pipeline Technology, May 9 to 13, 2004, Ostend, Belgium.
Asahi, et al., Development of Ultra-high-strength Linepipe, X120, Nippon Steel Technical Report, Jul. 2004, Issue 90, pp. 82-87.
ASM Handbook, Mechanical Tubing and Cold Finishing, Metals Handbook Desk Edition, (2000), 5 pages.
Bai, M., D. Liu, Y. Lou, X. Mao, L. Li, X. Huo, "Effects of Ti addition on low carbon hot strips produced by CSP process", Journal of University of Science and Technology Beijing, 2006, vol. 13, N° 3, p. 230.
Beretta, Stefano et al., "Fatigue Assessment of Tubular Automotive Components in Presence of Inhomogeneities", Proceedings of IMECE2004, ASME International Mechanical Engineering Congress, Nov. 13-19, 2004, pp. 1-8.
Berner, Robert A., "Tetragonal Iron Sulfide", Science, Aug. 31, 1962, vol. 137, Issue 3531, pp. 669.
Berstein et al.,"The Role of Traps in the Microstructural Control of Hydrogen Embrittlement of Steels" Hydrogen Degradation of Ferrous Alloys, Ed. T. Oriani, J. Hirth, and M. Smialowski, Noyes Publications, 1988, pp. 641-685.
Boulegue, Jacques, "Equilibria in a sulfide rich water from Enghien-les-Bains, France", Geochimica et Cosmochimica Acta, Pergamon Press, 1977, vol. 41, pp. 1751-1758, Great Britain.
Bruzzoni et al., "Study of Hydrogen Permeation Through Passive Films on Iron Using Electrochemical Impedance Spectroscopy", PhD Thesis, 2003, Universidad Nacional del Comahue de Buenos Aires, Argentina.
Cancio et al., "Characterization of microalloy precipitates in the austenitic range of high strength low alloy steels", Steel Research, 2002, vol. 73, pp. 340-346.
Carboni, A., A. Pigani, G. Megahed, S. Paul, "Casting and rolling of API X 70 grades for artic application in a thin slab rolling plant", Stahl u Eisen, 2008, N° 1, p. 131-134.
Chang, L.C., "Microstructures and reaction kinetics of bainite transformation in Si-rich steels," XP0024874, Materials Science and Engineering, vol. 368, No. 1-2, Mar. 15, 2004, pp. 175-182, Abstract, Table 1.
Clark, A. Horrell, "Some Comments on the Composition and Stability Relations of Mackinawite", Neues Jahrbuch fur Mineralogie, 1966, vol. 5, pp. 300-304, London, England.
Craig, Bruce D., "Effect of Copper on the Protectiveness of Iron Sulfide Films", Corrosion, National Association of Corrosion Engineers, 1984, vol. 40, Issue 9, pp. 471-474.
D.O.T. 178.68 Spec. 39, pp. 831-840, Non reusable (non refillable) cylinders, Oct. 1, 2002.
De Medicis, Rinaldo, "Cubic FeS, A Metastable Iron Sulfide", Science, American Association for the Advancement of Science, Steenbock Memorial Library, Dec. 11, 1970, vol. 170, Issue 3963, pp. 723-728.
Drill Rod Joint Depth Capacity Chart, downloaded Jan. 15, 2013; http://www.boartlongyear.com/drill-rod-joint-depth-capacity-chart.
Echaniz, G., Morales, C., Perez, T., "Advances in Corrosion Control and Materials in Oil and Gas Production" Papers from Eurocorr 97 and Eurocorr 98, 13, P. S. Jackman and L.M. Smith, Published for the European Federation of Corrosion, No. 26, European Federation of Corrosion Publications, 1999.
Fang, Hong-Sheng, et al.: "The Developing Prospect of Air-cooled Bainitic Steels", International Journal of Issi, vol. 2, No. 2, Feb. 1, 2005, pp. 9-18.
Fratini et al.: "Improving friction stir welding of blanks of different thicknesses," Materials Science and Engineering A 459 (2007).
Gojic, Mirko and Kosec, Ladislav, "The Susceptibility to the Hydrogen Embrittlement of Low Alloy Cr and CrMo Steels", ISIJ International, 1997, vol. 37, Issue 4, pp. 412-418.
Heckmann, et al., Development of low carbon Nb-Ti-B microalloyed steels for high strength large diameter linepipe, Ironmaking and Steelmaking, 2005, vol. 32, Issue 4, pp. 337-341.
Howells, et al.: "Challenges for Ultra-Deep Water Riser Systems", IIR, London, Apr. 1997, 11 pages.
Iino et al., "Aciers pour pipe-lines resistant au cloquage et au criquage dus a l'hydrogene", Revue de Metallurgie, 1979, vol. 76, Issue 8-9, pp. 591-609.
Ikeda et al., "Influence of Environmental Conditions and Metallurgical Factors on Hydrogen Induced Cracking of Line Pipe Steel", Corrosion/80, National Association of Corrosion Engineers, 1980, vol. 8, pp. 8/1-8/18, Houston, Texas.
Izquierdo, et al.: "Qualification of Weldable X65 Grade Riser Sections with Upset Ends to Improve Fatigue Performance of Deepwater Steel Catenary Risers", Proceedings of the Eighteenth International Offshore and Polar Engineering Conference, Vancouver, BC, Canada, Jul. 6-11, 2008, p. 71.
Johnston, P. W., G.Brooks, "Effect of Al2O3 and TiO2 Additions on the Lubrication Characteristics of Mould Fluxes", Molten Slags, Fluxes and Salts '97 Conference, 1997 pp. 845-850.
Keizer, Joel, "Statistical Thermodynamics of Nonequilibrium Processes", Springer-Verlag, 1987.
Kishi, T., H.Takeucgi, M.Yamamiya, H.Tsuboi, T.Nakano, T.Ando, "Mold Powder Technology for Continuous Casting of Ti-Stabilized Stainless Steels", Nippon Steel Technical Report, No. 34, Jul. 1987, pp. 11-19.
Korolev, D. F., "The Role of Iron Sulfides in the Accumulation of Molybdenum in Sedimentary Rocks of the Reduced Zone", Geochemistry, 1958, vol. 4, pp. 452-463.
Lee, Sung Man and Lee, Jai Young, "The Effect of the Interface Character of TiC Particles on Hydrogen Trapping in Steel", Acta Metall., 1987, vol. 35, Issue 11, pp. 2695-2700.
Mehling, Wilfred L.: "Hot Upset Forging," ASM Handbook vol. 14, 1998, pp. 84-95.
Mishael, et al., "Practical Applications of Hydrogen Permeation Monitoring," Corrosion, Mar. 28-Apr. 1, 2004, Corrosion 2004, Nacional Association of Corrosion Engineers, vol. Reprint No. 04476.
Morice et al., "Möessbauer Studies of Iron Sulfides", J. Inorg. Nucl. Chem., 1969, vol. 31, pp. 3797-3802.

(56) **References Cited**

OTHER PUBLICATIONS

Mukongo, T., P.C.Pistorius, and A.M.Garbers-Craig, "Viscosity Effect of Titanium Pickup by Mould Fluxes for Stainless Steel", Ironmaking and Steelmaking, 2004, vol. 31, No. 2, pp. 135-143.
Mullet et al., "Surface Chemistry and Structural Properties of Mackinawite Prepared by Reaction of Sulfide Ions with Metallic Iron", Geochimica et Cosmochimica Acta, 2002, vol. 66, Issue 5, pp. 829-836.
Murcowchick, James B. and Barnes, H.L., "Formation of a cubic FeS", American Mineralogist, 1986, vol. 71, pp. 1243-1246.
Nagata, M., J. Speer, D. Matlock, "Titanium nitride precipitation behavior in thin slab cast high strength low alloyed steels", Metallurgical and Materials Transactions A, 2002 ,vol. 33A, p. 3099-3110.
Nakai et al., "Development of Steels Resistant to Hydrogen Induced Cracking in Wet Hydrogen Sulfide Environment", Transactions of the ISIJ, 1979, vol. 19, pp. 401-410.
Nandan et al.: "Recent advances in friction-stir welding—Process, weldment structure and properties," Progress in Materials Science 53 (2008) 980-1023.
Pressure Equipment Directive 97/23/EC, May 29, 1997, downloaded from website:http://ec.europa.eu/enterprise/pressure_equipment/ped/index_en.html on Aug. 4, 2010.
Prevéy, Paul, et al., "Introduction of Residual Stresses to Enhance Fatigue Performance in the Initial Design", Proceedings of Turbo Expo 2004, Jun. 14-17, 2004, pp. 1-9.
Rickard, D.T., "The Chemistry of Iron Sulphide Formation at Low Temperatures", Stockholm Contrib. Geol., 1969, vol. 26, pp. 67-95.
Riecke, Ernst and Bohnenkamp, Konrad, "Uber den Einfluss von Gittersoerstellen in Eisen auf die Wassersroffdiffusion", Z. Metallkde . . . , 1984, vol. 75, pp. 76-81.
Savatori et al.: European Commission Report, EUR 2006, EUR2207, 3 pp. STN_Abstract.
Shanabarger, M.R. and Moorhead, R. Dale, "H2O Adsorption onto clean oxygen covered iron films", Surface Science, 1996, vol. 365, pp. 614-624.
Shoesmith, et al., "Formation of Ferrous Monosulfide Polymorphs During Corrosion of Iron by Aqueous Hydrogen Sulfide at 21 degrees C", Journal of the Electrochemical Society, 1980, vol. 127, Issue 5, pp. 1007-1015.
Skoczylas, G., A.Dasgupta, R.Bommaraju, "Characterization of the chemical interactions during casting of High-titanium low carbon enameling steels", 1991 Steelmaking Conference Proceeding, pp. 707-717.
Smyth, D., et al.: Steel Tubular Products, Properties and Selection: Irons, Steels, and High-Performance Alloys, vol. 1, ASM Handbook, ASM International, 1990, p. 327-336.
Spry, Alan, "Metamorphic Textures", Perganon Press, 1969, New York.
Taira et al., "HIC and SSC Resistance of Line Pipes for Sour Gas Service, Nippon Kokan Technical Report", 1981, vol. 31, Issue 1-13.
Taira et al., "Study on the Evaluation of Environmental Condition of Wet Sour Gas", Corrosion 83 (Reprint. No. 156, National Association of Corrosion Engineers), 1983, pp. 156/2-156/13, Houston, Texas.
Takeno et al., "Metastable Cubic Iron Sulfide—With Special Reference to Mackinawite", American Mineralogist, 1970, vol. 55, pp. 1639-1649.
Tenaris Newsletter for Pipeline Services, Apr. 2005, p. 1-8.
Tenaris Newsletter for Pipeline Services, May 2003, p. 1-8.
Thethi, et al.: "Alternative Construction for High Pressure High Temperature Steel Catenary Risers", OPT USA, Sep. 2003, p. 1-13.
Thewlis, G., Weldability of X100 linepipe, Science and Technology of Welding and Joining, 2000, vol. 5, Issue 6, pp. 365-377.
Tivelli, M., G. Cumino, A. Izquierdo, E. Anelli, A. Di Schino, "Metallurgical Aspects of Heavy Wall—High Strength Seamless Pipes for Deep Water Applications", RioPipeline 2005, Oct. 17 to 19, 2005, Rio (Brasil), Paper n° IBP 1008_05.
Todoroki, T. Ishii, K. Mizuno, A. Hongo, "Effect of crystallization behavior of mold flux on slab surface quality of a Ti-bearing Fe—Cr—Ni super alloy cast by means of continuous casting process", Materials Science and Engineering A, 2005, vol. 413-414, p. 121-128.
Turconi, G. L.: "Improvement of resistance to SSC initiation and propagation of high strength OCTG through microstructure and precipitation control"; "Paper 01077", NACE International, Houston, TX, Mar. 16, 2001. (XP009141583).
Vaughan, D. J. and Ridout, M.S., "Moessbauer Studies of Some Sulphide Minerals", J. Inorg Nucl. Chem., 1971, vol. 33, pp. 741-746.
Wegst, C.W., "Stahlüssel", Auflage 1989, Seite 119, 2 pages.
Yu, et al.: "New steels and alloys in mechanical engineering / ed.," M: Mechanical Engineering, 1976, p. 19.
ASTM A 213/A 213M "Standard Specification for Seamless Ferritic and Austenitic Alloy-Steel Boiler, Superheater, and Heat-Exchanger Tubes".
ASTM A182/A182M "Standard Specification for Forged or Rolled Alloy and Stainless Steel Pipe Flanges, Forged Fittings, and Valves and Parts for High-Temperature Service".
ASTM A336/A336M "Standard Specification for Alloy Steel Forgings for Pressure and High-Temperature Parts".
ASTM A355 which is related to "Seamless Ferritic Alloy-Steel Pipe for High-Temperature Service".
ASTM, "E112-13 Standard Test Methods for Determining Average Grain Size," ASTM International. 2012. p. 1-28.
Davis, J.R., et al. "ASM—Speciality Handbook—Carbon and alloy steels" ASM Speciality Handbook, Carbon and Alloy Steels, 1996, pp. 12-27, XP002364757 US.
E. Anelli, et al., "Metallurgical Design of Advanced Heavy Wall Seamless pipes for Deepwater Applications", 4th International Conference on Pipeline Technology, May 9-13, 2004, Ostend, Belgium.
Echaniz, "The effect of microstructure on the KISSC of low alloy carbon steels", NACE Corrosion '98, EE. UU., Mar. 1998, pp. 22-27, San Diego.
Extrait du Catalogue N 940, 1994.
Fritz T et al, "Characterization of electroplated nickel", Microsystem Technologies, Dec. 31, 2002, vol. 9, No. 1-2, pp. 87-91, Berlin, DE.
Gomez, G., et al.: "Air cooled bainitic steels for strong, seamless pipes—Part 1—allowy design, kinetics and microstructure", Materials Science and Technology, vol. 25, No. 12, Dec. 1, 2009. (XP002611498).
Hutchings et al., "Ratio of Specimen thickness to charging area for reliable hydrogen permeation measurement", British Corrosion. Journal, 1993, vol. 28, Issue 4, pp. 309-312.
Jacobs, Lucinda and Emerson, Steven, "Trace Metal Solubility in an Anoxid Fjord", Earth and Planetary Sci. Letters, Elsevier Scientific Publishing Company, 1982, vol. 60, pp. 237-252, Amsterdam, Netherlands.
Kazutoshi Ohashi et al, "Evaluation of r-value of steels using Vickers hardness test", Journal of Physics: Conference Series, Aug. 7, 2012, p. 12045, vol. 379, No. 1, Institute of Physics Publishing, Bristol, GB.
Tivelli et al., "Metakkurgical Aspects of Heavy Wall—High Strength Seamless Pipes for Deep Water Applications", RioPipeline, Oct. 17-19, 2005, Rio, Brasil.
Mechanical Tubing and Cold Finishing, Metals Handbook Desk Edition, (2000), 5 pages.
NACE MR0175/ISO 15156-1 Petroleum and natural gas industries—Materials for use in H2S-containing Environments in oil and gas production—Part 1: General principles for selection of cracking-resistant materials, Jun. 28, 2007.
Specification for Threading, Gauging and Thread Inspection of Casing, Tubing, and Line Pipe Threads, American Petroleum Institute, Specification 5B, Apr. 2008, 15th Edition (Excerpts Only).

* cited by examiner


STD2 steel, AGS = 10-20 μm
Temperature (°C)
Times (s)
F
B
M
100°C/s
50°C/s
30°C/s
20°C/s
10°C/s
5°C/s
2.2°C/s
1°C/s

FIG. 1A


STD3 steel, AGS = 10-20 μm
Temperature (°C)
Times (s)
F
B
M
100°C/s
50°C/s
30°C/s
20°C/s
10°C/s
5°C/s
2.2°C/s
1°C/s

FIG. 1B



BTi2 steel, AGS = 10-20 µm
Temperature (°C)
800
700
600
500
400
300
200
100
1
10
100
1000
Times (s)
F + P
B
M
50°C/s
25°C/s
20°C/s
10°C/s
5°C/s
1°C/s


FIG. 2A



CrMoBTi3 steel, AGS = 10-20 µm
Temperature (°C)
800
700
600
500
400
300
200
100
1
10
100
1000
10000
Times (s)
F + P
B
M
40°C/s
15°C/s
5°C/s
1°C/s
0.2°C/s


FIG. 2B



Cooling in quenching heads:
internal
Cooling Rate (°C/s)
60
50
40
30
20
10
0
0,0
0,1
0,2
0,3
0,4
0,5
WT (inches)


FIG. 3



BTi2 steel
Strength (ksi)
150
140
130
120
110
100
90
80
70
No soaking (WT=0.2")
YS
UTS
550
575
600
625
650
675
700
Tmax (°C)
Tempering at 720°C
YS
UTS
1
2
3
4
5
6
7
8
9
10
Time at 720°C (min)


FIG. 4


HV
25kV
Spot
3.7
Mag
2000 x
Det
SE
WD
10mm
10 µm

FIG. 5B


HV
25kV
Spot
4.5
Mag
500 x
Det
SE
WD
10mm
50 µm

FIG. 5A


100 µm
Acc.V 25.0 kV
Spot 6.0
Mag 200x
Det SE
WD 10.0

FIG. 6A


20 µm
Acc.V 25.0 kV
Spot 5.0
Mag 1000x
Det SE
WD 9.9

FIG. 6B


500 µm
Acc.V Spot Mag Det WD
25.0 kV 6.0 500x BSE 10.5
Fracture surface
("cone")
500 µm
Acc.V Spot Mag Det WD
25.0 kV 6.0 50x SE 10.6

FIG. 7B

FIG. 7A


Acc.V 25.0 kV
Spot 4.5
Mag 1000x
Det SE
WD 10.1
20 μm

FIG. 8B


Acc.V 25.0 kV
Spot 3.7
Mag 1000x
Det SE
WD 9.9
20 μm

FIG. 8A


ERW line
Acc.V 25.0 kV
Spot 6.0
Mag 1000x
Det SE
WD 10.0
20 µm

FIG. 9B


ERW line
HV 25.0 kV
Spot 5.972
Mag 1000x
Det SE
WD 10mm
20 µm

FIG. 9A




FIG. 10B




FIG. 10A




FIG. 11B




FIG. 11A




FIG. 12


HAZ
FZ
HAZ
130%
125%
120%
115%
110%
105%
100%
95%
90%
% of base tube hardness
-15,0
-10,0
-5,0
0,0
5,0
10,0
15,0
Distance from the Bias Weld center line (mm)
Conventional BW
New Process Route

FIG. 13




FIG. 14B




FIG. 14A


HYDRAULIC ACTUATOR
BENDING MANDREL
COILED TUBE SAMPLE
STRAIGHTENING BLOCK
SAMPLE RESTRAINT

FIG. 15


Fatigue life at BW relative to BM (%)
0
20
40
60
80
100
120
Conventional
New Chem and Process

FIG. 16


Fatigue life improvement (%)
0
20
40
60
80
100
120
140
160
180
200
220
240
260
280
300
80
90
100
110
120
130
140
Minimum yield Strength (Ksi)

FIG. 17



FIG. 18B



FIG. 18A

# HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## RELATED APPLICATION

This application is related to Applicant's co-pending application entitled COILED TUBE WITH VARYING MECHANICAL PROPERTIES FOR SUPERIOR PERFORMANCE AND METHODS TO PRODUCE THE SAME BY A CONTINUOUS HEAT TREATMENT, Ser. No. 13/229,517, filed Sep. 9, 2011 and published as US 2012/0186686 A1 on Jul. 26, 2012, the entirety of which is hereby incorporated by reference.

## BACKGROUND

### Description of the Related Art

In recent years the use of coiled tubing has been expanded to applications that require high pressure and extended reach operations. As a consequence, there is a need to produce coiled tubing with elevated tensile properties in order to withstand: i) axial loads on hanging or pooling long strings, and ii) elevated pressures applied during operation.

The standard production of coiled tubing uses as raw material, hot rolled strips with mechanical properties achieved through microstructural refinement during rolling. This refinement is obtained with the use of different microalloying additions (Ti, N, V) as well as appropriate selection of hot rolling processing conditions. The objective is to control material recrystallization and grain growth in order to achieve an ultra-fine microstructure. The material is limited in the use of solid solution alloying elements and precipitation hardening, since refinement is the only mechanism that allows for high strength and toughness, simultaneously.

This raw material is specified to each supplier, and may require varying mechanical properties in the hot rolled steel in order to produce coiled tubes with varying mechanical properties as well. As the properties increase, the cost of production and hence the raw material cost also increases. It is known that the strip-to-strip welding process used during the assembly of the "long strip" that will be ERW formed/welded into the coiled tubing, deteriorates the joining area. Thereafter, the coiled tubing with increasing properties, tend to have a relatively lower performance on the area of the strip welds. This deterioration is caused by the fact that the welding processes destroys the refinement introduced during hot rolling, and there is no simple post weld heat treatment capable of regenerating both tensile and toughness properties. In general tensile is restored but toughness and its associated fatigue life are deteriorated in this zone. Current industrial route can produce high strength coiled tubing, only at elevated cost and with poor relative performance of strip welds joins with respect to pipe body.

One alternative for producing a coiled tubing is through a full body heat treatment. This treatment is applied to a material that has been formed into a pipe in the so called



"green" state, because its properties are yet to be defined by the heat treatment conditions. In this case the main variables affecting the final product properties are the steel chemistry and the heat treatments conditions. Thereafter, by appropriately combining steel composition with welding material and heat treatment, the coiled tubing could be produced with uniform properties across the length eliminating the weak link of the strip-to-strip join that is critical on high strength conventional coiled tubing. This general concept has been described before but never applied successfully to the production of high strength coiled tubing (yield strength in the range from 80 to 140 ksi). The reason being that the heat treatment at elevated line speed (needed to achieve high productivity) will generally result in the need for complicated and extended facilities. This process could be simplified if the appropriated chemistry and heat treatment conditions are selected.

The selection of the chemistry that is compatible with an industrial heat treatment facility of reasonable dimensions requires of an understanding of the many variables that affect coiled tubing performance measured as: a) Axial Mechanical Properties, b) Uniformity of Microstructure and Properties, c) Toughness, d) Fatigue Resistance, e) Sour Resistance, among others.

## SUMMARY

Below is described chemistry designed to produce a heat treated coiled tubing which is mostly outside current limits for coiled tubing as set by API 5ST standard. (Max.C:0.16%, Max.Mn:1.2% (CT70-90) Max.Mn:1.65 (CT100-110), Max.P:0.02% (CT70-90) Max.P:0.025 (CT100-CT110), Max.S:0.005, Si.Max:0.5).

Embodiments of this disclosure are for a coiled steel tube and methods of producing the same. The tube in some embodiments can comprise a yield strength higher than about 80 Ksi. The composition of the tube can comprise 0.16-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.35 wt. % silicon, up to 0.005 wt. % sulfur, up to 0.018 wt. % phosphorus, the remainder being iron and inevitable impurities. The tube can also comprise a final microstructure comprising a mixture of tempered martensite and bainite, wherein the final microstructure of the coiled tube comprises more than 90 volume % tempered martensite, wherein the microstructure is homogenous in pipe body, ERW line and strip end-to-end joints.

Disclosed herein is a coiled steel tube formed from a plurality of welded strips, wherein the tube can include base metal regions, weld joints, and their heat affected zones, and can comprise a yield strength greater than about 80 ksi, a composition comprising iron and, 0.17-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.30 wt. % silicon, 0.010-0.040 wt. % aluminum, up to 0.010 wt. % sulfur, and up to 0.015 wt. % phosphorus, and a final microstructure comprising a mixture of tempered martensite and bainite, wherein the final microstructure of the coiled tube comprises more than 90 volume % tempered martensite in the base metal regions, the weld joints, and the heat affected zones, wherein the final microstructure across all base metal regions, weld joints, and heat affected zones is homogeneous, and wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the composition further comprises, up to 1.0 wt. % chromium, up to 0.5 wt. % molybdenum, up to 0.0030 wt. % boron, up to 0.030 wt. % titanium, up to 0.50 wt. % copper, up to 0.50 wt. % nickel, up to 0.1 wt. %

niobium, up to 0.15 wt. % vanadium, up to 0.0050 wt. % oxygen, and up to 0.05 wt. % calcium.

In some embodiments, the composition can comprise 0.17 to 0.30 wt. % carbon, 0.30 to 1.60 wt. % manganese, 0.10 to 0.20 wt. % silicon, up to 0.7 wt. % chromium, up to 0.5 wt. % molybdenum, 0.0005 to 0.0025 wt. % boron, 0.010 to 0.025 wt. % titanium, 0.25 to 0.35 wt. % copper, 0.20 to 0.35 wt. % nickel, up to 0.04 wt. % niobium, up to 0.10 wt. % vanadium, up to 0.0015 wt. % oxygen, up to 0.03 wt. % calcium, up to 0.003 wt. % sulfur; and up to 0.010 wt. % phosphorus.

In some embodiments, the tube can have a minimum yield strength of 125 ksi. In some embodiments, the tube can have a minimum yield strength of 140 ksi. In some embodiments, the tube can have a minimum yield strength of between 125 ksi and 140 ksi.

In some embodiments, the final microstructure can comprise at least 95 volume % tempered martensite in the base metal regions, the weld joints, and the heat affected zones. In some embodiments, the tube can have a final grain size of below 20 μm in the base metal regions, the weld joints, and the heat affected zones. In some embodiments, the tube can have a final grain size of below 15 μm in the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the weld joints can comprise bias welds. In some embodiments, the fatigue life at the bias welds can be at least about 80% of the base metal regions. In some embodiments, the a percent hardness of a weld joint, including its heat affected zone, can be 110% or less than a hardness of the base metal.

Also disclosed herein is a method of forming a coiled steel tube which can comprise providing strips having a composition comprising iron and 0.17-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.30 wt. % silicon, 0.010-0.040 wt. % aluminum, up to 0.010 wt. % sulfur, up to 0.015 wt. % phosphorus, and welding the strips together, forming a tube from the welded strips, wherein the tube comprises base metal regions, joint welds, and their heat affected zones, austenitizing the tube between 900-1000° C., quenching the tube to form a final as quenched microstructure of martensite and bainite, wherein the as quenched microstructure comprises at least 90% martensite in the base metal regions, the weld joints, and the heat affected zones, and tempering the quenched tube between 550-720° C., wherein tempering of the quenched tube results in a yield strength greater than about 80 ksi, wherein the microstructure across all base metal regions, weld joints, and the heat affected zones is homogeneous, and wherein the microstructure comprises a uniform distribution of fine carbides across the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the welding the strips can comprise bias welding. In some embodiments, the forming the tube can comprise forming a line joint. In some embodiments, the method can further comprise coiling the tempered tube on a spool. In some embodiments, the austenitizing can form a grain size below 20 μm in the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the composition can further comprise up to 1.0 wt. % chromium up to 0.5 wt. % molybdenum up to 0.0030 wt. % boron, up to 0.030 wt. % titanium, up to 0.50 wt. % copper, up to 0.50 wt. % nickel, up to 0.1 wt. % niobium, up to 0.15 wt. % vanadium, up to 0.0050 wt. % oxygen, and up to 0.05 wt. % calcium.

In some embodiments, the composition can comprise 0.17 to 0.30 wt. % carbon, 0.30 to 1.60 wt. % manganese, 0.10 to 0.20 wt. % silicon, up to 0.7 wt. % chromium, up to 0.5 wt. % molybdenum, 0.0005 to 0.0025 wt. % boron, 0.010 to



0.025 wt. % titanium, 0.25 to 0.35 wt. % copper, 0.20 to 0.35 wt. % nickel, up to 0.04 wt. % niobium, up to 0.10 wt. % vanadium, up to 0.00015 wt. % oxygen, up to 0.03 wt. % calcium, up to 0.003 wt. % sulfur, and up to 0.010 wt. % phosphorus.

In some embodiments, the tempered tube can have a yield strength greater than or equal to 125 ksi. In some embodiments, the tempered tube can have a minimum yield strength of 140 ksi. In some embodiments, the tempered tube can have a minimum yield strength between 125 and 140 ksi.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-B illustrate CCT diagrams corresponding to STD2 (A) and STD3 (B) steels.

FIGS. **2**A-B illustrate CCT diagrams corresponding to $BTi_2$ (A) and $CrMoBTi_3$ (B) steels.

FIG. **3** illustrates a cooling rate at an internal pipe surface as a function of the wall thickness (WT) for a coiled tube quenched from the external with water sprays.

FIG. **4** illustrates tensile properties of $BTi_2$ steel as a function of the maximum tempering temperature ($T_{max}$). Peak-like tempering cycles were used in these Gleeble® simulations. (right) Tensile properties of the same steel as a function of the holding time at 720° C. (isothermal tempering cycles).

FIGS. **5**A-B illustrate non-tempered martensite appearing at the central segregation band close to the ERW line after the seam annealing (PWHT). FIGS. **5**A-B correspond to a conventional coiled tube Grade 90.

FIGS. **6**A-B illustrate localized damage at the central segregation band produced during fatigue testing of a Grade 110 coiled tubing.

FIGS. **7**A-B illustrate localized damage at the central segregation band produced during fatigue testing with high inner pressure (9500 psi) of a Grade 100 coiled tubing.

FIGS. **8**A-B illustrate base metal microstructures corresponding to the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing has tensile properties corresponding to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **9**A-B illustrate ERW line microstructures corresponding to the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **10**A-B illustrate microstructures corresponding to HAZ of the ERW for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **11**A-B illustrate microstructures corresponding to HAZ of the bias weld for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIG. **12** illustrates a crack formed during service in the fusion zone of a bias weld (growing from the internal tube face). The crack is running in the direction of the large upper bainite laths.

FIG. **13** illustrates variations in hardness (base metal hardness=100%) across typical bias welds obtained with conventional processing and processing according to

embodiments of the present disclose. The fusion zone (FZ) is approximately located in the area between≈+/−5 mm from the weld center.

FIGS. **14**A-B illustrate microstructures corresponding to the intersection between bias weld and ERW line for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIG. **15** illustrates a schematic drawing of a fatigue testing machine.

FIG. **16** illustrates fatigue life measured for BW samples relative to those corresponding to BM samples. Results are average values over different testing conditions and coiled tube grades (80, 90 and 110 for conventional tubes and 80, 90, 110, 125 and 140 for coiled tubes produced according to this disclosure).

FIG. **17** illustrates fatigue life improvement in coiled tubes produced with an embodiment of the chemistry and processing conditions according to this disclosure. The improvement is determined by comparison against fatigue life measured for conventional coiled tubing of the same grade tested under similar conditions. Results are averaged for each grade over different testing conditions. In the case of grades 125 and 140, which are non-standard, the fatigue life comparison was performed against STD3 steel in Grade 110.

FIGS. **18**A-B illustrate C-ring samples after testing material grade 80 according to NACE TM0177 (90% SMYS, Solution A, 1 bar $H_2S$). A: conventional process. B: embodiment of the disclosed process.

## DETAILED DESCRIPTION

Coiled Tubing raw material is produced in a steel shop as hot rolled strips. Controlled rolling is used to guarantee high strength and good toughness through microstructural refinement. The strips are longitudinally cut to the width for pipe production, and then spliced end to end through a joining process (e.g. Plasma Arc Welding or Friction Stir Welding) to form a longer strip. Afterwards, the tube is formed using the ERW process. The final product performance is measured in terms of: a) axial mechanical properties, b) uniformity of microstructure and properties, c) toughness, d) fatigue resistance, e) sour resistance, among others. Using the traditional processing route, the coiled tubing mechanical properties result from the combination of the hot-rolled strip properties and the modifications introduced during welding operations and tube forming. The properties thus obtained are limited when coiled tube performance is measured as listed above. The reason being is that the welding process used to join the strips modifies the refined as-rolled microstructure in a way that, even if a post weld heat treatments is applied, final properties are still impaired. Reduced fatigue life and poor sour performance is associated to heterogeneities in microstructure and presence of brittle constituents across the welds. It has been proposed that a new route should at least comprise a full body heat treatment. This route has been described in general terms but never specified. The disclosure describes the chemistries and raw material characteristics, that combined with appropriated welding processes, and heat treatment conditions, will yield a quenched and tempered product with high performance in both pipe body and strip joining welds. This material is designed for coiled tubing since it is selected not only in terms of relative cost, but preferably in order to maximize fatigue life under the particular conditions that apply to the operation of coiled tubing (low cycle fatigue under bending with simultaneous axial load and internal pressures).

This disclosure is related to a high strength coiled tubing (minimum yield strength ranging from 80 ksi to 140 ksi) having increased low-cycle fatigue life in comparison with standard products, as defined by API 5ST. Additionally, Sulfide Stress Cracking (SSC) resistance is also improved in this disclosure. This outstanding combination of properties is obtained through an appropriate selection of steel chemistry and processing conditions. Industrial processing differs from the standard route in the application of a Full Body Heat Treatment (FBHT), as was disclosed in U.S. App. No. US2012/0186686 A1. This FBHT is performed after the coiled tubed is formed by ERW (Electrical Resistance Welding) and is composed of at least one cycle of austenitization, quenching and tempering. The above mentioned disclosure is more specifically related to the steel chemistries and processing parameters to produce a quenched and tempered coiled tubing with the above mentioned properties. Although the generation of certain mechanical properties through a heat treatment on a base material with a given composition are part of the general knowledge, the particular application for coiled tubing uses raw material with specific chemistry in order to minimize the detrimental effect of particular variables, such us segregation patterns, on the specific properties of this application.

One of the most important properties to the coiled tube is an increased resistance to low cycle fatigue. This is because during standard field operation coiled tubes are spooled and unspooled frequently, introducing cyclic plastic deformations that may eventually produce failures. During low cycle fatigue, deformation is preferentially localized at the microscopical scale in softer material regions. When brittle constituents are present at or close to these strain concentration regions, cracks can easily nucleate and propagate. Therefore, a reduction in fatigue life is associated with heterogeneous microstructures (having softer regions that localize deformation) in combination with brittle constituents (that nucleate and/or propagate cracks). All these micro-structural features appear in the Heat Affected Zone of the welds (HAZ). There are some types of pipe body microstructures that also present the above mentioned characteristics. This is because they are composed of a mixture of hard and soft constituents, for example ferrite, pearlite and bainite. In this case strain is localized in the softer ferrite, close to the boundary with bainite, in which cracks are nucleated and propagated. High strength coiled tubes have currently this type of microstructure.

In order to avoid strain localization during low cycle fatigue the microstructure has to be not only homogeneous throughout the pipe body and joints, but also in the microscopic scale. For low carbon steels a microstructure composed of tempered martensite, which is basically a ferrite matrix with a homogeneous and fine distribution of carbides, is ideal. Thereafter, the objective of the chemistry selection and processing conditions described in this disclosure is to achieve with the FBHT a homogeneous microstructure (in tube body, bias weld and ERW line) composed of at least 90% tempered martensite, preferably more than 95% tempered martensite.

Additionally, tempered martensite is more suitable to produce ultra-high strength grades than standard coiled tube microstructures (composed of ferrite, pearlite and bainite), for which extremely costly alloying additions are needed to reach yield strengths higher than about 125 Ksi.

When compared with structures containing bainite, other important benefits of tempered martensite is its improved SSC resistance.

Steel chemistry has been defined as the most suitable for production of heat treated coiled tubing using a FBHT, and can be described in terms of concentration of Carbon (wt % C), Manganese (w % Mn), Silicon (w % Si), Chromium (wt % Cr), Molybdenum (w % Mo), as well as micro-alloying elements as Boron (w % B), Titanium (w % Ti), Aluminum (w % Al), Niobium (w % Nb) and Vanadium (w % V). Also, upper limits can be on unavoidable impurities as Sulfur (w % S), Phosphorus (w % P) and Oxygen (w % O).

In order to produce a final structure composed of tempered martensite, the steel chemistry of this disclosure differs mainly from previous coiled tube art because of the higher Carbon content (see for example API 5ST in which maximum Carbon allowed for Coiled tubing is 0.16%), which allows for obtaining the desired microstructure through a FBHT composed of at least one cycle of austenitization, quenching and tempering.

The terms “approximately”, “about”, and “substantially” as used herein represent an amount close to the stated amount that still performs a desired function or achieves a desired result. For example, the terms “approximately”, “about”, and “substantially” may refer to an amount that is within less than 10% of, within less than 5% of, within less than 1% of, within less than 0.1% of, and within less than 0.01% of the stated amount.

Carbon is an element whose addition inexpensively raises the strength of the steel through an improvement in hardenability and the promotion of carbide precipitation during heat treatments. If carbon is reduced below 0.17% hardenability could not be guaranteed, and large fractions of bainite may be formed during heat treatments. The appearance of bainite makes it difficult to reach a yield strength above 80 ksi with the desired fatigue life and SSC resistance. Current coiled tubing route is not suitable for heat treatment since the maximum Carbon allowed by API5ST is 0.16%. Conventional coiled tubing microstructures present large fractions of bainite that impair toughness, fatigue life and SSC resistance in the higher strength grades, i.e. coiled tubings with minimum yield strength above 110 Ksi.

On the other hand, steels with more than 0.35% carbon will have poor weldability, being susceptible to present brittle constituents and cracks during welding and post-weld heat treatment operations. Additionally, higher carbon contents may result in significant amounts of retained austenite after quenching that transform into brittle constituents upon tempering. These brittle constituents impair fatigue life and SSC resistance. Therefore, the C content of the steel composition varies within the range from about 0.17% to about 0.35%, preferably from about 0.17% to about 0.30%.

Manganese addition improves hardenability and strength. Mn also contributes to deoxidation and sulfur control during the steelmaking process. If Mn content is less than about 0.30%, it may be difficult to obtain the desired strength level. However, as Mn content increases, large segregation patterns may be formed. Mn segregated areas will tend to form brittle constituents during heat treatment that impair toughness and reduce fatigue. Additionally, these segregated areas increase the material susceptibility to sulfide stress cracking (SSC). Accordingly, the Mn content of the steel composition varies within the range from 0.30% to 2.0%, preferably from 0.30% to 1.60%, and more preferably from 0.30% to 0.80% in application for which an improved SSC resistance is used.

Silicon is an element whose addition has a deoxidizing effect during the steel making process and also raises the



strength of the steel. In some embodiments, if Si exceeds about 0.30%, the toughness may decrease. Additionally, large segregation patterns may be formed. Therefore, the Si content of the steel composition varies within the range between about 0.10% to 0.30%, preferably about 0.10% to about 0.20%.

Chromium addition increases hardenability and tempering resistance of the steel. Cr can be used to partially replace Mn in the steel composition in order to achieve high strength without producing large segregation patterns that impair fatigue life and SSC resistance. However, Cr is a costly addition that makes the coiled tubing more difficult to produce because of its effects on hot forming loads. Therefore, in some embodiments Cr is limited to about 1.0%, preferably to about 0.7%.

Molybdenum is an element whose addition is effective in increasing the strength of the steel and further assists in retarding softening during tempering. The resistance to tempering allows the production of high strength steels with reduced Mn content increasing fatigue life and SSC resistance. Mo additions may also reduce the segregation of phosphorous to grain boundaries, improving resistance to inter-granular fracture. However, this ferroalloy is expensive, making it desirable to reduce the maximum Mo content within the steel composition. Therefore, in certain embodiments, maximum Mo is about 0.5%.

Boron is an element whose addition is strongly effective in increasing the hardenability of the steel. For example, B may improve hardenability by inhibiting the formation of ferrite during quenching. In some embodiments, B is used to achieve good hardenability (i.e. as quenched structure composed of at least 90% martensite) in steels with Mn content reduced to improve fatigue life and SSC resistance. If the B content is less than about 0.0005 wt. % it may be difficult in these embodiments to obtain the desired hardenability of the steel. However, if the B content too high, coarse boron carbides may be formed at grain boundaries adversely affecting toughness. Accordingly, in an embodiment, the concentration of B in the composition lower than about 0.0030%, in another embodiment B content is from about 0.0005% to 0.0025%.

Titanium is an element whose addition is effective in increasing the effectiveness of B in the steel, by fixing nitrogen impurities as Titanium Nitrides (TiN) and inhibiting the formation of Boron nitrides. If the Ti content is too low it may be difficult in some embodiments to obtain the desired effect of boron on hardenability of the steel. On the other hand, if the Ti content is higher than 0.03 wt % coarse Titanium nitrides and carbides (TiN and TiC) may be formed, adversely affecting ductility and toughness. Accordingly, in certain embodiments, the concentration of Ti may be limited to about 0.030%. In other embodiments, the concentration of Ti may range from about 0.010% to about 0.025%.

Considering that the production of coiled tubing of low mechanical properties benefits from low tempering resistance, B and Ti additions improve hardenability without increasing tempering resistance. Thereafter it allows for the production of 80 ksi grade without significant large soaking times during tempering, with the subsequent improvement in productivity. Since one of the limitations for the production of a coiled tubing in a heat treatment line is the length of the line to adequately soak the material during tempering, the use of B and Ti is particularly relevant to the production of low yield strength coiled tubing.

Copper is an element that is not required in certain embodiments of the steel composition. However, in some

coiled tubing applications Cu may be needed to improve atmospheric corrosion resistance. Thus, in certain embodiments, the Cu content of the steel composition may be limited to less than about 0.50%. In other embodiments, the concentration of Cu may range from about 0.25% to about 0.35%.

Nickel is an element whose addition increases the strength and toughness of the steel. If Cu is added to the steel composition, Ni can be used to avoid hot rolling defects known as hot shortness. However, Ni is very costly and, in certain embodiments, the Ni content of the steel composition is limited to less than or equal to about 0.50%. In other embodiments, the concentration of Ni may range from about 0.20% to about 0.35%.

Niobium is an element whose addition to the steel composition may refine the austenitic grain size of the steel during reheating into the austenitic region, with the subsequent increase in both strength and toughness. Nb may also precipitate during tempering, increasing the steel strength by particle dispersion hardening. In an embodiment, the Nb content of the steel composition may vary within the range between about 0% to about 0.10%, preferably about 0% to about 0.04%.

Vanadium is an element whose addition may be used to increase the strength of the steel by carbide precipitations during tempering. However if V content of the steel composition is greater than about 0.15%, a large volume fraction of vanadium carbide particles may be formed, with an attendant reduction in toughness of the steel. Therefore, in certain embodiments, the V content of the steel is limited to about 0.15%, preferably to about 0.10%.

Aluminum is an element whose addition to the steel composition has a deoxidizing effect during the steel making process and further refines the grain size of the steel. In an embodiment, if the Al content of the steel composition is less than about 0.010%, the steel may be susceptible to oxidation, exhibiting high levels of inclusions. In other embodiments, if the Al content of the steel composition greater than about 0.040%, coarse precipitates may be formed that impair the toughness of the steel. Therefore, the Al content of the steel composition may vary within the range between about 0.010% to about 0.040%.

Sulfur is an element that causes the toughness and workability of the steel to decrease. Accordingly, in some embodiments, the S content of the steel composition is limited to a maximum of about 0.010%, preferably about 0.003%.

Phosphorus is an element that causes the toughness of the steel to decrease. Accordingly, the P content of the steel composition limited to a maximum of about 0.015%, preferably about 0.010%.

Oxygen may be an impurity within the steel composition that is present primarily in the form of oxides. In an embodiment of the steel composition, as the O content increases, impact properties of the steel are impaired. Accordingly, in certain embodiments of the steel composition, a relatively low O content is desired, less than or equal to about 0.0050 wt %; preferably less than or equal to about 0.0015 wt %.

Calcium is an element whose addition to the steel composition may improve toughness by modifying the shape of sulfide inclusions. In an embodiment, the steel composition may comprise a minimum Ca to S content ratio of Ca/S>1.5. In other embodiments of the steel composition, excessive Ca is unnecessary and the steel composition may comprise a maximum content Ca of about 0.05%, preferably about 0.03%.



The contents of unavoidable impurities including, but not limited to N, Pb, Sn, As, Sb, Bi and the like are preferably kept as low as possible. However, properties (e.g., strength, toughness) of steels formed from embodiments of the steel compositions of the present disclosure may not be substantially impaired provided these impurities are maintained below selected levels. In one embodiment, the N content of the steel composition may be less than about 0.010%, preferably less than or equal to about 0.008%. In another embodiment, the Pb content of the steel composition may be less than or equal to about 0.005%. In a further embodiment, the Sn content of the steel composition may be less than or equal to about 0.02%. In an additional embodiment, the As content of the steel composition may be less than or equal to about 0.012%. In another embodiment, the Sb content of the steel composition may be less than or equal to about 0.008%. In a further embodiment, the Bi content of the steel composition may be less than or equal to about 0.003%.

The selection of a specific steel chemistry of this disclosure will depend on the final product specification and industrial facility constrains (for example in induction heat treatment lines it is difficult to achieve large soaking times during tempering). Mn addition will be reduced when possible because it impairs fatigue life and SSC resistance through the formation of large segregation patterns. Cr and to a less extent Mo will be used to replace Mn, and the full body heat treatment is kept as simple as possible. Both elements increase carbide stability and softening resistance, which may lead to large soaking times during tempering. Thereafter, these elements are preferred for the higher strength grades (for example Grade 110 and above) for which tempering resistance is desired, and avoided in the lower ones (Grade 80) for which long and impractical industrial heat treatment lines would be needed.

In the case of the lower grades (Grade 80), it will be preferred B and Ti microalloyed additions in combination with suitable C contents. These elements allow for achieving good hardenability without the use of high Mn additions. Moreover, B and Ti do not increase tempering resistance. Thereafter, simple and short tempering treatment can be used to achieve the desired strength level.

The industrial processing route corresponding to this disclosure is described in the following paragraphs, making focus on the Full Body Heat Treatment (FBHT) conditions.

Raw material for coiled tubing is produced in a steel shop as hot rolled strips with wall thickness that may vary from about 0.08 inches to about 0.30 inches. Controlled rolling may be used by the steel supplier to refine the as rolled microstructure. However, an important microstructural refinement of the as rolled strips is not needed, because in this disclosure microstructure and mechanical properties are mostly defined by the final FBHT. This flexibility in the hot rolling process helps to reduce raw-material cost, and allows to use steel chemistries not available when complex hot rolling procedures can be used (in general controlled rolling can be applied only to low carbon micro-alloyed steels).

The steel strips are longitudinally cut to the width for pipe production. Afterwards, the strips are joined end to end through a welding process (e.g. Plasma Arc Welding or Friction Stir Welding) to form a longer strip that allows to achieve the pipe length. These welded strips are formed into a pipe using, for example an ERW process. Typical coiled tube outer diameters are between 1 inch and 5 inches. Pipe lengths are about 15,000 feet, but lengths can be between about 10,000 feet to about 40,000 feet.

After forming the pipe, the Full Body Heat Treatment (FBHT) is applied. The objective of this heat treatment is to

produce a homogeneous final microstructure composed of at least 90% tempered martensite, the rest being bainite. This microstructure, having uniform carbide distribution and grain size below 20 μm—preferably below 15 guarantees good combinations of strength, ductility, toughness and low cycle fatigue life. Furthermore, as was previously mentioned, by properly selecting the steel chemistry this type of microstructure is suitable to improve Sulfide Stress Cracking (SSC) resistance in comparison with conventional structures, composed of ferrite, pearlite and large volume fractions of upper bainite.

The FBHT is composed of at least one austenitization and quenching cycle (Q) followed by a tempering treatment (T). The austenitization is performed at temperatures between 900° C. and 1000° C. During this stage the total time of permanence above the equilibrium temperature Ae3 should be selected to guarantee a complete dissolution of iron carbides without having excessive austenitic grain growth. The target grain size is below 20 μM, preferably below 15 μm. Quenching has to be performed controlling the minimum cooling rate in order to achieve a final as quenched microstructure composed of at least 90% martensite throughout the pipe.

Tempering is carried out at temperatures between 550° C. and 720° C. Heat treatment above 720° C. may led to partial martensite transformation to high carbon austenite. This constituent has to be avoided because tends to transform into brittle constituents, which may impair toughness and fatigue life. On the other hand, if tempering is performed below 550° C. the recovery process of the dislocated as quenched structure is not complete. Thereafter, toughness may be again strongly reduced. The tempering cycle has to be selected, within the above mentioned temperature range, in order to achieve the desired mechanical properties. Minimum yield strength may vary from 80 ksi to 140 ksi. An appropriate time of permanence at temperature has to be selected to guarantee an homogeneous carbide distribution in both base tube and weld areas (ERW line and strip to strip joints). In some cases, in order to improve the combination of strength and toughness more than one austenitization, quenching and tempering cycles may be performed. After FBHT the pipe may be subjected to a sizing process, in order to guarantee specified dimensional tolerances, stress relieved and spooled into a coil.

## EXAMPLES

### Example A: Chemistry Selection to Improve Hardenability

As was previously mentioned, the microstructure of this disclosure is composed of at least 90% tempered martensite with an homogenous distribution of fine carbides, the rest being bainite. This microstructure allows for production of a coiled tube with the desired combination of high strength, extended low cycle fatigue life and improved SSC resistance.

The tempered martensite is obtained by at least one heat treatment of quenching and tempering, performed after the pipe is formed by ERW. The heat treatment may be repeated two or more times if additional refinement is desired for improving SSC resistance. This is because subsequent cycles of austenization and quenching reduce not only prior austenitic grain size, but also martensite block and packet sizes.

To obtain the target microstructure with good hardenability, at least 90% martensite has to be formed at the end of the



quenching process. An adequate chemistry selection is paramount to achieve such volume fraction of martensite. The selection of suitable steel compositions was based on results from experiments performed with a thermo-mechanical simulator Gleeble® 3500. Industrial trials were performed afterwards to confirm laboratory findings.

Some of the steel chemistries analyzed in laboratory are listed in Table A1. For all these chemistries dilatometric tests were carried out at Gleeble® to construct Continuous Cooling Transformation (CCT) diagrams. The CCT diagrams were used, in combination with metallographic analysis of the samples obtained from the simulations, to determine the minimum cooling rate to have more than 90% martensite. This critical cooling rate, mainly dependent on steel chemistry, will be referred as CR90.

TABLE A1

Chemical composition of the steels experimentally studied. Element concentrations are in weight percent (wt %).

| Steel | C | Mn | Si | Cr | Mo | Ni | Cu | Other |
|---|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | 0.15 | 0.28 | Ti |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | 0.17 | 0.27 | Nb Ti |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | 0.22 | 0.28 | Nb Ti |
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | — | — |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | — | — |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | — | — | B Ti |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | — | — | B Ti |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | — | — |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | — | — |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | — | — | B Ti |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | — | — | B Ti |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | — | — | B Ti |
| CrMoBTi4 | 0.26 | 0.60 | 0.15 | 0.50 | 0.25 | | | B Ti |

Examples of obtained CCT diagrams are presented in FIGS. **1-2**. In all cases the austenitization was performed at 900-950° C. in order to obtain a fine austenitic grain size (AGS) of 10-20 μm. STD1, STD2 and STD3 steels have chemistries within API 5ST specification, but outside the range of this disclosure because of their low carbon addition (Table A1). The critical cooling CR90 was greater than 100° C./sec in the case of STD1 and STD2, and about 50° C./sec for STD3.

FIGS. **1**A-B show CCT diagrams corresponding to STD2 (A) and STD3 (B) steels. In bold is shown the critical cooling conditions to produce a final microstructure composed of about 90% martensite, the rest being bainite. FIGS. **2**A-B show the CCT diagrams corresponding to $BTi_2$ and $CrMoBTi_3$ steels. In bold are shown the critical cooling conditions to produce final microstructures composed of about 90% martensite, the rest being bainite. The first one is a C—Mn steel microalloyed with B—Ti (see Table A1). $CrMoBTi_2$ is a medium carbon steel having Cr and Mo additions, also microalloyed with B—Ti. The measured critical cooling rates (corresponding to the cooling curves shown in bold in the CCT diagrams) were 25° C./s and 15° C./s for $BTi_2$ and $CrMoBTi_3$, respectively.

In FIG. **3** is presented the average cooling rate of pipes treated in an industrial quenching heads facility (sprays of water cooling the tube from the external surface). Values are shown as a function of the pipe Wall Thickness (WT). The shaded area in the plot corresponds to the wall thickness range typical of coiled tube applications. It is clear that when selecting steel chemistries suitable to have more than 90% tempered martensite, the critical cooling rate of the alloy should be equal or lower than 30° C./s. Otherwise, more than

10% bainite will be formed during quenching the thicker tube (WT=0.3 inches) in the above mentioned facility.

STD1, STD2 and STD3 have critical cooling rates above 30° C./s, thereafter these steels are not suitable for this disclosure. On the other hand, hardenability is adequate in $BTi_2$ and $CrMoBTi_3$ steels. The hardenability improvement is due to an increased carbon content and the B—Ti addition.

In Table A2 is shown the critical cooling rates measured for the steels of Table A1. STD1, STD2 and STD3 are chemistries currently used for coiled tubes grades 80, 90 and 110; and fulfill API 5ST. However, even the more alloyed STD3 have a critical cooling rate to guarantee more than 90% tempered martensite in pipes with WT in the range of interest. It is clear that standard materials are not adequate to produce the target microstructure of this disclosure and hardenability has to be improved. In low alloy steels the most important element affecting hardenability is Carbon. Thereafter, C was increased above the maximum specified by API 5ST (0.16 wt. %) to have critical cooling rates not higher than 30° C./s. In this disclosure Carbon addition is in the range from 0.17% to 0.35% (the maximum level was selected to guarantee good weldability and toughness). As was just mentioned, the rest of the chemistry has to be adjusted to have CR90 values equal or lower than 30° C./s.

Cr—Mo steels: these steels have Cr and Mo additions that are useful to increase tempering resistance, which make them suitable for ultra-high strength grades. Additionally, Cr and Mo are elements that improve hardenability; so Mn addition may be further reduced. However, Cr and Mo are costly additions that reduce the steel hot workability, and their maximum content is limited to 1% and 0.5%, respectively. In one example with Carbon in the lower limit, about 1% Mn can be used to achieve the CR90 (CrMo1). If the steel is also microalloyed with B—Ti, a further reduction in Mn to 0.6% can be performed (CrMoBTi1).

Example B: Chemistry Selection for Different Coiled Tube Grades

To analyze tempering behavior of the steels presented in Table A1, simulations of industrial heat treatments were performed at Gleeble®. Simulations consisted in an austenitization at 900-950° C., quenching at 30° C./sec and tempering. In the particular case of STD1, STD2 and STD3 steels higher cooling rates were used in order to achieve at least 90% martensite during quenching. For STD1 and STD2 a quenching rate of about 150° C./s was used, while for STD3 cooling was at 50° C./s. These higher cooling rates can be achieved in small samples at Gleeble® when external water cooling is applied. After quenching the samples were tempered using two types of cycles:

TABLE A2

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) | Adequate hardenability? |
|---|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | 0.13 | Ni, Cu, Ti | >100 | No |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | Ni,Cu, Nb—Ti | >100 | No |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | Ni,Cu, Nb Ti | 50 | No |
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | 30 | Yes |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | 30 | Yes |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B Ti | 30 | Yes |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B Ti | 25 | Yes |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | 25 | Yes |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | 23 | Yes |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | B Ti | 25 | Yes |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | B Ti | 25 | Yes |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | B Ti | 15 | Yes |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B Ti | 30 | Yes |

The following guidelines for selecting adequate steel chemistries were obtained from the analysis of experimental results in Table A2:

C—Mn steels: hardenability depends mainly on Carbon and Manganese additions. About 2% Mn can be used to achieve the desired hardenability when C is in the lower limit (CMn1 steel). However, Mn is an element which produces strong segregation patterns that may decrease fatigue life. Thereafter, Mn addition is decreased in higher Carbon formulations. For example, when carbon concentration is about 0.25%, 1.6% Mn is enough to achieve the hardenability (CMn2 steel).

B—Ti steels: these alloys are plain carbon steels microalloyed with Boron and Titanium. Due to the increase in hardenability associated to the Boron effect, Mn can be further reduced. For Carbon in the lower limit, about 1.6% Mn can be used to achieve the hardenability. When carbon concentration is about 0.25%, 1.3% Mn is enough to achieve the hardenability ($BTi_2$steel).

Peak like cycle: Heating at 50° C./s up to a maximum temperature ($T_{max}$) that was in the range from 550° C. to 720° C. Cooling at about 1.5° C./s down to room temperature. These cycles were intended to simulate actual tempering conditions at induction furnaces, which are characterized by high heating rate, no soaking time at maximum temperature and air cooling.

Isothermal cycle: Heating at 50° C./s up to 710° C., soaking at this temperature during a time that ranged from 1 min to 1 hour and cooling at about 1.5° C./s. This cycle was used to simulate tempering in an industrial line with several soaking inductors or with a tunnel furnace.

In all cases tempering temperature ranged from 550° C. to 720° C. Temperatures higher than 720° C. were avoided because non-desired re-austenitization takes place. On the other hand, if tempering is performed below 550° C.,

recovery of the dislocated structure is not complete, and the material presents brittle constituents that may impair fatigue life.

Peak-like tempering cycles are preferred to reduce line length and to improve productivity. Thereafter, the feasibility of obtaining a given grade with a specific steel chemistry was mainly determined by the tempering curve obtaining using this type of cycles. If after a peak-like tempering at 720° C. strength is still high for the grade, soaking at maximum temperature can be performed. However, as soaking time increases, larger, more expensive and less productive industrial lines may be needed.

In FIG. **4** (inset on the left) is presented the tempering curve measured for $BTi_2$steel. Tensile properties are shown as a function of maximum tempering temperature. Peak-like thermal cycles were used in the simulations. From the figure it is seen that Grades 90 to 125 can be obtained by changing maximum peak temperature from about 710° C. to 575° C., respectively. With this chemistry is not possible to reach 140 Ksi of yield strength without reducing the tempering temperature below 550° C. Regarding the lower grades, 3 minutes of soaking at 710° C. can be used to obtain Grade 80 (inset on the right of FIG. **4**).

Based on the results obtained from Gleeble® simulations, Table B1 was constructed. This Table shows, for each analyzed steel, the feasibility of producing different grades, which ranged from 80 Ksi to 140 Ksi of minimum yield strength. For example, in the case of $BTi_2$ it is feasible to reach grades 90 to 125 using peak-like tempering cycles. But 2 minutes of soaking at 720° C. can be used in the case of Grade 80, which is why the in corresponding cell "soaking" is indicated.

TABLE B1

Feasibility of industrially producing Grades 80 to 140 using the steel chemistries analyzed. When "soaking" appears in the cell, it means that more than 1 minute of soaking at 720° C. can be used to reach the grade.

| | Grade 80 | Grade 90 | Grade 110 | Grade 125 | Grade 140 |
|---|---|---|---|---|---|
| | Yield Strength (Ksi) | | | | |
| Steel | 80-90 | 90-100 | 110-125 | 125-140 | 140-155 |
| STD1 | Yes | Yes | no | no | no |
| STD2 | Yes | Yes | yes | no | no |
| STD3 | soaking | Soaking | yes | yes | no |
| CMn1 | soaking | Yes | yes | yes | no |
| CMn2 | soaking | Soaking | yes | yes | no |
| BTi1 | Yes | Yes | yes | no | no |
| BTi2 | soaking | Yes | yes | yes | no |
| CrMo1 | soaking | Soaking | yes | Yes | Yes |
| CrMo2 | soaking | Soaking | soaking | Yes | Yes |
| CrMoBTi1 | soaking | Soaking | yes | Yes | Yes |
| CrMoBTi2 | soaking | Soaking | yes | Yes | Yes |
| CrMoBTi3 | soaking | Soaking | soaking | Yes | Yes |
| CrMoBTi4 | soaking | Soaking | yes | Yes | Yes |

From the results obtained is clear that in order to obtain the higher grades, increased Carbon and Cr—Mo additions can be used. Particularly, Grade 140 cannot be achieved with standard chemistries, as described in API5ST, because of the low Carbon content. On the other hand, to reach Grade 80 a lean chemistry with low carbon, no Cr or Mo additions are the best options. In this case, B—Ti microalloying additions may be used to guarantee good hardenability (for example, a chemistry like $BTi_1$ is a good alternative).

It is important to mention that in order to produce martensitic structures with the standard steels (STD1, STD2 and STD3) it was necessary to use at laboratory higher quenching rates than achievable at the mill. Thereafter, if we limit the cooling rate to that industrially achievable, none of the coiled tube grades can be obtained with conventional steels using the FBHT processing route.



Example C: Chemistry Selection to Reduce Negative Effects of Segregation During Solidification

During steel solidification alloying elements tend to remain diluted in the liquid because of its higher solubility in comparison with the solid (6 ferrite or austenite). Solute rich areas form two types of non-uniform chemical composition patterns upon solidification: microsegregation and macrosegregation.

Microsegregation results from freezing the solute-enriched liquid in the interdendritic spaces. But it does not constitute a major problem, since the effects of microsegregation can be removed during subsequent hot working. On the other hand, macrosegregation is non-uniformity of chemical composition in the cast section on a larger scale. It cannot be completely eliminated by soaking at high temperature and/or hot working. In the case of interest for this disclosure, which is the continuous slab cast, it produces the centerline segregation band.

A pronounced central segregation band has to be avoided because:

Brittle constituents as non-tempered martensite may appear in this region as a result of welding operations (bias weld and ERW, see for example FIGS. **5**A-B). These non-desired constituents are removed during the subsequent full body heat treatment. However, the tube may be plastically deformed by bending between welding and heat treatment operations, producing a failure during industrial production.

After FBHT the remnant of the central segregation band is a region enriched in substitutional solutes (as Mn, Si, Mo) with a higher density of coarse carbides than the rest of the material. This region is susceptible to nucleate cracks during low cycle fatigue, as it is observed in FIGS. **6-7**. Additionally, prominent segregation bands are associated to poor SSC resistance.

Although it is not possible to remove macrosegregation, its negative effects on toughness, fatigue life and SSC resistance can be reduced by a proper selection of steel chemistry.

Based on EDX measurements on samples corresponding to a wide range of steel chemistries, enrichment factors at the central segregation band were estimated for different alloying elements. The results are shown in Table C1. The enrichment factors (EF) are the ratios between each element concentration at the central band and that corresponding to the average in the matrix. These factors are mainly dependent on thermodynamic partition coefficient between liquid and solid; and diffusivities during solidification.

TABLE C1

Enrichment factors (EF) at the central segregation band corresponding to different substitutional alloying elements.

| Element | EF |
|---|---|
| Mn | 1.6 |
| Si | 3.2 |
| Cr | 1.2 |
| Mo | 2.1 |
| Ni | 1.3 |
| Cu | 3.4 |

Table C1 shows clearly that there are some elements that have a strong tendency to segregate during solidification, like Si and Cu. On the other hand Cr and Ni have low enrichment factors. Ni is a costly addition, but Cr may be used when an increase in hardenability and/or tempering resistance is desired without producing strong segregation patterns.

The enrichment factors give information about the increase in concentration that can be expected for each element at the central segregation band. However, not all these elements have the same effect regarding the material tendency to form brittle constituents during welding or heat treatment. It is observed that the higher the improvement on hardenability, the higher the tendency to form brittle constituents during processing. It is important to mention that elements with high diffusion coefficients as Carbon and Boron may segregate during solidification, but are homogenized during hot rolling. Thereafter, they do not contribute to form brittle constituents localized at the segregation band.

From the analysis of the CCT diagrams (Example A) it can be concluded that Manganese produces the strongest increase in hardenability. This is apart from Carbon and Boron, which do not present large segregation patterns after hot rolling. On the other hand, Si and Cu, which have a strong tendency to segregate, do not play a major role on hardenability. Because of its high enrichment factor and large effect on hardenability, Mn addition has to be reduced as much as possible when trying to diminish the negative effects of macro-segregation, as the reduction in low-cycle fatigue life.

High Mn contents are ordinarily added to the steel composition because of its effect on hardenability. In this disclosure the hardenability is mostly achieved through the higher Carbon addition, so Mn concentration can be generally reduced. Further Manganese reductions can be achieved using Boron and/or Chromium additions. Examples can be seen in Table C2, which shows the critical cooling rate (CR90) for different steels composition obtained from CCT diagrams (data taken from a previous Example A). In order to achieve the hardenability in a steel with about 0.25% Carbon, Mn can be reduced from 1.6% to 1.3% when adding Boron, and further reduced to 0.4% if Cr—Mo is additionally used.

TABLE C2

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) |
|---|---|---|---|---|---|---|---|
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | 30 |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | 30 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B Ti | 30 |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B Ti | 25 |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | 25 |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | 23 |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | B Ti | 25 |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | B Ti | 25 |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | B Ti | 15 |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B Ti | 30 |

Example D: Homogenization of Microstructure

As was previously mentioned the fatigue life of coiled tubing is strongly dependent on microscopical features as microstructural heterogeneities. The combination of soft and hard micro-constituents tends to produce plastic strain localization, which is the driving force for crack nucleation and propagation. In this section are compared the coiled tubing microstructures obtained with the standard production method applied to chemistries within API 5ST, and those corresponding to a chemistry and processing conditions within the ranges disclosed in this disclosure.

As reference material was used a standard coiled tubing grade 110 (yield strength from 110 Ksi to 120 Ksi) with chemistry named STD2 in Table A1, which is within API 5ST specification. This standard material was compared to a coiled tubed of the same grade produced with chemistry $BTi_2$ and applying the FBHT.

In this comparison different pipe locations will be considered:

Base Metal (BM): coiled tubing microstructure apart from the ERW line and bias welds, when "apart" means that are not included in this region the Heat Affected Zones (HAZ) produced during the any welding operation and their possible Post-Weld Heat Treatment (PWHT).

Bias Weld (BW): microstructural region corresponding to the strip-to-strip joint that can be performed by Plasma Arc Welding (PAW), Friction Stir Welding (FSW) or any other welding techniques. It is also included in this region the corresponding heat affected zone during welding and PWHT.

ERW line: microstructure resulting from the longitudinal ERW welding during tube forming and its localized PWHT, which is generally a seam annealing. As in previous cases, this region also includes the corresponding heat affected zone.

In FIGS. **8**A-B are presented the base metal microstructures corresponding to the standard coiled tube (A) and this disclosure (B). In the first case it is observed a ferrite matrix with a fine distribution of carbides. This matrix and fine structure results from the controlled hot rolling process. This disclosure microstructure (FIG. **8**B) is mainly composed of tempered martensite. The bainite volume fraction is lower than 5% in this case. The tempered martensite structure is also a fine distribution of iron carbides in a ferrite matrix. The main difference between conventional and new structures is related to the morphology of the ferrite grains and sub-grains, and the dislocation density. However, regarding refinement and homogeneity, both structures are very similar.

In FIGS. **9**A-B are shown scanning electron micrographs corresponding to the ERW line. It is clear that in the conventional structure two micro-constituents appear: there are soft ferrite grains and hard blocks composed of a mixture of fine pearlite, martensite and some retained austenite. In this type of structure plastic strain is localized in the ferrite, and cracks can nucleate and propagate in the neighboring brittle constituents (non-tempered martensite and high carbon retained austenite). On the other hand, the ERW line microstructure obtained with chemistry and processing conditions within the ranges of this disclosure is homogeneous and very similar to the corresponding base metal structure.

Microstructures corresponding to the HAZ of the ERW are presented in FIGS. **10**A-B. In the standard material it is clear the appearance of the remnant of the central segregation band, which after seam annealing is partially transformed into non-tempered martensite. Again, these are brittle constituents that are localized along the ERW line, and can nucleate and propagate cracks during service. The risk of failure is higher than in previous case because of the larger size of the just mentioned constituents. On the other

hand, in the quenched and tempered coiled tubing the structure close to the ERW line is homogeneous, and the remnants of the central segregation band are not observed.

In FIGS. **11**A-B are presented some scanning electron micrographs corresponding to the bias-weld HAZ of both conventional coiled tube and this disclosure. For the conventional material the microstructure is very different than in Base Metal (BM). It is mainly composed of upper bainite and the grain size is large (50 microns in comparison of less than 15 microns for the BM). This type of coarse structure is not adequate for low cycle fatigue because cracks can easily propagate along bainitic laths. An example of a fatigue crack running across coarse bainite in the bias weld is shown in FIG. **12**. This is a secondary crack located close to the main failure occurred during service of a standard coiled tubing grade 110.

On the other hand, the bias weld microstructure in this disclosure is again very similar to that corresponding to the base metal. No upper bainite grains were observed. It is important to mention that some bainite may appear after the full body heat treatment, but because of the selection of adequate chemistry and processing conditions, the corresponding volume fraction of this constituent is lower than 10%. This is the main reason for the good hardenability to the chemistries described in this disclosure. Additionally, due to the upper limit in the austenitization temperature the final grain size is small (lower than 20 microns), then large bainitic laths that can propagate cracks are completely avoided.

Other examples of the microstructural homogeneity achievable by the combination of steel chemistry and processing conditions disclosed in this disclosure are presented in FIGS. **13**-**14**. In FIG. **13** is shown the typical variation in hardness across the bias weld for coiled tubes produced conventionally compared to that obtained using the new chemistry and processing route. It is clear that when using this disclosure the hardness variation is strongly reduced. As a consequence, the tendency of the material to accumulate strain in localized regions (in this case the HAZ of the bias weld) is also reduced, and the fatigue life improved.

In FIGS. **14**A-B are shown some microstructures corresponding to the intersection between the bias weld and the ERW line. It is clear that large microstructural heterogeneities are obtained following the conventional route. These heterogeneities are successfully eliminated using the chemistry and processing conditions disclosed in this disclosure.

Example E: Coiled Tube Fatigue Testing

In order to compare the performance of coiled tubing produced according to this disclosure with that corresponding to standard products, a series of tests were performed at laboratory. Coiled tube samples were tested in a fatigue machine schematically shown in FIG. **15**. This machine is able to simulate the bending deformations during spooling and un-spooling operations, applying at the same time internal pressures. Therefore, the tests are useful to rank materials under low-cycle fatigue conditions that are close to those experienced during actual field operation.

During testing, the fatigue specimens (tube pieces 5 or 6 feet long) are clamped on one end while an alternative force is applied by a hydraulic actuator on the opposite end. Deformation cycles are applied on the test specimens by bending samples over a curved mandrel of fixed radius, and then straightening them against a straight backup. Steel caps are welded at the ends of the specimen and connected to a hydraulic pump, so that cycling is conducted with the specimen filled with water at a constant internal pressure until it fails. The test ends when a loss of internal pressure occurs, due to the development of a crack through the wall thickness.

Testing was performed on coiled tubing with different chemistries and grades, as shown in Table E1. The pipe geometry was the same in all cases (OD 2", WT 0.19"). STD1, STD2 and STD3 are steels within the limits described in API 5ST, processed following the standard route. $BTi_1$, $BTi_2$ and $CrMoBTi_4$ are chemistries selected and processed according to this disclosure. It is important to mention that $CrMoBTi_4$ steel was used to produce two non-standard grades with 125 Ksi and 140 Ksi of minimum yield strength (the highest grade described in API 5ST has 110 Ksi of SMYS). Tests were performed on tube pieces with and without the bias weld (in all cases the longitudinal ERW line is included in the samples). The severity of the test mainly depends on two parameters: bend radius and inner pressure. In this study the bend radius was 48 inches, which corresponds to a plastic strain of about 2%. Inner pressures between 1600 psi and 13500 psi were considered, producing hoop stresses that ranged from about 10% to 60% of the minimum yield strength of the grades.

TABLE E1

Steel chemistries and coiled tube grades analyzed in this study.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | Grade |
|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | Ni, Cu, Ti | 80 |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | Ni,Cu, Nb Ti | 90 |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | Ni,Cu, Nb Ti | 110 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B Ti | 80 |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B Ti | 90, 110 |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B Ti | 125, 140 |

In FIG. **16** is presented some results regarding the comparison between the fatigue life measured in samples with and without the Bias Weld (BW). The values shown in the figure correspond to the averages obtained when testing conventional and non-conventional coiled tubes grades. In the case of the conventional material there is clearly a reduction in fatigue life when testing samples containing the bias weld. On the other hand, the coiled tubes produced according to this disclosure do not present an important change in fatigue life when the tests are performed on BW samples. This is a consequence of the tube homogeneous structure, with almost no differences in mechanical properties between base metal, ERW line and bias weld.

In FIG. **17** is shown the coiled tube fatigue life improvements obtained with chemistries and processing conditions as disclosed by this disclosure. For Grades 80, 90 and 110 the comparison was made against the equivalent grade produced by the conventional route. In the case of grades 125 and 140, which are non-standard, the fatigue life comparison was performed against STD3 steel in Grade 110 tested under the similar conditions (pipe geometry, bend radius and inner pressure). The results presented in the figure correspond to average values for each grade, the error bars represent the dispersion obtained when using different inner pressures.

In FIG. **17** it is clear that a notorious improvement of fatigue life is observed when using chemistries and process-

ing conditions according to this disclosure. For example, in Grade 110 there was an improvement of about 100% in fatigue life. This is a consequence of the fact that in conventional coiled tubing the fatigue performance is limited to that of the bias weld (which is generally the weak point regarding low cycle fatigue, because its microstructural heterogeneities and brittle constituents). In coiled tubes produced according to this disclosure there is no important fatigue life reduction at bias welds, which strongly increases the overall performance of the tube. Regarding the non-standard grades, the large improvement in fatigue life is due to the fact that the comparison is made against a conventional 110 grade tested under similar processing conditions. However, for the same inner pressures the applied hoop stresses are closer to the minimum yield strength of the lower grade, and the test severity increases for grade 110 in comparison to grades 125 and 140. These results show that by using higher grades (not achievable with the conventional method) fatigue life is strongly increased for the same service conditions.

Example F: Sulfide Stress Cracking Resistance

Material performance in regards to hydrogen embrittlement in $H_2S$ containing environments is related to the combined effects of corrosive environments, presence of traps (e.g. precipitates and dislocations) that could locally increase hydrogen concentration, as well as the presence of brittle areas, in which cracks could easily propagate. A possible source of critical brittle regions in conventional coiled tubing material is the segregation pattern of substitutional elements, such us Mn, in the raw material. Regions of differential concentrations tend to respond in a distinct way to thermal cycles imposed during bias weld, PWHT, ERW and seam annealing, and could lead to the local formation of brittle constituents. In particular, when the material is seam annealed after the ERW process, the pipe body quickly extracts heat from the weld area. If the segregation is high enough, elongated high hardness areas with the possible presence of martensite may be formed as a consequence of the cooling conditions. These areas will remain in the tube to become easy paths for crack propagation. The fact that the new process is applied as the last stage of manufacturing, allows for the minimization of the excessively hardened areas. Other relevant differences are: a) the dislocations introduced during pipe cold forming are not present in the new product, b) the carbides in new product are smaller and isolated in comparison with the typical pearlite/bainite long brittle carbides. As a consequence the coiled tube produced with chemistries and processing conditions according to this disclosure presents an improved performance to cracking in $H_2S$ containing environments.

TABLE F1

Steel chemistries and coiled tube grades analyzed in this study.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | Grade |
|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | Ni, Cu, Ti | 80 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B Ti | 80 |

In order to perform a first analysis on resistance to SSC cracking, coiled tube Grade 80 samples produced by i) the standard process and ii) the new chemistry-process were evaluated using method C (C-ring) of NACE TM0177. Steel chemistries are shown in Table F1. Both materials (3 specimens in each case) were tested with the ERW seam at center of C-ring sample, using the following conditions:

Load: 90% of 80 Ksi, Solution A, 1 bar $H_2S$, Test Time: 720 hs

In the case of the standard coiled tube all 3 specimens failed. On the other hand, the 3 samples corresponding to the new chemistry-process passed the test (FIGS. **5**A-B with pictures of C-rings). Although more tests are ongoing to analyze embrittlement resistance of different grades, as well as the effect of the bias weld, this first result shows a clear improvement in comparison with the standard condition, ascribed to a more homogeneous microstructure of base metal and ERW line in the case of the new process route.

As shown in FIGS. **18**A-B, the C ring formed by the conventional process has a large crack down the middle, whereas the C ring formed by embodiments of the disclosed process did not crack.

In some embodiments, B—Ti and Cr—Mo additions can reduce maximum Mn. In some embodiments, grades may be higher than 110 that are difficult to achieve using the standard method.

Features, materials, characteristics, or groups described in conjunction with a particular aspect, embodiment, or example are to be understood to be applicable to any other aspect, embodiment or example described herein unless incompatible therewith. All of the features disclosed in this specification (including any accompanying claims, abstract and drawings), and/or all of the steps of any method or process so disclosed, may be combined in any combination, except combinations where at least some of such features and/or steps are mutually exclusive. The protection is not restricted to the details of any foregoing embodiments. The protection extends to any novel one, or any novel combination, of the features disclosed in this specification (including any accompanying claims, abstract and drawings), or to any novel one, or any novel combination, of the steps of any method or process so disclosed.

While certain embodiments have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of protection. Indeed, the novel methods and apparatuses described herein may be embodied in a variety of other forms. Furthermore, various omissions, substitutions and changes in the form of the methods, compositions and apparatuses described herein may be made. Those skilled in the art will appreciate that in some embodiments, the actual steps taken in the processes illustrated and/or disclosed may differ from those shown in the figures. Depending on the embodiment, certain of the steps described above may be removed, others may be added. Furthermore, the features and attributes of the specific embodiments disclosed above may be combined in different ways to form additional embodiments, all of which fall within the scope of the present disclosure.

Although the present disclosure includes certain embodiments, examples and applications, it will be understood by those skilled in the art that the present disclosure extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses and obvious modifications and equivalents thereof, including embodiments which do not provide all of the features and advantages set forth herein. Accordingly, the scope of the present disclosure is not intended to be limited by the specific disclosures of preferred embodiments herein, and may be defined by claims as presented herein or as presented in the future.

What is claimed is:

1. A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled tube, the coiled steel tube comprising:

a plurality of strips welded together end to end by a bias weld and formed into a coiled steel tube, each of the plurality of strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints, each of the plurality of welded strips comprising:

a yield strength greater than about 80 ksi;

a composition comprising iron and:

0.17-0.35 wt. % carbon;
0.30-2.00 wt. % manganese;
0.10-0.30 wt. % silicon;
0.010-0.040 wt. % aluminum;
up to 0.010 wt. % sulfur; and
up to 0.015 wt. % phosphorus; and

wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube;

wherein the final microstructure comprises a mixture of tempered martensite and bainite;

wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite in the base metal regions, the bias weld joints, and the heat affected zones;

wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogeneous; and

wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the bias weld joints, and the heat affected zones.

2. The coiled steel tube of claim 1, wherein the composition further comprises:

up to 1.0 wt. % chromium;
up to 0.5 wt. % molybdenum;
up to 0.0030 wt. % boron;
up to 0.030 wt. % titanium;
up to 0.50 wt. % copper;
up to 0.50 wt. % nickel;
up to 0.1 wt. % niobium;
up to 0.15 wt. % vanadium;
up to 0.0050 wt. % oxygen; and
up to 0.05 wt. % calcium.

3. The coiled steel tube of claim 2, wherein the composition comprises:

0.17 to 0.30 wt. % carbon;
0.30 to 1.60 wt. % manganese;



0.10 to 0.20 wt. % silicon;
up to 0.7 wt. % chromium;
up to 0.5 wt. % molybdenum;
0.0005 to 0.0025 wt. % boron;
0.010 to 0.025 wt. % titanium;
0.25 to 0.35 wt. % copper;
0.20 to 0.35 wt. % nickel;
up to 0.04 wt. % niobium;
up to 0.10 wt. % vanadium;
up to 0.0015 wt. % oxygen;
up to 0.03 wt. % calcium;
up to 0.003 wt. % sulfur; and
up to 0.010 wt. % phosphorus.

4. The coiled steel tube of claim 1, wherein the tube has a minimum yield strength of 125 ksi.

5. The coiled steel tube of claim 1, wherein the tube has a minimum yield strength of 140 ksi.

6. The coiled steel tube of claim 1, wherein the tube has a minimum yield strength of between 125 ksi and 140 ksi.

7. The coiled steel tube of claim 1, wherein the final microstructure comprises at least 95 volume % tempered martensite in the base metal regions, the bias weld joints, and the heat affected zones.

8. The coiled steel tube of claim 1, wherein the tube has a final grain size of below 20 μm in the base metal regions, the bias weld joints, and the heat affected zones.

9. The coiled steel tube of claim 8, wherein the tube has a final grain size of below 15 μm in the base metal regions, the bias weld joints, and the heat affected zones.

10. The coiled steel tube of claim 1, wherein the fatigue life at the bias welds is at least about 80% of the base metal regions.

11. The coiled steel tube of claim 1, wherein a percent hardness of a bias weld joint, including its heat affected zone, is 110% or less than a hardness of the base metal.

12. The coiled steel tube of claim 1, wherein the coiled steel tube passes method C of NACE TM0177 for resistance to SSC cracking.

13. The coiled steel tube of claim 1, wherein a final length of the coiled steel tube is between 10,000 feet and 40,000 feet.

14. The coiled steel tube of claim 1, a fatigue life that is at least 100% greater than an equivalent grade steel which has not undergone the fully body heat treatment.

15. The coiled steel tube of claim 1, wherein the coiled steel tube has a reduced segregation band as compared to the equivalent grade steel which has not undergone the full body heat treatment.

* * * * *

US010378074B2

(12) **United States Patent**
**Valdez et al.**

(10) **Patent No.: US 10,378,074 B2**
(45) **Date of Patent: *Aug. 13, 2019**

(54) **HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME**

(71) Applicant: **TENARIS COILED TUBES, LLC**, Houston, TX (US)

(72) Inventors: **Martin Valdez**, Buenos Aires (AR); **Jorge Mitre**, Houston, TX (US); **Bruce A. Reichert**, Houston, TX (US)

(73) Assignee: **TENARIS COILED TUBES, LLC**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/665,054**

(22) Filed: **Jul. 31, 2017**

(65) **Prior Publication Data**

US 2017/0335421 A1 Nov. 23, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/190,886, filed on Feb. 26, 2014, now Pat. No. 9,803,256.

(Continued)

(51) **Int. Cl.**
***C21D 8/10*** (2006.01)
***C21D 9/08*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. ***C21D 8/105*** (2013.01); ***C21D 1/22*** (2013.01); ***C21D 8/10*** (2013.01); ***C21D 9/08*** (2013.01); ***C21D 9/085*** (2013.01); ***C21D 9/14*** (2013.01); ***C21D 9/50*** (2013.01); ***C21D 9/505*** (2013.01); *B21C 37/08* (2013.01); *C21D 2211/008* (2013.01); *Y10T 428/12333* (2015.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,315,396 A 4/1967 Trott et al.
3,316,395 A 4/1967 Lavin
(Continued)

FOREIGN PATENT DOCUMENTS

AR 0050159 10/2006
AT 388791 B 8/1989
(Continued)

OTHER PUBLICATIONS

Pending U.S. Appl. No. 15/236,056, filed Aug. 12, 2016, Valdez et al.

(Continued)

*Primary Examiner* — Daniel J. Schleis
(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57) **ABSTRACT**

Embodiments of the present disclosure are directed to coiled steel tubes and methods of manufacturing coiled steel tubes. In some embodiments, the final microstructures of the coiled steel tubes across all base metal regions, weld joints, and heat affected zones can be homogeneous. Further, the final microstructure of the coiled steel tube can be a mixture of tempered martensite and bainite.

**30 Claims, 16 Drawing Sheets**



**Related U.S. Application Data**

(60) Provisional application No. 61/783,701, filed on Mar. 14, 2013.

(51) **Int. Cl.**

| | |
|---|---|
| ***C21D 9/14*** | (2006.01) |
| ***C21D 9/50*** | (2006.01) |
| ***C21D 1/22*** | (2006.01) |
| *B21C 37/08* | (2006.01) |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,325,174 | A | 6/1967 | Weaver |
| 1,162,731 | A | 1/1968 | Gasche et al. |
| 3,366,392 | A | 1/1968 | Kennel |
| 3,413,166 | A | 11/1968 | Zackay et al. |
| 3,489,437 | A | 1/1970 | Duret |
| 3,512,789 | A | 5/1970 | Tanner |
| 3,552,781 | A | 1/1971 | Helland |
| 3,572,777 | A | 3/1971 | Blose et al. |
| 3,575,430 | A | 4/1971 | Alpine |
| 3,592,491 | A | 7/1971 | Glover |
| 3,599,931 | A | 8/1971 | Hanson |
| 3,655,465 | A | 4/1972 | Snape et al. |
| 3,733,093 | A | 5/1973 | Seiler |
| 3,810,793 | A | 5/1974 | Heller |
| 3,854,760 | A | 12/1974 | Duret |
| 3,889,989 | A | 6/1975 | Legris et al. |
| 3,891,224 | A | 6/1975 | Ditcher |
| 3,893,919 | A | 7/1975 | Flegel et al. |
| 3,915,697 | A | 10/1975 | Giuliani et al. |
| 3,918,726 | A | 11/1975 | Kramer |
| 3,986,731 | A | 10/1976 | De Hoff |
| 4,014,568 | A | 3/1977 | Carter et al. |
| 4,147,368 | A | 4/1979 | Baker et al. |
| 4,163,290 | A | 7/1979 | Sutherlin et al. |
| 4,219,204 | A | 8/1980 | Pippert |
| 4,231,555 | A | 11/1980 | Saito |
| 4,299,412 | A | 10/1981 | Parmann |
| 4,305,059 | A | 12/1981 | Benton |
| 4,310,163 | A | 1/1982 | Pippert |
| 4,336,081 | A | 6/1982 | Hijikata et al. |
| 4,345,739 | A | 8/1982 | Wheatley |
| 4,354,882 | A | 10/1982 | Greer |
| 4,366,971 | A | 1/1983 | Lula |
| 4,368,894 | A | 1/1983 | Parmann |
| 4,373,750 | A | 2/1983 | Mantelle et al. |
| 4,376,528 | A | 3/1983 | Ohshimatani et al. |
| 4,379,482 | A | 4/1983 | Suzuki et al. |
| 4,384,737 | A | 5/1983 | Reusser |
| 4,406,561 | A | 9/1983 | Ewing |
| 4,407,681 | A | 10/1983 | Ina et al. |
| 4,426,095 | A | 1/1984 | Buttner |
| 4,445,265 | A | 5/1984 | Olson et al. |
| 4,473,471 | A | 9/1984 | Robichaud et al. |
| 4,475,839 | A | 10/1984 | Strandberg |
| 4,491,725 | A | 1/1985 | Pritchard |
| 4,506,432 | A | 3/1985 | Smith |
| 4,526,628 | A | 7/1985 | Ohno et al. |
| 4,527,815 | A | 7/1985 | Smith |
| 4,564,392 | A | 1/1986 | Ohhashi et al. |
| 4,570,982 | A | 2/1986 | Blose et al. |
| 4,591,195 | A | 5/1986 | Chelette et al. |
| 4,592,558 | A | 6/1986 | Hopkins |
| 4,601,491 | A | 7/1986 | Bell, Jr. et al. |
| 4,602,807 | A | 7/1986 | Bowers |
| 4,623,173 | A | 11/1986 | Handa et al. |
| 4,629,218 | A | 12/1986 | Dubois |
| 4,662,659 | A | 5/1987 | Blose et al. |
| 4,674,756 | A | 6/1987 | Fallon et al. |
| 4,688,832 | A | 8/1987 | Ortloff et al. |
| 4,706,997 | A | 11/1987 | Carstensen |
| 4,710,245 | A | 12/1987 | Roether |
| 4,721,536 | A | 1/1988 | Koch et al. |
| 4,758,025 | A | 7/1988 | Frick |
| 4,762,344 | A | 8/1988 | Perkins et al. |
| 4,812,182 | A | 3/1989 | Fang et al. |
| 4,814,141 | A | 3/1989 | Imai et al. |
| 4,844,517 | A | 7/1989 | Beiley et al. |
| 4,856,828 | A | 8/1989 | Kessler et al. |
| 4,955,645 | A | 9/1990 | Weems |
| 4,958,862 | A | 9/1990 | Cappelli et al. |
| 4,988,127 | A | 1/1991 | Cartensen |
| 5,007,665 | A | 4/1991 | Bovisio et al. |
| 5,067,874 | A | 11/1991 | Foote |
| 5,137,310 | A | 8/1992 | Noel et al. |
| 5,143,381 | A | 9/1992 | Temple |
| 5,154,534 | A | 10/1992 | Guerin et al. |
| 5,180,008 | A | 1/1993 | Aldridge et al. |
| 5,191,911 | A | 3/1993 | Dubois |
| 5,242,199 | A | 9/1993 | Hann et al. |
| 5,328,158 | A | 7/1994 | Lewis et al. |
| 5,348,350 | A | 9/1994 | Blose et al. |
| 5,352,406 | A | 10/1994 | Barteri et al. |
| 5,360,239 | A | 11/1994 | Klementich |
| 5,449,420 | A | 9/1995 | Okada et al. |
| 5,454,883 | A | 10/1995 | Yoshie et al. |
| 5,456,405 | A | 10/1995 | Stagg |
| 5,505,512 | A | 4/1996 | Smith et al. |
| 5,515,707 | A | 5/1996 | Smith |
| 5,538,566 | A | 7/1996 | Gallagher |
| 5,592,988 | A | 1/1997 | Meroni et al. |
| 5,598,735 | A | 2/1997 | Saito et al. |
| 5,653,452 | A | 8/1997 | Jarvenkyla |
| 5,712,706 | A | 1/1998 | Castore et al. |
| 5,794,985 | A | 8/1998 | Mallis |
| 5,810,401 | A | 9/1998 | Mosing et al. |
| 5,860,680 | A | 1/1999 | Drijver et al. |
| 5,879,030 | A | 3/1999 | Clayson et al. |
| 5,879,474 | A | 3/1999 | Bhadeshia et al. |
| 5,944,921 | A | 8/1999 | Cumino et al. |
| 5,993,570 | A | 11/1999 | Gray |
| 6,006,789 | A | 12/1999 | Toyooka et al. |
| 6,030,470 | A | 2/2000 | Hensger et al. |
| 6,044,539 | A | 4/2000 | Guzowski |
| 6,045,165 | A | 4/2000 | Sugino et al. |
| 6,056,324 | A | 5/2000 | Reimert et al. |
| 6,070,912 | A | 6/2000 | Latham |
| 6,173,968 | B1 | 1/2001 | Nelson et al. |
| 6,188,037 | B1 | 2/2001 | Hamada et al. |
| 6,196,530 | B1 | 3/2001 | Muhr et al. |
| 6,217,676 | B1 | 4/2001 | Takabe et al. |
| 6,248,187 | B1 | 6/2001 | Asahi et al. |
| 6,257,056 | B1 | 7/2001 | Shibayama et al. |
| 6,267,828 | B1 | 7/2001 | Kushida et al. |
| 6,311,965 | B1 | 11/2001 | Muhr et al. |
| 6,331,216 | B1 | 12/2001 | Toyooka et al. |
| 6,347,814 | B1 | 2/2002 | Cerruti |
| 6,349,979 | B1 | 2/2002 | Noel et al. |
| 6,358,336 | B1 | 3/2002 | Miyata |
| 6,384,388 | B1 | 5/2002 | Anderson et al. |
| 6,412,831 | B1 | 7/2002 | Noel et al. |
| 6,447,025 | B1 | 9/2002 | Smith |
| 6,478,344 | B2 | 11/2002 | Pallini, Jr. et al. |
| 6,481,760 | B1 | 11/2002 | Noel et al. |
| 6,494,499 | B1 | 12/2002 | Galle, Sr. et al. |
| 6,514,359 | B2 | 2/2003 | Kawano |
| 6,527,056 | B2 | 3/2003 | Newman |
| 6,540,848 | B2 | 4/2003 | Miyata et al. |
| 6,550,822 | B2 | 4/2003 | Mannella et al. |
| 6,557,906 | B1 | 5/2003 | Carcagno |
| 6,558,484 | B1 | 5/2003 | Onoe et al. |
| 6,581,940 | B2 | 6/2003 | Dittel |
| 6,632,296 | B2 | 10/2003 | Yoshinaga et al. |
| 6,648,991 | B2 | 11/2003 | Turconi et al. |
| 6,669,285 | B1 | 12/2003 | Park et al. |
| 6,669,789 | B1 | 12/2003 | Edelman et al. |
| 6,682,610 | B1 | 1/2004 | Inoue |
| 6,683,834 | B2 | 1/2004 | Ohara et al. |
| 6,709,534 | B2 | 3/2004 | Kusinski et al. |
| 6,752,436 | B1 | 6/2004 | Verdillon |
| 6,755,447 | B2 | 6/2004 | Galle, Jr. et al. |
| 6,764,108 | B2 | 7/2004 | Ernst et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,767,417 B2 | 7/2004 | Fujita et al. | |
| 6,814,358 B2 | 11/2004 | Keck | |
| 6,851,727 B2 | 2/2005 | Carcagno et al. | |
| 6,857,668 B2 | 2/2005 | Otten et al. | |
| 6,883,804 B2 | 4/2005 | Cobb | |
| 6,905,150 B2 | 6/2005 | Carcagno et al. | |
| 6,921,110 B2 | 7/2005 | Marotti et al. | |
| 6,958,099 B2 | 10/2005 | Nakamura et al. | |
| 6,971,681 B2 | 12/2005 | Dell'Erba et al. | |
| 6,991,267 B2 | 1/2006 | Ernst et al. | |
| 7,014,223 B2 | 3/2006 | Della Pina et al. | |
| 7,066,499 B2 | 6/2006 | Della Pina et al. | |
| 7,074,283 B2 | 7/2006 | Omura | |
| 7,083,686 B2 | 8/2006 | Itou | |
| 7,108,063 B2 | 9/2006 | Carstensen | |
| 7,118,637 B2 | 10/2006 | Kusinski et al. | |
| 7,182,140 B2 | 2/2007 | Wood | |
| 7,214,278 B2 | 5/2007 | Kusinski et al. | |
| 7,255,374 B2 | 8/2007 | Carcagno et al. | |
| 7,264,684 B2 | 9/2007 | Numata et al. | |
| 7,284,770 B2 | 10/2007 | Dell'erba et al. | |
| 7,310,867 B2 | 12/2007 | Corbett, Jr. | |
| 7,431,347 B2 | 10/2008 | Ernst et al. | |
| 7,464,449 B2 | 12/2008 | Santi et al. | |
| 7,475,476 B2 | 1/2009 | Roussie | |
| 7,478,842 B2 | 1/2009 | Reynolds, Jr. et al. | |
| 7,506,900 B2 | 3/2009 | Carcagno et al. | |
| 7,621,034 B2 | 11/2009 | Roussie | |
| 7,635,406 B2 | 12/2009 | Numata et al. | |
| 7,735,879 B2 | 6/2010 | Toscano et al. | |
| 7,744,708 B2 | 6/2010 | Lopez et al. | |
| 7,753,416 B2 | 7/2010 | Mazzaferro et al. | |
| 7,862,667 B2 | 1/2011 | Turconi et al. | |
| 8,002,910 B2 | 8/2011 | Tivelli et al. | |
| 8,007,601 B2 | 8/2011 | Lopez et al. | |
| 8,007,603 B2 | 8/2011 | Garcia et al. | |
| 8,016,362 B2 | 9/2011 | Itoga | |
| 8,262,094 B2 | 9/2012 | Beele | |
| 8,262,140 B2 | 9/2012 | Santi et al. | |
| 8,317,946 B2 | 11/2012 | Arai et al. | |
| 8,328,958 B2 | 12/2012 | Turconi et al. | |
| 8,328,960 B2 | 12/2012 | Gomez et al. | |
| 8,333,409 B2 | 12/2012 | Santi et al. | |
| 8,414,715 B2 | 4/2013 | Altschuler et al. | |
| 8,544,304 B2 | 10/2013 | Santi | |
| 8,636,856 B2 | 1/2014 | Altschuler et al. | |
| 8,821,653 B2 | 9/2014 | Anelli et al. | |
| 8,840,152 B2 | 9/2014 | Carcagno et al. | |
| 8,926,771 B2 | 1/2015 | Agazzi | |
| 9,004,544 B2 | 4/2015 | Carcagno et al. | |
| 9,163,296 B2 | 10/2015 | Valdez et al. | |
| 9,187,811 B2 | 11/2015 | Gomez et al. | |
| 9,222,156 B2 | 12/2015 | Altschuler et al. | |
| 9,234,612 B2 | 1/2016 | Santi et al. | |
| 9,340,847 B2 | 5/2016 | Altschuler et al. | |
| 9,383,045 B2 | 7/2016 | Santi et al. | |
| 9,598,746 B2 | 3/2017 | Anellie et al. | |
| 9,745,640 B2 | 8/2017 | Valdez et al. | |
| 9,803,256 B2 * | 10/2017 | Valdez | C21D 8/10 |
| 2001/0035235 A1 | 11/2001 | Kawano | |
| 2002/0011284 A1 | 1/2002 | Von Hagen et al. | |
| 2002/0153671 A1 | 10/2002 | Raymond et al. | |
| 2002/0158469 A1 | 10/2002 | Mannella et al. | |
| 2003/0019549 A1 | 1/2003 | Turconi et al. | |
| 2003/0111146 A1 | 6/2003 | Kusinski et al. | |
| 2003/0116238 A1 | 6/2003 | Fujita | |
| 2003/0155052 A1 | 8/2003 | Kondo et al. | |
| 2003/0165098 A1 | 9/2003 | Ohara et al. | |
| 2003/0168859 A1 | 9/2003 | Watts | |
| 2004/0118490 A1 | 6/2004 | Klueh et al. | |
| 2004/0118569 A1 | 6/2004 | Brill et al. | |
| 2004/0131876 A1 | 7/2004 | Ohgami et al. | |
| 2004/0139780 A1 | 7/2004 | Cai et al. | |
| 2004/0187971 A1 | 9/2004 | Omura | |
| 2004/0195835 A1 | 10/2004 | Noel et al. | |
| 2004/0262919 A1 | 12/2004 | Dutilleul et al. | |
| 2005/0012278 A1 | 1/2005 | Delange | |
| 2005/0076975 A1 | 4/2005 | Lopez et al. | |
| 2005/0087269 A1 | 4/2005 | Merwin | |
| 2005/0093250 A1 | 5/2005 | Santi et al. | |
| 2005/0166986 A1 | 8/2005 | Dell'erba et al. | |
| 2006/0006600 A1 | 1/2006 | Roussie | |
| 2006/0124211 A1 | 6/2006 | Takano et al. | |
| 2006/0137781 A1 | 6/2006 | Kusinski et al. | |
| 2006/0157539 A1 | 7/2006 | DuBois | |
| 2006/0169368 A1 | 8/2006 | Lopez et al. | |
| 2006/0231168 A1 | 10/2006 | Nakamura et al. | |
| 2006/0231186 A1 | 10/2006 | Nakmura et al. | |
| 2006/0243355 A1 | 11/2006 | Haiderer et al. | |
| 2006/0273586 A1 | 12/2006 | Reynolds, Jr. et al. | |
| 2007/0039147 A1 | 2/2007 | Shimanouchi et al. | |
| 2007/0039149 A1 | 2/2007 | Roussie | |
| 2007/0089813 A1 | 4/2007 | Tivelli | |
| 2007/0137736 A1 | 6/2007 | Omura et al. | |
| 2007/0216126 A1 | 9/2007 | Lopez et al. | |
| 2007/0246219 A1 | 10/2007 | Manella et al. | |
| 2008/0047635 A1 | 2/2008 | Kanda et al. | |
| 2008/0115863 A1 | 5/2008 | McCrink et al. | |
| 2008/0129044 A1 | 6/2008 | Carcagno et al. | |
| 2008/0219878 A1 | 9/2008 | Kanda et al. | |
| 2008/0226396 A1 | 9/2008 | Garcia et al. | |
| 2008/0226491 A1 | 9/2008 | Satou et al. | |
| 2008/0257459 A1 | 10/2008 | Arai et al. | |
| 2008/0264129 A1 | 10/2008 | Cheppe et al. | |
| 2008/0286504 A1 | 11/2008 | Asahi et al. | |
| 2008/0303274 A1 | 12/2008 | Mazzaferro et al. | |
| 2008/0314481 A1 | 12/2008 | Garcia et al. | |
| 2009/0010794 A1 | 1/2009 | Turconi et al. | |
| 2009/0033087 A1 | 2/2009 | Carcagno et al. | |
| 2009/0047166 A1 | 2/2009 | Tomomatsu et al. | |
| 2009/0330807 | 2/2009 | Carcagno et al. | |
| 2009/0101242 A1 | 4/2009 | Lopez et al. | |
| 2009/0114318 A1 | 5/2009 | Arai et al. | |
| 2009/0226491 A1 | 9/2009 | Satou et al. | |
| 2009/0226988 A1 | 9/2009 | Tajima et al. | |
| 2010/0136363 A1 | 6/2010 | Valdez et al. | |
| 2010/0187808 A1 | 7/2010 | Santi | |
| 2010/0193085 A1 | 8/2010 | Garcia | |
| 2010/0206553 A1 | 8/2010 | Bailey et al. | |
| 2010/0294401 A1 | 11/2010 | Gomez | |
| 2010/0319814 A1 | 12/2010 | Perez | |
| 2010/0327550 A1 | 12/2010 | Lopez | |
| 2011/0042946 A1 | 2/2011 | Santi | |
| 2011/0077089 A1 | 3/2011 | Hirai et al. | |
| 2011/0097235 A1 | 4/2011 | Turconi et al. | |
| 2011/0133449 A1 | 6/2011 | Mazzaferro | |
| 2011/0233925 A1 | 9/2011 | Pina | |
| 2011/0247733 A1 | 10/2011 | Arai et al. | |
| 2011/0259482 A1 | 10/2011 | Peters et al. | |
| 2011/0284137 A1 | 11/2011 | Kami et al. | |
| 2012/0018056 A1 | 1/2012 | Nakagawa et al. | |
| 2012/0186686 A1 * | 7/2012 | Valdez | C21D 8/105 138/177 |
| 2012/0199255 A1 | 8/2012 | Anelli | |
| 2012/0267014 A1 | 10/2012 | Hitoshio et al. | |
| 2013/0000790 A1 | 1/2013 | Arai et al. | |
| 2013/0004787 A1 | 1/2013 | Ishiyama et al. | |
| 2013/0199674 A1 | 8/2013 | Altschuler et al. | |
| 2013/0264123 A1 | 10/2013 | Altschuler et al. | |
| 2014/0021244 A1 | 1/2014 | DuBois | |
| 2014/0027497 A1 | 1/2014 | Rowland et al. | |
| 2014/0057121 A1 | 2/2014 | Altschuler et al. | |
| 2014/0137992 A1 | 5/2014 | Ishiguro et al. | |
| 2014/0251512 A1 | 9/2014 | Gomez | |
| 2014/0272448 A1 | 9/2014 | Valdez et al. | |
| 2014/0299235 A1 | 10/2014 | Anelli | |
| 2014/0299236 A1 | 10/2014 | Anelli | |
| 2015/0368986 A1 | 12/2015 | Narikawa | |
| 2016/0024625 A1 | 1/2016 | Valdez | |
| 2016/0102856 A1 | 4/2016 | Minami | |
| 2016/0281188 A1 | 9/2016 | Valdez et al. | |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2016/0305192 | A1 | 10/2016 | Buhler |
| 2018/0044747 | A1 | 2/2018 | Valdez et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2319926 | | 7/2008 |
| CN | 1401809 | | 3/2003 |
| CN | 1487112 | | 4/2004 |
| CN | 1292429 | | 12/2006 |
| CN | 101480671 | | 7/2009 |
| CN | 101542002 | | 9/2009 |
| CN | 101613829 | A | 12/2009 |
| CN | 101413089 | | 11/2010 |
| DE | 3310226 | A1 | 10/1984 |
| DE | 4446806 | | 5/1996 |
| EA | 010037 | | 6/2008 |
| EA | 012256 | | 8/2009 |
| EP | 0 032 265 | | 7/1981 |
| EP | 0 092 815 | | 11/1983 |
| EP | 0 104 720 | | 4/1984 |
| EP | 0 159 385 | | 10/1985 |
| EP | 0 309 179 | | 3/1989 |
| EP | 0 340 385 | | 11/1989 |
| EP | 0 329 990 | | 11/1992 |
| EP | 0 658 632 | | 6/1995 |
| EP | 0 753 595 | | 1/1997 |
| EP | 0788850 | | 8/1997 |
| EP | 0 828 007 | A | 3/1998 |
| EP | 0 989 196 | | 3/2000 |
| EP | 1 008 660 | | 6/2000 |
| EP | 0 1 027 944 | | 8/2000 |
| EP | 1 065 423 | | 1/2001 |
| EP | 828 007 | | 11/2001 |
| EP | 1 269 059 | | 1/2003 |
| EP | 1 277 848 | | 1/2003 |
| EP | 1 288 316 | | 3/2003 |
| EP | 1 296 088 | | 3/2003 |
| EP | 1 362977 | | 11/2003 |
| EP | 1413639 | | 4/2004 |
| EP | 1 182 268 | | 9/2004 |
| EP | 1 705 415 | | 9/2006 |
| EP | 1 726 861 | | 11/2006 |
| EP | 1717324 | | 11/2006 |
| EP | 1 876 254 | | 1/2008 |
| EP | 1 914 324 | | 4/2008 |
| EP | 2 000 629 | | 12/2008 |
| EP | 1554518 | | 1/2009 |
| EP | 2 028 284 | | 2/2009 |
| EP | 2 133 442 | | 12/2009 |
| EP | 2 216 576 | | 8/2010 |
| EP | 2 239 343 | | 10/2010 |
| FR | 1149513 | | 12/1957 |
| FR | 1489013 | | 7/1967 |
| FR | 2 704 042 | A | 10/1994 |
| FR | 2 848 282 | A1 | 6/2004 |
| FR | 2855587 | | 12/2004 |
| GB | 498 472 | | 1/1939 |
| GB | 1 398 214 | | 6/1973 |
| GB | 1 428 433 | | 3/1976 |
| GB | 2 104 919 | A | 3/1983 |
| GB | 2 234 308 | | 1/1991 |
| GB | 2 276 647 | | 10/1994 |
| GB | 2 388169 | | 11/2003 |
| JP | S522825 | | 1/1977 |
| JP | 58-187684 | | 12/1983 |
| JP | 60-086209 | | 5/1985 |
| JP | S60 11 6796 | | 6/1985 |
| JP | 60-215719 | A | 10/1985 |
| JP | 36025719 | | 10/1985 |
| JP | S61-103061 | | 5/1986 |
| JP | 61 270355 | | 11/1986 |
| JP | 63 004046 | A2 | 1/1988 |
| JP | 63 004047 | A2 | 1/1988 |
| JP | 63-230847 | A2 | 9/1988 |
| JP | 63230851 | A2 | 9/1988 |
| JP | 01-242761 | | 9/1989 |
| JP | 01 259124 | | 10/1989 |
| JP | 01 259125 | A2 | 10/1989 |
| JP | 01 283322 | | 11/1989 |
| JP | 05-098350 | | 12/1990 |
| JP | 403006329 | | 1/1991 |
| JP | 04 021718 | | 1/1992 |
| JP | 04 107214 | | 4/1992 |
| JP | 04 231414 | | 8/1992 |
| JP | 05 287381 | | 11/1993 |
| JP | H06-042645 | | 2/1994 |
| JP | 06-093339 | | 4/1994 |
| JP | 06 172859 | | 6/1994 |
| JP | 06-220536 | | 8/1994 |
| JP | 07-003330 | | 1/1995 |
| JP | 07 041856 | | 2/1995 |
| JP | 07-139666 | | 5/1995 |
| JP | 07 197125 | | 8/1995 |
| JP | 08 311551 | | 11/1996 |
| JP | 09 067624 | | 3/1997 |
| JP | 09-235617 | | 9/1997 |
| JP | 2704042 | | 10/1997 |
| JP | 10 140250 | | 5/1998 |
| JP | 10 176239 | | 6/1998 |
| JP | 10 280037 | | 10/1998 |
| JP | 11 050148 | | 2/1999 |
| JP | 11 140580 | | 5/1999 |
| JP | 11 229079 | | 8/1999 |
| JP | 2000-063940 | | 2/2000 |
| JP | 2000-178645 | | 6/2000 |
| JP | 2000-248337 | | 9/2000 |
| JP | 2000-313919 | | 11/2000 |
| JP | 2001-131698 | | 5/2001 |
| JP | 2001-164338 | | 6/2001 |
| JP | 2001-172739 | | 6/2001 |
| JP | 2001-220653 | | 8/2001 |
| JP | 2001-271134 | | 10/2001 |
| JP | 2002-096105 | | 4/2002 |
| JP | 2002-130554 | | 5/2002 |
| JP | 2004-011009 | | 1/2004 |
| JP | 2007-031769 | | 7/2005 |
| JP | 60 174822 | | 9/2005 |
| KR | 0245031 | | 3/2000 |
| KZ | 1418 | B | 12/1994 |
| KZ | 2506 | B | 9/1995 |
| KZ | 2673 | B | 12/1995 |
| UA | 51138 | A | 11/2002 |
| WO | WO 1984/002947 | | 8/1984 |
| WO | WO 1994/29627 | | 12/1994 |
| WO | WO 1996/22396 | | 7/1996 |
| WO | WO 2000/06931 | | 2/2000 |
| WO | WO 2000/70107 | | 11/2000 |
| WO | WO 2001/075345 | | 10/2001 |
| WO | WO 2001/88210 | | 11/2001 |
| WO | WO 2002/29290 | | 4/2002 |
| WO | WO 2002/035128 | | 5/2002 |
| WO | WO 2002/068854 | | 9/2002 |
| WO | WO 2002/086369 | | 10/2002 |
| WO | WO 2002/093045 | | 11/2002 |
| WO | WO 2003/033856 | | 4/2003 |
| WO | WO 2003/048623 | | 6/2003 |
| WO | WO 2003/087646 | | 10/2003 |
| WO | WO 2004/023020 | | 3/2004 |
| WO | WO 2004/031420 | | 4/2004 |
| WO | WO 2004/033951 | | 4/2004 |
| WO | WO 2004/053376 | | 6/2004 |
| WO | WO 2004/097059 | | 11/2004 |
| WO | WO 2004/109173 | | 12/2004 |
| WO | WO 2006/003775 | | 6/2005 |
| WO | WO 2005/080621 | | 9/2005 |
| WO | WO 2006/009142 | | 1/2006 |
| WO | WO 2006/087361 | | 4/2006 |
| WO | WO 2006/078768 | | 7/2006 |
| WO | WO 2007/002576 | | 1/2007 |
| WO | WO 2007/017082 | | 2/2007 |
| WO | WO 2007/017161 | | 2/2007 |
| WO | WO 2007/023806 | | 3/2007 |
| WO | WO 2007/028443 | | 3/2007 |
| WO | WO 2007/034063 | | 3/2007 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2007/063079 | 6/2007 |
| WO | WO 2008/003000 | 1/2008 |
| WO | WO 2008/007737 | 1/2008 |
| WO | WO 2008/090411 | 7/2008 |
| WO | WO 2008/110494 | 9/2008 |
| WO | WO 2008/127084 | 10/2008 |
| WO | WO 2009/000851 | 12/2008 |
| WO | WO 2009/000766 | 1/2009 |
| WO | WO 2009/010507 | 1/2009 |
| WO | WO 2009/027308 | 3/2009 |
| WO | WO 2009/027309 | 3/2009 |
| WO | WO 2009/044297 | 4/2009 |
| WO | WO 2009/065432 | 5/2009 |
| WO | WO 2009/106623 | 9/2009 |
| WO | WO 2010/061882 | 6/2010 |
| WO | WO 2010/122431 | 10/2010 |
| WO | WO 2011/152240 | 12/2011 |
| WO | WO 2013/007729 | 1/2013 |

OTHER PUBLICATIONS

Chitwood, G. B., et al.: "High-Strength Coiled Tubing Expands Service Capabilities", as presented at the 24th Annual OTC in Houston, Texas, May 4-7, 1992, in 15 pages.
European Extended Search Report re EPO Application No. 12152516.6, dated Jun. 25, 2012.
Holloman, J.H., et al., Time-tempered Relations in Tempering Steel. New York Meeting, pp. 223-249, 1945.
International Standard Publication. Petroleum and natural gas industries—Materials for use in H2Scontaining environments in oil and gas production. ANSI/NACE ISO, 145 pages, 2009.
Pollack, Herman, W., Materials Science and Metallurgy, Fourth Edition, pp. 96 and 97, 1988.
Tenaris brochure. Coiled Tubes HS80CRA, 2 pages, 2008.
Tenaris brochure. Coiled Tubes Suggested Field Welding Procedure (GTAW) for Coiled Tubing Grads HS70, HS80, HS90, HS11 0, 3 pages, 2007.
Tenaris brochure. Coiled Tubing for Down hole Applications, 10 pages, 2007.
European Search Report and Opinion, re EPO Application No. EP 14159174.3, dated Jul. 3. 2014.
Savatori et al. European Commision Report, EUR 2006, EUR2207, 3 pp. STN_ABSTRACT.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 1: Non-alloy Steel Tubes with Specified Room Temperature Properties" British Standard BS EN 10216-1:2002 E:1-26, published May 2002.
Craig, Bruce D., "Effect of Copper on the Protectiveness of Iron Sulfide Films", Corrosion, National Association of Corrosion Engineers, 1984, vol. 40, Issue 9, pp. 471-474.
D.O.T. 178.68 Spec. 39. pp. 831-840, Non reusable (non refillable) cylinders, Oct. 1. 2002.
De Medicis, Rinaldo, "Cubic FeS, A Metastable Iron Sulfide", Science, American Association for the Advancement of Science, Steen bock Memorial Library, Dec. 11, 1970, vol. 170, Issue 3963, pp. 723-728.
Drill Rod Joint Depth Capacity Chart, downloaded Jan. 15, 2013; http://www.boartlongyear.com/d ri 11-rod-joi nt-depth-capacity-chart.
Echaniz, G., Morales, C., Perez, T., "Advances in Corrosion Control and Materials in Oil and Gas Production" Papers from Eurocorr 97 and Eurocorr 98, 13, P. S. Jackman and L. M. Smith, Published for the European Federation of Corrosion, No. 26, European Federation of Corrosion Publications, 1999.
Fang, Hong-Sheng, et al,: "The Developing Prospect of Air-cooled Bainitic Steels", International Journal of Issi, vol. 2, No. 2, Feb. 1, 2005, pp. 9-18.
Frati Ni et al.: "Improving friction stir welding of blanks of different thicknesses," Materials Science and Engineering A 459 (2007).
Gojic, Mirko and Kosec, Ladislav, "The Susceptibility to the Hydrogen Embrittlement of Low Alloy Cr and CrMo Steels", ISIJ International, 1997, vol. 37, Issue 4, pp. 412-418.
Heckmann, et al., Development of low carbon Nb—Ti—B microalloyed steels for high strength large diameter linepipe, Ironmaking and Steelmaking, 2005, vol. 32, Issue 4, pp. 337-341.
Howells, et al.: "Challenges for Ultra-Deep Water Riser Systems", I IR, London, Apr. 1997, 11 pages.
Hutchings et al., "Ratio of Specimen thickness to charging area for reliable hydrogen permeation measurement", British Corrosion. Journal, 1993, vol. 28 Issue 4, pp. 309-312.
Iino et al., "Aciers pour pipe-lines resistant au cloquage et au criquage dus a l'hydrogene", Revue de Metallurgie, 1979, vol. 76, Issue 8-9, pp. 591-609.
Ikeda et al., "Influence of Environmental Conditions and Metallurgical Factors on Hydrogen Induced Cracking of Line Pipe Steel", Corrosion/SO, National Association of Corrosion Engineers, 1980, vol. 8, pp. 8/1-8/18, Houston, Texas.
Izquierdo, et al.: "Qualification of Weldable X65 Grade Riser Sections with Upset Ends to Improve Fatigue Performance of Deepwater Steel Catenary Risers", Proceedings of the Eighteenth International Offshore and Polar Engineering Conference, Vancouver, BC, Canada, Jul. 6-11, 2008, p. 71.
Johnston, P. W., G.Brooks, "Effect of Al203 and Ti02 Additions on the Lubrication Characteristics of Mould Fluxes", Molten Slags, Fluxes and Salts •97 Conference, 1997 pp. 845-850.
Keizer, Joel, "Statistical Thermodynamics of Nonequilibrium Processes", Springer-Verlag, 1987.
Kishi, T., H,Takeucgi, M.Yamamiya, H.Tsuboi, T.Nakano, T.Ando, "Mold Powder Technology for Continuous Casting of Ti-Stabilized Stainless Steels", Nippon Steel Technical Report, No. 34, Jul. 1987, pp. 11-19.
Korolev D. F., "The Role of Iron Sulfides in the Accumulation of Molybdenum in Sedimentary Rocks of the Reduced Zone", Geochemistry, 1958, vol. 4, pp. 452-463.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 2: Non-alloy and Alloy Steel Tubes with Specified Elevated Temperature Properties" British Standard BS EN 10216-2:2002+A2:2007: E: 1-45, published Aug. 2007.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 3: Alloy Fine Grain Steel Tubes" British Standard BS EN 10216-3:2002 +A 1 :2004 E: 1-34, published Mar. 2004.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 4: Non-alloy and Alloy Steel Tubes with Specified Low Temperature Properties" British Standard BS EN 10216-4:2002 +A 1 :2004 E: 1-30, published Mar. 2004.
Aggarwal, R. K., et al.: "Qualification of Solutions for Improving Fatigue Life at SCR Touch Down Zone", Deep OffShore Technology Conference, Nov. 8-10, 2005, Vitoria, Espirito Santo, Brazil, in 12 pages.
Anelli, E., D. Colleluori, M. Pontremoli, G. Cumino, A Izquierdo, H. Quintanilla, "Metallurgical design of advanced heavy wall seamless pipes for deep-water applications", 4th International Conference on Pipeline Technology, May 9 to 13, 2004, Ostend, Belgium.
Asahi, et al., Development of Ultra-high-strength Linepipe, X120, Nippon Steel Technical Report, Jul. 2004, Issue 90, pp. 82-87.
ASM Handbook, Mechanical Tubing and Cold Finishing, Metals Handbook Desk Edition, (2000), 5 pages.
Bai, M., D. Liu, Y. Lou, X. Mao, L. Li, X. Huo. "Effects of Ti addition on low carbon hot strips produced by CSP process", Journal of University of Science and Technology Beijing, 2006, vol. 13, N° 3, p. 230.
Beretta, Stefano et al., "Fatigue Assessment of Tubular Automotive Components in Presence of Inhomogeneities", Proceedings of IMECE2004, ASME International Mechanical Engineering Congress, Nov. 13-19, 2004, pp. 1-8.
Berner, Robert A, "Tetragonal Iron Sulfide", Science, Aug. 31, 1962, vol. 137, Issue 3531, pp. 669.
Berstein et al.,"The Role of Traps in the Microstructural Control of Hydrogen Embrittlement of Steels" Hydrogen Degradation of Ferrous Alloys, Ed. T. Oriani, J. Hirth, and M. Smialowski, Noyes Publications, 1988, pp. 641-685.

(56) **References Cited**

OTHER PUBLICATIONS

Boulegue, Jacques, "Equilibria in a sulfide rich Water from Enghien-les-Bains, France", Geochimica et Cosmochimica Acta, Pergamon Press, 1977, vol. 41, pp. 1751-1758, Great Britain.
Bruzzoni et al., "Study of Hydrogen Permeation Through Passive Films on Iron Using Electrochemical Impedance Spectroscopy", PhD Thesis, 2003, Universidad Nacional del Comahue de Buenos Aires, Argentina (Abrstract).
Cancio et al., "Characterization of microalloy precipitates in the austenitic range of high strength low alloy steels", Steel Research, 2002, vol. 73, pp. 340-346.
Carboni A, A Pigani, G. Megahed, S. Paul, "Casting and rolling of: API X 70 grades for artic application in a thin slab rolling plant", Stahl u Eisen, 2008, N° 1, p. 131-134.
Chang, L.C., "Microstructures and reaction kinetics of bainite transfomiation in Si-Rich steels" XP0024874, Materials Science and Engineering, vol. 368, No. 1-2. Mar. 15, 2004, pp. 175-182, Abstract, Table 1.
Clark, A Horrell, "Some Comments on the Composition and Stability Relations of Mackinawite", Neues Jahrbuch fur Mineralogie, 1966, vol. 5, pp. 300-304 London, England.
Taira et al., "HIC and SSC Resistance of Line Pipes for Sour Gas Service", Nippon Kokan Technical Report, 1981, vol. 31, Issue 1-13.
Taira et al., "Study on the Evaluation of Environmental Condition of Wet Sour Gas", Corrosion 83 (Reprint. No. 156, National Association of Corrosion Engineers), 1983. pp. 156/2-156/13, Houston, Texas.
Takeno et al., "Metastable Cubic Iron Sulfide—With Special Reference to Mackinawite", American Mineralogist, 1970. vol. 55, pp. 1639-1649.
Tenaris Newsletter for Pipeline Services, Apr. 2005, p. 1-8.
Tenaris Newsletter for Pipeline Services, May 2003, p. 1-8.
Thethi, et al.: "Alternative Construction for High Pressure High Temperature Steel Catenary Risers", OPT USA, Sep. 2003, p. 1-13.
Thewlis, G., Weidability of X100 linepipe, Science and Technology of Welding and Joining, 2000, vol. 5, Issue 6, pp. 365-377.
Tivelli, M., G. Cumino, A Izquierdo, E. Anelli, A Di Schino, "Metallurgical Aspects of Heavy Wall—High Strength Seamless Pipes for Deep Water Applications", RioPipeline 2005, Oct. 17 to 19, 2005, Rio (Brasil), Paper n° IBP 1008 05.
Todoroki, T. Ishii, K, Mizuno, A. Hongo, "Effect of crystallization behavior of mold flux on slab surface quality of a Ti-bearing Fe—Cr—Ni super alloy cast by means of continuous casting process", Materials Science and Engineering A, 2005, vol. 413-414, p. 121-128.
Turconi, G. L.: "Improvement of resistance to SSC initiation and propagation of high strength OCTG through microstructure and precipitation control"; Paper 01077, NACE International, Houston, TX, Mar. 16, 2001. (XP009141583).
Vaughan, D. J. and Ridout, M.S., "Moessbauer Studies of Some Sulphide Minerals", J. Inorg Nucl. Chem., 1971, vol. 33, pp. 741-746.
Wegst, C.W., "Stahlussel", Auflage 1989, Seite 119, 2 pages.
Yu, et al.: "New steels and alloys in mechanical engineering I ed.," M: Mechanical Engineering, 1976, p. 19.
ASTM A 213/A 213M "Standard Specification for Seamless Ferritic and Austenitic Alloy-Steel Boiler, Superheater, and Heat-Exchanger Tubes".
ASTM A 182/ A 182M "Standard Specification for Forged or Rolled Alloy and Stainless Steel Pipe Flanges, Forged Fittings, and Valves and Parts for High-Temperature Service".
ASTM A336/A336M "Standard Specification for Alloy Steel Forgings for Pressure and High-Temperature Parts".
ASTM A355 which is related to "Seamless Ferritic Alloy-Steel Pipe for High-Temperature Service".
ASTM, "E112-13 Standard Test Methods for Determining Average Grain Size," ASTM International. 2012. p. 1-28.
Davis, J.R., et al. "ASM—Speciality Handbook—Carbon and alloy steels" ASM Speciality Handbook, Carbon and Alloy Steels, 1996, pp. 12-27, XP002364757 US.
E. Anelli, et al., "Metallurgical Design of Advanced Heavy Wall Seamless pipes for Deepwater Applications", 4th International Conference on Pipeline Technology, May 9-13, 2004, Ostend, Belgium.
Lee, Sung Man and Lee, Jai Young, "The Effect of the Interface Character of TiC Particles on Hydrogen Trapping in Steel", Acta Metal I., 1987, vol. 35, Issue 11, pp. 2695-2700.
Mehling, Wilfred L.: "Hot Upset Forging," ASM Handbook vol. 14, 1998, pp. 84-95.
Mishael, et al., "Practical Applications of Hydrogen Permeation Monitoring," Corrosion, Mar. 28-Apr. 1, 2004, Corrosion 2004, Nacional Association of Corrosion Engineers, vol. Reprint No. 04476.
Morice et al., "Moessbauer Studies of Iron Sulfides", J Inorg. Nucl. Chem., 1969, vol. 31 pp. 3797-3802.
Mukongo, T., P.C.Pistorius, and A.M.Garbers-Craig, "Viscosity Effect of Titanium Pickup by Mould Fluxes for Stainless Steel", Ironmaking and Steelmaking, 2004, vol. 31, No. 2, pp. 135-143.
Mullet et al., "Surface Chemistry and Structural Properties of Mackinawite Prepared by Reaction of Sulfide Ions with Metallic Iron", Geochimica et Cosmochimica Acta, 2002, vol. 66, Issue 5, pp. 829-836.
Murcowchick, James B. and Barnes H.L., "Formation of a cubic FeS", American Mineralogist, 1986. vol. 71 pp. 1243-1246.
Nagata, M., J. Speer, D. Matlock, "Titanium nitride precipitation behavior in thin slab cast high strength low alloyed steels", Metallurgical and Materials Transactions A, 2002, vol. 33A, p. 3099-3110.
Nakai et al., "Development of Steels Resistant to Hydrogen Induced Cracking in Wet Hydrogen Sulfide Environment", Transactions of the ISIJ, 1979, vol. 19, pp. 401-410.
Nandan et al.: "Recent advances in friction-stir welding—Process, weldment structure and properties," Progress in Materials Science 53 (2008) 980-1023.
Pressure Equipment Directive 97/23/EC, May 29, 1997, downloaded from website: http://ec.europa.en/enterpise/pressure equipment/ped/index en. html on Aug. 4, 2010.
Prevey, Paul, et al., "Introduction of Residual Stresses to Enhance Fatigue Performance in the Initial Design" Proceedings of Turbo Expo 2004, Jun. 14-17, 2004, pp. 1-9.
Rickard, D.T., "The Chemistry of Iron Sulphide Formation at Low Temperatures", Stockholm Contrib. Geo I., 1969, vol. 26, pp. 67-95.
Riecke, Ernst and Bohnenkamp, Konrad, "Uber den Einfluss von Gittersoerstellen in eisen auf die X-abs Wassersroffdiffusion", Z. Metallkde .. , 1984, vol. 75, pp. 76-81 (Abstract).
Savatori et al.: European Commission Report, EUR 2006, EUR2207, 3 pp. STN_Abstract.
Shanabarger, M.R. and Moorhead, R. Dale, "H20 Adsorption onto clean oxygen covered iron films", Surface Science, 1996. vol. 365, pp. 614-624.
Shoesmith, et al., "Formation of Ferrous Monosulfide Polymorphs During Corrosion of Iron by Aqueous Hydrogen Sulfide at 21 degrees C'", Journal of the Electrochemical Society, 1980, vol. 127, Issue 5, pp. 1007-1015.
Skoczylas, G., A Dasgupta, R. Bommaraju, "Characterization of the chemical interactions during casting of High-titanium low carbon enameling steels", 1991 Steelmaking Conference Proceeding, pp. 707-717.
Smyth, D., et al.: Steel Tubular Products, Properties and Selection: Irons, Steels, and High-Performance Alloys, vol. 1 ASM Handbook, ASM International, 1990, p. 327-336.
Spry, Alan, "Metamorphic Textures", Perganon Press, 1969, New York.
Extrait du Catalogue N 940, 1994.
Fritz T et al, "Characterization of electroplated nickel", Microsystem Technologies, Dec. 31, 2002, vol. 9, No. 1-2, pp. 87-91, Berlin, DE.
Gomez, G., et al.: "Air cooled bainitic steels for strong, seamless pipes—Part 1—allowy design, kinetics and microstructure", Materials Science and Technology, vol. 25, No. 12, Dec. 1, 2009. (XP002611498).

(56) **References Cited**

OTHER PUBLICATIONS

Jacobs, Lucinda and Emerson, Steven, "Trace Metal Solubility in an Anoxid Fjord", Earth and Planetary Sci. Letters, Elsevier Scientific Publishing Company, 1982, vol. 60, pp. 237-252, Amsterdam, Netherlands.
Kazutoshi Ohashi et al, "Evaluation of r-value of steels using Vickers hardness test", Journal of Physics: Conference Series, Aug. 7, 2012, p. 12045, vol. 379, No. 1, Institute of Physics Publishing, Bristol, GB.
Tivelli et al., "Metakkurgical Aspects of Heavy Wall—High Strength Seamless Pipes for Deep Water Applications", RioPipeline, Oct. 17-19, 2005 Rio, Brasil.
Mechanical Tubing and Cold Finishing, Metals Handbook Desk Edition, (2000), 5 pages
NACE MR0175/ISO 15156-1 Petroleum and natural gas industries—Materials for use in H2S-containing Environments in oil and gas production—Part 1 : General principles for selection of crackina-resistant materials, Jun. 28, 2007.
Specification for Threading, Gauging and Thread Inspection of Casing, Tubing, and Line Pipe Threads, American Petroleum Institute, Specification 58, Apr. 2008, 15th Edition (Excerpts Only).
Echaniz, "The effect of microstructure on the KISSC of low alloy carbon steels", NACE Corrosion '98, EE. UU., Mar. 1998, pp. 22-27, San Diego.
Echaniz, "The effect of microstructure on the KISSC of low alloy carbon steels", NACE Corrosion '98, EE. UU., Mar. 1988, pp. 22-27, San Diego.
U.S. Appl. No. 15/665,054, filed Oct. 19, 2017, Valdez et al.
Bhadeshia et al., "Steels, Microstructure and Properties," Third Edition, Elsevier, Published in 2006, pp. 296.
European Office Action in European Application No. 14159174.3 dated Sep. 16, 2016, 4 pages.
European Search Report in European Application No. 14159174.3, dated Jul. 10, 2014. 5 pages.
European Office Action in European Application No. 14159174.3 dated Jan. 12, 2018, 4 pages.
[No Author Listed], "Coiled Tubing String Design," Unknown if this document was publicly disclosed, 2 pages.
[No Author Listed], "CYMAX Division—Coiled Tubing Reel Sizes," Unknown if this document was publicly disclosed, 1 page.
[No Author Listed], "Orbital TIG Welding Cymax Coiled Tubing," Unknown if this document was publicly disclosed, but dated Nov. 1992, 13 pages.
[No Author Listed], "Southwestern Pipe, Inc.—Cymax Coiled Tubing," Unknown if this document was publicly disclosed, 1 page.
[No Author Listed], "The Development and Testing of CYMAX 100 Coiled Tubing," This document is dated Jan. 1992 and is cited in the bibliography of the Full Body Quenched and Tempered Coiled Tubing dated Mar. 1, 1994, 15 pages.
Faszold et al., "Full-Scale Fatigue Testing With 130K Yield Tubing." Paper SPE-153945, Presented at SPE/ICoTA Coiled Tubing & Well Intervention Conference and Exhibition Jan. 2012, Society of Petroleum Engineers, 6 pages.
Thompson et al., "Full Body Quenched and Tempered Coiled Tubing—Theory vs. Field Experience," Presented at the Second International Conference and Exhibition on Coiled Tubing Technology: Operations, Services, Practices, held at Adams Mark hotel in Houston on or about Mar. 28-31, 1994, Mar. 1, 1994, 20 pages.
U.S. Appl. No. 15/788,534, filed Oct. 19, 2017, Valdez et al.
U.S. Appl. No. 15/943,528, filed Apr. 2, 2018, Valdez et al.
U.S. Appl. No. 14/872,490, filed Oct. 1, 2015, Valdez et al.
U.S. Appl. No. 15/076,305, filed Mar. 21, 2016, Valdez et al.

* cited by examiner


STD2 steel, AGS = 10-20 μm
Temperature (°C)
Times (s)
F
B
M
100°C/s
30°C/s
10°C/s
2.2°C/s
50°C/s
20°C/s
5°C/s
1°C/s
800
700
600
500
400
300
200
100
1
10
100
1000

FIG. 1A


STD3 steel, AGS = 10-20 μm
Temperature (°C)
Times (s)
F
B
M
100°C/s
30°C/s
10°C/s
2.2°C/s
50°C/s
20°C/s
5°C/s
1°C/s
800
700
600
500
400
300
200
100
1
10
100
1000

FIG. 1B


BTi2 steel, AGS = 10-20 µm
Temperature (°C)
800
700
600
500
400
300
200
100
1
10
100
1000
Times (s)
F + P
B
M
50°C/s
25°C/s
20°C/s
10°C/s
5°C/s
1°C/s

FIG. 2A


CrMoBTi3 steel, AGS = 10-20 µm
Temperature (°C)
800
700
600
500
400
300
200
100
1
10
100
1000
10000
Times (s)
F + P
B
M
40°C/s
15°C/s
5°C/s
1°C/s
0.2°C/s

FIG. 2B



Cooling in quenching heads:
internal
Cooling Rate (°C/s)
WT (inches)
0
10
20
30
40
50
60
0,0
0,1
0,2
0,3
0,4
0,5


FIG. 3



BTi2 steel
No soaking (WT=0.2")
YS
UTS
Tempering at 720°C
YS
UTS
Strength (ksi)
Tmax (°C)
Time at 720°C (min)
70
80
90
100
110
120
130
140
150
550
575
600
625
650
675
700
1
2
3
4
5
6
7
8
9
10


FIG. 4


HV 25kV
Spot 3.7
Mag 2000 x
Det SE
WD 10mm
10 μm

FIG. 5B


HV 25kV
Spot 4.5
Mag 500 x
Det SE
WD 10mm
50 μm

FIG. 5A


Acc.V 25.0 kV
Spot 5.0
Mag 1000x
Det SE
WD 9.9
20 µm

FIG. 6B


Acc.V 25.0 kV
Spot 6.0
Mag 200x
Det SE
WD 10.0
100 µm

FIG. 6A


Acc.V Spot Mag Det WD
25.0 kV 6.0 500x BSE 10.5
500 µm

FIG. 7B


Fracture surface
("cone")
Acc.V Spot Mag Det WD
25.0 kV 6.0 50x SE 10.6
500 µm

FIG. 7A


Acc.V 25.0 kV
Spot 4.5
Mag 1000x
Det SE
WD 10.1
20 µm

FIG. 8B


Acc.V 25.0 kV
Spot 3.7
Mag 1000x
Det SE
WD 9.9
20 µm

FIG. 8A


ERW line
20 μm
Acc.V 25.0 kV
Spot 6.0
Mag 1000x
Det SE
WD 10.0

FIG. 9B


ERW line
20 μm
HV 25.0 kV
Spot 5.972
Mag 1000x
Det SE
WD 10mm

FIG. 9A




FIG. 10A




FIG. 10B




FIG. 11B




FIG. 11A




FIG. 12


HAZ
FZ
HAZ
130%
125%
120%
115%
110%
105%
100%
95%
90%
% of base tube hardness
-15,0
-10,0
-5,0
0,0
5,0
10,0
15,0
Distance from the Bias Weld center line (mm)
Conventional BW
New Process Route

FIG. 13




FIG. 14B




FIG. 14A


HYDRAULIC ACTUATOR
BENDING MANDREL
COILED TUBE SAMPLE
STRAIGHTENING BLOCK
SAMPLE RESTRAINT

FIG. 15


Fatigue life at BW relative to BM (%)
0
20
40
60
80
100
120
Conventional
New Chem and Process

FIG. 16


Fatigue life improvement (%)
0
20
40
60
80
100
120
140
160
180
200
220
240
260
280
300
80
90
100
110
120
130
140
Minimum yield Strength (Ksi)

FIG. 17



FIG. 18B



FIG. 18A

# HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

### Related Applications

This application is a continuation of and claims the benefit of priority to application entitled HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME, U.S. patent application Ser. No. 14/190,886, filed Feb. 26, 2014, now issued as U.S. Pat. No. 9,803,256 on Oct. 31, 2017, which claims priority to U.S. Provisional Application Ser. No. 61/783,701, filed on Mar. 14, 2013, the entirety of both of which are hereby incorporated by reference.

## BACKGROUND

### Description of the Related Art

In recent years the use of coiled tubing has been expanded to applications that require high pressure and extended reach operations. As a consequence, there is a need to produce coiled tubing with elevated tensile properties in order to withstand: i) axial loads on hanging or pooling long strings, and ii) elevated pressures applied during operation.

The standard production of coiled tubing uses as raw material, hot rolled strips with mechanical properties achieved through microstructural refinement during rolling. This refinement is obtained with the use of different microalloying additions (Ti, N, V) as well as appropriate selection of hot rolling processing conditions. The objective is to control material recrystallization and grain growth in order to achieve an ultra-fine microstructure. The material is limited in the use of solid solution alloying elements and precipitation hardening, since refinement is the only mechanism that allows for high strength and toughness, simultaneously.

This raw material is specified to each supplier, and may require varying mechanical properties in the hot rolled steel in order to produce coiled tubes with varying mechanical properties as well. As the properties increase, the cost of production and hence the raw material cost also increases. It is known that the strip-to-strip welding process used during the assembly of the "long strip" that will be ERW formed/welded into the coiled tubing, deteriorates the joining area. Thereafter, the coiled tubing with increasing properties, tend to have a relatively lower performance on the area of the strip welds. This deterioration is caused by the fact that the welding processes destroys the refinement introduced during hot rolling, and there is no simple post weld heat treatment capable of regenerating both tensile and toughness properties. In general tensile is restored but toughness and its associated fatigue life are deteriorated in this zone. Current industrial route can produce high strength coiled tubing, only at elevated cost and with poor relative performance of strip welds joins with respect to pipe body.

One alternative for producing a coiled tubing is through a full body heat treatment. This treatment is applied to a



material that has been formed into a pipe in the so called "green" state, because its properties are yet to be defined by the heat treatment conditions. In this case the main variables affecting the final product properties are the steel chemistry and the heat treatments conditions. Thereafter, by appropriately combining steel composition with welding material and heat treatment, the coiled tubing could be produced with uniform properties across the length eliminating the weak link of the strip-to-strip join that is critical on high strength conventional coiled tubing. This general concept has been described before but never applied successfully to the production of high strength coiled tubing (yield strength in the range from 80 to 140 ksi). The reason being that the heat treatment at elevated line speed (needed to achieve high productivity) will generally result in the need for complicated and extended facilities. This process could be simplified if the appropriated chemistry and heat treatment conditions are selected.

The selection of the chemistry that is compatible with an industrial heat treatment facility of reasonable dimensions requires of an understanding of the many variables that affect coiled tubing performance measured as: a) Axial Mechanical Properties, b) Uniformity of Microstructure and Properties, c) Toughness, d) Fatigue Resistance, e) Sour Resistance, among others.

## SUMMARY

Below is described chemistry designed to produce a heat treated coiled tubing which is mostly outside current limits for coiled tubing as set by API 5ST standard. (Max.C: 0.16%, Max.Mn: 1.2% (CT70-90) Max.Mn: 1.65 (CT100-110), Max.P: 0.02% (CT70-90) Max.P: 0.025 (CT100-CT110), Max.S: 0.005, Si.Max: 0.5).

Embodiments of this disclosure are for a coiled steel tube and methods of producing the same. The tube in some embodiments can comprise a yield strength higher than about 80 Ksi. The composition of the tube can comprise 0.16-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.35 wt. % silicon, up to 0.005 wt. % sulfur, up to 0.018 wt. % phosphorus, the remainder being iron and inevitable impurities. The tube can also comprise a final microstructure comprising a mixture of tempered martensite and bainite, wherein the final microstructure of the coiled tube comprises more than 90 volume % tempered martensite, wherein the microstructure is homogenous in pipe body, ERW line and strip end-to-end joints.

Disclosed herein is a coiled steel tube formed from a plurality of welded strips, wherein the tube can include base metal regions, weld joints, and their heat affected zones, and can comprise a yield strength greater than about 80 ksi, a composition comprising iron and, 0.17-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.30 wt. % silicon, 0.010-0.040 wt. % aluminum, up to 0.010 wt. % sulfur, and up to 0.015 wt. % phosphorus, and a final microstructure comprising a mixture of tempered martensite and bainite, wherein the final microstructure of the coiled tube comprises more than 90 volume % tempered martensite in the base metal regions, the weld joints, and the heat affected zones, wherein the final microstructure across all base metal regions, weld joints, and heat affected zones is homogeneous, and wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the composition further comprises, up to 1.0 wt. % chromium, up to 0.5 wt. % molybdenum, up to 0.0030 wt. % boron, up to 0.030 wt. % titanium, up to

0.50 wt. % copper, up to 0.50 wt. % nickel, up to 0.1 wt. % niobium, up to 0.15 wt. % vanadium, up to 0.0050 wt. % oxygen, and up to 0.05 wt. % calcium.

In some embodiments, the composition can comprise 0.17 to 0.30 wt. % carbon, 0.30 to 1.60 wt. % manganese, 0.10 to 0.20 wt. % silicon, up to 0.7 wt. % chromium, up to 0.5 wt. % molybdenum, 0.0005 to 0.0025 wt. % boron, 0.010 to 0.025 wt. % titanium, 0.25 to 0.35 wt. % copper, 0.20 to 0.35 wt. % nickel, up to 0.04 wt. % niobium, up to 0.10 wt. % vanadium, up to 0.0015 wt. % oxygen, up to 0.03 wt. % calcium, up to 0.003 wt. % sulfur, and up to 0.010 wt. % phosphorus.

In some embodiments, the tube can have a minimum yield strength of 125 ksi. In some embodiments, the tube can have a minimum yield strength of 140 ksi. In some embodiments, the tube can have a minimum yield strength of between 125 ksi and 140 ksi.

In some embodiments, the final microstructure can comprise at least 95 volume % tempered martensite in the base metal regions, the weld joints, and the heat affected zones. In some embodiments, the tube can have a final grain size of below 20 μm in the base metal regions, the weld joints, and the heat affected zones. In some embodiments, the tube can have a final grain size of below 15 μm in the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the weld joints can comprise bias welds. In some embodiments, the fatigue life at the bias welds can be at least about 80% of the base metal regions. In some embodiments, the a percent hardness of a weld joint, including its heat affected zone, can be 110% or less than a hardness of the base metal.

Also disclosed herein is a method of forming a coiled steel tube which can comprise providing strips having a composition comprising iron and 0.17-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.30 wt. % silicon, 0.010-0.040 wt. % aluminum, up to 0.010 wt. % sulfur, up to 0.015 wt. % phosphorus, and welding the strips together, forming a tube from the welded strips, wherein the tube comprises base metal regions, joint welds, and their heat affected zones, austenitizing the tube between 900-1000° C., quenching the tube to form a final as quenched microstructure of martensite and bainite, wherein the as quenched microstructure comprises at least 90% martensite in the base metal regions, the weld joints, and the heat affected zones, and tempering the quenched tube between 550-720° C., wherein tempering of the quenched tube results in a yield strength greater than about 80 ksi, wherein the microstructure across all base metal regions, weld joints, and the heat affected zones is homogeneous, and wherein the microstructure comprises a uniform distribution of fine carbides across the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the welding the strips can comprise bias welding. In some embodiments, the forming the tube can comprise forming a line joint. In some embodiments, the method can further comprise coiling the tempered tube on a spool. In some embodiments, the austenitizing can form a grain size below 20 m in the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the composition can further comprise up to 1.0 wt. % chromium up to 0.5 wt. % molybdenum up to 0.0030 wt. % boron, up to 0.030 wt. % titanium, up to 0.50 wt. % copper, up to 0.50 wt. % nickel, up to 0.1 wt. % niobium, up to 0.15 wt. % vanadium, up to 0.0050 wt. % oxygen, and up to 0.05 wt. % calcium.

In some embodiments, the composition can comprise 0.17 to 0.30 wt. % carbon, 0.30 to 1.60 wt. % manganese, 0.10 to 0.20 wt. % silicon, up to 0.7 wt. % chromium, up to 0.5



wt. % molybdenum, 0.0005 to 0.0025 wt. % boron, 0.010 to 0.025 wt. % titanium, 0.25 to 0.35 wt. % copper, 0.20 to 0.35 wt % nickel, up to 0.04 wt. % niobium, up to 0.10 wt. % vanadium, up to 0.00015 wt. % oxygen, up to 0.03 wt. % calcium, up to 0.003 wt. % sulfur, and up to 0.010 wt. % phosphorus.

In some embodiments, the tempered tube can have a yield strength greater than or equal to 125 ksi. In some embodiments, the tempered tube can have a minimum yield strength of 140 ksi. In some embodiments, the tempered tube can have a minimum yield strength between 125 and 140 ksi.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-B illustrate CCT diagrams corresponding to STD2 (A) and STD3 (B) steels.

FIGS. **2**A-B illustrate CCT diagrams corresponding to $BTi_2$ (A) and $CrMoBTi_3$ (B) steels.

FIG. **3** illustrates a cooling rate at an internal pipe surface as a function of the wall thickness (WT) for a coiled tube quenched from the external with water sprays.

FIG. **4** illustrates tensile properties of $BTi_2$ steel as a function of the maximum tempering temperature (Tmax). Peak-like tempering cycles were used in these Gleeble® simulations. (right) Tensile properties of the same steel as a function of the holding time at 720° C. (isothermal tempering cycles).

FIGS. **5**A-B illustrate non-tempered martensite appearing at the central segregation band close to the ERW line after the seam annealing (PWHT). FIGS. **5**A-B correspond to a conventional coiled tube Grade 90.

FIGS. **6**A-B illustrate localized damage at the central segregation band produced during fatigue testing of a Grade 110 coiled tubing.

FIGS. **7**A-B illustrate localized damage at the central segregation band produced during fatigue testing with high inner pressure (9500 psi) of a Grade 100 coiled tubing.

FIGS. **8**A-B illustrate base metal microstructures corresponding to the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing has tensile properties corresponding to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **9**A-B illustrate ERW line microstructures corresponding to the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **10**A-B illustrate microstructures corresponding to HAZ of the ERW for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **11**A-B illustrate microstructures corresponding to HAZ of the bias weld for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIG. **12** illustrates a crack formed during service in the fusion zone of a bias weld (growing from the internal tube face). The crack is running in the direction of the large upper bainite laths.

FIG. **13** illustrates variations in hardness (base metal hardness=100%) across typical bias welds obtained with

conventional processing and processing according to embodiments of the present disclose. The fusion zone (FZ) is approximately located in the area between ≈+/−5 mm from the weld center.

FIGS. **14**A-B illustrate microstructures corresponding to the intersection between bias weld and ERW line for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both cases the coiled tubing tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIG. **15** illustrates a schematic drawing of a fatigue testing machine.

FIG. **16** illustrates fatigue life measured for BW samples relative to those corresponding to BM samples. Results are average values over different testing conditions and coiled tube grades (80, 90 and 110 for conventional tubes and 80, 90, 110, 125 and 140 for coiled tubes produced according to this disclosure).

FIG. **17** illustrates fatigue life improvement in coiled tubes produced with an embodiment of the chemistry and processing conditions according to this disclosure. The improvement is determined by comparison against fatigue life measured for conventional coiled tubing of the same grade tested under similar conditions. Results are averaged for each grade over different testing conditions. In the case of grades 125 and 140, which are non-standard, the fatigue life comparison was performed against STD3 steel in Grade 110.

FIGS. **18**A-B illustrate C-ring-samples after testing material grade 80 according to NACE TM0177 (90% SMYS, Solution A, 1 bar $H_2S$). A: conventional process. B: embodiment of the disclosed process.

## DETAILED DESCRIPTION

Coiled Tubing raw material is produced in a steel shop as hot rolled strips. Controlled rolling is used to guarantee high strength and good toughness through microstructural refinement. The strips are longitudinally cut to the width for pipe production, and then spliced end to end through a joining process (e.g. Plasma Arc Welding or Friction Stir Welding) to form a longer strip. Afterwards, the tube is formed using the ERW process. The final product performance is measured in terms of: a) axial mechanical properties, b) uniformity of microstructure and properties, c) toughness, d) fatigue resistance, e) sour resistance, among others. Using the traditional processing route, the coiled tubing mechanical properties result from the combination of the hot-rolled strip properties and the modifications introduced during welding operations and tube forming. The properties thus obtained are limited when coiled tube performance is measured as listed above. The reason being is that the welding process used to join the strips modifies the refined as-rolled microstructure in a way that, even if a post weld heat treatments is applied, final properties are still impaired. Reduced fatigue life and poor sour performance is associated to heterogeneities in microstructure and presence of brittle constituents across the welds. It has been proposed that a new route should at least comprise a full body heat treatment. This route has been described in general terms but never specified. The disclosure describes the chemistries and raw material characteristics, that combined with appropriated welding processes, and heat treatment conditions, will yield a quenched and tempered product with high performance in both pipe body and strip joining welds. This material is designed for coiled tubing since it is selected not only in terms of relative cost, but preferably in order to maximize fatigue life under the particular conditions that apply to the operation of coiled tubing (low cycle fatigue under bending with simultaneous axial load and internal pressures).

This disclosure is related to a high strength coiled tubing (minimum yield strength ranging from 80 ksi to 140 ksi) having increased low-cycle fatigue life in comparison with standard products, as defined by API 5ST. Additionally, Sulfide Stress Cracking (SSC) resistance is also improved in this disclosure. This outstanding combination of properties is obtained through an appropriate selection of steel chemistry and processing conditions. Industrial processing differs from the standard route in the application of a Pull Body Heat Treatment (FBHT), as was disclosed in U.S. App. No. US2012/0186686 A1. This FBHT is performed after the coiled tubed is formed by ERW (Electrical Resistance Welding) and is composed of at least one cycle of austenitization, quenching and tempering. The above mentioned disclosure is more specifically related to the steel chemistries and processing parameters to produce a quenched and tempered coiled tubing with the above mentioned properties. Although the generation of certain mechanical properties through a heat treatment on a base material with a given composition are part of the general knowledge, the particular application for coiled tubing uses raw material with specific chemistry in order to minimize the detrimental effect of particular variables, such us segregation patterns, on the specific properties of this application.

One of the most important properties to the coiled tube is an increased resistance to low cycle fatigue. This is because during standard field operation coiled tubes are spooled and unspooled frequently, introducing cyclic plastic deformations that may eventually produce failures. During low cycle fatigue, deformation is preferentially localized at the microscopical scale in softer material regions. When brittle constituents are present at or close to these strain concentration regions, cracks can easily nucleate and propagate. Therefore, a reduction in fatigue life is associated with heterogeneous microstructures (having softer regions that localize deformation) in combination with brittle constituents (that nucleate and/or propagate cracks). All these micro-structural features appear in the Heat Affected Zone of the welds (HAZ). There are some types of pipe body microstructures that also present the above mentioned characteristics. This is because they are composed of a mixture of hard and soft constituents, for example ferrite, pearlite and bainite. In this case strain is localized in the softer ferrite, close to the boundary with bainite, in which cracks are nucleated and propagated. High strength coiled tubes have currently this type of microstructure.

In order to avoid strain localization during low cycle fatigue the microstructure has to be not only homogeneous throughout the pipe body and joints, but also in the microscopic scale. For low carbon steels a microstructure composed of tempered martensite, which is basically a ferrite matrix with a homogeneous and fine distribution of carbides, is ideal. Thereafter, the objective of the chemistry selection and processing conditions described in this disclosure is to achieve with the FBHT a homogeneous microstructure (in tube body, bias weld and ERW line) composed of at least 90% tempered martensite, preferably more than 95% tempered martensite.

Additionally, tempered martensite is more suitable to produce ultra-high strength grades than standard coiled tube microstructures (composed of ferrite, pearlite and bainite), for which extremely costly alloying additions are needed to reach yield strengths higher than about 125 Ksi.

When compared with structures containing bainite, other important benefits of tempered martensite is its improved SSC resistance.

Steel chemistry has been defined as the most suitable for production of heat treated coiled tubing using a FBHT, and can be described in terms of concentration of Carbon (wt % C), Manganese (w % Mn), Silicon (w % Si), Chromium (wt % Cr), Molybdenum (w % Mo), as well as micro-alloying elements as Boron (w % B), Titanium (w % Ti), Aluminum (w % Al), Niobium (w % Nb) and Vanadium (w % V). Also, upper limits can be on unavoidable impurities as Sulfur (w % S), Phosphorus (w % P) and Oxygen (w % O).

In order to produce a final structure composed of tempered martensite, the steel chemistry of this disclosure differs mainly from previous coiled tube art because of the higher Carbon content (see for example API 5ST in which maximum Carbon allowed for Coiled tubing is 0.16%), which allows for obtaining the desired microstructure through a FBHT composed of at least one cycle of austenitization, quenching and tempering.

The terms “approximately”, “about”, and “substantially” as used herein represent an amount close to the stated amount that still performs a desired function or achieves a desired result. For example, the terms “approximately”, “about”, and “substantially” may refer to an amount that is within less than 10% of, within less than 5% of, within less than 1% of, within less than 0.1% of, and within less than 0.01% of the stated amount.

Carbon is an element whose addition inexpensively raises the strength of the steel through an improvement in hardenability and the promotion of carbide precipitation during heat treatments. If carbon is reduced below 0.17% hardenability could not be guaranteed, and large fractions of bainite may be formed during heat treatments. The appearance of bainite makes it difficult to reach a yield strength above 80 ksi with the desired fatigue life and SSC resistance. Current coiled tubing route is not suitable for heat treatment since the maximum Carbon allowed by API 5ST is 0.16%. Conventional coiled tubing microstructures present large fractions of bainite that impair toughness, fatigue life and SSC resistance in the higher strength grades, i.e. coiled tubings with minimum yield strength above 110 Ksi.

On the other hand, steels with more than 0.35% carbon will have poor weldability, being susceptible to present brittle constituents and cracks during welding and post-weld heat treatment operations. Additionally, higher carbon contents may result in significant amounts of retained austenite after quenching that transform into brittle constituents upon tempering. These brittle constituents impair fatigue life and SSC resistance. Therefore, the C content of the steel composition varies within the range from about 0.17% to about 0.35%, preferably from about 0.17% to about 0.30%.

Manganese addition improves hardenability and strength. Mn also contributes to deoxidation and sulfur control during the steelmaking process. If Mn content is less than about 0.30%, it may be difficult to obtain the desired strength level. However, as Mn content increases, large segregation patterns may be formed. Mn segregated areas will tend to form brittle constituents during heat treatment that impair toughness and reduce fatigue. Additionally, these segregated areas increase the material susceptibility to sulfide stress cracking (SSC). Accordingly, the Mn content of the steel composition varies within the range from 0.30% to 2.0%, preferably from 0.30% to 1.60%, and more preferably from 0.30% to 0.80% in application for which an improved SSC resistance is used.

Silicon is an element whose addition has a deoxidizing effect during the steel making process and also raises the strength of the steel. In some embodiments, if Si exceeds about 0.30%, the toughness may decrease. Additionally, large segregation patterns may be formed. Therefore, the Si content of the steel composition varies within the range between about 0.10% to 0.30%, preferably about 0.10% to about 0.20%.



Chromium addition increases hardenability and tempering resistance of the steel. Cr can be used to partially replace Mn in the steel composition in order to achieve high strength without producing large segregation patterns that impair fatigue life and SSC resistance. However, Cr is a costly addition that makes the coiled tubing more difficult to produce because of its effects on hot forming loads. Therefore, in some embodiments Cr is limited to about 1.0%, preferably to about 0.7%.

Molybdenum is an element whose addition is effective in increasing the strength of the steel and further assists in retarding softening during tempering. The resistance to tempering allows the production of high strength steels with reduced Mn content increasing fatigue life and SSC resistance. Mo additions may also reduce the segregation of phosphorous to grain boundaries, improving resistance to inter-granular fracture. However, this ferroalloy is expensive, making it desirable to reduce the maximum Mo content within the steel composition. Therefore, in certain embodiments, maximum Mo is about 0.5%.

Boron is an element whose addition is strongly effective in increasing the hardenability of the steel. For example, B may improve hardenability by inhibiting the formation of ferrite during quenching. In some embodiments, B is used to achieve good hardenability (i.e. as quenched structure composed of at least 90% martensite) in steels with Mn content reduced to improve fatigue life and SSC resistance. If the B content is less than about 0.0005 wt. % it may be difficult in these embodiments to obtain the desired hardenability of the steel. However, if the B content too high, coarse boron carbides may be formed at grain boundaries adversely affecting toughness. Accordingly, in an embodiment, the concentration of B in the composition lower than about 0.0030%, in another embodiment B content is from about 0.0005% to 0.0025%.

Titanium is an element whose addition is effective in increasing the effectiveness of B in the steel, by fixing nitrogen impurities as Titanium Nitrides (TiN) and inhibiting the formation of Boron nitrides. If the Ti content is too low it may be difficult in some embodiments to obtain the desired effect of boron on hardenability of the steel. On the other hand, if the Ti content is higher than 0.03 wt % coarse Titanium nitrides and carbides (TiN and TiC) may be formed, adversely affecting ductility and toughness. Accordingly, in certain embodiments, the concentration of Ti may be limited to about 0.030%. In other embodiments, the concentration of Ti may range from about 0.010% to about 0.025%.

Considering that the production of coiled tubing of low mechanical properties benefits from low tempering resistance, B and Ti additions improve hardenability without increasing tempering resistance. Thereafter it allows for the production of 80 ksi grade without significant large soaking times during tempering, with the subsequent improvement in productivity. Since one of the limitations for the production of a coiled tubing in a heat treatment line is the length of the line to adequately soak the material during tempering, the use of B and Ti is particularly relevant to the production of low yield strength coiled tubing.

Copper is an element that is not required in certain embodiments of the steel composition. However, in some

coiled tubing applications Cu may be needed to improve atmospheric corrosion resistance. Thus, in certain embodiments, the Cu content of the steel composition may be limited to less than about 0.50%. In other embodiments, the concentration of Cu may range from about 0.25% to about 0.35%.

Nickel is an element whose addition increases the strength and toughness of the steel. If Cu is added to the steel composition, Ni can be used to avoid hot rolling defects known as hot shortness. However, Ni is very costly and, in certain embodiments, the Ni content of the steel composition is limited to less than or equal to about 0.50%. In other embodiments, the concentration of Ni may range from about 0.20% to about 0.35%.

Niobium is an element whose addition to the steel composition may refine the austenitic grain size of the steel during reheating into the austenitic region, with the subsequent increase in both strength and toughness. Nb may also precipitate during tempering, increasing the steel strength by particle dispersion hardening. In an embodiment, the Nb content of the steel composition may vary within the range between about 0% to about 0.10%, preferably about 0% to about 0.04%.

Vanadium is an element whose addition may be used to increase the strength of the steel by carbide precipitations during tempering. However if V content of the steel composition is greater than about 0.15%, a large volume fraction of vanadium carbide particles may be formed, with an attendant reduction in toughness of the steel. Therefore, in certain embodiments, the V content of the steel is limited to about 0.15%, preferably to about 0.10%.

Aluminum is an element whose addition to the steel composition has, a deoxidizing effect during the steel making process and further refines the grain size of the steel. In an embodiment, if the Al content of the steel composition is less than about 0.010%, the steel may be susceptible to oxidation, exhibiting high levels of inclusions. In other embodiments, if the Al content of the steel composition greater than about 0.040%, coarse precipitates may be formed that impair the toughness of the steel. Therefore, the Al content of the steel composition may vary within the range between about 0.010% to about 0.040%.

Sulfur is an element that causes the toughness and workability of the steel to decrease. Accordingly, in some embodiments, the S content of the steel composition is limited to a maximum of about 0.010%, preferably about 0.003%.

Phosphorus is an element that causes the toughness of the steel to decrease. Accordingly, the P content of the steel composition limited to a maximum of about 0.015%, preferably about 0.010%.

Oxygen may be an impurity within the steel composition that is present primarily in the form of oxides. In an embodiment of the steel composition, as the O content increases, impact properties of the steel are impaired. Accordingly, in certain embodiments of the steel composition, a relatively low O content is desired, less than or equal to about 0.0050 wt %; preferably less than or equal to about 0.0015 wt %.

Calcium is an element whose addition to the steel composition may improve toughness by modifying the shape of sulfide inclusions. In an embodiment, the steel composition may comprise a minimum Ca to S content ratio of Ca/S>1.5. In other embodiments of the steel composition, excessive Ca is unnecessary and the steel composition may comprise a maximum content Ca of about 0.05%, preferably about 0.03%.

The contents of unavoidable impurities including, but not limited to N, Pb, Sn, As, Sb, Bi and the like are preferably kept as low as possible. However, properties (e.g., strength, toughness) of steels formed from embodiments of the steel compositions of the present disclosure may not be substantially impaired provided these impurities are maintained below selected levels. In one embodiment, the N content of the steel composition may be less than about 0.010%, preferably less than or equal to about 0.008%. In another embodiment, the Pb content of the steel composition may be less than or equal to about 0.005%. In a further embodiment, the Sn content of the steel composition may be less than or equal to about 0.02%. In an additional embodiment, the As content of the steel composition may be less than or equal to about 0.012%. In another embodiment, the Sb content of the steel composition may be less than or equal to about 0.008%. In a further embodiment, the Bi content of the steel composition may be less than or equal to about 0.003%.

The selection of a specific steel chemistry of this disclosure will depend on the final product specification and industrial facility constrains (for example in induction heat treatment lines it is difficult to achieve large soaking times during tempering). Mn addition will be reduced when possible because it impairs fatigue life and SSC resistance through the formation of large segregation patterns. Cr and to a less extent Mo will be used to replace Mn, and the full body heat treatment is kept as simple as possible. Both elements increase carbide stability and softening resistance, which may lead to large soaking times during tempering. Thereafter, these elements are preferred for the higher strength grades (for example Grade 110 and above) for which tempering resistance is desired, and avoided in the lower ones (Grade 80) for which long and impractical industrial heat treatment lines would be needed.

In the case of the lower grades (Grade 80), it will be preferred B and Ti microalloyed additions in combination with suitable C contents. These elements allow for achieving good hardenability without the use of high Mn additions. Moreover, B and Ti do not increase tempering resistance. Thereafter, simple and short tempering treatment can be used to achieve the desired strength level.

The industrial processing route corresponding to this disclosure is described in the following paragraphs, making focus on the Full Body Heat Treatment (FBHT) conditions.

Raw material for coiled tubing is produced in a steel shop as hot rolled strips with wall thickness that may vary from about 0.08 inches to about 0.30 inches. Controlled rolling may be used by the steel supplier to refine the as rolled microstructure. However, an important microstructural refinement of the as rolled strips is not needed, because in this disclosure microstructure and mechanical properties are mostly defined by the final FBHT. This flexibility in the hot rolling process helps to reduce raw-material cost, and allows to use steel chemistries not available when complex hot rolling procedures can be used (in general controlled rolling can be applied only to low carbon micro-alloyed steels).

The steel strips are longitudinally cut to the width for pipe production. Afterwards, the strips are joined end to end through a welding process (e.g. Plasma Arc Welding or Friction Stir Welding) to form a longer strip that allows to achieve the pipe length. These welded strips are formed into a pipe using, for example an ERW process. Typical coiled tube outer diameters are between 1 inch and 5 inches. Pipe lengths are about 15,000 feet, but lengths can be between about 10,000 feet to about 40,000 feet.

After forming the pipe, the Full Body Heat Treatment (FBHT) is applied. The objective of this heat treatment is to

produce a homogeneous final microstructure composed of at least 90% tempered martensite, the rest being bainite. This microstructure, having uniform carbide distribution and grain size below 20 μm—preferably below 15 μm-guarantees good combinations of strength, ductility, toughness and low cycle fatigue life. Furthermore, as was previously mentioned, by properly selecting the steel chemistry this type of microstructure is suitable to improve Sulfide Stress Cracking (SSC) resistance in comparison with conventional structures, composed of ferrite, pearlite and large volume fractions of upper bainite.

The FBHT is composed of at least one austenitization and quenching cycle (Q) followed by a tempering treatment (T). The austenitization is performed at temperatures between 900° C. and 1000° C. During this stage the total time of permanence above the equilibrium temperature Ae3 should be selected to guarantee a complete dissolution of iron carbides without having excessive austenitic grain growth. The target grain size is below 20 μm, preferably below 15 μm. Quenching has to be performed controlling the minimum cooling rate in order to achieve a final as quenched microstructure composed of at least 90% martensite throughout the pipe.

Tempering is carried out at temperatures between 550° C. and 720° C. Heat treatment above 720° C. may led to partial martensite transformation to high carbon austenite. This constituent has to be avoided because tends to transform into brittle constituents, which may impair toughness and fatigue life. On the other hand, if tempering is performed below 550° C. the recovery process of the dislocated as quenched structure is not complete. Thereafter, toughness may be again strongly reduced. The tempering cycle has to be selected, within the above mentioned temperature range, in order to achieve the desired mechanical properties. Minimum yield strength may vary from 80 ksi to 140 ksi. An appropriate time of permanence at temperature has to be selected to guarantee an homogeneous carbide distribution in both base tube and weld areas (ERW line and strip to strip joints). In some cases, in order to improve the combination of strength and toughness more than one austenitization, quenching and tempering cycles may be performed. After FBHT the pipe may be subjected to a sizing process, in order to guarantee specified dimensional tolerances, stress relieved and spooled into a coil.

## EXAMPLES

### Example A: Chemistry Selection to Improve Hardenability

As was previously mentioned, the microstructure of this disclosure is composed of at least 90% tempered martensite with an homogenous distribution of fine carbides, the rest being bainite. This microstructure allows for production of a coiled tube with the desired combination of high strength, extended low cycle fatigue life and improved SSC resistance.

The tempered martensite is obtained by at least one heat treatment of quenching and tempering, performed after the pipe is formed by ERW. The heat treatment may be repealed two or more times if additional refinement is desired for improving SSC resistance. This is because subsequent cycles of austenization and quenching reduce not only prior austenitic grain size, but also martensite block and packet sizes.

To obtain the target microstructure with good hardenability, at least 90% martensite has to be formed at the end of the



quenching process. An adequate chemistry selection is paramount to achieve such volume fraction of martensite. The selection of suitable steel compositions was based on results from experiments performed with a thermo-mechanical simulator Gleeble® 3500. Industrial trials were performed afterwards to confirm laboratory findings.

Some of the steel chemistries analyzed in laboratory are listed in Table A1. For all these chemistries dilatometric tests were carried out at Gleeble® to construct Continuous Cooling Transformation (CCT) diagrams. The CCT diagrams were used, in combination with metallographic analysis of the samples obtained from the simulations, to determine the minimum cooling rate to have more than 90% martensite. This critical cooling rate, mainly dependent on steel chemistry, will be referred as CR90.

TABLE A1

Chemical composition of the steels experimentally studied. Element concentrations are in weight percent (wt %).

| Steel | C | Mn | Si | Cr | Mo | Ni | Cu | Other |
|---|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | 0.15 | 0.28 | Ti |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | 0.17 | 0.27 | Nb—Ti |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | 0.22 | 0.28 | Nb—Ti |
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | — | — |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | — | — |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | — | — | B—Ti |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | — | — | B—Ti |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | — | — |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | — | — |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | — | — | B—Ti |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | — | — | B—Ti |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | — | — | B—Ti |
| CrMoBTi4 | 0.26 | 0.60 | 0.15 | 0.50 | 0.25 | | | B—Ti |

Examples of obtained CCT diagrams are presented in FIGS. **1-2**. In all cases the austenitization was performed at 900-950° C. in order to obtain a fine austenitic grain size (AGS) of 10-20 μm. STD1, STD2 and STD3 steels have chemistries within API 5ST specification, but outside the range of this disclosure because of their low carbon addition (Table A1). The critical cooling CR90 was greater than 100° C./sec in the case of STD1 and STD2, and about 50° C./sec for STD3.

FIGS. **1**A-B show CCT diagrams corresponding to STD2 (A) and STD3 (B) steels. In bold is shown the critical cooling conditions to produce a final microstructure composed of about 90% martensite, the rest being bainite. FIGS. **2**A-B show the CCT diagrams corresponding to $BTi_2$ and $CrMoBTi_3$ steels. In bold are shown the critical cooling conditions to produce final microstructures composed of about 90% martensite, the rest being bainite. The first one is a C—Mn steel microalloyed with B—Ti (see Table A1). $CrMoBTi_2$ is a medium carbon steel having Cr and Mo additions, also microalloyed with B—Ti. The measured critical cooling rates (corresponding to the cooling curves shown in bold in the CCT diagrams) were 25° C./s and 15° C./s for $BTi_2$ and $CrMoBTi_3$, respectively.

In FIG. **3** is presented the average cooling rate of pipes treated in an industrial quenching heads facility (sprays of water cooling the tube from the external surface). Values are shown as a function of the pipe Wall Thickness (WT). The shaded area in the plot corresponds to the wall thickness range typical of coiled tube applications. It is clear that when selecting steel chemistries suitable to have more than 90% tempered martensite, the critical cooling rate of the alloy should be equal or lower than 30° C./s. Otherwise, more than

10% bainite will be formed during quenching the thicker tube (WT=0.3 inches) in the above mentioned facility.

STD1, STD2 and STD3 have critical cooling rates above 30° C./s, thereafter these steels are not suitable for this disclosure. On the other hand, hardenability is adequate in $BTi_2$ and $CrMoBTi_3$ steels. The hardenability improvement is due to an increased carbon content and the B—Ti addition.

In Table A2 is shown the critical cooling rates measured for the steels of Table A1. STD1, STD2- and STD3 are chemistries currently used for coiled tubes grades 80, 90 and 110; and fulfill API 5ST. However, even the more alloyed STD3 have a critical cooling rate to guarantee more than 90% tempered martensite in pipes with WT in the range of interest. It is clear that standard materials are not adequate to produce the target microstructure of this disclosure and hardenability has to be improved. In low alloy steels the most important element affecting hardenability is Carbon. Thereafter, C was increased above the maximum specified by API 5ST (0.16 wt. %) to have critical cooling rates not higher than 30° C./s. In this disclosure Carbon addition is in the range from 0.17% to 0.35% (the maximum level was selected to guarantee good weldability and toughness). As was just mentioned, the rest of the chemistry has to be adjusted to have CR90 values equal or lower than 30° C./s.



Cr—Mo steels: these steels have Cr and Mo additions that are useful to increase tempering resistance, which make them suitable for ultra-high strength grades. Additionally, Cr and Mo are elements that improve hardenability; so Mn addition may be further reduced. However, Cr and Mo are costly additions that reduce the steel hot workability, and their maximum content is limited to 1% and 0.5%, respectively. In one example with Carbon in the lower limit, about 1% Mn can be used to achieve the CR90 (CrMo1). If the steel is also microalloyed with B—Ti, a further reduction in Mn to 0.6% can be performed (CrMoBTi1).

Example B: Chemistry Selection for Different Coiled Tube Trades

To analyze tempering behavior of the steels presented in Table A1, simulations of industrial heat treatments were performed at Gleeble®. Simulations consisted in an austenitization at 900-950° C., quenching at 30° C./sec and tempering. In the particular case of STD1, STD2 and STD3 steels higher cooling rates were used in order to achieve at least 90% martensite during quenching. For STD1 and STD2 a quenching rate of about 150° C./s was used, while for STD3 cooling was at 50° C./s. These higher cooling rates

TABLE A2

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) | Adequate harden-ability? |
|---|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | 0.13 | Ni, Cu, Ti | >100 | No |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | Ni, Cu, Nb—Ti | >100 | No |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | Ni, Cu, Nb—Ti | 50 | No |
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | 30 | Yes |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | 30 | Yes |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 30 | Yes |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B—Ti | 25 | Yes |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | 25 | Yes |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | 23 | Yes |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | B—Ti | 25 | Yes |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | B—Ti | 25 | Yes |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | B—Ti | 15 | Yes |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B—Ti | 30 | Yes |

The following guidelines for selecting adequate steel chemistries were obtained from the analysis of experimental results in Table A2:

C—Mn steels: hardenability depends mainly on Carbon and Manganese additions. About 2% Mn can be used to achieve the desired hardenability when C is in the lower limit (CMn1 steel). However, Mn is an element which produces strong segregation patterns that may decrease fatigue life. Thereafter, Mn addition is decreased in higher Carbon formulations. For example, when carbon concentration is about 0.25%, 1.6% Mn is enough to achieve the hardenability (CMn2 steel).

B—Ti steels: these alloys are plain carbon steels microalloyed with Boron and Titanium. Due to the increase in hardenability associated to the Boron effect, Mn can be further reduced. For Carbon in the lower limit, about 1.6% Mn can be used to achieve the hardenability. When carbon concentration is about 0.25%, 1.3% Mn is enough to achieve the hardenability ($BTi_2$steel).

can be achieved in small samples at Gleeble® when external water cooling is applied. After quenching the samples were tempered using two types of cycles:

Peak like cycle: Heating at 50° C./s up to a maximum temperature (Tmax) that was in the range from 550° C. to 720° C. Cooling at about 1.5° C./s down to room temperature. These cycles were intended to simulate actual tempering conditions at induction furnaces, which are characterized by high heating rate, no soaking time at maximum temperature and air cooling.

Isothermal cycle: Heating at 50° C./s up to 710° C., soaking at this temperature during a time that ranged from 1 min to 1 hour and cooling at about 1.5° C./s. This cycle was used to simulate tempering in an industrial line with several soaking inductors or with a tunnel furnace.

In all cases tempering temperature ranged from 550° C. to 720° C. Temperatures higher than 720° C. were avoided because non-desired re-austenitization takes place. On the

other hand, if tempering is performed below 550° C., recovery of the dislocated structure is not complete, and the material presents brittle constituents that may impair fatigue life.

Peak-like tempering cycles are preferred to reduce line length and to improve productivity. Thereafter, the feasibility of obtaining a given grade with a specific steel chemistry was mainly determined by the tempering curve obtaining using this type of cycles. If after a peak-like tempering at 720° C. strength is still high for the grade, soaking at maximum temperature can be performed. However, as soaking time increases, larger, more expensive and less productive industrial lines may be needed.

In FIG. **4** (inset on the left) is presented the tempering curve measured for $BTi_2$steel. Tensile properties are shown as a function of maximum tempering temperature. Peak-like thermal cycles were used in the simulations. From the figure it is seen that Grades 90 to 125 can be obtained by changing maximum peak temperature from about 710° C. to 575° C., respectively. With this chemistry is not possible to reach 140 Ksi of yield strength without reducing the tempering temperature below 550° C. Regarding the lower grades, 3 minutes of soaking at 710° C. can be used to obtain Grade 80 (inset on the right of FIG. **4**).

Based on the results obtained from Gleeble® simulations, Table B1 was constructed. This Table shows, for each analyzed steel, the feasibility of producing different grades, which ranged from 80 Ksi to 140 Ksi of minimum yield strength. For example, in the case of $BTi_2$ it is feasible to reach grades 90 to 125 using peak-like tempering cycles. But 2 minutes of soaking at 720° C. can be used in the case of Grade 80, which is why the in corresponding cell "soaking" is indicated.

TABLE B1

Feasibility of industrially producing Grades 80 to 140 using the steel chemistries analyzed. When "soaking" appears in the cell, it means that more than 1 minute of soaking at 720° C. can be used to reach the grade.

| | Grade 80 | Grade 90 | Grade 110 | Grade 125 | Grade 140 |
|---|---|---|---|---|---|
| | Yield Strength (Ksi) | | | | |
| Steel | 80-90 | 90-100 | 110-125 | 125-140 | 140-155 |
| STD1 | Yes | Yes | no | no | no |
| STD2 | Yes | Yes | yes | no | no |
| STD3 | soaking | Soaking | yes | yes | no |
| CMn1 | soaking | Yes | yes | yes | no |
| CMn2 | soaking | Soaking | yes | yes | no |
| BTi1 | Yes | Yes | yes | no | no |
| BTi2 | soaking | Yes | yes | yes | no |
| CrMo1 | soaking | Soaking | yes | Yes | Yes |
| CrMo2 | soaking | Soaking | soaking | Yes | Yes |
| CrMoBTi1 | soaking | Soaking | yes | Yes | Yes |
| CrMoBTi2 | soaking | Soaking | yes | Yes | Yes |
| CrMoBTi3 | soaking | Soaking | soaking | Yes | Yes |
| CrMoBTi4 | soaking | Soaking | yes | Yes | Yes |

From the results obtained is clear that in order to obtain the higher grades, increased Carbon and Cr—Mo additions can be used. Particularly, Grade 140 cannot be achieved with standard chemistries, as described in AP15ST, because of the low Carbon content. On the other hand, to reach Grade 80 a lean chemistry with low carbon, no Cr or Mo additions are the best options. In this case, B—Ti microalloying additions may be used to guarantee good hardenability (for example, a chemistry like $BTi_1$ is a good alternative).

It is important to mention that in order to produce martensitic structures with the standard steels (STD1, STD2 and STD3) it was necessary to use at laboratory higher quenching rates than achievable at the mill. Thereafter, if we limit the cooling rate to that industrially achievable, none of the coiled tube grades can be obtained with conventional steels using the FBHT processing route.

Example C: Chemistry Selection to Reduce Negative Effects of Segregation During Solidification

During steel solidification alloying elements tend to remain diluted in the liquid because of its higher solubility in comparison with the solid (**6** ferrite or austenite). Solute rich areas form two types of non-uniform chemical composition patterns upon solidification: microsegregation and macrosegregation.

Microsegregation results from freezing the solute-enriched liquid in the interdendritic spaces. But it does not constitute a major problem, since the effects of microsegregation can be removed during subsequent hot working. On the other hand, macrosegregation is non-uniformity of chemical composition in the cast section on a larger scale. It cannot be completely eliminated by soaking at high temperature and/or hot working. In the case of interest for this disclosure, which is the continuous slab cast, it produces the centerline segregation band.

A pronounced central segregation band has to be avoided because:

- Brittle constituents as non-tempered martensite may appear in this region as a result of welding operations (bias weld and ERW, see for example Figures SA-B). These non-desired constituents are removed during the subsequent full body heat treatment. However, the tube may be plastically deformed by bending between welding and heat treatment operations, producing a failure during industrial production.
- After FBHT the remnant of the central segregation band is a region enriched in substitutional solutes (as Mn, Si, Mo) with a higher density of coarse carbides than the rest of the material. This region is susceptible to nucleate cracks during low cycle fatigue, as it is observed in FIGS. **6**-**7**. Additionally, prominent segregation bands are associated to poor SSC resistance.

Although it is not possible to remove macrosegregation, its negative effects on toughness, fatigue life and SSC resistance can be reduced by a proper selection of steel chemistry.

Based on EDX measurements on samples corresponding to a wide range of steel chemistries, enrichment factors at the central segregation band were estimated for different alloying elements. The results are shown in Table C1. The enrichment factors (EF) are the ratios between each element concentration at the central band and that corresponding to the average in the matrix. These factors are mainly dependent on thermodynamic partition coefficient between liquid and solid; and diffusivities during solidification.

TABLE C1

Enrichment factors (EF) at the central segregation band corresponding to different substitutional alloying elements.

| Element | EF |
|---|---|
| Mn | 1.6 |
| Si | 3.2 |

TABLE C1-continued

Enrichment factors (EF) at the central segregation band corresponding to different substitutional alloying elements.

| Element | EF |
|---|---|
| Cr | 1.2 |
| Mo | 2.1 |
| Ni | 1.3 |
| Cu | 3.4 |

Table C1 shows clearly that there are some elements that have a strong tendency to segregate during solidification, like Si and Cu. On the other hand Cr and Ni have low enrichment factors. Ni is a costly addition, but Cr may be used when an increase in hardenability and/or tempering resistance is desired without producing strong segregation patterns.

The enrichment factors give information about the increase in concentration that can be expected for each element at the central segregation band. However, not all these elements have the same effect regarding the material tendency to form brittle constituents during welding or heat treatment. It is observed that the higher the improvement on hardenability, the higher the tendency to form brittle constituents during processing. It is important to mention that elements with high diffusion coefficients as Carbon and Boron may segregate during solidification, but are homogenized during hot rolling. Thereafter, they do not contribute to form brittle constituents localized at the segregation band.

From the analysis of the CCT diagrams (Example A) it can be concluded that Manganese produces the strongest increase in hardenability. This is apart from Carbon and Boron, which do not present large segregation patterns after hot rolling. On the other hand, Si and Cu, which have a strong tendency to segregate, do not play a major role on hardenability. Because of its high enrichment factor and large effect on hardenability, Mn addition has to be reduced as much as possible when trying to diminish the negative effects of macro-segregation, as the reduction in low-cycle fatigue life.

High Mn contents are ordinarily added to the steel composition because of its effect on hardenability. In this disclosure the hardenability is mostly achieved through the higher Carbon addition, so Mn concentration can be generally reduced. Further Manganese reductions can be achieved using Boron and/or Chromium additions. Examples can be seen in Table C2, which shows the critical cooling rate (CR90) for different steels composition obtained from CCT diagrams (data taken from a previous Example A). In order to achieve the hardenability in a steel with about 0.25% Carbon, Mn can be reduced from 1.6% to 1.3% when adding Boron, and further reduced to 0.4% if Cr—Mo is additionally used.

TABLE C2

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) |
|---|---|---|---|---|---|---|---|
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | 30 |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | 30 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 30 |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B—Ti | 25 |

TABLE C2-continued

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) |
|---|---|---|---|---|---|---|---|
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | 25 |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | 23 |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | B—Ti | 25 |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | B—Ti | 25 |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | B—Ti | 15 |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B—Ti | 30 |

Example D: Homogenization of Microstructure

As was previously mentioned the fatigue life of coiled tubing is strongly dependent on microscopical features as microstructural heterogeneities. The combination of soft and hard micro-constituents tends to produce plastic strain localization, which is the driving force for crack nucleation and propagation. In this section are compared the coiled tubing microstructures obtained with the standard production method applied to chemistries within API 5ST, and those corresponding to a chemistry and processing conditions within the ranges disclosed in this disclosure.

As reference material was used a standard coiled tubing grade 110 (yield strength from 110 Ksi to 120 Ksi) with chemistry named STD2 in Table A1, which is within API 5ST specification. This standard material was compared to a coiled tubed of the same grade produced with chemistry $BTi_2$ and applying the FBHT.

In this comparison different pipe locations will be considered:

- Base Metal (BM): coiled tubing microstructure apart from the ERW line and bias welds, when "apart" means that are not included in this region the Heat Affected Zones (HAZ) produced during the any welding operation and their possible Post-Weld Heat Treatment (PWHT).
- Bias Weld (BW): microstructural region corresponding to the strip-to-strip joint that can be performed by Plasma Arc Welding (PAW), Friction Stir Welding (FSW) or any other welding techniques. It is also included in this region the corresponding heat affected zone during welding and PWHT.
- ERW line: microstructure resulting from the longitudinal ERW welding during tube forming and its localized PWHT, which is generally a seam annealing. As in previous cases, this region also includes the corresponding heat affected zone.

In FIGS. **8**A-B are presented the base metal microstructures corresponding to the standard coiled tube (A) and this disclosure (B). In the first case it is observed a ferrite matrix with a fine distribution of carbides. This matrix and fine structure results from the controlled hot rolling process. This disclosure microstructure (FIG. **8**B) is mainly composed of tempered martensite. The bainite volume fraction is lower than 5% in this case. The tempered martensite structure is also a fine distribution of iron carbides in a ferrite matrix. The main difference between conventional and new structures is related to the morphology of the ferrite grains and sub-grains, and the dislocation density. However, regarding refinement and homogeneity, both structures are very similar.

In FIGS. **9**A-B are shown scanning electron micrographs corresponding to the ERW line. It is clear that in the

conventional structure two micro-constituents appear: there are soft ferrite grains and hard blocks composed of a mixture of fine pearlite, martensite and some retained austenite. In this type of structure plastic strain is localized in the ferrite, and cracks can nucleate and propagate in the neighboring brittle constituents (non-tempered martensite and high carbon retained austenite). On the other hand, the ERW line microstructure obtained with chemistry and processing conditions within the ranges of this disclosure is homogeneous and very similar to the corresponding base metal structure.

Microstructures corresponding to the HAZ of the ERW are presented in FIGS. **10**A-B. In the standard material it is clear the appearance of the remnant of the central segregation band, which after seam annealing is partially transformed into non-tempered martensite. Again, these are brittle constituents that are localized along the ERW line, and can nucleate and propagate cracks during service. The risk of failure is higher than in previous case because of the larger size of the just mentioned constituents. On the other hand, in the quenched and tempered coiled tubing the structure close to the ERW line is homogeneous, and the remnants of the central segregation band are not observed.

In FIGS. **11**A-B are presented some scanning electron micrographs corresponding to the bias-weld HAZ of both conventional coiled tube and this disclosure. For the conventional material the microstructure is very different than in Base Metal (BM). It is mainly composed of upper bainite and the grain size is large (50 microns in comparison of less than 15 microns for the BM). This type of coarse structure is not adequate for low cycle fatigue because cracks can easily propagate along bainite laths. An example of a fatigue crack running across coarse bainite in the bias weld is shown in FIG. **12**. This is a secondary crack located close to the main failure occurred during service of a standard coiled tubing grade 110.

On the other hand, the bias weld microstructure in this disclosure is again very similar to that corresponding to the base metal. No upper bainite grains were observed. It is important to mention that some bainite may appear after the full body heat treatment, but because of the selection of adequate chemistry and processing conditions, the corresponding volume fraction of this constituent is lower than 10%. This is the main reason for the good hardenability to the chemistries described in this disclosure. Additionally, due to the upper limit in the austenitization temperature the final grain size is small (lower than 20 microns), then large bainite laths that can propagate cracks are completely avoided.

Other examples of the microstructural homogeneity achievable by the combination of steel chemistry and processing conditions disclosed in this disclosure are presented in FIGS. **13**-**14**. In FIG. **13** is shown the typical variation in hardness across the bias weld for coiled tubes produced conventionally compared to that obtained using the new chemistry and processing route. It is clear that when using this disclosure the hardness variation is strongly reduced. As a consequence, the tendency of the material to accumulate strain in localized regions (in this case the HAZ of the bias weld) is also reduced, and the fatigue life improved.

In FIGS. **14**A-B are shown some microstructures corresponding to the intersection between the bias weld and the ERW line. It is clear that large microstructural heterogeneities are obtained following the conventional route. These heterogeneities are successfully eliminated using the chemistry and processing conditions disclosed in this disclosure.

Example E: Coiled Tube Fatigue Testing

In order to compare the performance of coiled tubing produced according to this disclosure with that correspond-



ing to standard products, a series of tests were performed at laboratory. Coiled tube samples were tested in a fatigue machine schematically shown in FIG. **15**. This machine is able to simulate the bending deformations during spooling and un-spooling operations, applying at the same time internal pressures. Therefore, the tests are useful to rank materials under low-cycle fatigue conditions that are close to those experienced during actual field operation.

During testing, the fatigue specimens (tube pieces 5 or 6 feet long) are clamped on one end while an alternative force is applied by a hydraulic actuator on the opposite end. Deformation cycles are applied on the test specimens by bending samples over a curved mandrel of fixed radius, and then straightening them against a straight backup. Steel caps are welded at the ends of the specimen and connected to a hydraulic pump, so that cycling is conducted with the specimen filled with water at a constant internal pressure until it fails. The test ends when a loss of internal pressure occurs, due to the development of a crack through the wall thickness.

Testing was performed on coiled tubing with different chemistries and grades, as shown in Table E1. The pipe geometry was the same in all cases (OD 2", WT 0.19"). STD1, STD2 and STD3 are steels within the limits described in API 5ST, processed following the standard route. $BTi_1$, $BTi_2$ and $CrMoBTi_4$ are chemistries selected and processed according to this disclosure. It is important to mention that $CrMoBTi_4$ steel was used to produce two non-standard grades with 125 Ksi and 140 Ksi of minimum yield strength (the highest grade described in API 5ST has 110 Ksi of SMYS). Tests were performed on tube pieces with and without the bias weld (in all cases the longitudinal ERW line is included in the samples). The severity of the test mainly depends on two parameters: bend radius and inner pressure. In this study the bend radius was 48 inches, which corresponds to a plastic strain of about 2%. Inner pressures between 1600 psi and 13500 psi were considered, producing hoop stresses that ranged from about 10% to 60% of the minimum yield strength of the grades.

TABLE E1

Steel chemistries and coiled tube grades analyzed in this study.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | Grade |
|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | Ni, Cu, Ti | 80 |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | Ni Cu, Nb—Ti | 90 |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | Ni, Cu, Nb—Ti | 110 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 80 |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B—Ti | 90, 110 |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B—Ti | 125, 140 |

In FIG. **16** is presented some results regarding the comparison between the fatigue life measured in samples with and without the Bias Weld (BW). The values shown in the figure correspond to the averages obtained when testing conventional and non-conventional coiled tubes grades. In the case of the conventional material there is clearly a reduction in fatigue life when testing samples containing the bias weld. On the other hand, the coiled tubes produced according to this disclosure do not present an important change in fatigue life when the tests are performed on BW samples. This is a consequence of the tube homogeneous

structure, with almost no differences in mechanical properties between base metal, ERW line and bias weld.

In FIG. **17** is shown the coiled tube fatigue life improvements obtained with chemistries and processing conditions as disclosed by this disclosure. For Grades 80, 90 and 110 the comparison was made against the equivalent grade produced by the conventional mute. In the case of grades 125 and 140, which are non-standard, the fatigue life comparison was performed against STD3 steel in Grade 110 tested under the similar conditions (pipe geometry, bend radius and inner pressure). The results presented in the figure correspond to average values for each grade, the error bars represent the dispersion obtained when using different inner pressures.

In FIG. **17** it is clear that a notorious improvement of fatigue life is observed when using chemistries and processing conditions according to this disclosure. For example, in Grade 110 there was an improvement of about 100% in fatigue life. This is a consequence of the fact that in conventional coiled tubing the fatigue performance is limited to that of the bias weld (which is generally the weak point regarding low cycle fatigue, because its microstructural heterogeneities and brittle constituents). In coiled tubes produced according to this disclosure there is no important fatigue life reduction at bias welds, which strongly increases the overall performance of the tube. Regarding the non-standard grades, the large improvement in fatigue life is due to the fact that the comparison is made against a conventional 110 grade tested under similar processing conditions. However, for the same inner pressures the applied hoop stresses are closer to the minimum yield strength of the lower grade, and the test severity increases for grade 110 in comparison to grades 125 and 140. These results show that by using higher grades (not achievable with the conventional method) fatigue life is strongly increased for the same service conditions.

## Example F: Sulfide Stress Cracking Resistance

Material performance in regards to hydrogen embrittlement in $H_2S$ containing environments is related to the combined effects of corrosive environments, presence of traps (e.g. precipitates and dislocations) that could locally increase hydrogen concentration, as well as the presence of brittle areas, in which cracks could easily propagate. A possible source of critical brittle regions in conventional coiled tubing material is the segregation pattern of substitutional elements, such us Mn, in the raw material. Regions of differential concentrations tend to respond in a distinct way to thermal cycles imposed during bias weld, PWHT, ERW and seam annealing, and could lead to the local formation of brittle constituents. In particular, when the material is seam annealed after the ERW process, the pipe body quickly extracts heat from the weld area. If the segregation is high enough, elongated high hardness areas with the possible presence of martensite may be formed as a consequence of the cooling conditions. These areas will remain in the tube to become easy paths for crack propagation. The fact that the new process is applied as the last stage of manufacturing, allows for the minimization of the excessively hardened areas. Other relevant differences are: a) the dislocations introduced during pipe cold forming are not present in the new product, b) the carbides in new product are smaller and isolated in comparison with the typical pearlite/bainite long brittle carbides. As a consequence the coiled tube produced with chemistries and processing conditions according to this disclosure presents an improved performance to cracking in $H_2S$ containing environments.



TABLE F1

Steel chemistries and coiled tube grades analyzed in this study.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | Grade |
|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | Ni, Cu, Ti | 80 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 80 |

In order to perform a first analysis on resistance to SSC cracking, coiled tube Grade 80 samples produced by i) the standard process and ii) the new chemistry-process were evaluated using method C (C-ring) of NACE TM0177. Steel chemistries are shown in Table F1. Both materials (3 specimens in each case) were tested with the ERW seam at center of C-ring sample, using the following conditions:

Load: 90% of 80 Ksi, Solution A, 1 bar $H_2S$, Test Time: 720 hs

In the case of the standard coiled tube all 3 specimens failed. On the other hand, the 3 samples corresponding to the new chemistry-process passed the test (FIGS. **5**A-B with pictures of C-rings). Although more tests are ongoing to analyze embrittlement resistance of different grades, as well as the effect of the bias weld, this first result shows a clear improvement in comparison with the standard condition, ascribed to a more homogeneous microstructure of base metal and ERW line in the case of the new process route.

As shown in FIGS. **18**A-B, the C ring formed by the conventional process has a large crack down the middle, whereas the C ring formed by embodiments of the disclosed process did not crack.

In some embodiments, B—Ti and Cr—Mo additions can reduce maximum Mn. In some embodiments, grades may be higher than 110 that are difficult to achieve using the standard method.

Features, materials, characteristics, or groups described in conjunction with a particular aspect, embodiment, or example are to be understood to be applicable to any other aspect, embodiment or example described herein unless incompatible therewith. All of the features disclosed in this specification (including any accompanying claims, abstract and drawings), and/or all of the steps of any method or process so disclosed, may be combined in any combination, except combinations where at least some of such features and/or steps are mutually exclusive. The protection is not restricted to the details of any foregoing embodiments. The protection extends to any novel one, or any novel combination, of the features disclosed in this specification (including any accompanying claims, abstract and drawings), or to any novel one, or any novel combination, of the steps of any method or process so disclosed.

While certain embodiments have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of protection. Indeed, the novel methods and apparatuses described herein may be embodied in a variety of other forms. Furthermore, various omissions, substitutions and changes in the form of the methods, compositions and apparatuses described herein may be made. Those skilled in the art will appreciate that in some embodiments, the actual steps taken in the processes illustrated and/or disclosed may differ from those shown in the figures. Depending on the embodiment, certain of the steps described above may be removed, others may be

added. Furthermore, the features and attributes of the specific embodiments disclosed above may be combined in different ways to form additional embodiments, all of which fall within the scope of the present disclosure.

Although the present disclosure includes certain embodiments, examples and applications, it will be understood by those skilled in the art that the present disclosure extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses and obvious modifications and equivalents thereof, including embodiments which do not provide all of the features and advantages set forth herein. Accordingly, the scope of the present disclosure is not intended to be limited by the specific disclosures of preferred embodiments herein, and may be defined by claims as presented herein or as presented in the future.

What is claimed is:

**1**. A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled steel tube, the coiled steel tube comprising:

a plurality of strips welded together end to end by a bias weld to form a plurality of bias welded strips and formed into the coiled steel tube, each of the plurality of bias welded strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints;

wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube; wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite and 0 volume % to less than about 10 volume % bainite in the base metal regions, the bias weld joints, and the heat affected zones;

wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogeneous;

wherein the yield strength following manufacture of the coiled steel tube is substantially uniform along substantially all of a length of the coiled steel tube; and

wherein a yield strength of the coiled steel tube is greater than about 80 ksi.

**2**. The coiled steel tube of claim **1**, wherein the tube has a yield strength of at least 110 ksi.

**3**. The coiled steel tube of claim **1**, wherein the tube has a yield strength of at least 125 ksi.

**4**. The coiled steel tube of claim **1**, wherein the final microstructure comprises at least 95 volume % tempered martensite and 0 volume % to less than about 5 volume % bainite in the base metal regions, the bias weld joints, and the heat affected zones.

**5**. The coiled steel tube of claim **1**, wherein the tube has a final grain size of below 20 μm in the base metal regions, the bias weld joints, and the heat affected zones.

**6**. The coiled steel tube of claim **5**, wherein the tube has a final grain size of below 15 μm in the base metal regions, the bias weld joints, and the heat affected zones.

**7**. The coiled steel tube of claim **1**, wherein the fatigue life at the bias weld joints is at least about 80% of the base metal regions.

**8**. The coiled steel tube of claim **1**, wherein a percent hardness of each of the bias weld joints, including its heat affected zone, is 110% or less than a hardness of the base metal region.

**9**. The coiled steel tube of claim **1**, wherein a total length of the coiled steel tube is between 10,000 feet and 40,000 feet.

**10**. The coiled steel tube of claim **1**, wherein the fatigue life is at least 100% greater than an equivalent grade steel which has not undergone the fully body heat treatment.

**11**. The coiled steel tube of claim **1**, wherein the full body heat treatment applied to the coiled steel tube comprises quenching and tempering.

**12**. The coiled steel tube of claim **1**, wherein the full body heat treatment comprises at least one cycle of austenitization, quenching and tempering.

**13**. The coiled steel tube of claim **12**, wherein the tempering is carried out at temperatures between 550 degrees C. and 720 degrees C.

**14**. The coiled steel tube of claim **12**, wherein the austenitization is performed at temperatures between 900 degrees C. and 1000 degrees C.

**15**. The coiled steel tube of claim **12**, wherein a cooling rate of quenching is equal to or lower than 30 degrees C./sec.

**16**. The coiled steel tube of claim **1**, wherein the full body heat treatment comprises at least one cycle of austenitization and quenching, followed by tempering.

**17**. The coiled steel tube of claim **16**, wherein the tempering is carried out at temperatures between 550 degrees C. and 720 degrees C.

**18**. The coiled steel tube of claim **16**, wherein the austenitization is performed at temperatures between 900 degrees C. and 1000 degrees C.

**19**. The coiled steel tube of claim **16**, wherein a cooling rate of quenching is equal to or lower than 30 degrees C./sec.

**20**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.010 wt. % to about 0.030 wt. % titanium and from about 0.0005 wt. % to about 0.0030 wt. % of boron.

**21**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.30 wt. % to about 2.0 wt. % manganese.

**22**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.10 wt. % to about 0.35 wt. % silicon.

**23**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.16 wt. % to about 0.35 wt. % carbon.

**24**. The coiled steel tube of claim **1**, wherein the final microstructure after full body heat treatment comprises a uniform distribution of fine carbides across the base metal regions, the bias weld, and the heat affected zones.

**25**. The coiled steel tube of claim **1**, wherein after full body heat treatment, the coiled steel tube has a final grain size of below about 20 μm in the base metal region, the bias weld joints, and the heat affected zones.

**26**. The coiled steel tube of claim **25**, wherein after full body heat treatment, the coiled steel tube has a final grain size of below about 15 μm in the base metal region, the bias weld joints, and the heat affected zones.

**27**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include up to about 0.010 wt. % sulfur.

**28**. The coiled steel tube of claim **27**, wherein the plurality of steel strips welded together include up to about 0.005 wt. % sulfur.

**29**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include about 0.010 wt. % to about 0.040 wt. % aluminum.

**30**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include up to 0.018 wt. % phosphorus.

* * * * *

US010378075B2

(12) **United States Patent**
**Valdez et al.**

(10) **Patent No.: US 10,378,075 B2**
(45) **Date of Patent: *Aug. 13, 2019**

(54) **HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME**

(71) Applicant: **TENARIS COILED TUBES, LLC**, Houston, TX (US)

(72) Inventors: **Martin Valdez**, Buenos Aires (AR); **Jorge Mitre**, Houston, TX (US); **Bruce A. Reichert**, Houston, TX (US)

(73) Assignee: **TENARIS COILED TUBES, LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/943,528**

(22) Filed: **Apr. 2, 2018**

(65) **Prior Publication Data**

US 2018/0223384 A1 Aug. 9, 2018

**Related U.S. Application Data**

(60) Division of application No. 15/665,054, filed on Jul. 31, 2017, which is a continuation of application No. 14/190,886, filed on Feb. 26, 2014, now Pat. No. 9,803,256.

(60) Provisional application No. 61/783,701, filed on Mar. 14, 2013.

(51) **Int. Cl.**

| | |
|---|---|
| ***C21D 8/10*** | (2006.01) |
| ***C21D 9/08*** | (2006.01) |
| ***C21D 9/14*** | (2006.01) |
| ***C21D 9/50*** | (2006.01) |

(Continued)

(52) **U.S. Cl.**

CPC .............. ***C21D 8/105*** (2013.01); ***C21D 1/22*** (2013.01); ***C21D 8/10*** (2013.01); ***C21D 9/08*** (2013.01); ***C21D 9/085*** (2013.01); ***C21D 9/14*** (2013.01); ***C21D 9/50*** (2013.01); ***C21D 9/505*** (2013.01);

(Continued)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,316,395 A | 4/1967 | Lavin |
| 3,316,396 A | 4/1967 | Trott et al. |
| 3,325,174 A | 6/1967 | Weaver |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AR | 0050159 | 10/2006 |
| AT | 388791 B | 8/1989 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/665,054, filed Jun. 31, 2017, Valdez et al.

(Continued)

*Primary Examiner* — Daniel J. Schleis

(74) *Attorney, Agent, or Firm* — Fish & Richardson P.C.

(57) **ABSTRACT**

Embodiments of the present disclosure are directed to coiled steel tubes and methods of manufacturing coiled steel tubes. In some embodiments, the final microstructures of the coiled steel tubes across all base metal regions, weld joints, and heat affected zones can be homogeneous. Further, the final microstructure of the coiled steel tube can be a mixture of tempered martensite and bainite.

**30 Claims, 16 Drawing Sheets**



(51) **Int. Cl.**
***C21D 1/22*** (2006.01)
*B21C 37/08* (2006.01)

(52) **U.S. Cl.**
CPC ........ *B21C 37/08* (2013.01); *C21D 2211/008* (2013.01); *Y10T 428/12333* (2015.01)

(56) **References Cited**


U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,362,731 | A | 1/1968 | Gasche et al. |
| 3,366,392 | A | 1/1968 | Kennel |
| 3,413,166 | A | 11/1968 | Zackay et al. |
| 3,489,437 | A | 1/1970 | Duret |
| 3,512,789 | A | 5/1970 | Tanner |
| 3,552,781 | A | 1/1971 | Helland |
| 3,572,777 | A | 3/1971 | Blose et al. |
| 3,575,430 | A | 4/1971 | Alpine |
| 3,592,491 | A | 7/1971 | Glover |
| 3,599,931 | A | 8/1971 | Hanson |
| 3,655,465 | A | 4/1972 | Snape et al. |
| 3,733,093 | A | 5/1973 | Seiler |
| 3,810,793 | A | 5/1974 | Heller |
| 3,854,760 | A | 12/1974 | Duret |
| 3,889,989 | A | 6/1975 | Legris et al. |
| 3,891,224 | A | 6/1975 | Ditcher |
| 3,893,919 | A | 7/1975 | Flegel et al. |
| 3,915,697 | A | 10/1975 | Giuliani et al. |
| 3,918,726 | A | 11/1975 | Kramer |
| 3,986,731 | A | 10/1976 | De Hoff |
| 4,014,568 | A | 3/1977 | Carter et al. |
| 4,147,368 | A | 4/1979 | Baker et al. |
| 4,163,290 | A | 7/1979 | Sutherlin et al. |
| 4,219,204 | A | 8/1980 | Pippert |
| 4,231,555 | A | 11/1980 | Saito |
| 4,299,412 | A | 11/1981 | Parmann |
| 4,305,059 | A | 12/1981 | Benton |
| 4,310,163 | A | 1/1982 | Pippert |
| 4,336,081 | A | 6/1982 | Hijikata et al. |
| 4,345,739 | A | 8/1982 | Wheatley |
| 4,354,882 | A | 10/1982 | Greer |
| 4,366,971 | A | 1/1983 | Lula |
| 4,368,894 | A | 1/1983 | Parmann |
| 4,373,750 | A | 2/1983 | Mantelle et al. |
| 4,376,528 | A | 3/1983 | Ohshimatani et al. |
| 4,379,482 | A | 4/1983 | Suzuki et al. |
| 4,384,737 | A | 5/1983 | Reusser |
| 4,406,561 | A | 9/1983 | Ewing |
| 4,407,681 | A | 10/1983 | Ina et al. |
| 4,426,095 | A | 1/1984 | Buttner |
| 4,445,265 | A | 5/1984 | Olson et al. |
| 4,473,471 | A | 9/1984 | Robichaud et al. |
| 4,475,839 | A | 10/1984 | Strandberg |
| 4,491,725 | A | 1/1985 | Pritchard |
| 4,506,432 | A | 3/1985 | Smith |
| 4,526,628 | A | 7/1985 | Ohno et al. |
| 4,527,815 | A | 7/1985 | Smith |
| 4,564,392 | A | 1/1986 | Ohhashi et al. |
| 4,570,982 | A | 2/1986 | Blose et al. |
| 4,591,195 | A | 5/1986 | Chelette et al. |
| 4,592,558 | A | 6/1986 | Hopkins |
| 4,601,491 | A | 7/1986 | Bell, Jr. et al. |
| 4,602,807 | A | 7/1986 | Bowers |
| 4,623,173 | A | 11/1986 | Handa et al. |
| 4,629,218 | A | 12/1986 | Dubois |
| 4,662,659 | A | 5/1987 | Blose et al. |
| 4,674,756 | A | 6/1987 | Fallon et al. |
| 4,688,832 | A | 8/1987 | Ortloff et al. |
| 4,706,997 | A | 11/1987 | Carstensen |
| 4,710,245 | A | 12/1987 | Roether |
| 4,721,536 | A | 1/1988 | Koch et al. |
| 4,758,025 | A | 7/1988 | Frick |
| 4,762,344 | A | 8/1988 | Perkins et al. |
| 4,812,182 | A | 3/1989 | Fang et al. |
| 4,814,141 | A | 3/1989 | Imai et al. |
| 4,844,517 | A | 7/1989 | Beiley et al. |
| 4,856,828 | A | 8/1989 | Kessler et al. |
| 4,955,645 | A | 9/1990 | Weems |
| 4,958,862 | A | 9/1990 | Cappelli et al. |
| 4,988,127 | A | 1/1991 | Cartensen |
| 5,007,665 | A | 4/1991 | Bovisio et al. |
| 5,067,874 | A | 11/1991 | Foote |
| 5,137,310 | A | 8/1992 | Noel et al. |
| 5,143,381 | A | 9/1992 | Temple |
| 5,154,534 | A | 10/1992 | Guerin et al. |
| 5,180,008 | A | 1/1993 | Aldridge et al. |
| 5,191,911 | A | 3/1993 | Dubois |
| 5,242,199 | A | 9/1993 | Hann et al. |
| 5,328,158 | A | 7/1994 | Lewis et al. |
| 5,348,350 | A | 9/1994 | Blose et al. |
| 5,352,406 | A | 10/1994 | Barteri et al. |
| 5,360,239 | A | 11/1994 | Klementich |
| 5,449,420 | A | 9/1995 | Okada et al. |
| 5,454,883 | A | 10/1995 | Yoshie et al. |
| 5,456,405 | A | 10/1995 | Stagg |
| 5,505,502 | A | 4/1996 | Smith et al. |
| 5,515,707 | A | 5/1996 | Smith |
| 5,538,566 | A | 7/1996 | Gallagher |
| 5,592,988 | A | 1/1997 | Meroni et al. |
| 5,598,735 | A | 2/1997 | Saito et al. |
| 5,653,452 | A | 8/1997 | Jarvenkyla |
| 5,712,706 | A | 1/1998 | Castore et al. |
| 5,794,985 | A | 8/1998 | Mallis |
| 5,810,401 | A | 9/1998 | Mosing et al. |
| 5,860,680 | A | 1/1999 | Drijver et al. |
| 5,879,030 | A | 3/1999 | Clayson et al. |
| 5,879,474 | A | 3/1999 | Bhadeshia et al. |
| 5,944,921 | A | 8/1999 | Cumino et al. |
| 5,993,570 | A | 11/1999 | Gray |
| 6,006,789 | A | 12/1999 | Toyooka et al. |
| 6,030,470 | A | 2/2000 | Hensger et al. |
| 6,044,539 | A | 4/2000 | Guzowksi |
| 6,045,165 | A | 4/2000 | Sugino et al. |
| 6,056,324 | A | 5/2000 | Reimert et al. |
| 6,070,912 | A | 6/2000 | Latham |
| 6,173,968 | B1 | 1/2001 | Nelson et al. |
| 6,188,037 | B1 | 2/2001 | Hamada et al. |
| 6,196,530 | B1 | 3/2001 | Muhr et al. |
| 6,217,676 | B1 | 4/2001 | Takabe et al. |
| 6,248,187 | B1 | 6/2001 | Asahi et al. |
| 6,267,828 | B1 | 7/2001 | Kushida et al. |
| 6,311,965 | B1 | 11/2001 | Muhr et al. |
| 6,331,216 | B1 | 12/2001 | Toyooka et al. |
| 6,347,814 | B1 | 2/2002 | Cerruti |
| 6,349,979 | B1 | 2/2002 | Noel et al. |
| 6,358,336 | B1 | 3/2002 | Miyata |
| 6,384,388 | B1 | 5/2002 | Anderson et al. |
| 6,412,831 | B1 | 7/2002 | Noel et al. |
| 6,447,025 | B1 | 9/2002 | Smith |
| 6,478,344 | B2 | 11/2002 | Pallini, Jr. et al. |
| 6,481,760 | B1 | 11/2002 | Noel et al. |
| 6,494,499 | B1 | 12/2002 | Galle, Sr. et al. |
| 6,514,359 | B2 | 2/2003 | Kawano |
| 6,527,056 | B2 | 3/2003 | Newman |
| 6,540,848 | B2 | 4/2003 | Miyata et al. |
| 6,550,822 | B2 | 4/2003 | Mannella et al. |
| 6,557,906 | B1 | 5/2003 | Carcagno |
| 6,558,484 | B1 | 5/2003 | Onoe et al. |
| 6,581,940 | B2 | 6/2003 | Dittel |
| 6,632,296 | B2 | 10/2003 | Yoshinaga et al. |
| 6,648,991 | B2 | 11/2003 | Turconi et al. |
| 6,669,285 | B1 | 12/2003 | Park et al. |
| 6,669,789 | B1 | 12/2003 | Edelman et al. |
| 6,682,610 | B1 | 1/2004 | Inoue |
| 6,683,834 | B2 | 1/2004 | Ohara et al. |
| 6,709,534 | B2 | 3/2004 | Kusinski et al. |
| 6,752,436 | B1 | 6/2004 | Verdillon |
| 6,755,447 | B2 | 6/2004 | Galle, Jr. et al. |
| 6,764,108 | B2 | 7/2004 | Ernst et al. |
| 6,767,417 | B2 | 7/2004 | Fujita et al. |
| 6,814,358 | B2 | 11/2004 | Keck |
| 6,851,727 | B2 | 2/2005 | Carcagno et al. |
| 6,857,668 | B2 | 2/2005 | Otten et al. |
| 6,883,804 | B2 | 4/2005 | Cobb |
| 6,905,150 | B2 | 6/2005 | Carcagno et al. |
| 6,921,110 | B2 | 7/2005 | Marotti et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,958,099 | B2 | 10/2005 | Nakamura et al. |
| 6,971,681 | B2 | 12/2005 | Dell'Erba et al. |
| 6,991,267 | B2 | 1/2006 | Ernst et al. |
| 7,014,223 | B2 | 3/2006 | Della Pina et al. |
| 7,066,499 | B2 | 6/2006 | Della Pina et al. |
| 7,074,283 | B2 | 7/2006 | Omura |
| 7,083,686 | B2 | 8/2006 | Itou |
| 7,108,063 | B2 | 9/2006 | Carstensen |
| 7,118,637 | B2 | 10/2006 | Kusinski et al. |
| 7,182,140 | B2 | 2/2007 | Wood |
| 7,214,278 | B2 | 5/2007 | Kusinski et al. |
| 7,255,374 | B2 | 8/2007 | Carcagno et al. |
| 7,264,684 | B2 | 9/2007 | Numata et al. |
| 7,284,770 | B2 | 10/2007 | Dell'erba et al. |
| 7,310,867 | B2 | 12/2007 | Corbett, Jr. |
| 7,431,347 | B2 | 10/2008 | Ernst et al. |
| 7,464,449 | B2 | 12/2008 | Santi et al. |
| 7,475,476 | B2 | 1/2009 | Roussie |
| 7,478,842 | B2 | 1/2009 | Reynolds, Jr. et al. |
| 7,506,900 | B2 | 3/2009 | Carcagno et al. |
| 7,621,034 | B2 | 11/2009 | Roussie |
| 7,635,406 | B2 | 12/2009 | Numata et al. |
| 7,735,879 | B2 | 6/2010 | Toscano et al. |
| 7,744,708 | B2 | 6/2010 | Lopez et al. |
| 7,753,416 | B2 | 7/2010 | Mazzaferro et al. |
| 7,862,667 | B2 | 1/2011 | Turconi et al. |
| 8,002,910 | B2 | 8/2011 | Tivelli et al. |
| 8,007,601 | B2 | 8/2011 | Lopez et al. |
| 8,007,603 | B2 | 8/2011 | Garcia et al. |
| 8,016,362 | B2 | 9/2011 | Itoga |
| 8,262,094 | B2 | 9/2012 | Beele |
| 8,262,140 | B2 | 9/2012 | Santi et al. |
| 8,317,946 | B2 | 11/2012 | Arai et al. |
| 8,328,958 | B2 | 12/2012 | Turconi et al. |
| 8,328,960 | B2 | 12/2012 | Gomez et al. |
| 8,333,409 | B2 | 12/2012 | Santi et al. |
| 8,414,715 | B2 | 4/2013 | Altschuler et al. |
| 8,544,304 | B2 | 10/2013 | Santi |
| 8,636,856 | B2 | 1/2014 | Altschuler et al. |
| 8,821,653 | B2 | 9/2014 | Anelli et al. |
| 8,840,152 | B2 | 9/2014 | Carcagno et al. |
| 8,926,771 | B2 | 1/2015 | Agazzi |
| 9,004,544 | B2 | 4/2015 | Carcagno et al. |
| 9,163,296 | B2 | 10/2015 | Valdez et al. |
| 9,187,811 | B2 | 11/2015 | Gomez et al. |
| 9,222,156 | B2 | 12/2015 | Altschuler et al. |
| 9,234,612 | B2 | 1/2016 | Santi et al. |
| 9,340,847 | B2 | 5/2016 | Altschuler et al. |
| 9,383,045 | B2 | 7/2016 | Santi et al. |
| 9,598,746 | B2 | 3/2017 | Anellie et al. |
| 9,745,640 | B2 | 8/2017 | Valdez et al. |
| 9,803,256 | B2 | 10/2017 | Valdez et al. |
| 2001/0035235 | A1 | 11/2001 | Kawano |
| 2002/0011284 | A1 | 1/2002 | Von Hagen et al. |
| 2002/0153671 | A1 | 10/2002 | Raymond et al. |
| 2002/0158469 | A1 | 10/2002 | Mannella et al. |
| 2003/0019549 | A1 | 1/2003 | Turconi et al. |
| 2003/0111146 | A1 | 6/2003 | Kusinski et al. |
| 2003/0116238 | A1 | 6/2003 | Fujita |
| 2003/0155052 | A1 | 8/2003 | Kondo et al. |
| 2003/0165098 | A1 | 9/2003 | Ohara et al. |
| 2003/0168859 | A1 | 9/2003 | Watts |
| 2004/0118490 | A1 | 6/2004 | Klueh et al. |
| 2004/0118569 | A1 | 6/2004 | Brill et al. |
| 2004/0131876 | A1 | 7/2004 | Ohgami et al. |
| 2004/0139780 | A1 | 7/2004 | Cai et al. |
| 2004/0187971 | A1 | 9/2004 | Omura |
| 2004/0195835 | A1 | 10/2004 | Noel et al. |
| 2004/0262919 | A1 | 12/2004 | Dutilleul et al. |
| 2005/0012278 | A1 | 1/2005 | Delange |
| 2005/0076975 | A1 | 4/2005 | Lopez et al. |
| 2005/0087269 | A1 | 4/2005 | Merwin |
| 2005/0093250 | A1 | 5/2005 | Santi et al. |
| 2005/0166986 | A1 | 8/2005 | Dell'erba et al. |
| 2006/0006600 | A1 | 1/2006 | Roussie |
| 2006/0124211 | A1 | 6/2006 | Takano et al. |
| 2006/0137781 | A1 | 6/2006 | Kusinski et al. |
| 2006/0157539 | A1 | 7/2006 | Dubois |
| 2006/0169368 | A1 | 8/2006 | Lopez et al. |
| 2006/0231168 | A1 | 10/2006 | Nakamura et al. |
| 2006/0231186 | A1 | 10/2006 | Nakmura et al. |
| 2006/0243355 | A1 | 11/2006 | Haiderer et al. |
| 2006/0273586 | A1 | 12/2006 | Reynolds, Jr. et al. |
| 2007/0039149 | A1 | 2/2007 | Roussie |
| 2007/0089813 | A1 | 4/2007 | Tivelli |
| 2007/0137736 | A1 | 6/2007 | Omura et al. |
| 2007/0216126 | A1 | 9/2007 | Lopez et al. |
| 2007/0246219 | A1 | 10/2007 | Manella et al. |
| 2008/0047635 | A1 | 2/2008 | Kanda et al. |
| 2008/0115863 | A1 | 5/2008 | McCrink et al. |
| 2008/0129044 | A1 | 6/2008 | Carcagno et al. |
| 2008/0219878 | A1 | 9/2008 | Kanda et al. |
| 2008/0226396 | A1 | 9/2008 | Garcia et al. |
| 2008/0226491 | A1 | 9/2008 | Satou et al. |
| 2008/0257459 | A1 | 10/2008 | Arai et al. |
| 2008/0264129 | A1 | 10/2008 | Cheppe et al. |
| 2008/0286504 | A1 | 11/2008 | Asahi et al. |
| 2008/0303274 | A1 | 12/2008 | Mazzaferro et al. |
| 2008/0314481 | A1 | 12/2008 | Garcia et al. |
| 2009/0010794 | A1 | 1/2009 | Turconi et al. |
| 2009/0033087 | A1 | 2/2009 | Carcagno et al. |
| 2009/0047166 | A1 | 2/2009 | Tomomatsu et al. |
| 2009/0101242 | A1 | 4/2009 | Lopez et al. |
| 2009/0114318 | A1 | 5/2009 | Arai et al. |
| 2009/0226988 | A1 | 9/2009 | Tajima et al. |
| 2010/0136363 | A1 | 6/2010 | Valdez et al. |
| 2010/0187808 | A1 | 7/2010 | Santi |
| 2010/0193085 | A1 | 8/2010 | Garcia |
| 2010/0206553 | A1 | 8/2010 | Bailey et al. |
| 2010/0294401 | A1 | 11/2010 | Gomez |
| 2010/0319814 | A1 | 12/2010 | Perez |
| 2010/0327550 | A1 | 12/2010 | Lopez |
| 2011/0042946 | A1 | 2/2011 | Santi |
| 2011/0077089 | A1 | 3/2011 | Hirai et al. |
| 2011/0097235 | A1 | 4/2011 | Turconi et al. |
| 2011/0133449 | A1 | 6/2011 | Mazzaferro |
| 2011/0233925 | A1 | 9/2011 | Pina |
| 2011/0247733 | A1 | 10/2011 | Arai et al. |
| 2011/0259482 | A1 | 10/2011 | Peters et al. |
| 2011/0284137 | A1 | 11/2011 | Kami et al. |
| 2012/0018056 | A1 | 1/2012 | Nakagawa et al. |
| 2012/0186686 | A1 | 7/2012 | Valdez |
| 2012/0199255 | A1 | 8/2012 | Anelli |
| 2012/0267014 | A1 | 10/2012 | Hitoshio et al. |
| 2013/0000790 | A1 | 1/2013 | Arai et al. |
| 2013/0004787 | A1 | 1/2013 | Ishiyama et al. |
| 2013/0199674 | A1 | 8/2013 | Altschuler et al. |
| 2013/0264123 | A1 | 10/2013 | Altschuler et al. |
| 2014/0021244 | A1 | 1/2014 | DuBois |
| 2014/0027497 | A1 | 1/2014 | Rowland et al. |
| 2014/0057121 | A1 | 2/2014 | Altschuler et al. |
| 2014/0137992 | A1 | 5/2014 | Ishiguro et al. |
| 2014/0251512 | A1 | 9/2014 | Gomez |
| 2014/0272448 | A1 | 9/2014 | Valdez et al. |
| 2014/0299235 | A1 | 10/2014 | Anelli |
| 2014/0299236 | A1 | 10/2014 | Anelli |
| 2015/0368986 | A1 | 12/2015 | Narikawa |
| 2016/0024625 | A1 | 1/2016 | Valdez |
| 2016/0102856 | A1 | 4/2016 | Minami |
| 2016/0281188 | A1 | 9/2016 | Valdez et al. |
| 2016/0305192 | A1 | 10/2016 | Buhler |
| 2018/0044747 | A1 | 2/2018 | Valdez et al. |
| 2018/0051353 | A1* | 2/2018 | Valdez ..................... C21D 1/22 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2319926 | 7/2008 |
| CN | 1401809 | 3/2003 |
| CN | 1487112 | 4/2004 |
| CN | 1292429 | 12/2006 |
| CN | 101480671 | 7/2009 |
| CN | 101542002 | 9/2009 |
| CN | 101613829 | 12/2009 |
| CN | 101413089 | 11/2010 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3310226 | A1 | 10/1984 |
| DE | 4446806 | | 5/1996 |
| EA | 010037 | | 6/2008 |
| EA | 012256 | | 8/2009 |
| EP | 0 032 265 | | 7/1981 |
| EP | 0 092 815 | | 11/1983 |
| EP | 0 104 720 | | 4/1984 |
| EP | 0 159 385 | | 10/1985 |
| EP | 0 309 179 | | 3/1989 |
| EP | 0 340 385 | | 11/1989 |
| EP | 0 329 990 | | 11/1992 |
| EP | 0 658 632 | | 6/1995 |
| EP | 0 753 595 | | 1/1997 |
| EP | 0788850 | | 8/1997 |
| EP | 0 828 007 | A | 3/1998 |
| EP | 0 989 196 | | 3/2000 |
| EP | 1 008 660 | | 6/2000 |
| EP | 0 1 027 944 | | 8/2000 |
| EP | 1 065 423 | | 1/2001 |
| EP | 828 007 | | 11/2001 |
| EP | 1 269 059 | | 1/2003 |
| EP | 1 277 848 | | 1/2003 |
| EP | 1 288 316 | | 3/2003 |
| EP | 1 296 088 | | 3/2003 |
| EP | 1 362977 | | 11/2003 |
| EP | 1413639 | | 4/2004 |
| EP | 1 182 268 | | 9/2004 |
| EP | 1 705 415 | | 9/2006 |
| EP | 1 726 861 | | 11/2006 |
| EP | 1717324 | | 11/2006 |
| EP | 1 876 254 | | 1/2008 |
| EP | 1 914 324 | | 4/2008 |
| EP | 2 000 629 | | 12/2008 |
| EP | 1554518 | | 1/2009 |
| EP | 2 028 284 | | 2/2009 |
| EP | 2 133 442 | | 12/2009 |
| EP | 2 216 576 | | 8/2010 |
| EP | 2 239 343 | | 10/2010 |
| FR | 1149513 | | 12/1957 |
| FR | 1489013 | | 7/1967 |
| FR | 2 704 042 | A | 10/1994 |
| FR | 2 848 282 | A1 | 6/2004 |
| FR | 2855587 | | 12/2004 |
| GB | 498 472 | | 1/1939 |
| GB | 1 398 214 | | 6/1973 |
| GB | 1 428 433 | | 3/1976 |
| GB | 2 104 919 | A | 3/1983 |
| GB | 2 234 308 | | 1/1991 |
| GB | 2 276 647 | | 10/1994 |
| GB | 2 388169 | | 11/2003 |
| JP | S522825 | | 1/1977 |
| JP | 58-187684 | | 12/1983 |
| JP | 60-086209 | | 5/1985 |
| JP | S60 11 6796 | | 6/1985 |
| JP | 60-215719 | A | 10/1985 |
| JP | 36025719 | | 10/1985 |
| JP | S61-103061 | | 5/1986 |
| JP | 61 270355 | | 11/1986 |
| JP | 63 004046 | | 1/1988 |
| JP | 63 004047 | | 1/1988 |
| JP | 63-230847 | A2 | 9/1988 |
| JP | 63230851 | | 9/1988 |
| JP | 01-242761 | | 9/1989 |
| JP | 01 259124 | | 10/1989 |
| JP | 01 259125 | | 10/1989 |
| JP | 01 283322 | | 11/1989 |
| JP | 05-098350 | | 12/1990 |
| JP | 403006329 | | 1/1991 |
| JP | 04 021718 | | 1/1992 |
| JP | 04 107214 | | 4/1992 |
| JP | 04 231414 | | 8/1992 |
| JP | 05 287381 | | 11/1993 |
| JP | H06-042645 | | 2/1994 |
| JP | 06-093339 | | 4/1994 |
| JP | 06 172859 | | 6/1994 |
| JP | 06-220536 | | 8/1994 |
| JP | 07-003330 | | 1/1995 |
| JP | 07 041856 | | 2/1995 |
| JP | 07-139666 | | 5/1995 |
| JP | 07 197125 | | 8/1995 |
| JP | 08 311551 | | 11/1996 |
| JP | 09 067624 | | 3/1997 |
| JP | 09-235617 | | 9/1997 |
| JP | 2704042 | | 10/1997 |
| JP | 10 140250 | | 5/1998 |
| JP | 10 176239 | | 6/1998 |
| JP | 10 280037 | | 10/1998 |
| JP | 11 050148 | | 2/1999 |
| JP | 11 140580 | | 5/1999 |
| JP | 11 229079 | | 8/1999 |
| JP | 2000-063940 | | 2/2000 |
| JP | 2000-178645 | | 6/2000 |
| JP | 2000-248337 | | 9/2000 |
| JP | 2000-313919 | | 11/2000 |
| JP | 2001-131698 | | 5/2001 |
| JP | 2001-164338 | | 6/2001 |
| JP | 2001-172739 | | 6/2001 |
| JP | 2001-220653 | | 8/2001 |
| JP | 2001-271134 | | 10/2001 |
| JP | 2002-096105 | | 4/2002 |
| JP | 2002-130554 | | 5/2002 |
| JP | 2004-011009 | | 1/2004 |
| JP | 2007-031769 | | 7/2005 |
| JP | 60 174822 | | 9/2005 |
| KR | 0245031 | | 3/2000 |
| KZ | 1418 | B | 12/1994 |
| KZ | 2506 | B | 9/1995 |
| KZ | 2673 | B | 12/1995 |
| UA | 51138 | A | 11/2002 |
| WO | WO 1984/002947 | | 8/1984 |
| WO | WO 1994/29627 | | 12/1994 |
| WO | WO 1996/22396 | | 7/1996 |
| WO | WO 2000/06931 | | 2/2000 |
| WO | WO 2000/70107 | | 11/2000 |
| WO | WO 2001 /075345 | | 10/2001 |
| WO | WO 2001/88210 | | 11/2001 |
| WO | WO 2002/29290 | | 4/2002 |
| WO | WO 2002/035128 | | 5/2002 |
| WO | WO 2002/068854 | | 9/2002 |
| WO | WO 2002/086369 | | 10/2002 |
| WO | WO 2002/093045 | | 11/2002 |
| WO | WO 2003/033856 | | 4/2003 |
| WO | WO 2003/048623 | | 6/2003 |
| WO | WO 2003/087646 | | 10/2003 |
| WO | WO 2004/023020 | | 3/2004 |
| WO | WO 2004/031420 | | 4/2004 |
| WO | WO 2004/033951 | | 4/2004 |
| WO | WO 2004/053376 | | 6/2004 |
| WO | WO 2004/097059 | | 11/2004 |
| WO | WO 2004/109173 | | 12/2004 |
| WO | WO 2006/003775 | | 6/2005 |
| WO | WO 2005/080621 | | 9/2005 |
| WO | WO 2006/009142 | | 1/2006 |
| WO | WO 2006/087361 | | 4/2006 |
| WO | WO 2006/078768 | | 7/2006 |
| WO | WO 2007/002576 | | 1/2007 |
| WO | WO 2007/017082 | | 2/2007 |
| WO | WO 2007/017161 | | 2/2007 |
| WO | WO 2007/023806 | | 3/2007 |
| WO | WO 2007/028443 | | 3/2007 |
| WO | WO 2007/034063 | | 3/2007 |
| WO | WO 2007/063079 | | 6/2007 |
| WO | WO 2008/003000 | | 1/2008 |
| WO | WO 2008/007737 | | 1/2008 |
| WO | WO 2008/090411 | | 7/2008 |
| WO | WO 2008/110494 | | 9/2008 |
| WO | WO 2008/127084 | | 10/2008 |
| WO | WO 2009/000851 | | 12/2008 |
| WO | WO 2009/000766 | | 1/2009 |
| WO | WO 2009/010507 | | 1/2009 |
| WO | WO 2009/027308 | | 3/2009 |
| WO | WO 2009/027309 | | 3/2009 |
| WO | WO 2009/044297 | | 4/2009 |
| WO | WO 2009/065432 | | 5/2009 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2009/106623 | 9/2009 |
| WO | WO 2010/061882 | 6/2010 |
| WO | WO 2010/122431 | 10/2010 |
| WO | WO 2011 /152240 | 12/2011 |
| WO | WO 2013/007729 | 1/2013 |

OTHER PUBLICATIONS

U.S. Appl. No. 15/788,534, filed Oct. 19, 2017, Valdez et al.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 1: Non-alloy Steel Tubes with Specified Room Temperature Properties" British Standard BS EN 10216-1:2002 E:1-26, published May 2002.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 2: Non-alloy and Alloy Steel Tubes with Specified Elevated Temperature Properties" British Standard BS EN 10216-2:2002+A2:2007: E: 1-45, published Aug. 2007.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 3: Alloy Fine Grain Steel Tubes" British Standard BS EN 10216-3:2002 +A 1 :2004 E: 1-34, published Mar. 2004.
"Seamless Steel Tubes for Pressure Purposes—Technical Delivery Conditions—Part 4: Non-alloy and Alloy Steel Tubes with Specified Low Temperature Properties" British Standard BS EN 10216-4:2002 + A 1 :2004 E: 1-30, published Mar. 2004.
Aggarwal, R. K., et al.: "Qualification of Solutions for Improving Fatigue Life at SCR Touch Down Zone", Deep Offshore Technology Conference, Nov. 8-10, 2005, Vitoria, Espirito Santo, Brazil, in 12 pages.
Anelli, E., D. Colleluori, M. Pontremoli, G. Cumino, A Izquierdo, H. Quintanilla, "Metallurgical design of advanced heavy wall seamless pipes for deep-water applications", 4th International Conference on Pipeline Technology, May 9-13, 2004, Ostend, Belgium.
Asahi, et al., Development of Ultra-high-strength Linepipe, X120, Nippon Steel Technical Report, Jul. 2004, Issue 90, pp. 82-87.
ASM Handbook, Mechanical Tubing and Cold Finishing, Metals Handbook Desk Edition, (2000), 5 pages.
ASTM A 182/ A 182M "Standard Specification for Forged or Rolled Alloy and Stainless Steel Pipe Flanges, Forged Fittings, and Valves and Parts for High-Temperature Service".
ASTM A 213/A 213M "Standard Specification for Seamless Ferritic and Austenitic Alloy-Steel Boiler, Superheater, and Heat-Exchanger Tubes".
ASTM A336/A336M "Standard Specification for Alloy Steel Forgings for Pressure and High-Temperature Parts".
ASTM A355 which is related to "Seamless Ferritic Alloy-Steel Pipe for High-Temperature Service".
ASTM, "E112-13 Standard Test Methods for Determining Average Grain Size," ASTM International. 2012. p. 1-28.
Bai, M., D. Liu, Y. Lou, X. Mao, L. Li, X. Huo, "Effects of Ti addition on low carbon hot strips produced by CSP process", Journal of University of Science and Technology Beijing, 2006, vol. 13, N° 3, p. 230.
Beretta, Stefano et al., "Fatigue Assessment of Tubular Automotive Components in Presence of Inhomogeneities", Proceedings of IMECE2004, ASME International Mechanical Engineering Congress, Nov. 13-19, 2004, pp. 1-8.
Berner, Robert A, "Tetragonal Iron Sulfide", Science, Aug. 31, 1962, vol. 137, Issue 3531, pp. 669.
Berstein et al.,"The Role of Traps in the Microstructural Control of Hydrogen Embrittlement of Steels" Hydrogen Degradation of Ferrous Alloys, Ed. T. Oriani, J. Hirth, and M. Smialowski, Noyes Publications, 1988, pp. 641-685.
Bhadeshia et al., "Steels, Microstructure and Properties," Third Edition, Elsevier, Published in 2006, pp. 296.
Boulegue, Jacques, "Equilibria in a sulfide rich water from Enghien-les-Bains, France", Geochimica et Cosmochimica Acta, Pergamon Press, 1977, vol. 41, pp. 1751-1758, Great Britain.
Bruzzoni et al., "Study of Hydrogen Permeation Through Passive Films on Iron Using Electrochemical Impedance Spectroscopy", PhD Thesis, 2003, Universidad Nacional del Comahue de Buenos Aires, Argentina (Abstract).
Cancio et al., "Characterization of microalloy precipitates in the austenitic range of high strength low alloy steels", Steel Research, 2002, vol. 73, pp. 340-346.
Carboni, A, A Pigani, G. Megahed, S. Paul, "Casting and rolling of API X 70 grades for artic application in a thin slab rolling plant", Stahl u Eisen, 2008, N° 1, p. 131-134.
Chang, L.C., "Microstructures and reaction kinetics of bainite transformation in Si-rich steels," XP0024874, Materials Science and Engineering, vol. 368, No. 1-2, Mar. 15, 2004, pp. 175-182, Abstract, Table 1.
Chitwood, G. B., et al.: "High-Strength Coiled Tubing Expands Service Capabilities", as presented at the 24th Annual OTC in Houston, Texas, May 4-7, 1992, in 15 pages.
Clark, A Horrell, "Some Comments on the Composition and Stability Relations of Mackinawite", Neues Jahrbuch fur Mineralogie, 1966, vol. 5, pp. 300-304, London, England.
Craig, Bruce D., "Effect of Copper on the Protectiveness of Iron Sulfide Films", Corrosion, National Association of Corrosion Engineers, 1984, vol. 40, Issue 9, pp. 471-474.
D.O.T. 178.68 Spec. 39, pp. 831-840, Non reusable (non refillable) cylinders, Oct. 1, 2002.
Davis, J.R., et al. "ASM—Speciality Handbook—Carbon and alloy steels" ASM Speciality Handbook, Carbon and Alloy Steels, 1996, pp. 12-27, XP002364757 US.
De Medicis, Rinaldo, "Cubic FeS, A Metastable Iron Sulfide", Science, American Association for The Advancement of Science, Steen bock Memorial Library, Dec. 11, 1970, vol. 170, Issue 3963, pp. 723-728.
Drill Rod Joint Depth Capacity Chart, downloaded Jan. 15, 2013; http://www. boartlongyear. com/d ri ll-rod-joi nt-depth-capacity-chart.
E. Anelli, et al., "Metallurgical Design of Advanced Heavy Wall Seamless pipes for Deepwater Applications", 4th International Conference on Pipeline Technology, May 9-13, 2004, Ostend, Belgium.
Echaniz, "The effect of microstructure on the KISSC of low alloy carbon steels", NACE Corrosion '98, EE. UU., Mar. 1998, pp. 22-27, San Diego.
Echaniz, G., Morales, C., Perez, T., "Advances in Corrosion Control and Materials in Oil and Gas Production" Papers from Eurocorr 97 and Eurocorr 98, 13, P. S. Jackman and L. M. Smith, Published for the European Federation of Corrosion, No. 26, European Federation of Corrosion Publications, 1999.
European Extended Search Report re EPO Application No. 12152516.6, dated Jun. 25, 2012.
European Search Report and Opinion, re EPO Application No. EP 14159174.3, dated Jul. 3, 2014.
Extrait du Catalogue N 940, 1994.
Fang, Hong-Sheng, et al.: "The Developing Prospect of Air-cooled Bainitic Steels", International Journal of Issi, vol. 2, No. 2, Feb. 1, 2005, pp. 9-18.
Frati Ni et al.: "Improving friction stir welding of blanks of different thicknesses," Materials Science and Engineering A 459 (2007).
Fritz T et al, "Characterization of electroplated nickel", Microsystem Technologies, Dec. 31, 2002, vol. 9, No. 1-2, pp. 87-91, Berlin, DE.
Gojic, Mirko and Kosec, Ladislav, , "The Susceptibility to the Hydrogen Embrittlement of Low Alloy Cr and CrMo Steels", ISIJ International, 1997, vol. 37, Issue 4, pp. 412-418.
Gomez, G., et al.: "Air cooled bainitic steels for strong, seamless pipes—Part 1—allowy design, kinetics and microstructure", Materials Science and Technology, vol. 25, No. 12, Dec. 1, 2009. (X002611498).
Heckmann, et al., Development of low carbon Nb—Ti—B microalloyed steels for high strength large diameter linepipe, lronmaking and Steelmaking, 2005, vol. 32, Issue 4, pp. 337-341.
Hollomon, J.H., et al., Time-tempered Relations in Tempering Steel. New York Meeting, pp. 223-249, 1945.
Howells, et al.: "Challenges for Ultra-Deep Water Riser Systems", I IR, London, Apr. 1997, 11 pages.

(56) **References Cited**

OTHER PUBLICATIONS

Hutchings et al., "Ratio of Specimen thickness to charging area for reliable hydrogen permeation measurement," British Corrosion. Journal, 1993, vol. 28, Issue 4, pp. 309-312.
Iino et al., "Aciers pour pipe-lines resistant au cloquage et au criquage dus a l'hydrogene", Revue de Metallurgic, 1979, vol. 76, Issue 8-9, pp. 591-609.
Ikeda et al., "Influence of Environmental Conditions and Metallurgical Factors on Hydrogen Induced Cracking of Line Pipe Steel", Corrosion/SO, National Association of Corrosion Engineers, 1980, vol. 8, pp. 8/1-8/18, Houston, Texas.
International Standard Publication. Petroleum and natural gas industries—Materials for use in H2Scontaining environments in oil and gas production. ANSI/NACE ISO, 145 pages, 2009.
Izquierdo, et al.: "Qualification of Weldable X65 Grade Riser Sections with Upset Ends to Improve Fatigue Performance of Deepwater Steel Catenary Risers", Proceedings of the Eighteenth International Offshore and Polar Engineering Conference, Vancouver, BC, Canada, Jul. 6-11, 2008, p. 71.
Jacobs, Lucinda and Emerson, Steven, "Trace Metal Solubility in an Anoxid Fjord", Earth and Planetary Sci. Letters, Elsevier Scientific Publishing Company, 1982, vol. 60, pp. 237-252, Amsterdam, Netherlands.
Johnston, P. W., G.Brooks, "Effect of Al203 and Ti02 Additions on the Lubrication Characteristics of Mould Fluxes", Molten Slags, Fluxes and Salts •97 Conference, 1997 pp. 845-850.
Kazutoshi Ohashi et al, "Evaluation of r-value of steels using Vickers hardness test", Journal of Physics: Conference Series, Aug. 7, 2012, p. 12045, vol. 379, No. 1, Institute of Physics Publishing, Bristol, GB.
Keizer, Joel, "Statistical Thermodynamics of Nonequilibrium Processes", Springer-Verlag, 1987.
Kishi, T., H.Takeucgi, M.Yamamiya, H.Tsuboi, T.Nakano, T.Ando, "Mold Powder Technology for Continuous Casting of Ti-Stabilized Stainless Steels", Nippon Steel Technical Report, No. 34, Jul. 1987, pp. 11-19.
Korolev, D. F., "The Role of Iron Sulfides in the Accumulation of Molybdenum in Sedimentary Rocks of the Reduced Zone", Geochemistry, 1958, vol. 4, pp. 452-463.
Lee, Sung Man and Lee, Jai Young, "The Effect of the Interface Character of TiC Particles on Hydrogen Trapping in Steel", Acta Metal I., 1987, vol. 35, Issue 11, pp. 2695-2700.
Mechanical Tubing and Cold Finishing, Metals Handbook Desk Edition, (2000), 5 pages.
Mehling, Wilfred L.: "Hot Upset Forging," ASM Handbook vol. 14, 1998, pp. 84-95.
Mishael, et al., "Practical Applications of Hydrogen Permeation Monitoring," Corrosion, Mar. 28-Apr. 1, 2004, Corrosion 2004, Nacional Association of Corrosion Engineers, vol. Reprint No. 04476.
Morice et al., "Moessbauer Studies of Iron Sulfides", J. lnorg. Nucl. Chem., 1969, vol. 31, pp. 3797-3802.
Mukongo, T., P.C.Pistorius, and A.M.Garbers-Craig, "Viscosity Effect of Titanium Pickup by Mould Fluxes for Stainless Steel", lronmaking and Steelmaking, 2004, vol. 31, No. 2, pp. 135-143.
Mullet et al., "Surface Chemistry and Structural Properties of Mackinawite Prepared by Reaction of Sulfide Ions with Metallic Iron", Geochimica et Cosmochimica Acta, 2002, vol. 66, Issue 5, pp. 829-836.
Murcowchick, James B. and Barnes, H.L., "Formation of a cubic FeS", American Mineralogist, 1986, vol. 71, pp. 1243-1246.
NACE MR0175/ISO 15156-1 Petroleum and natural gas industries—Materials for use in H2S—containing Environments in oil and gas production—Part 1 : General principles for selection of crackina-resistant materials, Jun. 28, 2007.
Nagata, M., J. Speer, D. Matlock, "Titanium nitride precipitation behavior in thin slab cast high strength low alloyed steels", Metallurgical and Materials Transactions A, 2002 , vol. 33A, p. 3099-3110.
Nakai et al., "Development of Steels Resistant to Hydrogen Induced Cracking in Wet Hydrogen Sulfide Environment", Transactions of the ISIJ, 1979, vol. 19, pp. 401-410.
Nandan et al.: "Recent advances in friction-stir welding—Process, weldment structure and properties," Progress in Materials Science 53 (2008) 980-1023.
Pollack, Herman, W., Materials Science and Metallurgy, Fourth Edition, pp. 96 and 97, 1988.
Pressure Equipment Directive 97/23/EC, May 29, 1997, downloaded from website: http://ec.europa.eu/enterprise/pressure equipment/ped/index en. html on Aug. 4, 2010.
Prevey, Paul, et al., "Introduction of Residual Stresses to Enhance Fatigue Performance in the Initial Design", Proceedings of Turbo Expo 2004, Jun. 14-17, 2004, pp. 1-9.
Rickard, D.T., "The Chemistry of Iron Sulphide Formation at Low Temperatures", Stockholm Contrib. Geo I., 1969, vol. 26, pp. 67-95.
Riecke, Ernst and Bohnenkamp, Konrad, "Uber den Einfluss von Gittersoerstellen in Eisen auf die X-abs Wassersroffdiffusion", Z. Metallkde . . . , 1984, vol. 75, pp. 76-81 (Abstract).
Savatori et al.: European Commission Report, EUR 2006, EUR2207, 3 pp. STN_ABSTRACT.
Savatori et. al. European Commision Report, EUR 2006, EUR2207, 3 pp. STN_ABSTRACT.
Shanabarger, M.R. and Moorhead, R. Dale, "H20 Adsorption onto clean oxygen covered iron films", Surface Science, 1996, vol. 365, pp. 614-624.
Shoesmith, et al., "Formation of Ferrous Monosulfide Polymorphs During Corrosion of Iron by Aqueous Hydrogen Sulfide at 21 degrees C", Journal of the Electrochemical Society, 1980, vol. 127, Issue 5, pp. 1007-1015.
Skoczylas, G., A Dasgupta, R. Bommaraju, "Characterization of the chemical interactions during casting of High-titanium low carbon enameling steels", 1991 Steelmaking Conference Proceeding, pp. 707-717.
Smyth, D., et al.: Steel Tubular Products, Properties and Selection: Irons, Steels, and High-Performance Alloys, vol. 1, ASM Handbook, ASM International, 1990, p. 327-336.
Specification for Threading, Gauging and Thread Inspection of Casing, Tubing, and Line Pipe Threads, American Petroleum Institute, Specification 58, Apr. 2008, 15th Edition (Excerpts Only).
Spry, Alan, "Metamorphic Textures", Perganon Press, 1969, New York.
Taira et al., "HIC and SSC Resistance of Line Pipes for Sour Gas Service", Nippon Kokan Technical Report, 1981, vol. 31, Issue 1-13.
Taira et al., "Study on the Evaluation of Environmental Condition of Wet Sour Gas", Corrosion 83 (Reprint. No. 156, National Association of Corrosion Engineers), 1983, pp. 156/2-156/13, Houston, Texas.
Takeno et al., "Metastable Cubic Iron Sulfide—With Special Reference to Mackinawite", American Mineralogist, 1970, vol. 55, pp. 1639-1649.
Tenaris brochure. Coiled Tubes HS80CRA, 2 pages, 2008.
Tenaris brochure. Coiled Tubes Suggested Field Welding Procedure (GTAW) for Coiled Tubing Grads HS70, HS80, HS90, HS11 0, 3 pages, 2007.
Tenaris brochure. Coiled Tubing for Down hole Applications, 10 pages, 2007.
Tenaris Newsletter for Pipeline Services, Apr. 2005, p. 1-8.
Tenaris Newsletter for Pipeline Services, May 2003, p. 1-8.
Thethi, et al.: "Alternative Construction for High Pressure High Temperature Steel Catenary Risers", OPT USA, Sep. 2003, p. 1-13.
Thewlis, G., Weldability of X100 linepipe, Science and Technology of Welding and Joining, 2000, vol. 5, Issue 6, pp. 365-377.
Tivelli et al., "Metakkurgical Aspects of Heavy Wall—High Strength Seamless Pipes for Deep Water Applications", RioPipeline, Oct. 17-19, 2005, Rio, Brasil.
Tivelli, M., G. Cumino, A Izquierdo, E. Anelli, A Di Schino, "Metallurgical Aspects of Heavy Wall—High Strength Seamless Pipes for Deep Water Applications", RioPipeline 2005, Oct. 17 to 19, 2005, Rio (Brasil), Paper n° IBP 1008 05.
Todoroki, T. Ishii, K. Mizuno, A Hongo, "Effect of crystallization behavior of mold flux on slab surface quality of a Ti-bearing

(56) **References Cited**

OTHER PUBLICATIONS

Fe—Cr—Ni super alloy cast by means of continuous casting process", Materials Science and Engineering A, 2005, vol. 413-414, p. 121-128.
Turconi, G. L.: "Improvement of resistance to SSC initiation and propagation of high strength OCTG through microstructure and precipitation control"; "Paper 01077", NACE International, Houston, TX, Mar. 16, 2001. (XP009141583).
Vaughan, D. J. and Ridout, M.S., "Moessbauer Studies of Some Sulphide Minerals", J. lnorg Nucl. Chem., 1971, vol. 33, pp. 741-746.
Wegst, C.W., "Stahlussel", Auflage 1989, Seite 119, 2 pages.
Yu, et al.: "New steels and alloys in mechanical engineering I ed.," M: Mechanical Engineering, 1976, p. 19.
European Office Action in European Application No. 14159174.3 dated Sep. 16, 2016, 4 pages.
European Search Report in European Application No. 14159174.3, dated Jul. 10, 2014. 5 pages.
European Office Action in European Application No. 14159174.3 dated Jan. 12, 2018, 4 pages.
[No Author Listed], "Coiled Tubing String Design," Unknown if this document was publicly disclosed, 2 pages.
[No Author Listed], "CYMAX Division—Coiled Tubing Reel Sizes," Unknown if this document was publicly disclosed, 1 page.
[No Author Listed], "Orbital TIG Welding Cymax Coiled Tubing," Unknown if this document was publicly disclosed, but dated Nov. 1992, 13 pages.
[No Author Listed], "Southwestern Pipe, Inc.—Cymax Coiled Tubing," Unknown if this document was publicly disclosed, but dated Jan. 1992, 1 page.
[No Author Listed], "The Development and Testing of CYMAX 100 Coiled Tubing," This document is dated Jan. 1992 and is cited in the bibliography of the Full Body Quenched and Tempered Coiled Tubing dated Mar. 1, 1994, 15 pages.
Faszold et al., "Full-Scale Fatigue Testing With 130K Yield Tubing." Paper SPE-153945, Presented at SPE/ICoTA Coiled Tubing & Well Intervention Conference and Exhibition Jan. 2012, Society of Petroleum Engineers, 6 pages.
Thompson et al., "Full Body Quenched and Tempered Coiled Tubing—Theory vs. Field Experience," Presented at the Second International Conference and Exhibition on Coiled Tubing Technology: Operations, Services, Practices, held at Adams Mark hotel in Houston on or about Mar. 28-31, 1994, Mar. 1, 1994, 20 pages.

* cited by examiner


STD2 steel, AGS = 10-20 µm
Temperature (°C)
Times (s)
F
B
M
100°C/s
50°C/s
30°C/s
20°C/s
10°C/s
5°C/s
2.2°C/s
1°C/s

FIG. 1A


STD3 steel, AGS = 10-20 µm
Temperature (°C)
Times (s)
F
B
M
100°C/s
50°C/s
30°C/s
20°C/s
10°C/s
5°C/s
2.2°C/s
1°C/s

FIG. 1B


BTi2 steel, AGS = 10-20 μm
Temperature (°C)
Times (s)
F + P
B
M
50°C/s
25°C/s
20°C/s
10°C/s
5°C/s
1°C/s

FIG. 2A


CrMoBTi3 steel, AGS = 10-20 μm
Temperature (°C)
Times (s)
F + P
B
M
40°C/s
15°C/s
5°C/s
1°C/s
0.2°C/s

FIG. 2B


Cooling in quenching heads:
internal
Cooling Rate (°C/s)
WT (inches)
60
50
40
30
20
10
0
0,0
0,1
0,2
0,3
0,4
0,5

FIG. 3


BTi2 steel
Strength (ksi)
Tmax (°C)
Time at 720°C (min)
No soaking (WT=0.2")
YS
UTS
Tempering at 720°C
YS
UTS
150
140
130
120
110
100
90
80
70
550
575
600
625
650
675
700
1
2
3
4
5
6
7
8
9
10

FIG. 4


HV 25kV
Spot 3.7
Mag 2000 x
Det SE
WD 10mm
10 µm

FIG. 5B


HV 25kV
Spot 4.5
Mag 500 x
Det SE
WD 10mm
50 µm

FIG. 5A


Acc.V 25.0 kV
Spot 6.0
Mag 200x
Det SE
WD 10.0
100 µm

FIG. 6A


Acc.V 25.0 kV
Spot 5.0
Mag 1000x
Det SE
WD 9.9
20 µm

FIG. 6B



500 µm
Acc.V Spot Mag Det WD
25.0 kV 6.0 500x BSE 10.5


FIG. 7B



Fracture surface
("cone")
500 µm
Acc.V Spot Mag Det WD
25.0 kV 6.0 50x SE 10.6


FIG. 7A


Acc.V 25.0 kV
Spot 4.5
Mag 1000x
Det SE
WD 10.1
20 µm

FIG. 8B


Acc.V 25.0 kV
Spot 3.7
Mag 1000x
Det SE
WD 9.9
20 µm

FIG. 8A


ERW line
20 μm
Acc.V 25.0 kV
Spot 6.0
Mag 1000x
Det SE
WD 10.0

FIG. 9B


ERW line
20 μm
HV 25.0 kV
Spot 5.972
Mag 1000x
Det SE
WD 10mm

FIG. 9A




FIG. 10B




FIG. 10A




FIG. 11B




FIG. 11A




FIG. 12


HAZ
FZ
HAZ
% of base tube hardness
130%
125%
120%
115%
110%
105%
100%
95%
90%
-15,0
-10,0
-5,0
0,0
5,0
10,0
15,0
Distance from the Bias Weld center line (mm)
Conventional BW
New Process Route

FIG. 13




FIG. 14B




FIG. 14A


HYDRAULIC ACTUATOR
BENDING MANDREL
COILED TUBE SAMPLE
STRAIGHTENING BLOCK
SAMPLE RESTRAINT

FIG. 15


Fatigue life improvement (%)
0
20
40
60
80
100
120
140
160
180
200
220
240
260
280
300
80
90
100
110
120
130
140
Minimum yield Strength (Ksi)

FIG. 17


Fatigue life at BW relative to BM (%)
0
20
40
60
80
100
120
Conventional
New Chem and Process

FIG. 16



FIG. 18B



FIG. 18A

# HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## RELATED APPLICATION

This application is a divisional of and claims the benefit of priority to application entitled HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME, U.S. patent application Ser. No. 15/665,054, filed Jul. 31, 2017, which claims priority to application entitled HIGH PERFORMANCE MATERIAL FOR COILED TUBING APPLICATIONS AND THE METHOD OF PRODUCING THE SAME, U.S. patent application Ser. No. 14/190,886, filed Feb. 26, 2014, now Issued U.S. Pat. No. 9,803,256, which claims priority to U.S. Provisional Application Ser. No. 61/783,701, filed on Mar. 14, 2013, the entirety of both of which are hereby incorporated by reference.

## BACKGROUND

### Description of the Related Art

In recent years the use of coiled tubing has been expanded to applications that require high pressure and extended reach operations. As a consequence, there is a need to produce coiled tubing with elevated tensile properties in order to withstand: i) axial loads on hanging or pooling long strings, and ii) elevated pressures applied during operation.

The standard production of coiled tubing uses as raw material, hot rolled strips with mechanical properties achieved through microstructural refinement during rolling. This refinement is obtained with the use of different microalloying additions (Ti, N, V) as well as appropriate selection of hot rolling processing conditions. The objective is to control material recrystallization and grain growth in order to achieve an ultra-fine microstructure. The material is limited in the use of solid solution alloying elements and precipitation hardening, since refinement is the only mechanism that allows for high strength and toughness, simultaneously.

This raw material is specified to each supplier, and may require varying mechanical properties in the hot rolled steel in order to produce coiled tubes with varying mechanical properties as well. As the properties increase, the cost of production and hence the raw material cost also increases. It is known that the strip-to-strip welding process used during the assembly of the "long strip" that will be ERW formed/welded into the coiled tubing, deteriorates the joining area. Thereafter, the coiled tubing with increasing properties, tend to have a relatively lower performance on the area of the strip welds. This deterioration is caused by the fact that the welding processes destroys the refinement introduced during hot rolling, and there is no simple post weld heat treatment capable of regenerating both tensile and toughness properties. In general tensile is restored but toughness and its associated fatigue life are deteriorated in this zone. Current industrial route can produce high strength coiled tubing, only at elevated cost and with poor relative performance of strip welds joins with respect to pipe body.



One alternative for producing a coiled tubing is through a full body heat treatment. This treatment is applied to a material that has been formed into a pipe in the so called "green" state, because its properties are yet to be defined by the heat treatment conditions. In this case the main variables affecting the final product properties are the steel chemistry and the heat treatments conditions. Thereafter, by appropriately combining steel composition with welding material and heat treatment, the coiled tubing could be produced with uniform properties across the length eliminating the weak link of the strip-to-strip join that is critical on high strength conventional coiled tubing. This general concept has been described before but never applied successfully to the production of high strength coiled tubing (yield strength in the range from 80 to 140 ksi). The reason being that the heat treatment at elevated line speed (needed to achieve high productivity) will generally result in the need for complicated and extended facilities. This process could be simplified if the appropriated chemistry and heat treatment conditions are selected.

The selection of the chemistry that is compatible with an industrial heat treatment facility of reasonable dimensions requires of an understanding of the many variables that affect coiled tubing performance measured as: a) Axial Mechanical Properties, b) Uniformity of Microstructure and Properties, c) Toughness, d) Fatigue Resistance, e) Sour Resistance, among others.

## SUMMARY

Below is described chemistry designed to produce a heat treated coiled tubing which is mostly outside current limits for coiled tubing as set by API 5ST standard. (Max.C:0.16%, Max.Mn:1.2% (CT70-90) Max.Mn:1.65 (CT100-110), Max.P:0.02% (CT70-90) Max.P:0.025 (CT100-CT100), Max.S:0.005, Si.Max:0.5).

Embodiments of this disclosure are for a coiled steel tube and methods of producing the same. The tube in some embodiments can comprise a yield strength higher than about 80 Ksi. The composition of the tube can comprise 0.16-0.35 wt. % carbon, 0.30-2.00 wt % manganese, 0.10-0.35 wt. % silicon, up to 0.005 wt. % sulfur, up to 0.018 wt. % phosphorus, the remainder being iron and inevitable impurities. The tube can also comprise a final microstructure comprising a mixture of tempered martensite and bainite, wherein the final microstructure of the coiled tube comprises more than 90 volume % tempered martensite, wherein the microstructure is homogenous in pipe body, ERW line and strip end-to-end joints.

Disclosed herein is a coiled steel tube formed from a plurality of welded strips, wherein the tube can include base metal regions, weld joints, and their heat affected zones, and can comprise a yield strength greater than about 80 ksi, a composition comprising iron and, 0.17-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.30 wt. % silicon, 0.010-0.040 wt. % aluminum, up to 0.010 wt. % sulfur, and up to 0.015 wt. % phosphorous, and a final microstructure comprising a mixture of tempered martensite and bainite, wherein the final microstructure of the coiled tube comprises more than 90 volume % tempered martensite in the base metal regions, the weld joints, and the heat affected zones, wherein the final microstructure across all base metal regions, weld joints, and heat affected zones ins homogeneous, and wherein the final microstructure comprises a

uniform distribution of fine carbides across the base metal regions, weld joints, and heat affected zones.

In some embodiments, the composition further comprises, up to 1.0 wt. % chromium, up to 0.5 wt. % molybdenum, up to 0.0030 wt. % boron, up to 0.030 wt. % titanium, up to 0.50 wt. % copper, up to 0.50 wt. % nickel, up to 0.1 wt. % niobium up to 0.15 wt. % vanadium, up to 0.0050 wt. % oxygen, and up to 0.05 wt. % calcium.

In some embodiments, the composition can comprise 0.17 to 0.30 wt. % carbon, 0.30 to 1.60 wt. % manganese, 0.10 to 0.20 wt. % silicon, up to 0.7 wt. % chromium up to 0.5 wt. % molybdenum, 0.0005 to 0.0025 wt. % boron, 0.010 to 0.025 wt. % titanium, 0.25 to 0.35 wt. % copper, 0.20 to 0.35 wt. % nickel, up to 0.04 wt. % niobium, up to 0.10 wt. % vanadium, up to 0.0015 wt. % oxygen, up to 0.013 wt. % calcium, up to 0.003 wt. % sulfur, and up to 0.010 wt. % phosphorus.

In some embodiments, the tube can have a minimum yield strength of 125 ksi. In some embodiments, the tube can have a minimum yield strength of 140 ksi. In some embodiments, the tube can have a minimum yield strength of between 125 ksi and 140 ksi.

In some embodiments, the final microstructure can comprise at least 95 volume % tempered martensite in the base metal regions, the weld joints, and the heat affected zones. In some embodiments, the tube can have a final grain size of below 20 μm in the base metal regions, the weld joints, and the heat affected zones. In some embodiments, the tube can have a final grain size of below 15 μm in the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the weld joints can comprise bias welds. In some embodiments, the fatigue life at the bias welds can be at least about 80% of the base metal regions. In some embodiments, the a percent hardness of a weld joint, including its heat affected zone, can be 110% or less than a hardness of the base material.

Also disclosed herein is the method of forming a coiled steel tube which can comprise providing strips having a composition comprising iron and 0.17-0.35 wt. % carbon, 0.30-2.00 wt. % manganese, 0.10-0.30 wt. % silicon, 0.010-0.040 wt. % aluminum, up to 0.010 wt. % sulfur, up to 0.015 wt. % phosphorus, and welding the strips together, forming a tube from the welded strips, wherein the tube comprises base metal regions, joint welds, and their heat affected zones, austenitizing the tube between 900-1000° C., quenching the tube to form a final as quenched microstructure of martensite and bainite, wherein the as quenched microstructure comprises at least 90% martensite in the base metal regions, the weld joints, and the heat affected zones, and tempering the quenched tube between 550-720° C., wherein tempering the of the quenched tube results in a yield strength greater than about 80 ksi, wherein the microstructure across all base metal regions, the weld joints, and the heat affected zones is homogeneous, and wherein the microstructure comprises a uniform distribution of fine carbides across base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the welding the strips can comprise bias welding. In some embodiments, the forming the tube can comprise forming a line joint. In some embodiments, the method can further comprise coiling the tempered tube on a spool. In some embodiments, the austenitizing can form a grain size below 20 μm in the base metal regions, the weld joints, and the heat affected zones.

In some embodiments, the composition can further comprise up to 1.0 wt. % chromium up to 0.5 wt. % molybdenum up to 0.0030 wt. % boron, up to 0.030 wt. % titanium, up to 0.50 wt. % copper, up to 0.50 wt. % nickel, up to 0.1 wt. % niobium, up to 0.15 wt. % vanadium, up to 0.0050 wt. % oxygen, and up to 0.05 wt. % calcium.

In some embodiments, the composition can comprise 0.17 to 0.30 wt. % carbon, 0.30 to 1.60 wt. % manganese, 0.10 to 0.20 wt. % silicon, up to 0.7 wt. % chromium, up to 0.5 wt. % molybdenum, 0.0005 to 0.0025 wt. % boron, 0.010 to 0.025 wt. % titanium, 0.25 to 0.35 wt. % copper, 0.20 to 0.35 wt. % nickel, up to 0.04 wt. % niobium, up to 0.10 wt. % vanadium, up to 0.00015 wt. % oxygen, up to 0.03 wt. % calcium, up to 0.003 wt. % sulfur, and up to 0.010 wt. % phosphorus.

In some embodiments, the tempered tube can have a yield strength greater than or equal to 125 ksi. In some embodiments, the tempered tube can have a minimum yield strength of 140 ksi. In some embodiments, the tempered tube can have a minimum yield strength between 125 and 140 ksi.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-B illustrate CCT diagrams corresponding to STD2 (A) and STD3 (B) steels.

FIGS. **2**A-B illustrate CCT diagrams corresponding to $BTi_2$ (A) and $CrMoBTu_3$ (B) steels.

FIG. **4** illustrates tensile properties of $BTi_2$ steel as a function of the maximum tempering temperature (Tmax). Peak-like tempering cycles were used in these Gleeble® stimulations. (right) Tensile properties of the same steel as a function of the holding time at 720° C. (isothermal tempering cycles).

FIGS. **5**A-B illustrate non-tempered martensite appearing at the central segregation band close to the ERW line after the seam annealing (PWHT). FIGS. **5**A-B correspond to a conventional coiled tube Grade 90.

FIGS. **6**A-B illustrate localized damage at the central segregation band produced during fatigue testing of a Grade 110 coiled tubing.

FIGS. **7**A-B illustrate localized damage at the central segregation band produced during fatigue testing with high inner pressure (9500 psi) of a Grade 100 coiled tubing.

FIGS. **8**A-B illustrate base metal microstructures corresponding to the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both case the coiled tubing has tensile properties corresponding to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **9**A-B illustrate ERW line microstructures corresponding to the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both case the coiled tubing has tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **10**A-B illustrate microstructures corresponding to HAZ of the bias weld for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both case the coiled tubing has tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIGS. **11**A-B illustrate microstructures corresponding to HAZ of the bias weld for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both case the coiled tubing has tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIG. **12** illustrates a crack formed during service in the fusion zone of a bias weld (growing from the internal tube face). The crack is running in the direction of the large upper bainite laths.

FIG. **13** illustrates variations in hardness (base metal hardness=100%) across typical bias welds obtained with conventional processing and processing according to embodiments of the present disclosure. The fusion zone (FZ) is approximately located in the area between ≈+/−5 mm from the weld center.

FIGS. **14**A-B illustrate microstructures corresponding to the intersection between bias weld and ERW line for the standard coiled tube (A) and a coiled tube manufactured from embodiments of the present disclosure (B). In both case the coiled tubing has tensile properties correspond to a Grade 110 (yield strength from 110 Ksi to 120 Ksi).

FIG. **15** illustrates a schematic drawing of a fatigue testing machine.

FIG. **16** illustrates fatigue life measured for BW samples relative to those corresponding to BM samples. Results are average values over different testing conditions and coiled tube grades (80, 90 and 110 for conventional tubes and 80, 90, 110, 125 and 140 for coiled tubes produced according to this disclosure).

FIG. **17** illustrates fatigue life improvement in coiled tubes produced with an embodiment of the chemistry and processing conditions according to this disclosure. The improvement is determined by comparison against fatigue life measured for conventional coiled tubing of the same grade tested under similar conditions. Results are averaged for each grade over different testing conditions. In the case of grades 125 and 140, which are non-standard, the fatigue life comparison was performed against STD3 steel in Grade 110.

FIGS. **18**A-B illustrate C-ring samples after testing material grade 80 according to NACE TM0177 (90% SMYS, Solution A, 1 bar $H_2S$). A: conventional process. B: embodiment of the disclosed process.

## DETAILED DESCRIPTION

Coiled Tubing raw material is produced in a steel shop as hot rolled strips. Controlled rolling is used to guarantee high strength and good toughness through microstructural refinement. The strips are longitudinally cut to the width for pipe production, and then spliced end to end through a joining process (e.g. Plasma Arc Welding or Friction Stir Welding) to form a longer strip. Afterwards, the tube is formed using the ERW process. The final product performance is measured in terms of: a) axial mechanical properties, b) uniformity of microstructure and properties, c) toughness, d) fatigue resistance, e) sour resistance, among others. Using the traditional processing route, the coiled tubing mechanical properties result from the combination of the hot-rolled strip properties and the modifications introduced during welding operations and tube forming. The properties thus obtained are limited when coiled tube performance is measured as listed above. The reason being is that the welding process used to join the strips modifies the refined as-rolled microstructures in a way that, even if a post weld heat treatments is applied, final properties are still impaired. Reduced fatigue life and poor sour performance is associated to heterogeneities in microstructure and presence of brittle constituents across the welds. It has been proposed that a new route should at least comprise a full body heat treatment. This routine has been described in general terms but never specified. The disclosure describes the chemistries and raw material characteristics, that combined with appropriated welding processes, and heat treatment conditions, will yield a quenched and tempered product with high performance in both pipe body and strip joining welds. This



material is designed for coiled tubing since it is selected not only in terms of relative cost, but preferably in order to maximize fatigue life under the particular conditions that apply to the operation of coiled tubing (low cycle fatigue under bending with simultaneous axial load and internal pressures).

This disclosure is related to a high strength coiled tubing (minimum yield strength ranging from 80 ksi to 140 ksi) having increased low-cycle fatigue life in comparison with standard products, as defined by API 5ST. Additionally, Sulfide Stress Cracking (SSC) resistance is also improved in this disclosure. This outstanding combination of properties is obtained through an appropriate selection of steel chemistry and processing conditions. Industrial processing differs from the standard route in the application of a Full Body Heat Treatment (FBHT), as was disclosed in U.S. App. No. US2012/0186686 A1. This FBHT is performed after the coiled tubed is formed by ERW (Electrical Resistance Welding) and is composed of at least one cycle of austenitization, quenching and tempering. The above mentioned disclosure is more specifically related to the steel chemistries and processing parameters to produce a quenched and tempered coiled tubing with the above mentioned properties. Although the generation of certain mechanical properties through a heat treatment on a base material with a given composition are part of the general knowledge, the particular application fro coiled tubing uses raw material with specific chemistry in order to minimize the detrimental effect of particular variables, such as segregation patterns, on the specific properties of this application.

One of the most important properties to the coiled tube is an increased resistance to low cycle fatigue. This is because during standard field operation coiled tubes are spooled and unspooled frequently, introducing cyclic plastic deformations that may eventually produce failures. During low cycle fatigue, deformation is preferentially localized at the microscopical scale in softer material regions. When brittle constituents are present at or close to these strain concentration regions, cracks can easily nucleate and propagate. Therefore, a reduction in fatigue life is associated with heterogeneous microstructures (having softer regions that localize deformation) in combination with brittle constituents (that nucleate and/or propagate cracks). All these micro-structural features appear in the Heat Affected Zone of the welds (HAZ). There are some types of pipe body microstructures that also present the above mentioned characteristics. This is because they are composed of a mixture of hard and soft constituents, for example ferrite, pearlite and bainite. In this case strain is localized in the softer ferrite, close to the boundary with bainite, in which cracks are nucleated and propagated. High strength coiled tubes have currently this type of microstructure.

In order to avoid strain localization during low cycle fatigue the microstructure has to be not only homogeneous throughout the pipe body and joints, but also in the microscopic scale. For low carbon steels a microstructure composed of tempered martensite, which is basically a ferrite matrix with a homogeneous and fine distribution of carbides, is ideal. Thereafter, the objective of the chemistry selection and processing conditions described in this disclosure is to achieve with the FBHT a homogeneous microstructure (in tube body, bias weld and ERW line) composed of at least 90% tempered martensite, preferably more than 95% tempered martensite.

Additionally, tempered martensite is more suitable to produce ultra-high strength grades than standard coiled tube microstructures (composed of ferrite, pearlite and bainite),

for which extremely costly alloying additions are needed to reach yield strengths higher than about 125 Ksi.

When compared with structures containing bainite, other important benefits of tempered martensite is its improved SSC resistance.

Steel chemistry has been defined as the most suitable for production of heat treated coiled tubing using a FBHT, and can be described in terms of concentration of Carbon (wt % C), Manganese (w % Mn), Silicon (w % Si), Chromium (wt % Cr), Molybdenum (w % Mo), as well as micro-alloying elements as Boron (w % B), Titanium (w % Ti), Aluminum (w % Al), Niobium (w % Nb) and Vanadium (w % V). Also, upper limits can be on unavoidable impurities as Sulfur (w % S), Phosphorus (w % P) and Oxygen (w %) O).

In order to produce a final-structure composed of tempered martensite, the steel chemistry of this disclosure differs mainly from previous coiled tube art because of the higher Carbon content (see for example API 5ST in which maximum Carbon allowed for Coiled tubing is 0.16%), which allows for obtaining the desired microstructure through a FBHT composed of at least one cycle of austenitization, quenching and tempering.

The terms "approximately", "about", and "substantially" as used herein represent an amount close to the stated amount that still performs a desired function or achieves a desired result. For example, the terms "approximately", "about", and "substantially" may refer to an amount that is within less than 10% of, within less than 5% of, within less than 1% of, within less than 0.1% of, and within less than 0.01% of the stated amount.

Carbon is an element whose addition inexpensively raises the strength of the steel through and improvement in hardenability and the promotion of carbide precipitation during heat treatments. If carbon is reduced below 0.17% hardenability could not be guaranteed, and large fractions of bainite may be formed during heat treatments. The appearance of bainite makes it difficult to reach a yield strength above 80 ksi with the desired fatigue life and SSC resistance. Current coiled tubing route is not suitable for heat treatment since the maximum Carbon allowed by API5ST is 0.16%. Conventional coiled tubing microstructures present large fractions of bainite that impair toughness, fatigue life and SSC resistance in the higher strength grades, i.e. coiled tubing with minimum yield strength above 110 Ksi.

On the other hand, steels with more than 0.35% carbon will have poor weldability, being susceptible to present brittle constituents and cracks during welding and post-weld heat treatment operations. Additionally, higher carbon contents may result in significant amounts of retained austenite after quenching that transform into brittle constituents upon tempering. These brittle constituents impair fatigue life and SSC resistance. Therefore, the C content of the steel composition varies within the range from about 0.17% to about 0.35%, preferably from about 0.17% to about 0.30%.

Manganese addition improves hardenability and strength. Mn also contributes to deoxidation and sulfur control during the steelmaking process. If Mn content is less than about 0.30%, it may be difficult to obtain the desired strength level. However, as Mn content increases, large segregation patterns may be formed. Mn segregated areas will tend to form brittle constituents during heat treatment that impair toughness and reduce fatigue. Additionally, these segregated areas increase the material susceptibility to sulfide stress cracking (SSC). Accordingly, the Mn content of the steel composition varies within the range from 0.30% to 2.0%, preferably from 0.30% to 1.60%, and more preferably from 0.30% to 0.80% in application for which an improved SSC resistance is used.



Silicon is an element whose addition has a deoxidizing effect during the steel making process and also raises the strength of the steel. In some embodiments, if Si exceeds about 0.30%, the toughness may decrease. Additionally, large segregation patterns may be formed. Therefore, the Si content of the steel composition varies within the range between about 0.10% to 0.30%, preferably about 0.10% to about 0.20%.

Chromium addition increases hardenability and tempering resistance of the steel. Cr can be used to partially replace Mn in the steel composition in order to achieve high strength without producing large segregation patterns that impair fatigue life and SSC resistance. However, Cr is a costly addition that makes the coiled tubing more difficult to produce because of its effects on hot forming loads. Therefore, in some embodiments Cr is limited to about 1.0%, preferably to about 0.7%.

Molybdenum is an element whose addition is effective in increasing the strength of the steel and further assists in retarding softening during tempering. The resistance to tempering allows the production of high strength steels with reduced Mn content increasing fatigue life and SSC resistance. Mo additions may also reduce the segregation of phosphorous to grain boundaries, improving resistance to inter-granular fracture. However, this ferroalloy is expensive, making it desirable to reduce the maximum Mo content within the steel composition. Therefore, in certain embodiments, maximum Mo is about 0.5%.

Boron is an element whose addition is strongly effective in increasing the hardenability of the steel. For example, B may improve hardenability by inhibiting the formation of ferrite during quenching. In some embodiments, B is used to achieve good hardenability (i.e. as quenched structure composed of at least 90% martensite) in steels with Mn content reduced to improve fatigue life and SSC resistance. If the B content is less than about 0.0005 wt. % it may be difficult in these embodiments to obtain the desired hardenability of the steel. However, if the B content too high, coarse boron carbides may be formed at grain boundaries adversely affecting toughness. Accordingly, in an embodiment, the concentration of B in the composition lower than about 0.0030%, in another embodiment B content is from about 0.0005% to 0.0025%.

Titanium is an element whose addition is effective in increasing the effectiveness of B in the steel, by fixing nitrogen impurities as Titanium Nitrides (TiN) and inhibiting the formation of Boron nitrides. If the Ti content is too low it may be difficult in some embodiments to obtain the desired effect of boron on hardenability of the steel. On the other hand, if the Ti content is higher than 0.035 wt % coarse Titanium nitrides and carbides (TiN and TiC) may be formed, adversely affecting ductility and toughness. Accordingly, in certain embodiments, the concentration of Ti may be limited to about 0.0030%. In other embodiments, the concentration of Ti may range from about 0.010% to about 0.025%.

Considering that the production of coiled tubing of low mechanical properties benefits from low tempering resistance, B and Ti additions improve hardenability without increasing tempering resistance. Thereafter it allows for the production of 80 ksi grade without significant large soaking times during tempering, with the subsequent improvement in productivity. Since one of the limitations of the production of a coiled tubing in a heat treatment line is the length of the line to adequately soak the material during tempering, the use of B and Ti is particularly relevant to the production of low yield strength coiled tubing.

Copper is an element that is not required in certain embodiments of the steel composition. However, in some coiled tubing applications Cu may be needed to improve atmospheric corrosion resistance. Thus, in certain embodiments, the Cu content of the steel composition may be limited to less than about 0.50%. In other embodiments, the concentration of Cu may range from about 0.25% to about 0.35%.

Nickel is an element whose addition increases the strength and toughness of the steel. If Cu is added to the steel composition, Ni can be sued to avoid hot rolling defects knows as hot shortness. However, Ni is very costly and, in certain embodiments, the Ni content of the steel composition is limited to less than or equal to about 0.50%. In other embodiments, the concentration of Ni may range from about 0.20% to about 0.35%.

Niobium is an element whose addition to the steel composition may refine the austenitic grain size of the steel during reheating into the austenitic region, with the subsequent increase in both strength and toughness. Nb may also precipitate during tempering, increasing the steel strength by particle dispersion hardening. In an embodiment, the Nb content of the steel composition may vary within the range between about 0% to about 0.10%, preferably about 0% to about 0.04%.

Vanadium is an element whose addition may be used to increase the strength of the steel by carbide precipitations during tempering. However if V content of the steel composition is greater than about 0.15%, a large volume fraction of vanadium carbide particles may be formed, with an attendant reduction in toughness of the steel. Therefore, in certain embodiments, the V content of the steel is limited to about 0.15%, preferably to about 0.10%.

Aluminum is an element whose addition to the steel composition has a deoxidizing effect during the steel making process and further refines the grain size of the steel. In an embodiment, if the Al content of the steel composition is less than about 0.010%, the steel may be susceptible to oxidation, exhibiting high levels of inclusions. In other embodiments, if the Al content of the steel composition greater than about 0.040%, course precipitates may be formed that impair the toughness of the steel. Therefore, the Al content of the steel composition may vary within the range between about 0.010% to about 0.040%.

Sulfur is an element that causes the toughness and workability of the steel to decrease. Accordingly, in some embodiments, the S content of the steel composition is limited to a maximum of about 0.010%, preferably about 0.003%.

Phosphorus is an element that causes the toughness of the steel to decrease. Accordingly, the P content of the steel composition limited to a maximum of about 0.015%, preferably about 0.010%.

Oxygen may be an impurity within the steel composition that is present primarily in the form of oxides. In an embodiment of the steel composition, as the O content increases, impact properties of the steel are impaired. Accordingly, in certain embodiments of the steel composition, a relatively low O content is desired, less than or equal to about 0.0050 wt %, preferably less than or equal to about 0.0015 wt %.

Calcium is an element whose addition to the steel composition may improve toughness by modifying the shape of sulfide inclusions. In an embodiment, the steel composition may comprise a minimum Ca to S content ratio of Ca/S>1.5. In other embodiments of the steel composition, excessive Ca is unnecessary and the steel composition may comprise a maximum content Ca of about 0.005%, preferably about 0.03%.



The contents of unavoidable impurities including, but not limited to N, Pb, Sn, As, Sb, Bi and the like are preferably kept as low as possible. However, properties (e.g., strength, toughness) of steels formed from embodiments of the steel compositions of the present disclosure may not be substantially impaired provided these impurities are maintained below selected levels. In one embodiment, the N content of the steel composition may be less than about 0.010%, preferably less than or equal to 0.008%. In another embodiment, the Pb content of the steel composition may be less than or equal to about 0.005%. In a further embodiment, the Sn content of the steel composition may be less than or equal to about 0.02%. In an additional embodiment, the As content of the steel composition may be less than or equal to about 0.012%. In another embodiment, the Sb content of the steel composition may be less than or equal to about 0.008%. In a further embodiment, the Bi content of the steel composition may be less than or equal to about 0.003%.

The selection of a specific steel chemistry of this disclosure will depend on the final product specification and industrial facility constrains (for example in induction heat treatment lines it is difficult to achieve large soaking times during tempering). Mn addition will be reduced when possible because it impairs fatigue life and SSC resistance through the formation of large segregation patterns. Cr and to a less extent Mo will be used to replace Mn, and the full body heat treatment is kept as simple as possible. Both elements increase carbide stability and softening resistance, which may lead to large soaking times during tempering. Thereafter, these elements are preferred for the higher strength grades (for example Grade 110 and above) for which tempering resistance is desired, and avoided in the lower ones (Grade 80) for which long and impractical industrial heat treatment lines would be needed.

In the case of the lower grades (Grade 80), it will be preferred B and Ti microalloyed additions in combination with suitable C contents. These elements allow for achieving good hardenability without the use of high Mn addition. Moreover, B and Ti do not increase tempering resistance. Thereafter, simple and short tempering treatment can be used to achieve the desired strength level.

The industrial processing route corresponding to this disclosure is described in the following paragraphs, making focus on the Full Body Heat Treatment (FBHT) conditions.

Raw material for coiled tubing is produced in a steel shop as hot rolled strips with wall thickness that may vary from about 0.08 inches to about 0.30 inches. Controlled rolling may be used by the steel supplier to refine the as rolled microstructure. However, an important microstructural refinement of the as rolled strips is not needed, because in this disclosure microstructure and mechanical properties are mostly defined by the final FBHT. This flexibility in the hot rolling process helps to reduce raw-material cost, and allows to use steel chemistries not available when complex hot rolling procedures can be used (in general controlled rolling can be applied only to low carbon micro-alloyed steels).

The steel strips are longitudinally cut to the width for pipe production. Afterwards, the strips are joined end to end through a welding process (e.g. Plasma Arc Welding or Friction Stir Welding) to form a longer strip that allows to achieve the pipe length. These welded strips are formed into a pipe using, for example an ERW process. Typical coiled tube outer diameters are between 1 inch and 5 inches. Pipe

lengths are about 15,000 feet, but lengths can be between about 10,000 feet to about 40,000 feet.

After forming the pipe, the Full Body Heat Treatment (FBHT) is applied. The objective of this heat treatment is to produce a homogeneous final microstructure composed of at least 90% tempered martensite, the rest being bainite. This microstructure, having uniform carbide distribution and grain size below 20 μm—preferably below 15 μm—guarantees good combinations of strength, ductility, toughness and low cycle fatigue life. Furthermore, as was previously mentioned, by properly selecting the steel chemistry this type of microstructure is suitable to improve Sulfide Stress Cracking (SSC) resistance in comparison with conventional structures, composed of ferrite, pearlite and large volume fractions of upper bainite.

The FBHT is composed of at least one austenitization and quenching cycle (Q) followed by a tempering treatment (T). The austenitization is performed at temperatures between 900° C. and 1000° C. During this stage the total time of permanence above the equilibrium temperature Ae3 should be selected to guarantee a complete dissolution of iron carbides without having excessive austenitic grain growth. The target grain size is below 20 μm, preferably below 15 μm. Quenching has to be performed controlling the minimum cooling rate in order to achieve a final as quenched microstructure composed of at least 90% martensite throughout the pipe.

Tempering is carried out at temperatures between 550° C. and 720° C. Heat treatment above 720° C. may led to partial martensite transformation to high carbon austenite. This constituent has to be avoided because tends to transform into brittle constituents, which may impair toughness and fatigue life. On the other hand, if tempering is performed below 550° C. the recovery process of the dislocated as quenched structure is not complete. Thereafter, toughness may be again strongly reduced. The tempering cycle has to be selected, within the above mentioned temperature range, in order to achieve the desired mechanical properties. Minimum yield strength may vary from 80 ksi to 140 ksi. An appropriate time of permanence at temperature has to be selected to guarantee an homogeneous carbide distribution in both base tube and weld areas (ERW line and strip to strip joints). In some cases, in order to improve the combination of strength and toughness more than one austenitization, quenching and tempering cycles may be performed. After FBHT the pipe may be subjected to a sizing process, in order to guarantee specified dimensional tolerances, stress relieved and spooled into a coil.

## EXAMPLES

### Example A: Chemistry Selection to Improve Hardenability

As was previously mentioned, the microstructure of this disclosure is composed of at least 90% tempered martensite with an homogeneous distribution of fine carbides, the rest being bainite. This microstructure allows for production of a coiled tube with the desired combination of high strength, extended low cycle fatigue life and improved SSC resistance.

The tempered martensite is obtained by at least one heat treatment of quenching and tempering, performed after the pipe is formed by ERW. The heat treatment may be repeated two or more times if additional refinement is desired for improving SSC resistance. This is because subsequent



cycles of austenitization and quenching reduce not only prior austenitic grain size, but also martensite block and packet sizes.

To obtain the target microstructure with good hardenability, at least 90% martensite has to be formed at the end of the quenching process. An adequate chemistry selection is paramount to achieve such volume fraction of martensite. The selection of suitable steel compositions was based on results from experiments performed with a thermo-mechanical stimulator Gleeble® 3500. Industrial trials were performed afterwards to confirm laboratory findings.

Some of the steel chemistries analyzed in laboratory are listed in Table A1. For all these chemistries dilatometric tests were carried out at Gleeble® to construct Continuous Cooling Transformation (CCT) diagrams. The CCT diagrams were used, in combination with metallographic analysis of the samples obtained from the simulations, to determine the minimum cooling rate to have more than 90% martensite. This critical cooling rate, mainly dependent on steel chemistry, will be referred as CR90.

TABLE A1

Chemical composition of the steels experimentally studied. Element concentrations are in weight percent (wt %).

| Steel | C | Mn | Si | Cr | Mo | Ni | Cu | Other |
|---|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | 0.15 | 0.28 | Ti |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | 0.17 | 0.27 | Nb—Ti |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | 0.22 | 0.28 | Nb—Ti |
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | — | — |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | — | — |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | — | — | B—Ti |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | — | — | B—Ti |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | — | — |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | — | — |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | — | — | B—Ti |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | — | — | B—Ti |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | — | — | B—Ti |
| CrMoBTi4 | 0.26 | 0.60 | 0.15 | 0.50 | 0.25 | | | B—Ti |

Examples of obtained CCT diagrams are presented in FIGS. **1-2**. In all cases the austenitization was performed at 900-950° C. in order to obtain a fine austenitic grain size (AGS) of 10-20 μm. STD1, STD2 and STD3 steels have chemistries within API 5ST specification, but outside the range of this disclosure because of their low carbon addition (Table A1). The critical cooling CR90 was greater than 100° C./sec in the case of STD1 and STD2, and about 50° C./sec for STD3.

FIGS. **1**A-B show CCT diagrams corresponding to STD2 (A) and STD3 (B) steels. In bold is shown the critical cooling conditions to produce a final microstructure composed of about 90% martensite, the rest being bainite. FIGS. **2**A-B show the CCT diagrams corresponding to $BTi_2$ and $CrMoBTi_3$ steels. In bold are shown the critical cooling conditions to produce final microstructures composed of about 90% martensite, the rest being bainite. The first one is a C—Mn steel microalloyed with B—Ti (see Table A1). $CrMoBTi_2$ is a medium carbon steel having Cr and Mo additions, also microalloyed with B—Ti. The measured critical cooling rates (corresponding to the cooling curves shown in bold in the CCT diagrams) were 25° C./s and 15° C./s for $BTi_2$ and $CrMoBTi_3$, respectively.

In FIG. **3** is presented the average cooling rate of pipes treated in an industrial quenching heads facility (sprays of water cooling the tube from the external surface). Values are shown as a function of the pipe Wall Thickness (WT). The shaded area in the plot corresponds to the wall thickness

range typical of coiled tube applications. It is clear that when selecting steel chemistries suitable to have more than 90% tempered martensite, the critical cooling rate of the alloy should be equal or lower than 30° C./s. Otherwise, more than 10% bainite will be formed during quenching the thicker tube (WT=0.3 inches) in the above mentioned facility.

STD1, STD2 and STD3 have critical cooling rates above 30° C./s, thereafter these steels are not suitable for this disclosure. On the other hand, hardenability is adequate in $BTi_2$ and $CrMoBTi_3$ steels. The hardenability improvement is due to an increased carbon content and the B—Ti addition.

In Table A2 is shown the critical cooling rates measured for the steels of Table A1. STD1, STD2 and STD3 are chemistries currently used for coiled tubes grades 80, 90 and 110; and fulfill API 5ST. However, even the more alloyed STD3 have a critical cooling rate to guarantee more than 90% tempered martensite in pipes with WT in the range of interest. It is clear that standard materials are not adequate to produce the target microstructure of this disclosure and hardenability has to be improved. In low alloy steels the most important element affecting hardenability is Carbon. Thereafter, C was increased above the maximum specified by API 5ST (0.16 wt. %) to have critical cooling rates not higher than 30° C./s. In this disclosure Carbon addition is in the range from 0.17% to 0.35% (the maximum level was selected to guarantee good weldability and toughness). As was just mentioned, the rest of the chemistry has to be adjusted to have CR90 values equal or lower than 30° C./s.



concentrations is about 0.25%, 1.3% Mn is enough to achieve the hardenability ($BTi_2$ steel).

Cr—Mo steels: these steels have Cr and Mo additions that are useful to increase tempering resistance, which make them suitable for ultra-high strength grades. Additionally, Cr and Mo are elements that improve hardenability; so Mn addition may be further reduces. However, Cr and Mo are costly additions that reduce the steel hot workability, and their maximum content is limited to 1% and 0.5%, respectively. In one example with Carbon in the lower limit, about 1% Mn can be used to achieve the CR90 (CrMo1). If the steel is also microalloyed with B—Ti, a further reduction in Mn to 0.65% can be performed (CrMoBTi1).

Example B: Chemistry Selection for Different Coiled Tube Grades

To analyze tempering behavior of the steels presented in Table A1, simulations of industrial heat treatments were performed at Gleeble®. Simulations consisted in an austenitization at 900-950° C., quenching a 30° C./sec and tempering. In the particular case of STD1, STD2 and STD3 steels higher cooling rates were used in order to achieve at least 90% martensite during quenching. For STD1 and STD2 a quenching rate of about 150° C./s was used, while for STD3 cooling was at 50° C./s. These higher cooling rates can be achieved in small samples at Gleeble® when external

TABLE A2

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) | Adequate hardenability? |
|---|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | 0.13 | Ni, Cu, Ti | >100 | No |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | Ni, Cu, Nb—Ti | >100 | No |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | Ni, Cu, Nb—Ti | 50 | No |
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | 30 | Yes |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | 30 | Yes |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 30 | Yes |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B—Ti | 25 | Yes |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | 25 | Yes |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | 23 | Yes |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | B—Ti | 25 | Yes |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | B—Ti | 25 | Yes |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | B—Ti | 15 | Yes |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B—Ti | 30 | Yes |

The following guidelines for selecting adequate steel chemistries were obtained from the analysis of experimental results in Table A2:

C—Mn steels: hardenability depends mainly on Carbon and Manganese additions. About 2% Mn can be used to achieve the desired hardenability when C is in the lower limit (CMn1 steel). However, Mn is an element which produces strong segregation patterns that may decrease fatigue life. Thereafter, Mn addition is decreased in higher Carbon formulations. For example, when carbon concentration is about 0.25%, 1.6% Mn is enough to achieve the hardenability (CMn2 steel).

B—Ti steels: these alloys are plain carbon steels microalloyed with Boron and Titanium. Due to the increase in hardenability associated to the Boron effect, Mn can be further reduced. For Carbon in the lower limit, about 1.6% Mn can be used to achieve the hardenability. When carbon

water cooling is applied. After quenching the samples were tempered using two types of cycles:

Peak like cycle: Heating at 50° C./s up to a maximum temperature (Tmax) that was in the range from 550° C. to 720° C. Cooling at about 1.5° C./s down to room temperature. These cycles were intended to simulate actual tempering conditions at induction furnaces, which are characterized by high heating rate, no soaking time at maximum temperature and air cooling.

Isothermal cycle: Heating at 50° C./s up to 710° C., soaking at this temperature during a time that ranged from 1 min to 1 hour and cooling at about 1.5° C./s. This cycle was used to simulate tempering in an industrial line with several soaking inductors or with a tunnel furnace.

In all cases tempering temperature ranged from 550° C. to 720° C. Temperatures higher than 720° C. were avoided

because non-desired re-austenitization takes place. On the other hand, if tempering is performed below 550° C. recovery of the dislocated structure is not complete, and the material presents brittle constituents that may impair fatigue life.

Peak-like tempering cycles are preferred to reduce line length and to improve productivity. Thereafter, the feasibility of obtaining a given grade with a specific steel chemistry was mainly determined by the tempering curve obtaining using this type of cycles. If after a peak-like tempering at 720° C. strength is still high for the grade, soaking at maximum temperature can be performed. However, as soaking time increases, larger, more expensive and less productive industrial lines may be needed.

In FIG. **4** (inset on the left) is presented the tempering curve measured for $BTi_2$ steel. Tensile properties are shown as a function of maximum tempering temperature. Peak-like thermal cycles were used in the simulations. From the figure it is seen that Grades 90 to 125 can be obtained by changing maximum peak temperature from about 710° C. to 575° C., respectively. With this chemistry is not possible to reach 140 Ksi of yield strength without reducing the tempering temperature below 550° C. Regarding the lowers grads, 3 minutes of soaking at 710° C. can be used to obtain Grade 80 (insert on the right of FIG. **4**).

Based on the results obtained from Gleeble® simulations, Table B1 was constructed. This Table shows, for each analyzed steel, the feasibility of producing different grades, which ranged from 80 Ksi to 140 Ksi of minimum yield strength. For example, in the case of $BTi_2$ it is feasible to reach grades 90 to 125 using peak-like tempering cycles. But 2 minutes of soaking at 720° C. can be used in the case of Grade 80, which is why the in corresponding cell "soaking" is indicated.

TABLE B1

Feasibility of industrially producing Grades 80 to 140 using the steel chemistries analyzed. When "soaking" appears in the cell, it means that more than 1 minute of soaking at 720° C. can be used to reach the grade.

| | Grade 80 | Grade 90 | Grade 110 | Grade 125 | Grade 140 |
|---|---|---|---|---|---|
| | Yield Strength (Ksi) | | | | |
| Steel | 80-90 | 90-100 | 110-125 | 125-140 | 140-155 |
| STD1 | Yes | Yes | no | no | no |
| STD2 | Yes | Yes | yes | no | no |
| STD3 | soaking | Soaking | yes | yes | no |
| CMn1 | soaking | Yes | yes | yes | no |
| CMn2 | soaking | Soaking | yes | yes | no |
| BTi1 | Yes | Yes | yes | no | no |
| BTi2 | soaking | Yes | yes | yes | no |
| CrMo1 | soaking | Soaking | yes | Yes | Yes |
| CrMo2 | soaking | Soaking | soaking | Yes | Yes |
| CrMoBTi1 | soaking | Soaking | yes | Yes | Yes |
| CrMoBTi2 | soaking | Soaking | yes | Yes | Yes |
| CrMoBTi3 | soaking | Soaking | soaking | Yes | Yes |
| CrMoBTi4 | soaking | Soaking | yes | Yes | Yes |

From the results obtained is clear that in order to obtain the higher grades, increased Carbon and Cr—Mo additions can be used. Particularly, Grade 140 cannot be achieved with standard chemistries, as described in API5ST, because of the low Carbon content. On the other hand, to reach Grade 80 a lean chemistry with low carbon, no Cr or Mo additions are the best options. In this case, B—Ti microalloying additions may be used to guarantee good hardenability (for example, a chemistry like $BTi_1$ is a good alternative).

It is important to mention that in order to produce martensitic structures with the standard steels (STD1, STD2 and STD3) it was necessary to use at laboratory higher quenching rates than achievable at the mill. Thereafter, if we limit the cooling rate to that industrially achievable, none of the coiled tube grades can be obtained with conventional steels using the FBHT processing route.



Example C: Chemistry Selection to Reduce Negative Effects of Segregation During Solidification

During steel solidification alloying elements tend to remain diluted in the liquid because of its higher solubility in comparison with the solid (δ ferrite or austenite). Solute rich areas form two types of non-uniform chemical composition patterns upon solidification: microsegregation and macrosegregation.

Microsegregation results form freezing the solute-enriched liquid in the interdendritic spaces. But it does not constitute a major problem, since the effects of microsegregation can be removed during subsequent hot working. On the other hand, macrosegregation is non-uniformity of chemical composition in the cast section on a larger scale. It cannot be completely eliminated by soaking at high temperature and/or hot working. In the case of interest for this disclosure, which is the continuous slab cast, it produces the centerline segregation band.

A pronounced central segregation band has to be avoided because:

Brittle constituents as non-tempered martensite may appear in this region as a result of welding operation (bias weld and ERW, see for Example FIGS. **5**A-B). These non-desired constituents are removed during the subsequent full body heat treatment. However, the tube may be plastically deformed by bending between welding and heat treatment operations, producing a failure during industrial production.

After FBHT the remnant of the central segregation band is a region enriched in substitutional solutes (as Mn, Si, Mo) with a higher density of coarse carbides than the rest of the material. This region is susceptible to nucleate cracks during low cycle fatigue, as it is observed in FIGS. **6**-**7**. Additionally, prominent segregation bands are associated to poor SSC resistance.

Although it is not possible to remove macrosegregation, its negative effects on toughness, fatigue life and SSC resistance can be reduced by a proper selection of steel chemistry.

Based on EDX measurements on samples corresponding to a wide range of steel chemistries, enrichment factors at the central segregation band were estimated for different alloying elements. The results are shown in Table C1. The enrichment factors (EF) are the ratios between each element concentration at the central band and that corresponding to the average in the matrix. These factors are mainly dependent on thermodynamic partition coefficient between liquid and sold; and diffusivities during solidification.

TABLE C1

Enrichment factors (EF) at the central segregation band corresponding to different substitutional alloying elements.

| Element | EF |
|---|---|
| Mn | 1.6 |
| Si | 3.2 |
| Cr | 1.2 |
| Mo | 2.1 |
| Ni | 1.3 |
| Cu | 3.4 |

Table C1 shows clearly that there are some elements that have a strong tendency to segregate during solidification, like Si and Cu. On the other hand Cr and Ni have low enrichment factors. Ni is a costly addition, but Cr may be used when an increase in hardenability and/or tempering resistance is desired without producing strong segregation patterns.

The enrichment factors give information about the increase in concentration that can be expected for each element at the central segregation band. However, not all these elements have the same effect regarding the material tendency to form brittle constituents during welding or heat treatment. It is observed that the higher the improvement on hardenability, the higher the tendency to form brittle constituents during processing. It is important to mention that elements with high diffusion coefficients as Carbon and Boron may segregate during solidification, but are homogenized during hot rolling. Thereafter, they do not contribute to form brittle constituents localized at the segregation band.

From the analysis of the CCT diagrams (Example A) it can be concluded that Manganese produces the strongest increase in hardenability. This is apart from Carbon and Boron, which do not present large segregation patterns after hot rolling. On the other hand, Si and Cu, which have a strong tendency to segregate, do not play a major role on hardenability. Because of its high enrichment factor and large effect on hardenability, Mn addition has to be reduced as much as possible when trying to diminish the negative effects of macro-segregation, as the reduction in low-cycle fatigue life.

High Mn contents are ordinarily added to the steel composition because of its effect on hardenability. In this disclosure the hardenability is mostly achieved through the higher Carbon addition, so Mn concentration can be generally reduced. Further Manganese reductions can be achieved using Boron and/or Chromium additions. Examples can be seen in Table C2, which shows the critical cooling rate (CR90) for different steels composition obtained from CCT diagrams (data taken from a previous Example A). In order to achieve the hardenability in a steel with about 0.25% Carbon. Mn can be reduced from 1.6% to 1.3% when adding Boron, and further reduced to 0.4% if Cr—Mo is additionally used.

TABLE C2

Critical cooling rates to have more than 90% martensite (CR90) measured for the analyzed steels. Values determined from Gleeble ® dilatometric tests and metallographic analysis.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | CR90 (° C./s) |
|---|---|---|---|---|---|---|---|
| CMn1 | 0.17 | 2.00 | 0.20 | — | — | — | 30 |
| CMn2 | 0.25 | 1.60 | 0.20 | — | — | — | 30 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 30 |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B—Ti | 25 |
| CrMo1 | 0.17 | 1.00 | 0.25 | 1.00 | 0.50 | — | 25 |
| CrMo2 | 0.25 | 0.60 | 0.20 | 1.00 | 0.50 | — | 23 |
| CrMoBTi1 | 0.17 | 0.60 | 0.20 | 1.00 | 0.50 | B—Ti | 25 |
| CrMoBTi2 | 0.24 | 0.40 | 0.15 | 1.00 | 0.25 | B—Ti | 25 |
| CrMoBTi3 | 0.24 | 0.40 | 0.15 | 1.00 | 0.50 | B—Ti | 15 |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B—Ti | 30 |

Example D: Homogenization of Microstructure

As way previously mentioned the fatigue life of coiled tubing is strongly dependent on microscopial features as microstructural heterogeneities. The combination of soft and hard micro-constituents tends to produce plastic strain localization, which is the driving force for crack nucleation and propagation. In this section are compared the coiled tubing microstructures obtained with the standard production method applied to chemistries within API5ST, and those corresponding to a chemistry and processing conditions within the ranges disclosed in this disclosure.

As reference material was used a standard coiled tubing grade 110 (yield strength from 110 Ksi to 120 Ksi) with chemistry named STD2 in Table A1, which is within API 5ST specification. This standard material was compared to a coiled tubed of the same grade produced with chemistry $BTi_2$ and applying the FBHT.

In this comparison different pipe locations will be considered:

Base Metal (BM): coiled tubing microstructure apart from the ERW line and bias welds, when “apart” means that are not included in this region the Heat Affected Zones (HAZ) produced during the any welding operation and their possible Post-Weld Heat Treatment (PWHT).

Bias Weld (BW): microstructural region corresponding to the strip-to-strip joint that can be performed by Plasma Arc Welding (PAW), Friction Stir Welding (FSW) or any other welding techniques. It is also included in this region the corresponding heat affected zone during welding and PWHT.

ERW line: microstructure resulting from the longitudinal ERW welding during tube forming and its localized PWHT, which is generally a scam annealing. As in previous cases, this region also includes the corresponding heat affected zone.

In FIGS. **8**A-B are presented the base metal microstructures corresponding to the standard coiled tube (A) and this disclosure (B). In the first case it is observed a ferrite matrix with a fine distribution of carbides. This matrix and fine structure results from the controlled hot rolling process. This disclosure microstructure (FIG. **8**B) is mainly composed of tempered martensite. The bainite volume fraction is lower than 5% in this case. The tempered martensite structure is also a fine distribution of iron carbides in a ferrite matrix. The main difference between conventional and new structures is related to the morphology of the ferrite grains and sub-grains, and the dislocation density. However, regarding refinement and homogeneity, both structures are very similar.

In FIGS. **9**A-B are shown scanning electron micrographs corresponding to the ERW line. It is clear that in the

conventional structure two micro-constituents appear: there are soft ferrite grains and hard blocks composed of a mixture of fine pearlite, martensite, and some retained austenite. In this type of structure plastic strain is localized in the ferrite, and cracks can nucleate and propagate in the neighboring brittle constituents (non-tempered martensite and high carbon retained austenite). On the other hand, the ERW line microstructure obtained with chemistry and processing conditions within the ranges of this disclosure is homogeneous and very similar to the corresponding base metal structure.

Microstructures corresponding to the HAZ of the ERW are presented in FIGS. **10**A-B. In the standard material it is clear the appearance of the remnant of the central segregation band, which after seam annealing is partially transformed into non-tempered martensite. Again, these are brittle constituents that are localized along the ERW line, and can nucleate and propagate cracks during service. The risk of failure is higher than in previous case because of the larger size of the just mentioned constituents. On the other hand, in the quenched and tempered coiled tubing the structure close to the ERW line is homogeneous, and the remnants of the central segregation band are not observed.

In FIGS. **11**A-B are presented some scanning electron micrographs corresponding to the bias-weld HAZ of both conventional coiled tube and this disclosure. For the conventional material the microstructure is very different than in Base Metal (BM). It is mainly composed of upper bainite and the grain size is large (50 microns in comparison of less than 15 microns for the BM). This type of coarse structure is not adequate for low cycle fatigue because cracks can easily propagate along bainite laths. An example of a fatigue crack running across coarse bainite in the bias weld is shown in FIG. **12**. This is a secondary crack located close to the main failure occurred during service of a standard coiled tubing grade 110.

On the other hand, the bias weld microstructure in this disclosure is again very similar to that corresponding to the base metal. No upper bainite grains were observed. It is important to mention that some bainite may appear after the full body heat treatment, but because of the selection of adequate chemistry and processing conditions, the corresponding volume fraction of this constituent is lower than 10%. This is the main reason for the good hardenability to the chemistries described in this disclosure. Additionally, due to the upper limit in the austenitization temperature the final grain size is small (lower than 20 microns), then large bainitic laths that can propagate cracks are completely avoided.

Other examples of the microstructural homogeneity achievable by the combination of steel chemistry and processing conditions disclosed in this disclosure are presented in FIGS. **13**-**14**. In FIG. **13** is shown the typical variation in hardness across the bias weld for coiled tubes produced



conventionally compared to that obtained using the new chemistry and processing route. It is clear that when using this disclosure the hardness variation is strongly reduced. As a consequence, the tendency of the material to accumulate strain in localized regions (in this case the HAZ of the bias weld) is also reduced, and the fatigue life improved.

In FIGS. **14**A-B are shown some microstructures corresponding to the intersection between the bias weld and the ERW line. It is clear that large microstructural heterogeneities are obtained following the conventional route. These heterogeneities are successfully eliminated using the chemistry and processing conditions disclosed in this disclosure.

Example E: Coiled Tube Fatigue Testing

In order compare the performance of coiled tubing produced according to this disclosure with that corresponding to standard products, a series of tests were performed at laboratory. Coiled tube samples were tested in a fatigue machine schematically shown in FIG. **15**. This machine is able to simulate the bending deformations during spooling and un-spooling operations, applying at the same time internal pressures. Therefore, the tests are useful to rank materials under low-cycle fatigue conditions that are close to those experienced during actual field operation.

During testing, the fatigue specimens (tube pieces 5 or 6 feet long) are clamped in one end while an alternative force is applied by a hydraulic actuator on the opposite end. Deformation cycles are applied on the test specimens by bending samples over a curved mandrel of fixed radius, and then straightening them against a straight backup. Steel caps are welded at the ends of the specimen and connected to a hydraulic pump, so that cycling is conducted with the specimen filled with water at a constant internal pressure until it fails. The test ends when a loss of internal pressure occurs, due to the development of a crack through the wall thickness.

Testing was performed on coiled tubing with different chemistries and grades, as shown in Table E1. The pipe geometry was the same in all cases (OD 2", WT 0.19"). STD1, STD2 and STD3 are steels within the limits described in API 5ST, processed following the standard route. $BTi_1$, $BTi_2$ and $CrMoBTi_4$ are chemistries selected and processed according to this disclosure. It is important to mention that $CrMoBTi_4$ steel was used to produce two non-standard grades with 126 Ksi and 140 Ksi of minimum yield strength (the highest grade described in API 5ST has 110 Ksi of SMYS). Tests were performed on tube pieces with and without the bias weld (in all cases the longitudinal ERW line is included in the samples). The severity of the test mainly depends on two parameters: bend radius and inner pressure. In this study the bend radius was 48 inches, which corresponds to a plastic strain of about 2%. Inner pressures between 1600 psi and 13500 psi were considered, producing hoop stresses that ranged from about 10% to 60% of the minimum yield strength of the grades.

TABLE E1

Steel chemistries and coiled tube grades analyzed in this study.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | Grade |
|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | Ni, Cu, Ti | 80 |
| STD2 | 0.14 | 0.80 | 0.33 | 0.55 | 0.10 | Ni, Cu, Nb—Ti | 90 |
| STD3 | 0.14 | 0.80 | 0.34 | 0.57 | 0.32 | Ni, Cu, Nb—Ti | 110 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 80 |
| BTi2 | 0.25 | 1.30 | 0.20 | — | — | B—Ti | 90, 110 |
| CrMoBTi4 | 0.26 | 0.60 | 0.16 | 0.50 | 0.25 | B—Ti | 125, 140 |

In FIG. **16** is presented some results regarding the comparison between the fatigue life measured in samples with and without the Bias Weld (BW). The values shown in the figure correspond to the averages obtained when testing conventional and non-conventional coiled tubes grades. In the case of the conventional material there is clearly a reduction in fatigue life when testing samples containing the bias weld. On the other hand, the coiled tubes produced according to this disclosure do not present an important change in fatigue life when the tests are performed on BW samples. This is a consequence of the tube homogeneous structure, with almost no differences in mechanical properties between base metal, ERW line and bias weld.

In FIG. **17** is shown the coiled tube fatigue life improvements obtained with chemistries and processing conditions as disclosed by this disclosure. For Grades 80, 90 and 110 the comparison was made against the equivalent grade produced by the conventional route. In the case of grades 125 and 140, which are non-standard, the fatigue life comparison was performed against STD3 steel in Grade 110 tested under the similar conditions (pipe geometry, bend radius and inner pressure). The results presented in the figure correspond to average values for each grade, the error bars represent the dispersion obtained when using different inner pressures.

In FIG. **17** it is clear that a notorious improvement of fatigue life is observed when using chemistries and processing conditions according to this disclosure. For example, in Grade 110 there was an improvement of about 100% in fatigue life. This is a consequence of the fact that in conventional coiled tubing the fatigue performance is limited to that of the bias weld (which is generally the weak point regarding low cycle fatigue, because its microstructural heterogeneities and brittle constituents). In coiled tubes produced according to this disclosure there is no important fatigue life reduction at bias welds, which strongly increases the overall performance of the tube. Regarding the non-standard grades, the large improvement in fatigue life is due to the fact that the comparison is made against a conventional 110 grade tested under similar processing continues. However, for the same inner pressures the applied hoop stresses are closer to the minimum yield strength of the lower grade, and the test severity increases for grade 110 in comparison to grades 125 and 140. These results show that by using higher grades (not achievable with the conventional method) fatigue life is strongly increased for the same service conditions.

Example F: Sulfide Stress Cracking Resistance

Material performance in regards to hydrogen embrittlement in $H_2S$ containing environments is related to the combined effects of corrosive environments, presence of traps (e.g. precipitates and dislocations) that could locally increase hydrogen concentration, as well as the presence of brittle areas, in which cracks could easily propagate. A possible source of critical brittle regions in conventional coiled tubing material is the segregation pattern of substitutional elements, such as Mn, in the raw material. Regions of differential concentrations tend to respond in a distinct way to thermal cycles imposed during bias weld, PWHT, ERW and seam annealing, and could lead to the local formation of brittle constituents. In particular, when the material is seam annealed after the ERW process, the pipe body quickly extracts heat from the weld area. If the segregation is high enough, elongated high hardness areas with the possible presence of martensite may be formed as a consequence of the cooling conditions. These areas will remain in the tube to become easy paths for crack propagation. The fact that the new process is applied as the last stage of manufacturing, allows for the minimization of the excessively hardened areas. Other relevant differences are: a) the dislocations introduced during pip cold forming are not present in the new product, b) the carbides in new product are smaller and isolated in comparison with the typical pearlite/bainite long brittle carbides. As a consequence the coiled tube produced with chemistries and processing conditions according to the disclosure presents are improved performance to cracking in $H_2S$ containing environments.

TABLE F1

Steel chemistries and coiled tube grades analyzed in this study.

| Steel | C (wt %) | Mn (wt %) | Si (wt %) | Cr (wt %) | Mo (wt %) | Other | Grade |
|---|---|---|---|---|---|---|---|
| STD1 | 0.13 | 0.80 | 0.35 | 0.52 | — | Ni, Cu, Ti | 80 |
| BTi1 | 0.17 | 1.60 | 0.20 | — | — | B—Ti | 80 |

In order to perform a first analysis on resistance to SSC cracking, coiled tube Grade 80 samples produced by i) the standard process and ii) the new chemistry-process were evaluated using method C (C-ring) of NACE TM0177. Steel chemistries are shown in Table F1. Both materials (3 specimens in each case) were tested with the ERW seam at center of C-ring sample, using the following conditions:

Load: 90% of 80 Ksi, Solution A, 1 bar $H_2S$, Test Time: 720 hs

In the case of the standard coiled tube all 3 specimens failed. On the other hand, the 3 samples corresponding to the new chemistry-process passed the test (FIGS. **5**A-B with pictures of C-rings). Although more tests are ongoing to analyze embrittlement resistance of different grades, as well as the effect of the bias weld, this first result shows a clear improvement in comparison with the standard condition, ascribed to a more homogeneous microstructure of base metal and ERW line in the case of the new process route.

As shown in FIGS. **18**A-B, the C ring formed by the conventional process has a large crack down the middle, whereas the C ring formed by embodiments of the disclosed process did not crack.

In some embodiments, B—Ti and Cr—Mo additions can reduce maximum Mn. In some embodiments, grades may be higher than 110 that are difficult to achieve using the standard method.

Features, materials, characteristics, or groups described in conjunction with a particular aspect, embodiment, or example are to be understood to be applicable to any other aspect, embodiment or example described herein unless incompatible therewith. All of the features disclose in this specification (including any accompanying claims, abstract and drawings), and/or all of the steps of any method or process so disclosed, may be combined in any combination, except combinations where at least some of such features and/or steps are mutually exclusive. The protection is not restricted to the details of any foregoing embodiments. The protection extends to any novel one, or any novel combination, of the features disclosed in this specification (including any accompanying claims, abstract and drawings), or to any novel one, or any novel combination, of the steps of any method or process so disclosed.

While certain embodiments have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of protection. Indeed, the novel methods and apparatuses described herein may be embodied in a variety of other forms. Furthermore, various omissions, substitutions and changes in the form of the methods, compositions and apparatuses described herein may be made. Those skilled in the art will appreciate that in some embodiments, the actual steps taken in the processes illustrated and/or disclosed may differ form those shown in the figures. Depending on the embodiment, certain of the steps described above may be removed, others may be added. Furthermore, the features and attributes of the specific embodiments disclosed above may be combined in different ways to form additional embodiments, all of which fall within the scope of the present disclosure.

Although the present disclosure includes certain embodiments, examples and applications, it will be understood by those skilled in the art that the present disclosure extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses and obvious modifications and equivalents thereof, including embodiments which do no provide all of the features and advantages set forth herein. Accordingly, the scope of the present disclosure is not intended to be limited by the specific disclosures of preferred embodiments herein, and may be defined by claims as presented herein or as presented in the future.

What is claimed is:

**1**. A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled steel tube, the coiled steel tube comprising:

a plurality of strips welded together end to end by a bias weld to form a plurality of bias welded strips and formed into the coiled steel tube, each of the plurality of bias welded strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints;

wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube; wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite and 0 volume % to less than about 10 volume % bainite in the base metal regions, the bias weld joints, and the heat affected zones;

wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogeneous;

wherein the hardness is substantially uniform along substantially all of a length of the coiled steel tube; and

wherein a yield strength of the coiled steel tube is greater than about 80 ksi.

**2**. The coiled steel tube of claim **1**, wherein the tube has a yield strength of at least 110 ksi.

**3**. The coiled steel tube of claim **1**, wherein the tube has a yield strength of at least 125 ksi.

**4**. The coiled steel tube of claim **1**, wherein the final microstructure comprises at least 95 volume % tempered martensite and 0 volume % to less than about 5 volume % bainite in the base metal regions, the bias weld joints, and the heat affected zones.

**5**. The coiled steel tube of claim **1**, wherein the tube has a final grain size of below 20 μm in the base metal regions, the bias weld joints, and the heat affected zones.

**6**. The coiled steel tube of claim **1**, wherein the tube has a final grain size of below 15 μm in the base metal regions, the bias weld joints, and the heat affected zones.



**7**. The coiled steel tube of claim **1**, wherein the fatigue life at the bias weld joints is at least about 80% of the base metal regions.

**8**. The coiled steel tube of claim **1**, wherein a percent hardness of each of the bias weld joints, including its heat affected zone, is 110% or less than a hardness of the base metal region.

**9**. The coiled steel tube of claim **1**, wherein the fatigue life is at least 100% greater than an equivalent grade steel which has not undergone the fully body heat treatment.

**10**. The coiled steel tube of claim **1**, wherein the full body heat treatment applied to the coiled steel tube comprises quenching and tempering.

**11**. The coiled steel tube of claim **1**, wherein a total length of the coiled steel tube is between 10,000 feet and 40,000 feet and the hardness is substantially uniform along substantially all of a length of the coiled steel tube including a plurality of bias weld joints.

**12**. The coiled steel tube of claim **1**, wherein the full body heat treatment comprises at least one cycle of austenitization, quenching and tempering.

**13**. The coiled steel tube of claim **12**, wherein the tempering is carried out at temperatures between 550 degrees C. and 720 degrees C.

**14**. The coiled steel tube of claim **12**, wherein the austenitization is performed at temperatures between 900 degrees C. and 1000 degrees C.

**15**. The coiled steel tube of claim **12**, wherein a cooling rate of quenching is equal to or lower than 30 degrees C./sec.

**16**. The coiled steel tube of claim **1**, wherein the full body heat treatment comprises at least one cycle of austenitization and quenching, followed by tempering.

**17**. The coiled steel tube of claim **16**, wherein the tempering is carried out at temperatures between 550 degrees C. and 720 degrees C.

**18**. The coiled steel tube of claim **16**, wherein the austenitization is performed at temperatures between 900 degrees C. and 1000 degrees C.

**19**. The coiled steel tube of claim **16**, wherein a cooling rate of quenching is equal to or lower than 30 degrees C./sec.

**20**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.010 wt. % to about 0.030 wt. % titanium and from about 0.0005 wt. % to about 0.0030 wt. % boron.

**21**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.30 wt. % to about 2.0 wt. % manganese.

**22**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.10 wt. % to about 0.35 wt. % silicon.

**23**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include from about 0.16 wt. % to about 0.35 wt. % carbon.

**24**. The coiled steel tube of claim **1**, wherein the final microstructure after full body heat treatment comprises a uniform distribution of fine carbides across the base metal regions, the bias weld, and the heat affected zones.

**25**. The coiled steel tube of claim **1**, wherein after full body heat treatment, the coiled steel tube has a final grain size of below about 20 μm in the base metal region, the bias weld, and the heat affected zones.

**26**. The coiled steel tube of claim **25** wherein after full body heat treatment, the coiled steel tube has a final grain size of below about 15 μm in the base metal region, the bias weld, and the heat affected zones.

**27**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include up to about 0.010 wt. % sulfur.

**28**. The coiled steel tube of claim **27**, wherein the plurality of steel strips welded together include up to about 0.005 wt. % sulfur.

**29**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include about 0.010 wt. % to about 0.040 wt. % aluminum.

**30**. The coiled steel tube of claim **1**, wherein the plurality of steel strips welded together include up to 0.018 wt. % phosphorus.

* * * * *

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of the Federal Rules of Appellate Procedure and the Rules of this Court. According to the word processing system used to prepare this document, the brief contains 13,803 words.

*/s/ John C. O'Quinn*