**Nos. 23-1882, -1883**

**IN THE**

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

GLOBAL TUBING LLC,

*Plaintiff-Cross-Appellant*,

v.

TENARIS COILED TUBES LLC, TENARIS S.A.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:17-cv-3299, Hon. Keith P. Ellison

## RESPONSE AND OPENING CROSS-APPEAL BRIEF FOR CROSS-APPELLANT GLOBAL TUBING LLC

R. Paul Yetter
Jeffrey A. Andrews
Matthew C. Zorn
YETTER COLEMAN, LLP
909 Fannin Street, Suite 3600
Houston, TX 77010
(713) 632-8000 (telephone)
(713) 632-8002 (fax)
pyetter@yettercoleman.com

Jeffrey A. Lamken
*Counsel of Record*
Rayiner I. Hashem
Lauren M. Weinstein
Walter H Hawes IV
Lois S. Ahn
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000 (telephone)
(202) 556-2001 (fax)
jlamken@mololamken.com

*Counsel for Cross-Appellant Global Tubing LLC*
*(Additional Counsel Listed on Inside Cover)*

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (fax)

*Counsel for Cross-Appellant*
*Global Tubing LLC*

## PATENT CLAIM AT ISSUE

**Representative Claim 1 of the '256 patent:**

A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled tube,

the coiled steel tube comprising: a plurality of strings welded together end to end by a bias weld and formed into a coiled steel tube, each of the plurality of strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints,

each of the plurality of welded strips comprising: a yield strength greater than about 80 ksi;

a composition comprising iron and:

0.17-0.35 wt. % carbon;

0.30-2.00 wt. % manganese;

0.10-0.30 wt. % silicon;

0.010-0.040 wt. % aluminum;

up to 0.010 wt. % sulfur; and

up to 0.015 wt. % phosphorous; and

wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube;

wherein the final microstructure comprises a mixture of tempered martensite and bainite;

wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite in the base metal regions, the bias weld joints, and the heat affected zones;

wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogenous; and

wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the bias weld joints, and the heat affected zones.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1882, 23-1883

**Short Case Caption** Global Tubing LLC v. Tenaris Coiled Tubes LLC

**Filing Party/Entity** Global Tubing LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/05/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Global Tubing LLC | | Forum Energy Technologies, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# CERTIFICATE OF INTEREST – ADDITIONAL PAGES

## 4. Legal Representatives

**Yetter Coleman LLP:** David J. Gutierrez, James E. Zucker, Katherine S. Dannenmaier, and Pamela L. Hemphill née Hohensee

**Robinson Bradshaw LLP:** Emma W. Perry

**McAughan Deaver PLLC:** Robert J. McAughan, Jr.

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................... 1

ISSUES PRESENTED .................................................................................. 4

STATEMENT OF THE CASE ......................................................................... 4

I. Coiled-Tubing Technology and Southwestern's Advances ............................ 4

A. Southwestern Invents Quenched-and-Tempered Coiled Tubing .......... 6

B. Tenaris Acquires Southwestern's Assets and Copies Its Quench-and-Temper Process ............................................................. 7

II. Tenaris Fraudulently Obtains a Patent on CYMAX Technology ................... 8

A. The Inventors Discuss the CYMAX Documents Extensively But File the '256 Patent Application Without Disclosing Them .......... 8

B. The Examiner Rejects the '256 Patent Application as Obvious ......... 11

C. Tenaris Overcomes the Obviousness Rejection by Emphasizing Features Disclosed in the CYMAX Documents While Withholding Those Documents ......................................................... 12

III. Global Develops Non-Infringing, Low-Carbon Quenched-and-Tempered Coiled Tubing .................................................... 14

IV. Tenaris Obtains the '074 and '075 Patents by Disclosing Doctored Versions of the CYMAX Documents ......................................................... 16

A. Tenaris Obtains the '074 and '075 Patents To Cover Low-Carbon Quenched-and-Tempered Coiled Tubing ............................... 16

B. The PTO Rejects the '326 and '407 Application Claims Based on a Reference Indistinguishable from the CYMAX Brochure .......... 19

V. Proceedings Below ....................................................................20

A. Global Obtains Privileged Documents Under the Crime-Fraud Exception ....................................................................21

B. The District Court Grants Global's Summary Judgment Motion .......22

SUMMARY OF ARGUMENT ....................................................................24

ARGUMENT ....................................................................26

I. The District Court Properly Granted Summary Judgment That the '256 Patent Is Unenforceable Due to Inequitable Conduct ...........................29

A. The PTO Would Not Have Issued the '256 Patent Had Tenaris Disclosed the CYMAX Documents ..................................................32

1. Disclosure of the CYMAX Documents Would Have Precluded Issuance of the '256 Patent .....................................32

2. The District Court Properly Decided Materiality at Summary Judgment, When Tenaris Failed To Create Any Fact Dispute ....................................................................37

3. The Prosecution Histories of the '326 and '407 Applications Confirm Materiality............................................41

4. The Other Evidence of Materiality Is Overwhelming .............42

5. The CYMAX Documents Cannot Be Dismissed as Cumulative ....................................................................43

B. Tenaris Withheld the CYMAX Documents with Specific Intent To Deceive ....................................................................45

1. Tenaris Deliberately Withheld Material Information ...............46

2. Tenaris's Putative "Innocent" Explanation Is Non-Responsive and Insufficient To Avoid Summary Judgment ....................................................................48

II. Tenaris's Fraudulent Conduct Infected the '074 and '075 Patents, Rendering Them Unenforceable as Well ....................52

III. The Egregious Misconduct Here Warrants Unenforceability in Any Event ....................54

CONCLUSION ....................58

CROSS-APPEAL....................59

JURISDICTIONAL STATEMENT ....................60

ISSUE PRESENTED....................60

STATEMENT ....................61

I. The Legal Framework for Patent-Based Antitrust Claims....................61

II. Proceedings on Global's Antitrust Claims ....................62

A. Global Presents Evidence That No Non-Infringing Substitutes Existed ....................63

B. The District Court Grants Tenaris's Summary Judgment Motion......63

SUMMARY OF ARGUMENT ....................65

STANDARD OF REVIEW ....................66

ARGUMENT ....................67

I. The District Court Looked to the Wrong Measure of Tenaris's Potential To Monopolize ....................67

II. The District Court Impermissibly Considered Market Conditions Years After Tenaris's Attempted Monopolization....................69

A. Tenaris Concededly Controlled the Market When It Tried To Exclude Global ....................69

B. Even Tenaris's Later Market Share Was Sufficient Under Fifth Circuit Law ....................71

C. Tenaris Concededly Engaged in Exclusionary Conduct ..... 72

III. The District Court Ignored Material Fact Disputes Regarding the Relevant Market ..... 73

A. Evidence Showed That Quenched-and-Tempered Tubing Comprises a Distinct Product Market ..... 74

B. Evidence Showed that the Relevant Geographic Market Was the United States ..... 77

CONCLUSION ..... 78

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott Labs. v. Brennan*,
952 F.2d 1346 (Fed. Cir. 1991) ....................68

*Access Telecom, Inc. v. MCI Telecomms. Corp.*,
197 F.3d 694 (5th Cir. 1999) ....................74

*Agfa Corp. v. Creo Prods. Inc.*,
451 F.3d 1366 (Fed. Cir. 2006) ....................52

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
768 F.3d 1185 (Fed. Cir. 2014) ....................32, 36, 38, 53

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ....................40

*Apotex Inc. v. UCB, Inc.*,
763 F.3d 1354 (Fed. Cir. 2014) ....................56

*Aventis Pharma S.A., v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) ....................45, 47, 48

*Avid Identification Sys., Inc. v. Crystal Imp. Corp.*,
603 F.3d 967 (Fed. Cir. 2010) ....................29

*Baxter Healthcare Corp. v. Spectramed, Inc.*,
49 F.3d 1575 (Fed. Cir. 1995) ....................29

*Belcher Pharms., LLC v. Hospira, Inc.*,
11 F.4th 1345 (Fed. Cir. 2021) ....................*passim*

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) ....................62

*C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.*,
884 F.2d 209 (5th Cir. 1989) ....................71

*C.E. Servs., Inc. v. Control Data Corp.*,
759 F.2d 1241 (5th Cir. 1985) ....................72, 74

*Cargill, Inc. v. Canbra Foods, Ltd.*,
476 F.3d 1359 (Fed. Cir. 2007) ....................48

*Chandler v. Phoenix Servs.*,
419 F. Supp. 3d 972 (N.D. Tex. 2019) ....................68

*In re Chavin*,
150 F.3d 726 (7th Cir. 1998) ....................48, 51

*Consol. Aluminum Corp. v. Foseco Int'l Ltd.*,
910 F.2d 804 (Fed. Cir. 1990) ....................52

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*,
679 F.2d 516 (5th Cir. 1982) ....................72

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) ....................77

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ....................74

*Ferring B.V. v. Barr Labs., Inc.*,
437 F.3d 1181 (Fed. Cir. 2006) ....................48

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) ....................75

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997) ....................34, 49

*Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*,
618 F.3d 1294 (Fed. Cir. 2010) ....................*passim*

*Handgards, Inc. v. Ethicon, Inc.*,
601 F.2d 986 (9th Cir. 1979) ....................62

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
322 U.S. 238 (1944) ....................58

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
714 F.2d 1384 (5th Cir. 1983) ....................74

*Houston N. Hosp. Props. v. Telco Leasing, Inc.*,
680 F.2d 19 (5th Cir. 1982) ....................................................................38

*Hydril Co. LP v. Grant Prideco LP*,
474 F.3d 1344 (Fed. Cir. 2007) ................................................................68

*Intellect Wireless, Inc. v. HTC Corp.*,
732 F.3d 1339 (Fed. Cir. 2013) ..................................................24, 55, 56

*Johnson v. Diversicare Afton Oaks, LLC*,
597 F.3d 673 (5th Cir. 2010) ..................................................................38

*Jones v. United States*,
936 F.3d 318 (5th Cir. 2019) ......................................................29, 38, 51

*Kingsland v. Dorsey*,
338 U.S. 318 (1949)...................................................................................29

*Molins PLC v. Textron, Inc.*,
48 F.3d 1172 (Fed. Cir. 1995) ..................................................................41

*Moore v. LaSalle Mgmt. Co.*,
41 F.4th 493 (5th Cir. 2022) ....................................................................66

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)...............................................................................76

*Ohio Willow Wood Co. v. Alps S., LLC*,
735 F.3d 1333 (Fed. Cir. 2013) ...........................................................32, 38

*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*,
701 F.3d 698 (Fed. Cir. 2012) ..................................................................78

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
984 F.2d 1182 (Fed. Cir. 1993) .........................................................*passim*

*Pharmacia Corp. v. Par Pharm., Inc.*,
417 F.3d 1369 (Fed. Cir. 2005) ................................................................54

*In re Placid Oil Co.*,
932 F.2d 394 (5th Cir. 1991) ..................................................................38

*Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*,
739 F.2d 624 (Fed. Cir. 1984) ....................................................................38

*Regeneron Pharms., Inc. v. Merus B.V.*,
144 F. Supp. 3d 530 (S.D.N.Y. 2015) ..........................................................56

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997) ...........................................................44, 45

*Rohm & Haas Co. v. Crystal Chem. Co.*,
722 F.2d 1556 (Fed. Cir. 1983) ..................................................................53

*Rsch. Corp. Techs. v. Microsoft Corp.*,
536 F.3d 1247 (Fed. Cir. 2008) ..................................................................78

*Smith & Nephew, Inc. v. Rea*,
721 F.3d 1371 (Fed. Cir. 2013) ..................................................................40

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ..................................................................39

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)........................................................................*passim*

*Tamini v. Salen Dry Cargo AB*,
866 F.2d 741 (5th Cir. 1989) ......................................................................38

*Taylor Publ'g Co. v. Jostens, Inc.*,
216 F.3d 465 (5th Cir. 2000) ...............................................................60, 70

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ...........................................................*passim*

*Times-Picayune Publ'g Co. v. United States*,
345 U.S. 594 (1953)........................................................................................68

*TransWeb, LLC v. 3M Innovative Props. Co.*,
812 F.3d 1295 (Fed. Cir. 2016) ...................................................61, 71, 74

*Treehouse Avatar LLC v. Valve Corp.*,
54 F.4th 709 (Fed. Cir. 2022) ......................................................................66

*United States v. Am. Airlines, Inc.*,
743 F.2d 1114 (5th Cir. 1984) ....................................................66, 70, 72

*Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*,
382 U.S. 172 (1965)..........................................................................*passim*

## STATUTES AND RULES

15 U.S.C §2 ..........................................................................................61

37 C.F.R. §1.132 ...................................................................................12

37 C.F.R. §1.56 .....................................................................................17

Fed. R. App. P. 4(a)(3)..........................................................................60

## OTHER AUTHORITIES

Charles A. Wright & Arthur R. Miller,
*Federal Practice and Procedure* (4th ed. 2023)...................................................38

U.S. Dep't of Justice & Federal Trade Commission,
*Horizontal Merger Guidelines* (2010) ..................................................77

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Cross-Appellant Global Tubing LLC notes that:

(1) there have been no other appeals in this case; and

(2) there are no other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in Nos. 23-1882, -1883.

# INTRODUCTION

A clearer instance of inequitable conduct is hard to imagine. For years, Tenaris wielded three patents directed to "quenched-and-tempered" coiled tubing—the '256, '074, and '075 patents—to bar competitors from the market. But another company, Southwestern, had developed that technology first, calling it CYMAX. Tenaris knew that. It had purchased Southwestern's assets, and based its product, "BlueCoil," on CYMAX. And it possessed public Southwestern documents disclosing ***each*** limitation Tenaris told the PTO distinguished its claims from the prior art. Those documents disclosed the claimed "specific chemistry," "full body heat treatment," "homogenous microstructure," and resulting enhancements to "yield strength," "fatigue strength," and "running distance" that Tenaris claimed it invented.

For years, Tenaris hid the CYMAX documents from the PTO. When the PTO rejected the '256 patent as obvious, the lead inventor, Martin Valdez, submitted a declaration asserting that the patent's benefits could "only be achieved" through the "controlled chemistry" and "full body heat treatment" "processing techniques recited in" the claims. Valdez knew those elements were disclosed in the CYMAX documents. So he told Tenaris's counsel it would not be a "good idea to disclose" the documents to the PTO. Appx3258.

For the ’074 and ’075 patents, Tenaris’s strategy was more brazen. Tenaris’s new counsel insisted that the CYMAX documents had to be disclosed: An “IPR” asserting them as prior art, they advised, “would likely prevail.” Appx5542. After months of scheming about how to avoid disclosure, Tenaris gave the PTO a doctored version. It divided a single, spiral-bound document into six parts, omitted the pages that disclosed the chemical composition that Tenaris’s patent claimed as novel, omitted title pages and dividers indicating the structure of the document, and submitted other parts, out of order, as ostensibly separate references.

Tenaris finally disclosed the complete CYMAX documents while prosecuting further continuations (the ’326 and ’407 applications). But the PTO rejected those claims—which are patentably indistinct from those of the ’256 patent—based on “Zernick,” a document Tenaris’s expert admits is virtually identical to one of the CYMAX documents. Appx11795-97; Appx11828-30.

The district court properly granted summary judgment on Global’s inequitable-conduct claim. It found the CYMAX documents “satisf[y] even the strictest criteria” of “materiality” and that Valdez’s direction to withhold them was “rare[]” “direct evidence” of intent to deceive. Appx13-14. That inequitable conduct rendered the ’256 patent—and the related ’074 and ’075 patents—unenforceable.

Tenaris has no defense. It denigrates Southwestern's CYMAX. But it knows that any shortcomings of that product resulted from peculiarities of Southwestern's production processes unrelated to the CYMAX documents' disclosures. Tenaris urges that a full trial might have persuaded the district court the documents were immaterial. But it cannot explain how that could be. The CYMAX documents Tenaris withheld disclosed the very limitations Valdez identified as novel to overcome an obviousness rejection. Tenaris makes no effort to distinguish the '256 patent claims from the CYMAX documents, or other art before the Examiner.

Tenaris points to the '326 and '407 applications, but overlooks that the PTO rejected the claims based on Zernick, and allowed claims to issue only after Tenaris added limitations absent from the '256 patent. Tenaris insists the CYMAX documents were cumulative of Chitwood, which it disclosed. But the CYMAX documents disclose a specific chemistry, which Chitwood does not. Precedent forecloses Tenaris's argument that it could avoid disclosing stronger prior art as "cumulative" of weaker prior art it had disclosed. And Tenaris's reliance on its selective disclosures in prosecuting the '074 and '075 patents as cleansing the taint of misconduct is backwards. That continued fraud confirms that the '074 and '075 patents are unenforceable as well.

As to intent, Tenaris offers an "innocent" explanation—that Valdez did not disclose the CYMAX documents because he thought CYMAX was outside the

claimed carbon range and disclosing it would "confuse" the Examiner. Even accepting that as true—and it is not—the CYMAX documents disclosed other limitations Valdez asserted were novel. Valdez never explained why he thought those teachings were immaterial. Any reasonable factfinder would agree that he, and Tenaris, acted with intent to deceive the PTO.

## ISSUES PRESENTED

1. Whether the district court correctly held the '256 patent unenforceable due to Tenaris's inequitable conduct.

2. Whether the district court correctly held Tenaris's inequitable conduct in prosecuting the '256 patent infected the '074 and '075 child patents, rendering them unenforceable.

3. Whether Tenaris's affirmative egregious misconduct independently renders its patent family unenforceable.

## STATEMENT OF THE CASE

This case arises from a supposed invention in connection with "coiled tubing" used to service wells in the oil-and-gas industry. Appx5825(¶19).

### I. COILED-TUBING TECHNOLOGY AND SOUTHWESTERN'S ADVANCES

Coiled tubing consists of continuous steel pipe, usually between 1" and 3.5" in diameter, that can be tens of thousands of feet long. Appx5824(¶18). Flat strips of steel are welded to form a single, continuous strip. Appx5832-33(¶¶37, 39). The strip is then rolled into a tube and welded along the seam to form a "string," and

wound around reels. Appx5834 (¶41); Appx5862 (¶¶103-05).



Appx5825 (coiled tube on a reel).

Coiled tubing must be strong and durable. Tubes must have high "yield strength," allowing them to be pushed into long wells without breaking, and to deliver high-pressure fluids without rupturing. Appx5977-79 (¶¶8-10); Appx5982-83 (¶¶14-16). Tubes also must have long "fatigue life," so they can be unwound and rewound repeatedly without cracking. Appx5978 (¶10). Joints where individual segments are welded together are particularly vulnerable. Appx5978 (¶10).

### A. Southwestern Invents Quenched-and-Tempered Coiled Tubing

For decades, coiled-tubing manufacturers struggled to increase yield strength and fatigue life. Appx9287(¶24); Appx5978-79(¶10); Appx5982(¶14). In the 1990s, Southwestern Pipe Inc. ("Southwestern") invented a novel process that increased fatigue life dramatically. After forming a string of tubing (a so-called "green string"), Southwestern: (1) applied heat treatment along the ***entire string***, (2) quenched the string to cool it, (3) coiled it on a reel, and (4) tempered it in a furnace. Appx5301. That full-body heat treatment produced tubing with increased yield strength, and higher uniformity of the steel microstructure and thus longer fatigue life. Appx5843(¶¶59-60); Appx5982-83(¶¶14-15).

Southwestern sold tubing manufactured using its new process as "CYMAX" (CYMAX 80 and 100). Appx5274; Appx7743-44. CYMAX "showed good fatigue performance in the field." Appx7207-08. It lasted "three to six times" longer than conventional tubing. Appx5256. Southwestern customers ran CYMAX strings over 1,000,000 feet. Appx5256; Appx7204.

Southwestern disclosed its quench-and-temper process in public marketing materials and technical publications. Those documents included a technical paper (the "Thompson Paper"), Appx5253-72, and a brochure (the "CYMAX brochure"), Appx5273-312 (together, the "CYMAX documents"). The CYMAX brochure was

bound with a "spine" holding the pages together, and provided as a "sales package" to customers. Appx8403(¶194); Appx8404(¶197); Appx8410(64:19-24).

The CYMAX documents disclose detailed technical information. Appx5253-312. Page 30 of the brochure reveals the "[c]hemistry" and "steel specification" for CYMAX 100, including the carbon content (0.13-0.17% by weight ("wt.%")), and the yield strength ("100,000 PSI"). Appx5282.

### B. Tenaris Acquires Southwestern's Assets and Copies Its Quench-and-Temper Process

Despite its advantages, CYMAX was not a commercial success. In the mid-1990s, Southwestern exited the coiled-tubing business. Appx5839(¶51). In 2006, Tenaris acquired Southwestern's former assets. Appx4028; Appx2085. Over the next decade, Tenaris used those assets and what it learned of the CYMAX process to reintroduce quenched-and-tempered tubing under its own "BlueCoil" brand. Appx2463(62:2-18); Appx2489; Appx5316(27:8-29:10); Appx5319.

In September 2010, a Tenaris employee discovered the CYMAX furnace among assets acquired from Southwestern and informed other Tenaris employees—including two inventors on the patents-at-issue, Bruce Reichert and Jorge Mitre. Appx2489-90. One employee recalled that Southwestern had used the furnace for heat-treating and "quenching" "carbon coiled tubing." Appx2490. Mitre instructed his team to "evaluate" how that process could be used and "seriously consider [it] as an option." Appx2490.

Mitre emailed his colleagues soon after, suggesting they could "[c]hange" Tenaris's existing manufacturing process by taking green string, "increas[ing] [its] temperature" above a critical temperature, "quench[ing]" it, and "temper[ing]" it in a "furnace." Appx2492. Mitre attached a "sketch" showing how he "imagine[d] [the] process" would work. Appx2492. The sketch reflected the process Southwestern had used to make CYMAX. *See* Appx2459 (33:16-21). Referencing pictures of the CYMAX furnace, Mitre explained that "heat treatment for coils" had been "used in the past to treat carbon strings." Appx2492. Years later, in 2015, when Tenaris was launching BlueCoil, Mitre forwarded those emails to his team, commenting that these "are the emails that started the development of BlueCoil." Appx2489.

In December 2012, William Clark, a Tenaris employee who once worked for Southwestern, reached out to Reichert. Appx8970. Clark "remember[ed] quench and tempered tubing well." Appx8970. Clark told Reichert "all the good stuff" about CYMAX and provided him "the CYMAX 100 sales . . . brochure." Appx2463 (63:7-21); *see* Appx2458 (27:4-28:11).

## II. TENARIS FRAUDULENTLY OBTAINS A PATENT ON CYMAX TECHNOLOGY

### A. The Inventors Discuss the CYMAX Documents Extensively But File the '256 Patent Application Without Disclosing Them

Reichert disseminated the CYMAX documents within Tenaris, including to other putative inventors, Jorge Mitre and Martin Valdez. Appx5321-22; Appx8778.

Reichert described CYMAX as the "world's first Q&T [quenched-and-tempered] coiled tubing," and directed his colleagues to "look at the chemistries" for "CYMAX 100" on "page 30" of the CYMAX brochure. Appx7656. Valdez sent the documents to a fourth putative inventor, Gonzalo Gomez. Appx5321-22; Appx8778; Appx8976; Appx9039. He directed Gomez to investigate the "carbon" content of the CYMAX steel, and they discussed "CYMAX 100" with Reichert. Appx2547. The putative inventors forwarded the CYMAX documents to Tenaris's IP manager and its patent prosecution counsel. Appx7791 (18:1-21); Appx2565-66.

In February 2014, Tenaris filed a patent application (issued as the '256 patent), listing Valdez, Mitre, Reichert, and Gomez as inventors. Appx1057. It submitted 573 prior-art references to the PTO, but not the CYMAX documents. Appx1057-62; Appx3008-14.

Claim 1 recites:

> A coiled steel tube having improved yield strength and fatigue life at weld joints of the coiled tube,
>
> the coiled steel tube comprising: a plurality of strings welded together end to end by a bias weld and formed into a coiled steel tube, each of the plurality of strips having base metal regions, bias weld joints, and heat affected zones surrounding the bias weld joints,
>
> each of the plurality of welded strips comprising: a yield strength greater than about 80 ksi;
>
> a composition comprising iron and:
>
> 0.17-0.35 wt. % carbon;

> 0.30-2.00 wt. % manganese;
>
> 0.10-0.30 wt. % silicon;
>
> 0.010-0.040 wt. % aluminum;
>
> up to 0.010 wt. % sulfur; and
>
> up to 0.015 wt. % phosphorous; and
>
> wherein the coiled steel tube has a final microstructure formed from a full body heat treatment applied to the coiled steel tube;
>
> wherein the final microstructure comprises a mixture of tempered martensite and bainite;
>
> wherein the final microstructure of the coiled steel tube comprises more than 90 volume % tempered martensite in the base metal regions, the bias weld joints, and the heat affected zones;
>
> wherein the final microstructure across all base metal regions, bias weld joints, and heat affected zones is homogenous; and
>
> wherein the final microstructure comprises a uniform distribution of fine carbides across the base metal regions, the bias weld joints, and the heat affected zones.

Appx1090 (23:2-34).

Those limitations correspond directly to the CYMAX documents' disclosures. The CYMAX brochure discloses "higher strength, longer lasting coiled tubing," as in the claim's preamble. Appx5274; Appx5280; Appx5282. The claimed yield strength (>80 ksi) corresponds to CYMAX's 80 and 100 ksi versions. Appx5280; Appx5282. So does the claimed chemical composition. Tenaris claimed 0.17-.035 wt.% carbon, and CYMAX disclosed 0.17 wt.%. Appx5282. The proportions of manganese, sulfur, silicon, and phosphorous are the same or overlap. Appx5282.

The claimed "full body heat treatment" is disclosed. Appx5282; *see* Appx5274 ("entire string . . . is fully treated"). So is the claimed "homogenous" "microstructure" of "martensite." *See* Appx5291 ("consistent microstructure" of "tempered martensite").[1]

Tenaris disclosed "Chitwood," which describes CYMAX 100 without referring to it by name or disclosing it was sold commercially. Appx6503; Appx6505; Appx3464. Chitwood discloses use of a "low-carbon 4100 series steel." Appx7231 (88:9-89:4); Appx3463. The CYMAX brochure, by contrast, discloses a special "modified" "4100 series, chrome-moly alloy" steel and its particular composition. Appx5282.

### B. The Examiner Rejects the '256 Patent Application as Obvious

The Examiner initially rejected all claims of the '256 patent application as obvious in view of two references, Valdez '363 and Dubois. Appx5387. The Examiner found that "the concentrations of elements of the steel" in Valdez '363 are "within the ranges of claims 1-2." Appx5393. She also noted that Valdez '363 and Dubois taught the claimed production process: "weld[ing]" and "heat treatment." Appx5387-88. And the Examiner found that, because of inherency, those claimed characteristics and the claimed production process made obvious the claimed properties of the tubing, such as the "range of tempered martensite," "homogenous"

[1] Martensite is one of several crystalline "phases" of steel. Appx4929.

"final structure," and "yield strength." Appx5388-89. She explained that, where prior art teaches the claimed material "structure" and production "process[]," the "claimed properties" of the material are "presumed to be inherent" to that structure and process. Appx5389-90 (citing M.P.E.P. § 2112.02). Insofar as Valdez '363 and Dubois teach the "structures, materials, the common property of yield strength and the method of making the product" of the '256 patent, resulting properties, such as "uniform distribution of fine carbides" and "fatigue life at the bias welds," could not distinguish the prior art. Appx5390-91.

In February 2017, the Examiner interviewed Tenaris's counsel, Daniel Fischer. Appx5414. Fischer urged that the claimed "homogenous microstructure" distinguished the invention. Appx5417. The Examiner disagreed, explaining that the "recitation of a newly discovered property, inherently possessed by things in the prior art," was insufficient. Appx5414. She insisted that any "alleged difference in properties or microstructures" in the '256 patent claims compared to the prior art "must be supported by a declaration or affidavit." Appx5414.

### C. Tenaris Overcomes the Obviousness Rejection by Emphasizing Features Disclosed in the CYMAX Documents While Withholding Those Documents

In response to the Examiner's rejection, Tenaris filed an affidavit from Valdez pursuant to 37 C.F.R. § 1.132. Appx5490-96. Counsel asked Valdez for evidence of others "struggling to achieve the claimed coiled tube." Appx7721. Valdez sent

him the CYMAX documents, drawing his attention to the "chemistry" disclosed on "page 30" of the brochure. Appx3258; Appx7721. Valdez added, "***I am not sure it is a good idea to disclose this document***." Appx3258; Appx7721 (emphasis added). Tenaris filed the declaration without the CYMAX documents. Appx5490-96.

To distinguish the prior art asserted by the Examiner, Valdez's declaration focused on the "compositions and processing techniques recited in Claim 1." Appx5491. Valdez identified two things "recited in the claims" as the "***critical features***"—the "specific ***chemistry*** and specific ***heat treatment***." Appx5492 (emphasis added). He did not disclose that the CYMAX documents taught chemistry that overlapped with the claimed ranges for every element (carbon, manganese, silicon, and sulfur) except aluminum. *Compare* Appx1090 (23:12-18), *with* Appx5282. Nor did he disclose that the CYMAX documents taught the claimed "full-body heat treat[ment]." Appx5282.

Touting the claimed "full body heat treatment," Valdez urged that it produced a "homogenous" "final microstructure across all base metal regions, bias weld joints, and heat affected zones." Appx5491-96. That homogenous microstructure, Valdez said, is responsible for the tubing's "high yield strength and high fatigue strength," which Valdez declared "ha[d] not been achieved before." Appx5491-92. He did not disclose that the CYMAX documents described a "full-body heat treated" process to produce a "consistent microstructure of tempered martensite." Appx5291; *see*

Appx5274 ("entire string, including splice welds, is fully treated to provide a microstructure that . . . provides superior cycling properties"). He did not disclose that the CYMAX documents described CYMAX 100 as achieving a yield strength higher than the claims' (100 ksi) and a longer "fatigue life" than conventional tubing. Appx5254-55; Appx5264-65; *see* Appx5311.

As evidence of improved yield strength and fatigue life, Valdez averred that "the coiled tube recited in Claim 1 can run more than 1,000,000 feet," which according to him was "double" the running distance of prior-art tubes, which could "only run approximately 500,000 feet." Appx5493. He withheld the CYMAX documents' disclosure that "strings of CYMAX . . . have run over 1,000,000 running feet." Appx5256.

The Examiner then allowed the '256 patent claims. Appx5498-505. She explained her change in position by pointing to Tenaris's April 25, 2017 submission, including Valdez's declaration. Appx5503. The '256 patent issued on October 31, 2017. Appx1057.

## III. GLOBAL DEVELOPS NON-INFRINGING, LOW-CARBON QUENCHED-AND-TEMPERED COILED TUBING

Around early 2016, while Tenaris's '256 patent application was pending, Global began developing its own quenched-and-tempered tubing, DURACOIL. Appx10829(49:3-6). Global developed low-carbon and high-carbon versions, DURACOIL 110 and 130. Appx10245-46(66:7-73:15). Designed with an eye to

the CYMAX prior art, DURACOIL 110 has a lower carbon concentration than the 0.17-0.35 wt.% in the ’256 patent. Appx10246(70:1-71:6); Appx5094(193:9-19).

In March 2017, Global unveiled DURACOIL to the public. Appx10873-74; Appx10830(186:20-188:6); Appx10837(67:3-6). In response, Tenaris went on the “attack.” Appx10873-74. As discussed above, it submitted the false and misleading Valdez Declaration to overcome the PTO’s obviousness objection. In it, Tenaris told the PTO that Global was “attempting to copy the [’256 patent’s] claimed tubes.” Appx7703. In the ensuing days and weeks, Tenaris executives “pass[ed] the message of potential violations” to mutual customers, warning them to “***watch out***” if they bought DURACOIL. Appx10869 (emphasis added); Appx10830-31(186:20-188:6; 206:10-207:16).

In July 2017, Global launched DURACOIL 110, its low-carbon product, which did not meet the ’256 patent claims. Appx2343; Appx5987-88(¶23). On October 30, 2017, Global filed this suit, seeking a declaratory judgment of noninfringement of the ’256 patent. Appx2001-11.

## IV. TENARIS OBTAINS THE ’074 AND ’075 PATENTS BY DISCLOSING DOCTORED VERSIONS OF THE CYMAX DOCUMENTS

### A. Tenaris Obtains the ’074 and ’075 Patents To Cover Low-Carbon Quenched-and-Tempered Coiled Tubing

To cover Global’s low-carbon DURACOIL 110 tubing, Tenaris filed the ’074 and ’075 patent applications, as continuations of the ’256 patent application, on July 31, 2017 and April 2, 2018, respectively. Appx1091; Appx1126.

With those applications pending, Tenaris retained new prosecution counsel, Fish & Richardson. Counsel quickly realized there was a problem. Appx5542. In a January 2019 email, a Tenaris attorney explained that “Fish thinks the CYMAX Documents come close to the inventions included in the continuations, and therefore, ***we need to disclose them to the patent office***.” Appx5542 (emphasis added). Even if the continuations issued, Global “***would likely prevail in an IPR***” based on the CYMAX documents, “invalidat[ing] the continuations and even perhaps the ’256 [patent].” Appx5542 (emphasis added). Counsel also advised Tenaris of its duty to disclose material information to the PTO, its duty of candor, and the risk of an inequitable conduct ruling. Appx5545-49; *see* Appx5551.

Tenaris spent ***months*** scheming up reasons to withhold the documents. It resisted disclosure on the theory that the documents had not been made public. Appx5646. Counsel disagreed: “It appears from the face of the documents that they have been disclosed or were intended for disclosure.” Appx5545; *see* Appx5546-

Appx5549 (documents all "bear several 'earmarks' of publication"); Appx5281 (addressing "the purchaser").

Asked if doubts about the documents' publication might excuse disclosure, a "Senior Principal" at the firm minced no words: "Re-read Rule 56 [and] . . . [n]ote the absence of any qualifying language such as '. . . but only if you're absolutely certain that it qualifies as prior art.' You state below that the reference is material. It sure sounds to me like 'intent to deceive' . . . if the non-discloser had any reasonable doubt about the reference's prior art status but withholds it. And as you know, materiality + intent = inequitable conduct." Appx10131; *see* Appx10127 (referring to Federal Circuit "inequitable conduct" precedent).

Counsel underscored that Tenaris at least had a "duty to investigate" whether the "CYMAX references were publicly disclosed." Appx5549. It urged Tenaris to interview "Mr. Reichert, and any other Tenaris employee who Tenaris reasonably believes may have direct knowledge of the provenance of the documents," to ensure they "ha[ve] no information" suggesting the documents were public. Appx5549. Counsel also advised that "a Fish attorney should be [present] for each of these interviews." Appx8416. Tenaris never conducted those interviews. Appx5631(215:23-216:17); Appx5632-33(228:7-230:3); Appx8426(334:3-13); Appx8432(34:4-8).

Tenaris also resisted disclosure on the theory that the CYMAX documents were cumulative of Chitwood. *See* p. 11, *supra*. But Tenaris's R&D director, Hector Quintanilla, told a Tenaris attorney that the CYMAX documents disclosed a "more explicit" chemistry and "more information" than Chitwood, including the claimed "90+% tempered martensite." Appx5551.

Tenaris eventually submitted a doctored version of the documents. Rather than submit them as they were found, it divided the CYMAX brochure (a single, spiral-bound volume) into six parts—omitting title and divider pages indicating the original structure—and submitted five parts, out-of-order, as separate references. Appx3140; Appx3143; Appx5562. It withheld the sixth part, specifications of CYMAX's chemistry. Appx3140; Appx3143; Appx5562. That included page 30 of the brochure, which detailed CYMAX 100's chemistry (unlike Chitwood). Appx5282. That was the page Valdez was talking about when he told Tenaris's counsel it was not a "good idea" to submit the document. Appx5562; Appx7169-73 (¶¶ 306, 312, 346).[2]

[2] The lead Fish & Richardson attorney on the matter testified that he ultimately agreed to withhold those specification pages because Tenaris "represented" that the "chemical compositions were confidential." Appx7227 (118:16-22). He "relied on the assertions of the Tenaris representatives [he] dealt with to consider these confidential and that they were nonpublic." Appx7227 (118:16-22); *but see* pp. 16-17, *supra*.

The Examiner allowed the ’074 and ’075 patents. Appx6664-65; Appx6673; Appx1125; Appx1160-61.

### B. The PTO Rejects the ’326 and ’407 Application Claims Based on a Reference Indistinguishable from the CYMAX Brochure

In August 2019, Tenaris filed two more continuations, Application Nos. 16/538,326 and 16/538,407. Appx6348; Appx6433. The PTO rejected the claims as “not patentably distinct from . . . the claims of the ’256 patent.” Appx11772-73; Appx11804-05. Tenaris submitted a “terminal disclaimer over U.S. Patent No. 9,803,256.” Appx11788; Appx11821.

Then, Tenaris finally disclosed the CYMAX documents, along with another reference (“Zernick”). Appx10362(¶163). Zernick is a version of a technical report in the CYMAX brochure—the documents are “almost the same,” according to Tenaris’s own expert. Appx8296(209:1-17). Even then, Tenaris buried the CYMAX documents (totaling 60 pages) amongst ***10,000 pages*** of other materials. Appx6352; Appx6437.

The Examiner rejected the claims, based on Zernick (*i.e.*, the CYMAX brochure) and “Stagg.” Appx11795-97; Appx11828-30. Zernick, he said, “teaches a method for the full body heat treatment of coiled tubing with a tempered martensite structure and a yield strength of 120 [to] 100 KSI . . . with a homogenous microstructure.” Appx11796; *see* Appx11829. Stagg, cited on the face of the ’256 patent, discloses “bias welding” for forming continuous tubes. Appx11796; *see*

Appx11829. The Examiner found that it would have been "obvious" to combine Zernick's (*i.e.*, CYMAX's) heat-treatment with Stagg's improved welding to attain "all aspects of" the '326 and '407 claims. Appx11796; *see* Appx11829.

Tenaris did not distinguish Zernick and Stagg. Instead, it ***amended the claims*** to add limitations nowhere in the original claims (or the '256 patent). Appx8645; Appx8651; Appx8623-24. The amended claims recited additional processing, including an "austenitization cycle performed at temperatures at or above 900 degrees C to achieve dissolution of iron carbides in the tube and at or below an upper temperature threshold to limit a grain size to below 20 µm." Appx8645; Appx8651; Appx8623-24. Only ***after*** those amendments did the '326 claims issue as U.S. Patent No. 11,377,704. Appx6410-16.

## V. PROCEEDINGS BELOW

Global filed this declaratory-judgment action when the '256 patent issued. *See* p. 15, *supra*. Tenaris counterclaimed for infringement of the '256 patent. Appx8719-23 (¶¶48-66). After obtaining the '074 and '075 patents, Tenaris added infringement claims for them. Appx2202-08. When discovery alerted Global to Tenaris's fraud, Global amended its complaint to include inequitable conduct claims and a *Walker Process* claim. Appx2058-59 (¶¶146-52).

### A. Global Obtains Privileged Documents Under the Crime-Fraud Exception

Suspecting Tenaris had withheld material art from the PTO, Global moved to compel production of privileged documents related to the Valdez declaration and CYMAX. Appx3270-76; Appx2397-401. The magistrate judge ordered disclosure, invoking the crime-fraud exception to privilege. Appx4039-50. She found it "particularly significant" that, when Tenaris finally submitted the CYMAX documents in prosecuting the '074 and '075 patents, it did not submit them "as originally maintained," but "reorganized the material, removing the title page, divider pages, and entire Specifications section, which purportedly contained information on overlapping chemistries." Appx4042-43.

The magistrate judge also found Valdez's comment that it was not "a good idea" to disclose CYMAX was "***a rare example of direct evidence of an intent to defraud***." Appx4044 (emphasis added). Tenaris claimed Valdez was referring to confidentiality concerns or cumulativeness over Chitwood when he said that. Appx4044-45. But the magistrate judge found not a "shred of evidence to support [those] hypothetical inferences." Appx4044-45. The "statement speaks for itself," she explained, as "direct evidence of fraud." Appx4044-45.

"Valdez's knowledge of [the CYMAX] prior art, knowledge of its materiality given the inventors' prior discussions of overlapping chemistries and the PTO's rejection of the '256 patent on obviousness grounds based on chemistry overlap with

another patent"—along with other evidence—supported the conclusion that Valdez's "statement suggesting not to disclose CYMAX brochure to the PTO is evidence of an intent to defraud." Appx4045. Thus, the magistrate judge held, "to the extent any inference is required, intent to defraud the PTO is the single most reasonable inference to be drawn." Appx4044-46.

Tenaris's argument that it had a "good faith belief that the documents were confidential" was "not credible." Appx4046. Clark, the only witness with personal knowledge (having worked at Southwestern) testified that the CYMAX brochure was distributed publicly. Appx4047 (citing Appx2473). The magistrate judge also rejected Tenaris's contention that the documents were cumulative of Chitwood. Appx4047-48. She found that argument "belied by the fact that Tenaris submitted the CYMAX brochure to the PTO in prosecuting the Children Patents." Appx4047-48. The district court adopted that ruling over Tenaris's objection. Appx30749 (92:2-9); Appx1030 (8/25/2021 Minute Entry).

### B. The District Court Grants Global's Summary Judgment Motion

The parties filed cross-motions for summary judgment. Appx5106-36; Appx6258-91. Finding unmistakable evidence of inequitable conduct, the district court granted Global's motion. Appx14-16. It ruled that the record could support no conclusion other than that Tenaris defrauded the PTO by withholding the CYMAX documents during prosecution of the '256 patent. Appx12-15. The

documents "satisfie[d] even the strictest criteria" for materiality. Appx13. In particular, the CYMAX brochure listed "chemistry" that "overlap[ped] with the carbon content in Tenaris's '256 patent." Appx9.

The court rejected Tenaris's argument that Chitwood rendered the CYMAX brochure cumulative, because Chitwood does not "include[ ]" "the precise chemical specification that the CYMAX brochure include[s] at page 30." Appx13. It further explained that Tenaris would not have disclosed even pieces of the documents in prosecuting the '074 and '075 patents if they were immaterial. Appx14-15.

The district court held that the record indisputably "establish[ed] intent." Appx13. Valdez's statement that he was " 'not sure it [was] a good idea to disclose' " the brochure was "stark evidence of the intent fork of inequitable conduct," of a kind "[r]arely" seen. Appx14. A reasonable factfinder could draw no conclusion from Tenaris's decision to withhold the CYMAX brochure "other than intent to deceive" the PTO. Appx14.

The district court found "Tenaris's misconduct was infectious," rendering the child '074 and '075 patents unenforceable. Appx15. The court noted Tenaris's "continued" "fraud": When Tenaris disclosed the CYMAX documents in prosecuting the child patents, it "did not submit the CYMAX material as it had been originally maintained nor did [it] provide pages detailing the steel chemistry to the PTO." Appx9; Appx15.

The district court did not reach Global's argument that Tenaris's conduct constitutes affirmative egregious misconduct under cases like *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013). Appx15. The court entered final judgment. Appx1-3. Tenaris's appeal and this cross-appeal followed.

## SUMMARY OF ARGUMENT

**I.** Inequitable conduct bars enforcement of Tenaris's '256 patent. Tenaris knowingly and deliberately withheld material information from the PTO with the intent to deceive.

**A.** The district court correctly held that the CYMAX documents satisfied "even the strictest criteria" for "materiality." The CYMAX documents contradicted the Valdez Declaration's assertions regarding the novelty of the '256 patent. To overcome an obviousness rejection, Valdez averred that Tenaris's purported invention was distinct from prior art with respect to its "specific chemistry" and "specific heat treatment." But the CYMAX documents disclose overlapping chemistry, and the claimed "heat treatment." They also disclosed properties of the coiled tubing that Valdez represented were unique to Tenaris's invention, including a homogenous microstructure, high yield strength, and high fatigue strength. No reasonable juror could have found the CYMAX documents immaterial.

**B.** Tenaris withheld the CYMAX documents with the specific intent to deceive the PTO. Tenaris knew the documents were material. That is why Valdez

warned counsel that, it was " 'not . . . a good idea to disclose' " them. Given the prior obviousness rejection and the CYMAX documents' disclosures, only one inference is reasonable: Valdez understood his declaration and Tenaris's patent would be undermined by the limitations disclosed in the CYMAX documents. As the district court and magistrate judge both concluded, such "stark," "direct evidence of fraud" is rare. The evidence regarding Tenaris's interaction with the PTO confirms that conclusion. And Tenaris's after-the-fact rationalizations are insufficient. The district court's ruling that the '256 patent is unenforceable should be affirmed.

**II.** The child patents are likewise unenforceable. Tenaris's inequitable conduct infected the '074 and '075 patents because the subject matter of those patents is not "sufficiently distinct" from the '256 patent. The '256 patent, and the '074 and '075 patents, concededly have "patentably indistinct" claims directed to the same "subject matter."

Tenaris's partial disclosure of the CYMAX documents during the prosecution of the child patents fails to cure its misconduct. Far from informing the PTO of its prior misrepresentations, that selective disclosure ***furthered*** the fraud by continuing to deceive the PTO about the CYMAX documents' import. Tenaris submitted a doctored, partial version of the CYMAX brochure, omitting the key specification pages that disclosed CYMAX's chemistry. The district court's ruling regarding the '074 and '075 patents should be affirmed.

**III.** Tenaris's affirmative egregious misconduct warrants holding all three patents unenforceable. Tenaris's submission of an unmistakably false affidavit, and its intentionally incomplete and deceptive submissions to the PTO, make this a textbook case of egregious misconduct. Tenaris fails to advance even a passing explanation for its long-running fraud on the PTO, which contradicted the advice of counsel. This Court has held patents unenforceable based on far less egregious facts.

## ARGUMENT

The defense of inequitable conduct bars patent enforcement where the patentee "defraud[ed] the PTO" by "knowingly and deliberately" withholding material information to obtain the patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). The district court properly granted summary judgment that Tenaris's inequitable conduct bars patent enforcement here.

To overcome an obviousness rejection, Tenaris filed an affidavit from the lead inventor, Martin Valdez, asserting that the claimed "specific chemistry and specific heat treatment" distinguished the prior art, yielding results that had "not been achieved before in the industry." Appx5492. But Valdez knew the CYMAX documents in his possession belied those assertions. They disclosed the chemistry. They disclosed the "full body heat treatment." They disclosed the results—yield strength over 80 ksi, "high fatigue strength," and being able to run over 1,000,000

feet—that Tenaris told the PTO had "not been achieved before." Appx5492. Aware that the CYMAX documents would preclude the patent, Valdez told counsel it was "not . . . a good idea to disclose" them. Appx3258. So, Tenaris withheld the documents.

Tenaris then became more brazen. Pursuing continuations to expand patent scope and ensnare competing products, Tenaris ignored new counsel's repeated warnings to disclose. Counsel advised that Tenaris "need[ed] to disclose [the CYMAX documents]"; warned that the documents likely would "invalidate the continuations and even perhaps the '256 [patent]" in any IPR; and rejected, over two months, every theory Tenaris concocted for non-disclosure. Appx5542; *see* pp. 16-17, *supra*. "It sure sounds to me like 'intent to deceive,'" declared one senior partner, warning colleagues that "materiality + intent = inequitable conduct." Appx10131. But Tenaris still chose not to come clean, submitting an incomplete and manipulated version of the documents. Even as it distinguished the prior art based on different chemistry, Tenaris excised the pages of the CYMAX brochure disclosing the claimed chemistry. Appx3140; Appx3143. And it sliced the remainder of the CYMAX brochure into parts, removed title and divider pages indicating the original organization, and submitted them, out-of-order, as separate references. Appx3140; Appx3143.

The district court correctly recognized this as one of the "rare[]" occasions where deceptive intent and materiality were clear on the face of the record. Appx13-14. It correctly held that the unenforceability of the '256 patent infected the '074 and '075 patents directed to the same subject matter. Appx14-15. Tenaris's misconduct when prosecuting the '074 and '075 patents—submitting doctored, incomplete, and reorganized pieces of the CYMAX brochure—exacerbated rather than attenuated the fraud. That makes this precisely the sort of orchestrated scheme to defraud that inequitable conduct was designed to address.

It is also a glaring example of affirmative egregious misconduct. The Valdez Declaration is a false affidavit—the archetype of egregious misconduct. And in prosecuting the '074 and '075 patents, Tenaris doctored the CYMAX documents to conceal their significance and omit critical pages. It is hard to imagine conduct more egregious than submitting a false affidavit and then submitting the documents in doctored form. The district court committed no error in so recognizing at summary judgment.

<u>Standard of Review</u>. A grant of summary judgment is reviewed *de novo*. *See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1185 (Fed. Cir. 1993). Summary judgment cannot be defeated based on "conclusory statements or completely insupportable, specious, or conflicting explanations or excuses." *Id.* at 1190. Under Fifth Circuit law, which governs, trial courts have "greater discretion"

to grant summary judgment where, as here, the issue will be tried to the court. *Jones v. United States*, 936 F.3d 318, 321-22 (5th Cir. 2019); *see Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1584 (Fed. Cir. 1995). The trial judge, who would be the factfinder, "'has the limited discretion to decide that the same evidence, presented . . . in a plenary trial, could not possibly lead to a different result.'" *Jones*, 936 F.3d at 321-22 (quoting *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010)).

## I. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT THAT THE '256 PATENT IS UNENFORCEABLE DUE TO INEQUITABLE CONDUCT

Individuals who "participate in proceedings to obtain patents" owe the PTO "'the highest degree of candor and good faith.'" *Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949). That "includes a duty to disclose to the PTO all information known to [the patentee] that is material to the issue of patentability." *Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010) (citing 37 C.F.R. § 1.56). A breach of those duties becomes inequitable conduct when the patentee withholds information with "intent to deceive the PTO" and the withheld information, if disclosed, would have precluded issuance of "a claim." *Therasense*, 649 F.3d at 1290-91.

The district court committed no error in holding, on summary judgment, that Tenaris's conduct clearly met those standards. Tenaris withheld documents that directly contradicted its assertions about the novelty of its supposed invention—

assertions necessary to overcome an obviousness rejection. When pursuing continuations, it defied the warnings of counsel; deliberately doctored documents; and omitted key portions critical to obviousness. And when the PTO learned of the full documents in later proceedings, it rejected as obvious claims indistinguishable from those at issue.

Tenaris complains that the case was resolved on summary judgment. But it never explains how the district court could possibly have resolved any potentially disputable fact differently following a plenary trial. It ignores Fifth Circuit precedent holding that district courts have greater discretion to grant summary judgment where, as here, the issues would be tried to the court anyway and the court believes trial could not change the outcome. And it raises only the sort of "conclusory statements or completely insupportable, specious, or conflicting explanations or excuses" that cannot defeat summary judgment anyway. *Paragon*, 984 F.2d at 1190.

For example, Tenaris disputes materiality by urging that the PTO allowed certain claims in the '326 and '407 continuations, after it disclosed the CYMAX documents. Tenaris.Br.55-59. But Tenaris omits a key fact: The PTO ***rejected*** the original '326 and '407 claims—claims the PTO deemed patentably indistinct from the '256 patent claims here—based on a reference ("Zernick") that was a virtually identical version of a report in the CYMAX brochure Tenaris previously withheld.

Appx11795-97; Appx11828-30. The PTO allowed some claims only after Tenaris ***amended*** them to ***add limitations*** absent from the ’256 patent and other continuations. Appx6410-16; Appx6495-501. The history of the ’326 and ’407 applications thus ***confirms*** materiality.

Tenaris’s argument that the CYMAX documents are cumulative fares worse still. Chitwood discloses “4100 series” steel. But the CYMAX documents disclose a specific “chemistry” for a “***modified***” “4100 series” steel—chemistry nearly indistinguishable from the chemistry Tenaris invoked as novel. Appx5282. As a matter of law, the CYMAX documents were not cumulative. And Tenaris’s argument is foreclosed by *Belcher Pharmaceuticals, LLC v. Hospira, Inc.*, 11 F.4th 1345, 1352-53 (Fed. Cir. 2021).

Tenaris is mistaken that summary judgment cannot be granted on the issue of intent. And its argument that the district court improperly assessed Valdez’s credibility ignores the record. Valdez’s rationale—that he (incorrectly) believed that CYMAX was outside the claimed ***carbon*** range—cannot alter the result. The CYMAX documents would be material regardless. The PTO had already found ***all the limitations*** obvious, and the CYMAX documents contradicted Valdez’s position on a host of them, not just carbon.

### A. The PTO Would Not Have Issued the ’256 Patent Had Tenaris Disclosed the CYMAX Documents

Tenaris’s non-disclosure of the CYMAX documents satisfies “even the strictest criteria” for “materiality.” Appx13. Tellingly, Tenaris asserts that Valdez believed CYMAX was “outside our carbon range” in addressing ***intent***, Tenaris.Br.46, but nowhere attempts to distinguish the ’256 patent claims from the CYMAX documents in addressing ***materiality***, Tenaris.Br.51-65. And while Tenaris points to the ’326 and ’407 applications, their history makes materiality clearer still.

#### 1. *Disclosure of the CYMAX Documents Would Have Precluded Issuance of the ’256 Patent*

The CYMAX documents were material: They directly contradict assertions Tenaris made in the Valdez Declaration to secure patent issuance. Under this Court’s precedent, information that contradicts “argu[ments]” the patentee made to “distinguish [the claims] over the prior art” and thereby “obtain [the patent]” is material. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1345 (Fed. Cir. 2013). For example, in *American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185 (Fed. Cir. 2014), this Court found the withheld reference material because it disclosed “the only limitation that [the patentee] claim[ed] as novel.” *Id.* at 1189. Likewise, in *Belcher*, this Court found information material because it revealed that the feature the patentee identified as the “critical improvement over the prior art was

. . . already within the public domain." 11 F.4th at 1353. Here, the CYMAX documents disclose the very elements Tenaris insisted were missing from the prior art.

Specific Chemistry. Valdez's affidavit identified the "specific chemistry" and "specific heat treatment" "recited in the claims" as the "critical features" distinguishing prior "art." Appx5491-95; *see* Tenaris.Br.8 (acknowledging that "steel composition and heat treatment conditions" are key).

But the CYMAX brochure Tenaris withheld discloses the '256 patent's chemistry. As shown below, the ranges describing steel composition for the '256 patent overlap with CYMAX 100 for ***every element*** except aluminum (which is concededly irrelevant[3]):

| Element | '256 patent, claim 1 | CYMAX 100 |
|---|---|---|
| Carbon | 0.17-0.35 wt. % | 0.13-0.17 wt. % |
| Manganese | 0.30-2.00 wt. % | 0.6-0.9 wt. % |
| Silicon | 0.10-0.30 wt. % | 0.30-0.45 wt. % |
| Aluminum | 0.01-0.04 wt. % | - |
| Sulfur | *Up to* 0.010 wt. % | *Up to* 0.005 wt. % |
| Phosphorus | *Up to* 0.015 wt. % | *Up to* 0.025 wt. % |

*Compare* Appx1090(23:12-17), *with* Appx5282. Those overlapping ranges establish obviousness. Where the prior art discloses a range that "overlaps at its end

[3] Tenaris does not argue that the aluminum range distinguishes the prior art. Its VP of R&D admitted that it is "obvious" to include "aluminum" "because . . . you need the aluminum for oxidization. And almost any steel would have residual aluminum." Appx7222.

point" with a claimed range—as here—then the prior art teaches the claimed range. *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997). A patentee is not entitled to claim ranges that encompass the prior art.

Specific Heat Treatment. The CYMAX brochure also discloses the claimed "full body heat treatment" Valdez's affidavit touted as distinguishing Tenaris's invention from the "general knowledge of heat treatment" reflected in Dubois. Appx5491-92; *see* Appx5493 (distinguishing "traditional technology without a full body heat treatment"). Claim 1 of the '256 patent recites nothing more than "full body heat treatment," Appx1090(23:19-21), which is exactly what the CYMAX documents disclose, *see* Appx5274 (CYMAX "consists of a full body heat treated grade of tubing," where the "entire string . . . is fully treated"); Appx5274 (similar).

Homogenous Microstructure. Valdez urged that the "critical chemistry and process conditions . . . generally homogenize the microstructure at the base metal regions, the bias weld joints, and the heat affected zones." Appx5493; *see* Appx5491-92. The CYMAX brochure contains the same teaching. It explains that the "full-body heat treat[ment]" yields a "consistent microstructure of tempered martensite." Appx5282; Appx5291; *see* Appx5274 ("heat treatment in the full coil length" "provide[s] consistent properties"). It also includes testing and microscope pictures showing that the claimed "consistent microstructure" had been achieved.

Appx5291; Appx5298. Tenaris has never suggested that the term "consistent" is different from "homogenous" in this context.[4]

High Yield Strength and Fatigue Strength. Valdez stated that the invention provides a combination of "high yield strength and high fatigue strength," which "ha[d] not been achieved before in the industry." Appx5491-92; *see* Appx5494 ("high yield strength and increased fatigue resistance"); Appx5493 ("increased yield strength while also delivering high fatigue life . . . , which has never been done before."). But the withheld CYMAX documents disclose that CYMAX 100 had high yield strength and greater "fatigue life" than conventional tubing. The yield strength of CYMAX 100 is "100 KSI," higher than the '256 patent's 80 ksi. Appx5254. And in testing, CYMAX 100 lasted "three to six times" longer than conventional "70 KSI" tubing. Appx5256; *see* Appx5296 (CYMAX 100 lasts up to 300 bending cycles, versus 150 for conventional tubing).

To demonstrate the improved fatigue life, Valdez averred that "the coiled tube recited in Claim 1 can run more than 1,000,000 feet," which he claimed was "double" the length of prior-art tubes, which could "run only approximately 500,000 feet." Appx5493. But the CYMAX documents contradicted that, too. They disclose

[4] The Examiner found that Valdez '363 teaches a "homogenous" microstructure. Appx5390. She further found that the "homogenous final microstructure" was presumed to follow from the claimed chemistry and manufacturing process. Appx5390-91 (citing M.P.E.P § 2112.02).

that "several strings of CYMAX 100 . . . have run over 1,000,000 running feet." Appx5256; *see* Appx5260 (same).

* * *

A clearer case of materiality is hard to imagine. The withheld CYMAX documents contradicted each of Valdez's efforts to distinguish the prior art. Tenaris possessed those documents, and the inventors described their discovery of CYMAX as the origin of Tenaris's own product. Appx2492. Far from inventing anything, Tenaris sought to patent what had already been invented. By withholding the CYMAX documents—and falsely claiming the asserted limitations as its own—Tenaris received a patent anyway.

Indeed, the ***only*** basis the Examiner cited for withdrawing her obviousness rejection and allowing the '256 patent was Tenaris's April 25, 2017 submission with the Valdez Declaration. Appx5503; *see* Appx5592(286:21-287:16) (Tenaris's expert confirming declaration was "but-for material" to issuance of '256 patent). The notion that the Examiner would have allowed the claims even if Tenaris had disclosed those documents—which contradicted the very assertions Tenaris made to overcome the prior art—defies credulity. This Court has repeatedly found materiality in similar circumstances. *See Am. Calcar*, 768 F.3d at 1189; *Belcher*, 11 F.4th at 1352-53.

*Belcher* is virtually indistinguishable. There, the examiner rejected claims reciting a pH range of "2.8 to 3.3" in view of prior art disclosing a "'pH range of 3.0 to 4.0.'" 11 F.4th at 1353. The patentee overcame that rejection by stating that the specific pH range was "critical" in producing the invention's benefits. *Id.* The patentee, however, withheld a reference falling within that range. This Court ruled that the patentee's failure to disclose the fact that the invention's "alleged critical improvement over the prior art was . . . already within the public domain" established but-for materiality. *Id.* The same is true here, many times over. Valdez identified various limitations as "critical features" and urged they were absent from the prior art. Appx5492. But he possessed, and withheld, CYMAX documents disclosing ***each of those specific features***.

2. *The District Court Properly Decided Materiality at Summary Judgment, When Tenaris Failed To Create Any Fact Dispute*

According to Tenaris, Global never argued that failure to disclose the CYMAX documents was a but-for material omission. Tenaris.Br.52. Not so: Global argued that the "CYMAX brochure [was] 'But-For-Material'" because it "contradicted" the statements Tenaris made in the Valdez Declaration to overcome the Examiner's "reject[ion]." Appx5126-27. Tenaris suggests that Global was required to show that "the CYMAX brochure," standing alone, "would have led the examiner to deny claims." Tenaris.Br.53. But the Examiner ***had already rejected all the claims***. *See* pp. 11-12, *supra*. Global was required to show only that the

CYMAX documents disclosed the ***specific limitations*** Tenaris identified as the "critical improvement[s] over the prior art" to overcome that rejection. *Belcher*, 11 F.4th at 1353; *see Ohio Willow*, 735 F.3d at 1345; *Am. Calcar*, 768 F.3d at 1189. It was then Tenaris's burden to "offer[] some competent evidence that could be presented at trial showing that there is a genuine dispute as to a material fact." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §2727.2 (4th ed. 2023); *see Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-28 (Fed. Cir. 1984). Tenaris failed to do so.

Tenaris's contention that a "reasonable factfinder" could find non-materiality is both incorrect and irrelevant. Tenaris.Br.51-52. It is irrelevant because, under governing Fifth Circuit law, district courts have wider latitude to resolve issues at summary judgment where they would also be the factfinder at trial. Trial judges may "'decide that the same [undisputed] evidence, presented . . . in a plenary trial, could not possibly lead to a different result.'" *Johnson*, 597 F.3d at 676 (citation omitted); *see Houston N. Hosp. Properties v. Telco Leasing, Inc.*, 680 F.2d 19, 22 (5th Cir. 1982); *Jones*, 936 F.3d at 321-22; *In re Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *Tamini v. Salen Dry Cargo AB*, 866 F.2d 741, 742-43 (5th Cir. 1989) (quoting *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978)). Tenaris's contention that the district court failed to draw every inference in its favor, Tenaris.Br.51-52, is thus irrelevant. District courts are not required to conduct a

useless bench trial to go over the same facts they already have at summary judgment and that already point to a singular result.

Besides, Tenaris points to no relevant facts that, viewed in a different light, could support a different result. It does not address the contradictions between the Valdez Declaration and the CYMAX documents. *See* pp. 32-36, *supra*. Tenaris quibbles with the district court's reliance on Valdez's statement that the CYMAX documents "contain[] 'essentially our chemistry' "; in its view, Valdez meant the chemistry of "Tenaris's conventional tubing," not the putative invention. Tenaris.Br.53 (quoting Appx13). But it does not dispute that the withheld CYMAX documents disclose the actual chemistry of the '256 patent—chemistry Valdez touted as distinguishing the prior art—which is what matters. *See* pp. 32-33, *supra*. Nor does Tenaris identify any limitation included in the '256 patent (or addressed in the Valdez Declaration) absent from the CYMAX documents. And any effort to fill that gap on reply comes too late. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

In that respect, the contrast between Tenaris's arguments on intent and materiality are telling. Addressing ***intent***, Tenaris urges that Valdez "thought CYMAX" was "outside [the claimed] carbon" range, or that it "did not work." Tenaris.Br.46-47 (case altered). But Tenaris makes neither argument to distinguish CYMAX from the '256 patent claims for ***materiality***. With good reason: The

CYMAX documents make invalidating carbon-content disclosures. *See* pp. 33-34, *supra*. And they disclose myriad other limitations Tenaris specifically invoked to overcome rejection. *See* pp. 34-36, *supra*.

Tenaris disparages the reliability of Southwestern's commercial products, Tenaris.Br.11-12, 20, 47, but that is doubly irrelevant. First, a "reference need not work to qualify as prior art" and may even be "'inoperative.'" *Geo M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1302 (Fed. Cir. 2010); *see Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003). Southwestern's production difficulties do not prevent the CYMAX documents from being prior art where nothing in the claim distinguishes what Southwestern disclosed from what Tenaris claims as its invention. Second, Tenaris knows that Southwestern's difficulties were unrelated to the claimed invention. Tenaris argued below that Southwestern's "odd" process for full-body heat treatment produced defects. Appx7360; *see* Appx7408. But claim 1 of the '256 patent simply recites "full body heat treatment," Appx1090(23:19-21), precisely what the CYMAX documents disclose, Appx5493. If Tenaris thinks it improved the heat-treatment, that is not in claim 1. "[U]nclaimed … feature[s] … cannot be the basis for finding [a] patent to be non-obvious." *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1381 (Fed. Cir. 2013).

### 3. *The Prosecution Histories of the '326 and '407 Applications Confirm Materiality*

The PTO's action in connection with the '326 and '407 applications confirms materiality. There, the PTO considered claims "patentably indistinct" from the '256 patent claims. Tenaris.Br.55; *see* pp. 19-20, *supra*. It rejected those claims based on a reference called "Zernick." Appx11796; Appx11829. And what was Zernick? It was a version of—in Tenaris's expert's words, "almost the same" as—one of the CYMAX documents Tenaris had withheld when prosecuting the '256 patent. Appx8296.[5] That "establishe[s] materiality." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179 (Fed. Cir. 1995).

Tenaris ignores those rejections. Instead, Tenaris says the Examiner eventually allowed claims to issue. Tenaris.Br.56. But the allowed claims were ***different*** from the ones the Examiner rejected and found "patentably indistinct" from the '256 patent claims. *See* Appx11772-73; Appx11804-05. Tenaris overcame the rejection based on Zernick only by ***amending the claims*** to add limitations—such as an "austenitization" cycle before heat-treatment—absent from the original '326 and '407 application claims and the '256 patent claims. Appx8645; Appx8651; Appx8623-24. The subsequent issuance of different claims with additional limitations absent from the '256 patent claims does not help Tenaris. *See Therasense*, 649

---

[5] Zernick is a March 1993 conference paper. Appx10686-99. An earlier, virtually identical version of it is included in the CYMAX brochure. Appx5285-99.

F.3d at 1290-91 (showing that disclosure would have precluded grant of "a claim" sufficient to render entire patent unenforceable).

4. *The Other Evidence of Materiality Is Overwhelming*

Tenaris and its attorneys knew the CYMAX documents were material. Tenaris's attorneys warned Tenaris that it "need[ed] to disclose them." Appx5542. They insisted that Global "would ***likely prevail*** in an IPR" based on the CYMAX documents. Appx5542 (emphasis added). But Tenaris resisted disclosure for months, trying to come up with excuses. *See* pp. 16-18, *supra*. Tenaris theorized that perhaps the documents had not been published, but counsel warned that they "b[ore] several 'earmarks' of publication." Appx5549. And Tenaris's head of R&D refuted suggestions the documents were cumulative, pointing to their additional disclosures—including the actual chemistry of CYMAX. Appx5551. Recognizing that disclosure would result in rejection, Tenaris gave the PTO a manipulated set of the CYMAX documents in prosecuting the '074 and '075 patents. It removed the chemistry; it divided the documents into pieces as if they were separate prior art; it rearranged the elements; it left out key pages. Appx3140; Appx3143. That further evidences materiality. "After all, a patentee is unlikely to go to great lengths to deceive the PTO . . . unless it believes that [disclosure] will affect issuance of the patent." *Therasense*, 649 F.3d at 1292. Materiality—and Tenaris's knowledge of it—could not be more apparent.

When Tenaris finally disclosed the CYMAX documents in connection with the ’326 and ’407 applications, it still tried to bury them amidst 10,000 other pages. Appx6352; Appx6437. (The PTO found a reference nearly identical to one of them and rejected the claims, *see* pp. 19-20, *supra*.) Like Tenaris’s efforts to turn somersaults to avoid disclosure, its eventual acquiescence underscores materiality. It is something Tenaris “would not have done if the brochure was not material.” Appx13.

Tenaris urges that the district court applied a lower threshold of materiality in light of the overwhelming evidence of intent. Tenaris.Br.54-55. But the district court simply recognized that the lengths to which Tenaris was willing to go showed that even Tenaris thought the CYMAX documents material. Appx13-15.

5. *The CYMAX Documents Cannot Be Dismissed as Cumulative*

Tenaris’s argument that the CYMAX documents were “cumulative” of Chitwood, Tenaris.Br.59, goes nowhere. It is not just that Tenaris’s own lawyers did not buy that argument. *See* Appx5542; p. 18, *supra*. Or that Tenaris’s own head of R&D pointed to critical disclosures in the CYMAX documents—the very chemistry Tenaris was touting as absent from the prior art—that Chitwood lacked. Appx5646-47. The PTO’s actions also dispense with the argument. The PTO allowed the ’256 patent claims when presented with Chitwood, but rejected

indistinguishable claims when presented with Zernick, which is virtually identical to one of the CYMAX documents. *See* pp. 19-20, *supra*.

A reference is cumulative, moreover, only when it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997). Chitwood discloses "low-carbon 4100 series steel." Appx7167. That is a ***family*** of alloys, including alloys outside the '256 patent's claimed ranges. *See* Appx7231 (88:9-89:4). The CYMAX documents, by contrast, disclose a "***modified***" "4100 series, chrome-moly alloy per ASTM A-607." Appx5282 (emphasis added). And they disclose a "precise chemical specification" for that modified 4100-series alloy that contradicted the Valdez Declaration's arguments. Appx13. Tenaris's R&D Director Quintanilla explained to a Tenaris attorney that the CYMAX documents provide "more information" than Chitwood "because they disclose a ***modified*** 4100 series steel." Appx7222 (emphasis added). "[R]eviewing [the] CYMAX documents would" make the claimed "90%+ tempered martensite" and "uniform distribution of fine carbides" obvious, but Chitwood's "4100 series steel" was "not enough" to teach those claim "elements." Appx7222.

Once again, *Belcher* forecloses Tenaris's contrary argument. There, the patentee emphasized that a particular pH range was "critical." 11 F.4th at 1353. But the patentee tried to justify withholding prior-art disclosures within that range as

"'cumulative'" of prior art, already submitted to the PTO, disclosing a broader range. *Id.* This Court rejected that self-serving theory as "directly at odds with" the patentee's earlier assertion that the narrower range was "'critical.'" *Id.* The same is true here. Tenaris told the examiner that the "specific chemistry" was "critical." Appx5492. It cannot now dismiss a reference with a more specific disclosure of that chemistry as "cumulative."

Tenaris urges that, according to Global's invalidity expert, Chitwood and the CYMAX documents each render the '256 patent claims obvious. Tenaris.Br.25-26, 64. But a reference is not cumulative if it "teaches . . . more" than another reference, *Regents of the Univ. of Cal.*, 119 F.3d at 1575, even if each reference arguably renders the patent obvious. Patentees cannot withhold ***stronger*** prior art on the theory that they have disclosed ***weaker*** prior art that arguably could also render the claims obvious.

### B. Tenaris Withheld the CYMAX Documents With Specific Intent To Deceive

The element of "intent to deceive" is shown where "'the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it.'" *Aventis Pharma S.A., v. Hospira, Inc.*, 675 F.3d 1324, 1334-35 (Fed. Cir. 2012) (quoting *Therasense*, 649 F.3d at 1290). Once an accused infringer "'prove[s] a threshold level of intent to deceive,'" the patentee must offer a "'good faith

explanation.'" *Therasense*, 649 F.3d at 1296. The district court properly found the evidence here made for only one possible inference—"intent to deceive." Appx14.

### 1. *Tenaris Deliberately Withheld Material Information*

Tenaris undisputedly knew about the CYMAX documents. It possessed them. Appx2463 (63:7-21). Valdez was intimately familiar with them: He gave Tenaris's counsel a copy and directed him to read it. Appx5419-27; Appx7721. Another inventor, Mitre, touted Tenaris's discovery of CYMAX as the origin of Tenaris's own quenched-and-tempered product, BlueCoil. Appx2492.

The only question, then, is whether Tenaris knew the documents were material when choosing to withhold them. Clearly it did: Valdez told counsel he was "not sure it is a good idea to disclose this document." Appx7721. The reason was obvious: The CYMAX documents directly contradicted the affidavit Valdez was submitting to overcome a rejection, disclosing limitations he had told the PTO were missing from the prior art. *See* pp. 32-36, *supra*. Emphasizing the documents, the district court explained that "[r]arely do courts come across such stark evidence of the intent fork of inequitable conduct." Appx14. The magistrate judge, too, found Valdez's statement to be "direct evidence of fraud" and reasoned that "intent to defraud the PTO is the single most reasonable inference to be drawn." Appx4044-46.

"[I]ndirect and circumstantial evidence" compels the same conclusion. *Therasense*, 649 F.3d at 1290. Tenaris decided to withhold the CYMAX documents in seeking to overcome an Examiner rejection that found each limitation disclosed by the prior art. *See* pp. 11-12, *supra*. Valdez attested that he had "reviewed [that] Office Action." Appx5491. So did counsel. Appx7326. But they then persuaded the Examiner to change her mind, by asserting that: the "specific chemistry and heat treatment" of the claims was not in the prior art, Appx5492; that the prior art taught only "general knowledge of heat treatment," Appx5292, not the claimed "full body heat treatment"; and that "run[ning] more than 1,000,000 feet" of tubing was "double" what others had achieved, Appx5493. Having made those statements, they ***knew*** that prior art disclosing those elements would be material, because those were the very elements employed to save their claims from obviousness. But they also ***knew*** the CYMAX documents disclosed each of those things, which is why they repeatedly resisted disclosing them. *See* pp. 7-11, *supra*.

Nothing demonstrates an intent to deceive like telling the PTO that a limitation is novel in order to obtain a patent, while deliberately withholding information showing the limitation is not. In *Aventis*, for example, the claims recited the use of a "polysorbate" surfactant in a drug, in contrast to the "Cremophor" used in the prior art. 675 F.3d at 1335. During prosecution, the patentee highlighted a reference disclosing the problems associated with Cremophor, but withheld a reference

showing that the solution, polysorbate, was in the prior art. *Id.* "'[T]here is simply no justification,'" the Court explained, "'for telling the [PTO] about the prior art disclosing [a] problem, . . . while concealing key prior art disclosing the solution.'" *Id.* (quoting 743 F. Supp. 2d at 353). That is what Tenaris did here: Tenaris told the PTO that the limitations and results are novel, while concealing on-point prior art teaching those very limitations and results. Tenaris, moreover, continued the deception when seeking to expand the scope of its patent rights in continuations, submitting doctored documents that omitted key disclosures. *See* pp. 16-18, *supra*.

2. *Tenaris's Putative "Innocent" Explanation Is Non-Responsive and Insufficient To Avoid Summary Judgment*

Tenaris is wrong that it was "error" to resolve "intent at summary judgment." Tenaris.Br.50. Courts may grant "summary judgment" on "intent" where the "evidence is so one-sided that the factual issue of intent may be decided as a matter of law." *Paragon*, 984 F.2d at 1185 (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247-48 (1986)); *see Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006); *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359 (Fed. Cir. 2007); *In re Chavin*, 150 F.3d 726, 729 (7th Cir. 1998). A justification for withholding material information that is "conclusory," "insupportable," or "inconsistent," or which "lacks evidentiary support," is not "legally sufficient," or is "nonresponsive," cannot "raise a ***genuine*** issue of fact." *Paragon*, 984 F.2d at 1185, 1192.

Here, Tenaris's supposedly "innocent" explanation for why it withheld the CYMAX documents while prosecuting the '256 patent is that Valdez believed that CYMAX was "'outside [the] carbon range'" of the claims. Tenaris.Br.45. Even if that were true, it is no excuse—the CYMAX documents would be material regardless. Valdez overcame the Examiner's rejection by asserting that the "specific chemistry" (not just the carbon range), "full body heat treatment," "homogenous" "microstructure," "high yield strength and high fatigue strength," and capability of running "more than 1,000,000 feet," were novel. Appx5491-93; *see* pp. 32-36, *supra*. Valdez knew all of ***those*** limitations were also disclosed in the CYMAX documents. *See* pp. 7-11, *supra*. Valdez nowhere explains why he deemed the disclosure of ***those*** limitations immaterial.[6]

In an event, CYMAX ***is*** within the '256 patent's claimed carbon range, and Valdez knew it. The claims recite a range of 0.17-0.35 wt.% carbon, while CYMAX is in the range of 0.13-0.17 wt.%. Under well-established precedent, the CYMAX range is deemed to teach the claimed range. *See In re Geisler*, 116 F.3d at 1469. Notwithstanding his current protestations, Valdez insisted earlier in this case—before Global raised inequitable conduct—that the "invention in the '256 Patent

---

[6] Valdez's carbon-range excuse is manufactured. He initially told Tenaris's counsel that he did not disclose the CYMAX documents because he believed they were confidential. Appx13; *see* Appx7221. But in his deposition, he denied any such belief, offering a different excuse. Appx7792-7793 (25:17-28:18); Tenaris.Br.49.

would cover a steel that has below .17 weight percent carbon." Appx9714(351:1-7). That would cover CYMAX. Appx5282.

Tenaris's effort to explain away Valdez's comment to counsel that it was not "a good idea" to disclose CYMAX, Tenaris.Br.46, only further undermines its argument that Valdez did not know CYMAX was within the claimed carbon range. It urges that counsel had asked Valdez whether he had evidence of "'people struggling to achieve'" the invention and failing, to support Tenaris's argument that the '256 patent was non-obvious. *Id.* Valdez claims to have believed CYMAX was not useful evidence, because it was "'outside [the claimed] carbon'" range, and "'did not work.'" Tenaris.Br.47 (quoting Appx7788). But if Valdez had really believed CYMAX to be outside the carbon range, that would have been a reason to ***disclose*** CYMAX: A prior-art product with ***different*** chemistry that did not work as well as the '256 patent invention would have been exactly what counsel asked Valdez to find. That he did not disclose it speaks volumes. Valdez asserted that he thought disclosing CYMAX "would be 'confusing'" to the Examiner, Tenaris.Br.46, but never explained why that would be so.

It does not help Tenaris to assert that Valdez "sent [the CYMAX documents] to prosecution counsel." Tenaris.Br.49. Valdez told counsel that it was not a "good idea to disclose this document." Appx3258. And Tenaris never defends the non-disclosure by counsel that resulted.

The district court's grant of summary judgment here did not turn on Valdez's "credibility." Tenaris.Br.44. Even apart from Valdez's comment that it was not a "good idea to disclose this document," the district court ruled that "***the evidence***"—all the evidence—"establish[es] intent." Appx13 (emphasis added). It explained that "there is no other reasonable inference that can be drawn from Tenaris's withholding the CYMAX documents from the Patent Office, other than intent to deceive." Appx14. Even setting aside Valdez's comment to counsel, the "other evidence" of culpable intent was overwhelming. *See* pp. 45-48, *supra*. That evidence alone made intent to deceive the "single most reasonable inference." *Belcher*, 11 F.4th at 1354.

Where a finding of intent is inevitable, district courts have discretion to find it on summary judgment—especially where the district court would be the factfinder at trial. *Jones*, 936 F.3d at 321-22. For example, in *Chavin*, the Seventh Circuit upheld a finding of "intent" on summary judgment. 150 F.3d at 727-29. The Court found it appropriate to do so where a "mature and experienced businessman" falsely answered straightforward questions, and his "explanations for his failure to answer them correctly [were] ridiculous." *Id.* The same is true here. Valdez was an experienced inventor with many patents, and head of Tenaris's materials department. Appx5615(119:4-17). His explanations for non-disclosure were ridiculous, laden with inconsistencies and *ad hoc* rationales. He said he did not disclose the CYMAX

documents because CYMAX was outside the carbon range, *see* Appx7798-7799 (96:6-99:25), but CYMAX contained myriad teachings material to the ’256 patent claims, apart from the carbon range. *See* pp. 32-36, *supra*. And, earlier in this case, he said the invention would encompass the CYMAX range. *See* p. 50, *supra*. Valdez also said he did not disclose CYMAX because it was not a useful example of earlier struggles to achieve the invention. *See* pp. 48-49, *supra*. But he also insists that CYMAX was an early attempt at quenched-and-tempered tubing that was plagued with problems. *See* Tenaris.Br.19-20; p. 40, *supra*. Valdez’s (and Tenaris’s) gymnastics to avoid disclosure, in the face of counsel’s dire warnings, made the finding of intent inescapable. Summary judgment was warranted.

## II. Tenaris’s Fraudulent Conduct Infected The ’074 And ’075 Patents, Rendering Them Unenforceable As Well

The taint of Tenaris’s inequitable conduct also renders the ’074 and ’075 patents unenforceable. Inequitable conduct in prosecuting a parent patent is infectious when the “subject matter” of the child patent is not “sufficiently distinct from its parent.” *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006); *see Consol. Aluminum Corp. v. Foseco Int’l Ltd.*, 910 F.2d 804, 810-11 (Fed. Cir. 1990). Tenaris admits that the parent ’256 patent and the child ’074 and ’075 patents have “patentably indistinct” claims directed to the same “subject matter.” Tenaris.Br. 3, 10, 25, 56. Indeed, Tenaris filed a terminal disclaimer in the ’074 and ’075 patents to avoid a double-patenting rejection.

Tenaris invokes its ***selective*** disclosure of CYMAX documents during the prosecution of the ’074 and ’075 patents. Tenaris.Br.66. But two judges agreed below that such an incomplete disclosure showed that “Tenaris’s fraud ***continued*** through its prosecution of the ’074 and ’075 patents.” Appx15 (emphasis added). For good reason: A patentee cannot absolve itself by making an “***intentionally*** selective” disclosure. *Am. Calcar*, 768 F.3d at 1190 (emphasis added). Where “intentional material misrepresentations have been made, as here, a complete ‘cure’ must also be demonstrated by clear, unequivocal, and convincing evidence.” *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1572 (Fed. Cir. 1983). The party that deceived the PTO must prove by clear-and-convincing evidence that it told the PTO “*misrepresentations had been made*” and pointed out “*precisely where they had been made*.” *Id.* at 1572-73.

Tenaris did nothing of the sort here. Tenaris never told the PTO it had withheld the CYMAX documents. It never identified the misrepresentations in the Valdez Declaration. And, when Tenaris did disclose some CYMAX documents, it doctored them. It omitted the key pages showing the CYMAX products’ “specific chemistry”—an issue critical to obviousness—subdivided the remaining contents, rearranged them, and submitted them as separate references. *See* pp. 17-18, *supra*. That is a far cry from coming clean to the PTO, which is what is required to cleanse child patents of inequitable conduct in prosecution of a parent.

Tenaris finds no reprieve in *Pharmacia Corp. v. Par Pharmaceutical, Inc.*, 417 F.3d 1369 (Fed. Cir. 2005). There, this Court declined to find that "inequitable conduct in procuring a ***later*** prosecuted patent will automatically infect an ***earlier*** issued patent." *Id.* at 1374 (emphasis added). This case involves the opposite: misconduct in pursuing an earlier patent, covering the same subject matter, where the misconduct continued through prosecution of the later ones.

## III. THE EGREGIOUS MISCONDUCT HERE WARRANTS UNENFORCEABILITY IN ANY EVENT

*Therasense* recognized that patents may be unenforceable, even absent materiality, when patentees engage "in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit." 649 F.3d at 1292. That describes this case. In filing the Valdez Declaration, Tenaris filed an unmistakably false affidavit. Appx5123-35. And it continued that egregious misconduct, submitting incomplete, doctored disclosures in connection with the '074 and '075 patents, to continue its deception.

**A.** The submission of "an unmistakably false affidavit" is the epitome of "egregious misconduct." *Therasense*, 649 F.3d at 1292. Submitted to overcome a rejection in connection with the '256 patent, the Valdez Declaration is unmistakably false. *See* pp. 32-36, *supra*. Valdez told the PTO that the "specific chemistry and specific heat treatment" of the claims were novel, but that was false, and belied by the withheld CYMAX documents. Appx5492; *see* pp. 32-33, *supra*. Valdez told

the PTO that "full body heat treatment" to produce a "homogenous microstructure" was novel, but that was false. Appx5491-92; *see* pp. 33-34, *supra*. Valdez told the PTO that the "high yield strength and high fatigue strength" of the claimed invention were novel, but that was false. Appx5492; *see* pp. 35-36, *supra*. Valdez told the PTO that running coiled tubing 1,000,000 feet was novel, but that was false. Appx5493. The CYMAX documents Tenaris withheld contradicted each of those assertions directly. That makes this a textbook case of affirmative egregious misconduct. *See Therasense*, 649 F.3d at 1292.

This Court has found similar false declarations to be "egregious misconduct." In *Intellect Wireless v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013), the inventor sought to "overcome a prior art reference" by asserting "that 'the claimed invention was actually reduced to practice and was demonstrated at a meeting . . . in July of 1993.'" *Id.* at 1342. This Court held that was "unmistakably false" because the inventor "did ***not*** actually reduce the claimed invention to practice—nor did he demonstrate a prototype in July of 1993." *Id.* Nor did he "correct[] these misrepresentations" in his "revised declaration and subsequent statements to the PTO." *Id.* at 1343. The Court found those facts sufficient to establish affirmative egregious misconduct. *Id.* at 1343-44.

Here, as in *Intellect Wireless*, the inventor sought to overcome an Examiner rejection by filing an affidavit with unmistakably false statements. Here, as there,

those misstatements were never corrected. Here, as there, that amply proves affirmative egregious misconduct. *See also Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014) (submission of affirmative misrepresentations regarding the prior art to the PTO through a hired expert would "come close to the type of affirmative misconduct that in *Therasense* [the Court] held could justify finding inequitable conduct without showing but-for materiality"); *Regeneron Pharms., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 584-85 (S.D.N.Y. 2015).

**B**. This case differs from *Intellect Wireless* only because it is more egregious. While *Intellect Wireless* involved a single misrepresentation, the Valdez Declaration was replete with falsities across a range of limitations, from the novelty of the chemistry, to heat treatment, to resulting properties. While *Intellect Wireless* involved a failure to correct the deception, this case involves its perpetuation across multiple continuations. In pursuing the '074 and '075 patents, Tenaris selectively disclosed only part of the CYMAX documents, withholding the chemical specifications in the CYMAX brochure, and leaving out title pages and dividers that would have revealed that the disclosure was partial and the documents were doctored. Appx3140; Appx3143. That "suppression of evidence" is itself affirmative misconduct and aggravates the fraud. *Therasense*, 649 F.3d at 1293.

Tenaris has no plausible excuse. It submitted the CYMAX brochure in pieces as different references. But its own witness testified that the CYMAX brochure

"belong[s] together," and was bound with a "spine that held the materials together." Appx8403(¶194); Appx8410(64:19-24). The brochure, including the withheld specifications, was "given to customers" as a single document so they "could look at all the pages in the document." Appx8410(64:7-9, 65:12-15). Tenaris offers no plausible explanation for submitting that document in pieces when pursuing continuations; for putting the pieces out of order; and for leaving out portions, including key disclosures, entirely.

Tenaris contends the specification pages were confidential, but its attorneys disagreed. They explained that "[i]t appears from the face of the documents that they have been disclosed or were intended for disclosure." Appx5545; *see* Appx5549. That is obvious on inspection. The specification is two pages, with items numbered 1-4 on the first page, and items 5-7 on the second. Appx5282-83. Both pages are directed at ***customers***, which is confirmed by the "certification" on the second page addressing "the purchaser." Appx5283.

Moreover, Tenaris's counsel urged that, if Tenaris did not disclose the documents in full, Tenaris had to interview witnesses who might know whether the documents had actually been disclosed, with an outside attorney present. Appx8416. Tenaris never did that. Appx8435-36(228:7-230:3); Appx8426-27(334:18-335:22, 338:9-15); Appx8432(36:18-21). Had Tenaris done so, it would have discovered

that the CYMAX brochure, including the specification pages, was "distributed" to customers "[p]ublicly." Appx5316(28:7-21).

In total, Tenaris's conduct amounts to a "deliberately planned and carefully executed scheme to defraud . . . the Patent Office." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944). Affirmance is warranted.

## CONCLUSION

The judgment that the '256, '074, and '075 patents are unenforceable should be affirmed.

## CROSS-APPEAL

Tenaris did not merely deceive the PTO into issuing it patents. It attempted to use those fraudulently obtained patents to monopolize the quenched-and-tempered tubing market. When Global announced its competing DURACOIL product, Tenaris "attack[ed]," warning Global's customers to "watch out" if they bought from Global. Appx10869; Appx10873. Faced with Tenaris's unlawfully obtained patents, Global had no choice but to keep DURACOIL 130 off the market and file this suit, causing it millions of dollars in damages.

Tenaris's use of fraudulently obtained patents to exclude Global is textbook attempted monopolization under *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172 (1965). The district court nevertheless granted Tenaris summary judgment, ruling from the bench that "it would be legal error to hold that such a small market player was engaged in attempted monopolization." Appx31191 (74:17-19). The court offered no further explanation and issued no opinion.

That ruling cannot stand. The 43-word decision says nothing about the scope of Tenaris's patents, or the relevant timeframe or antitrust market. What little it does say is incorrect. First, in *Walker Process* claims, the would-be monopolist's ability to exclude competitors depends on "the exclusionary power ***of the illegal patent claim***"—not market share. 382 U.S. at 177 (emphasis added). There is good reason

for that: A "small market player" with the kind of sweeping patent rights Tenaris asserted can eliminate competition regardless of its initial market share.

Second, while Tenaris has reduced market share ***today***, attempted monopolization claims are assessed based on market conditions ***at the time of the attempt***. *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000). Tenaris was hardly a "small" player when it tried to exclude Global beginning in 2017; it was then the ***only*** supplier in the market for quenched-and-tempered tubing.

Third, "there is no way to measure" a would-be monopolist's likelihood of achieving a monopoly without first defining the "relevant market for the product involved." *Walker Process*, 382 U.S. at 177. Yet the district court never said ***which*** market it supposedly analyzed and never addressed the many disputes on that issue.

Reversal is warranted.

## JURISDICTIONAL STATEMENT

Global timely filed its notice of cross-appeal on April 28, 2023. Fed. R. App. P. 4(a)(3); Appx11766.

## ISSUE PRESENTED

Whether the district court erred in granting summary judgment for Tenaris on Global's attempted-monopolization claim.

# STATEMENT

## I. THE LEGAL FRAMEWORK FOR PATENT-BASED ANTITRUST CLAIMS

In *Walker Process*, 382 U.S. at 177, the Supreme Court held that a patent obtained "by knowingly and willfully misrepresenting facts to the Patent Office" loses "its exemption from the antitrust laws." Thus, "enforcement of a patent procured by fraud" can constitute actual or attempted monopolization in violation of §2 of the Sherman Act. *Id.* at 174.

A *Walker Process* claim requires proof the defendant knowingly asserted a fraudulently obtained patent and that the defendant's conduct satisfies "the other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). In ***attempted*** monopolization cases like this one, those other elements are: (1) "'predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* at 1306. The requirements overlap: Proof that the defendant knowingly asserted a fraudulently obtained patent also establishes anticompetitive conduct, with specific intent to monopolize, under §2. *Id.* at 1309.

The last element—the "dangerous probability of achieving monopoly power"—requires assessment of "the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved." *Spectrum Sports, Inc. v.*

*McQuillan*, 506 U.S. 447, 455-56 (1993). If customers cannot readily turn to non-infringing alternatives, there is a dangerous probability that the patentee will be able to raise prices and reduce competition—the definition of monopoly power. *See id.*; *Walker Process*, 382 U.S. at 177-78. Patentees thus necessarily have monopoly power where the product "cannot be produced efficiently other than by using [a] patented process," *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 264 (7th Cir. 1984), or the relevant market is "coterminous with that covered by the [illegal] patent," *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 n.13 (9th Cir. 1979).

## II. PROCEEDINGS ON GLOBAL'S ANTITRUST CLAIMS

When it uncovered evidence that Tenaris had defrauded the PTO, Global amended its complaint to add a *Walker Process* claim. *See* Appx2058-59(¶¶146-52). Tenaris, the complaint alleged, knowingly asserted its fraudulently obtained patents to prevent Global from entering the quenched-and-tempered tubing market. *See* Appx2059(¶149); Appx2039(¶84); Appx2049(¶107). Given Tenaris's "very broad patents" and "significant market share," that exclusionary conduct created a "dangerous probability" that it would achieve "monopoly power." Appx2059(¶149). Global sought damages, including lost profits from DURACOIL 130's delayed release and the costs of defending Tenaris's infringement claim. Appx2062(¶171(b)).

### A. Global Presents Evidence That No Non-Infringing Substitutes Existed

Global's expert economist, Dr. Bradley Reiff, opined that, if Tenaris increased prices above competitive levels, customers could not practically turn to any "realistic substitutes" for quenched-and-tempered coiled tubing. Appx10912-15 (¶¶44, 50). Even "if the price of a Q&T coiled tubing product increased, customers would generally not switch to conventional coiled tubing because such coiled tubing cannot be used effectively" in the shale wells "in which Q&T coiled tubing is normally implemented." Appx10912-13 (¶44).

Industry expert Teoman Altinkopru—who formerly headed coiled tubing operations for the world's largest oil-and-gas services company—agreed. He testified that the principal U.S. buyers of coiled tubing "have switched entirely from conventional coiled tubing to quench and temper coiled tubing to stay competitive." Appx5862 (¶105). Tenaris confirmed as much: Its Answer to Global's antitrust claim stated that Global "could not compete with Tenaris's BlueCoil™ without a quench and temper coiled tubing product of its own." Appx2083 (¶15).

### B. The District Court Grants Tenaris's Summary Judgment Motion

The district court granted summary judgment for Tenaris. Tenaris argued that no reasonable jury could accept Global's proposed definition of the relevant market—U.S. sales of quenched-and-tempered tubing. Appx5783-93. Alternatively, Tenaris urged that its market share was too small to support an attempted

monopolization claim because, in 2019, ***two years after*** Tenaris started asserting its fraudulently obtained patents against Global, another supplier, Quality Tubing, entered the market and assumed a dominant position. Appx5780-83.

Global disputed both arguments. It defended its experts' market analysis and pointed out that market definition "'is essentially a question of fact,'" rarely resolved on summary judgment. Appx10750 (quoting *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979 (5th Cir. 1977)). And it explained that "[m]onopoly power is not defined by market share" but by "'the power to control prices or exclude competition.'" Appx10765. That power is present, Global argued, where the defendant asserts patent rights that leave consumers "no alternatives." Appx31140(23:15). Tenaris urged that its patents—and the '256 patent, specifically—covered ***all*** quenched-and-tempered tubing. Appx11302; Appx11335-36(305:25-306:5). Thus, as the district court characterized Global's position, Tenaris's assertion of that "all-encompassing patent that will drive other people out of the market" established a "dangerous probability" of monopolization. Appx31141(24:4-6); *see* Appx31142(25:13-15).

In addition, courts "'evaluating the element of dangerous probability of success'" must "examine the probability of success at the times the act occurred." Appx31135-36(18:24-19:2) (quoting *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984)). When Tenaris first asserted its fraudulently obtained

patents against Global in 2017, Tenaris was the ***only*** supplier of quenched-and-tempered tubing and Global was its ***only*** potential competitor. Tenaris's efforts to exclude Global thus threatened to give it ***100%*** of the relevant market. *See* Appx31142 (25:10-12).

The trial court granted summary judgment from the bench following argument. Its ruling occupies fewer than ten lines of transcript:

> . . . I'm going to have to grant the motion for summary judgment. I think that it would be legal error to hold that ***such a small market player*** was engaged in attempted monopolization. I think the acts alleged as constituting an attempt at monopolization are insufficient to create a genuine issue of material fact. So defendant's motion will be granted.

Appx31191 (74:16-23) (emphasis added). The court provided no further explanation and issued no opinion. The order appeared as a minute entry on the docket stating only: "The Court GRANTED the Motion." Appx1051.

## SUMMARY OF ARGUMENT

**I.** The district court's ruling that a firm with a small market share cannot be liable for attempted monopolization contradicts *Walker Process*'s direction to focus on "the exclusionary power ***of the illegal patent*** claim." 382 U.S. at 177 (emphasis added). Tenaris urged that its patents—and the '256 patent, specifically—covered ***all*** quenched-and-tempered tubing. Appx11302; Appx11335-36 (305:25-306:5). There was amply sufficient evidence to establish a dangerous probability of monopolization, regardless of Tenaris's market share.

**II.** Insofar as market share matters, the court's description of Tenaris as a "small market player" shows it was focused on Tenaris's ***2019*** market share. That defies Fifth Circuit precedent, which directs courts to assess the market at the time of the ***attempt*** in attempted monopolization cases. *See Am. Airlines*, 743 F.2d at 1118. At that time, two years earlier, Tenaris dominated.

**III.** The district court never defined the relevant market or addressed numerous fact disputes on that issue. That contravenes the Supreme Court's admonition that "there is no way to measure" a would-be monopolist's likelihood of success without a definition of the "relevant market for the product involved." *Walker Process*, 382 U.S. at 177; *Spectrum Sports*, 506 U.S. at 456.

## STANDARD OF REVIEW

"[T]his court reviews a grant of summary judgment under the law of the regional circuit." *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 714 (Fed. Cir. 2022). The Fifth Circuit reviews a grant of summary judgment *de novo*. *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 502 (5th Cir. 2022). "A fact dispute is 'genuine' if 'a reasonable jury could return a verdict for [the nonmovant] based on the evidence.'" *Id.* The court "'must view all evidence and draw all justifiable inferences'" in Global's favor. *Id.*

# ARGUMENT

Tenaris's summary judgment motion focused on a single element of Global's antitrust claim: whether Tenaris's assertion of its fraudulently obtained patents raised a "dangerous probability" that Tenaris would obtain "monopoly power." The 43 words the district court devoted to ruling on that complex issue gave no hint of the four expert reports, hundreds of pages of exhibits, and extensive oral argument the parties submitted. The decision cited no authority, identified no undisputed facts, and essentially ignored the parties' contentions. Insofar as the decision reflects any rationale, it is clearly mistaken. Appx5772-74; Appx5778-83.

## I. THE DISTRICT COURT LOOKED TO THE WRONG MEASURE OF TENARIS'S POTENTIAL TO MONOPOLIZE

The district court concluded that it "would be legal error" to hold a "small market player" liable for attempted monopolization. Appx31191 (74:17-19). That is wrong. As Global explained, "[m]onopoly power is not defined by market share: It 'is the power to control prices or exclude competition.'" Appx10765; *see Spectrum Sports*, 506 U.S. at 455-56; Appx31140 (23:14-16). Amassing market share is ***one*** way to obtain market power. But it is not the ***only*** way.

The Supreme Court has long recognized that another way to obtain market power is through patents. In *Walker Process*, the Supreme Court explained that proof of monopolization based on a fraudulently obtained patent required examining "the exclusionary power ***of the illegal patent claim***." 382 U.S. at 177 (emphasis

added); *see Spectrum Sports*, 506 U.S. at 456; *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1349 (Fed. Cir. 2007). *Walker Process* cases thus require "due consideration to the exclusivity that inheres in the patent grant." *Abbott Labs. v. Brennan*, 952 F.2d 1346, 1354-55 (Fed. Cir. 1991); *cf. Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612-13 (1953) (acknowledging that "patent or copyright control" may affect market power).

That makes sense. A patent might not confer power in a market where technologies compete. But even a small firm can threaten competition if it controls—*i.e.*, has patents that cover—technology essential to compete in the market. *See, e.g.*, *Chandler v. Phoenix Servs*., 419 F. Supp. 3d 972, 985 (N.D. Tex. 2019) (patentee's assertion that there were no non-infringing alternatives effectively claimed "100% of [the] market").

Here, Tenaris itself insisted that the '256 patent it held in 2017 was sufficient to exclude others from the market: "Global ***could not compete*** with Tenaris's BlueCoil™," Tenaris argued, "without a quench and temper coiled tubing product of its own"—and Tenaris's '256 patent covered ***all*** quenched-and-tempered tubing. Appx2083(¶15) (emphasis added); Appx9283-84(¶15); Appx11302; Appx11335-36(305:25-306:5). The broad exclusionary power of Tenaris's patents thus put it in a position to "lessen or destroy competition" in the quenched-and-tempered tubing market. *Spectrum Sports*, 506 U.S. at 456. The district court reached the opposite

conclusion only by ignoring Tenaris's patents—and with them *Walker Process*'s instruction to examine "the exclusionary power of the illegal patent claim[s]" themselves. 382 U.S. at 177.

## II. THE DISTRICT COURT IMPERMISSIBLY CONSIDERED MARKET CONDITIONS YEARS AFTER TENARIS'S ATTEMPTED MONOPOLIZATION

The district court's description of Tenaris as "a small market player" shows the court was also looking at the wrong timeframe. Tenaris's "attack" on Global began around March 2017. At that time, Tenaris was the ***only*** player in the market for quenched-and-tempered coiled tubing, with 100% market share. Appx10873; Appx10830(186:20-188:6). Tenaris could not have been considered a "small market player" until Quality Tubing entered the market years later. And what matters in an attempted-monopolization case is the state of the market at the time ***of the exclusionary conduct***.

### A. Tenaris Concededly Controlled the Market When It Tried to Exclude Global

The district court's questions at argument focused not on the market in 2017, when Tenaris's "attack" began, but on the different market that emerged years later. The court repeatedly invoked Quality Tubing, which did not enter the market until late 2019. *See, e.g.*, Appx31122(5:20-23); Appx31134(17:8-11); Appx31141(24:24-25); Appx31151(34:17-19). It asked how Tenaris could have used its fraudulent patents to exclude Global "[e]ven though Quality is out there and

has a huge part of the market." Appx31159(42:10-11).[7] Global explained that Quality's market share was irrelevant because, under Fifth Circuit law, courts "evaluating the element of dangerous probability of success do not rely on hindsight but examine the probability of success at the times the act occurred" (here, 2017). Appx31135-36(18:24-19:2) (quoting *Am. Airlines*, 743 F.2d at 1118).

The trial court was nonetheless "confused," finding it "odd" to be "trying a lawsuit based on events that happened several years ago." Appx31174(57:13-15). But that is the ***essence*** of an ***attempt*** case. "If a defendant had the requisite intent and capacity, and [its] plan if executed would have had the prohibited market result, it is no defense that the plan proved to be impossible to execute." *Am. Airlines*, 743 F.2d at 1119-21 (holding that the mere offer of an agreement to fix prices establishes a Sherman Act violation even if the other party never agreed). Thus, courts "look to the defendant's conduct and the market at the time the conduct occurred, rather than evaluating the conduct's effects after-the-fact." *Taylor Publ'g Co.*, 216 F.3d at 475.

Even assuming that market share rather than patent scope matters, a properly instructed jury considering the facts in 2017 could easily conclude that Tenaris's assertion of its fraudulently obtained '256 patent, against its sole competitor, created

[7] *See* Appx31151(34:3-6) ("I'm still troubled by the notion that a patent which gave rise to a suggestion of market domination would be a threat of monopoly power when the market player who had the patent was such a small percentage of the market."); Appx31167(50:6-9) (similar).

a dangerous probability of monopolization. Tenaris concededly had ***100%*** of the market when Global announced its competing DURACOIL product in March 2017. Appx9289-91 (¶28). Tenaris's threats against Global and Global's customers forced Global to delay launching DURACOIL 130. Appx10246 (71:8-21). And Tenaris continued to dominate when Global could offer only a design-around product. Tenaris's expert testified that Tenaris's 2017 sales of quenched-and-tempered products far outstripped Global's, despite their higher price. Appx6102-03 (¶30). No other supplier emerged until Quality Tubing launched a quenched-and-tempered product ***two years later*** in 2019. Appx10914-24 (¶¶48-66). A reasonable jury could easily conclude there was a dangerous probability that Tenaris's earlier assertion of the '256 patent threatened to give it monopoly power in the quenched-and-tempered tubing market by eliminating its only competitor.[8]

### B. Even Tenaris's Later Market Share Was Sufficient Under Fifth Circuit Law

In any case, focusing on mid-2019 market share at most would raise a triable issue of fact. The Fifth Circuit has cautioned that courts must be "'particularly wary of the numbers game of market percentage'" in attempt cases. *C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.*, 884 F.2d 209, 211 (5th Cir. 1989).

[8] Proof that asserting an illegal patent created a dangerous probability of monopolization does not require a finding of infringement. *See TransWeb*, 812 F.3d at 1300-01 (affirming a *Walker Process* verdict that found no infringement).

Even shares of 10% are insufficient ***only*** "absent a showing of special market conditions." *Id.* Market shares of "twenty percent may raise attempt liability, depending on other characteristics of the market." *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 532-33 (5th Cir. 1982).

Here, the evidence showed that Tenaris's 17% post-2019 market share would have climbed to as much as 29% if it had succeeded in enforcing its patents against Global—far above the 20% threshold the Fifth Circuit has identified. *See Dimmitt*, 679 F.2d at 532-33. Market characteristics put Tenaris in an even stronger position. Tenaris faced just two competitors and had patents supposedly covering ***all*** of their products. Appx8237. That evidence was sufficient to show a dangerous probability of success even considering the (erroneous) 2019 timeframe the court considered.

### C. Tenaris Concededly Engaged In Exclusionary Conduct

The district court stated without explanation that "the acts alleged as constituting an attempt at monopolization are insufficient to create a genuine issue of material fact." Appx31191 (74:19-21). It is unclear what that means. Tenaris ***conceded*** that it "threatened" to sue Global for infringement of the fraudulently obtained patents. Appx31173 (56:6-9). Had Global responded by exiting the market, Tenaris would have secured a monopoly. The admitted threats were thus enough to show attempted monopolization. *See Am. Airlines*, 743 F.2d at 1118-19.

Insofar as the court thought Global's evidence of attempted monopolization was "insufficient" because it did not ***also*** show Tenaris had threatened ***Quality***, that concern was misplaced. Quality was not in the quenched-and-tempered tubing market when Tenaris's attempt began. Appx31159 (42:6-25); Appx6101 (¶27). Whether one looks to 2017, when Tenaris first threatened Global, or March 2019, when Tenaris counterclaimed for infringement, Global was the only competition. Appx31136-37 (19:11-20:7); Appx8719-8723; Appx10914-24 (¶¶48-66). Quality did not enter the market until July 2019—months after Tenaris made good on its threats to sue Global. Appx6101 (¶27).

Even if Quality's subsequent entry mattered, that would at most raise another triable fact issue. Although Tenaris did not immediately threaten Quality—likely because this antitrust claim was already pending—Tenaris's fraudulently obtained patents gave it the ***capacity*** to do so. And the evidence showed that Tenaris analyzed Quality's products and had its attorneys assess a potential infringement suit. *See* Appx11460-61; Appx11482-88; Appx11492-97; Appx11499; Appx11667-764; Appx9945-47. A jury could find that these were steps in furtherance of Tenaris's attempted monopolization.

## III. THE DISTRICT COURT IGNORED MATERIAL FACT DISPUTES REGARDING THE RELEVANT MARKET

The district court's decision also defies *Walker Process*'s admonition that "there is no way to measure" an attempted monopolist's "ability to lessen or destroy

competition" without defining the "relevant market for the product involved." 382 U.S. at 177. The court said nothing at all about the relevant market—or the myriad fact disputes that precluded summary judgment on that issue.

The "[r]elevant market" for antitrust purposes has two components. *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir. 1983); *see Transweb*, 812 F.3d at 1307 (regional circuit law governs market definition). The "product market" includes all products "'that have reasonable interchangeability for the purposes for which they were produced—price, use and qualities considered.'" *Hornsby Oil*, 714 F.2d at 1393. The "geographic market" is the area "in which the particular product or its reasonably interchangeable substitutes are traded." *Id.*

"The issue of relevant market is a fact question." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 719 (5th Cir. 1999). Given the "ad hoc, fact-specific core embedded in any determination of relevant market," courts "cannot frequently say as a matter of law that plaintiffs have no disputed material facts upon which to proceed to trial." *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985). This case is no exception.

### A. Evidence Showed That Quenched-and-Tempered Tubing Comprises a Distinct Product Market

To identify the relevant product market, Global's expert, Dr. Reiff, applied a standard economic tool—the hypothetical monopolist test. Appx10908-10(¶¶36-39); *see Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (market

analysis "[o]ften" involves this test); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022) (similar).

Starting with the market for quenched-and-tempered coiled tubing, Dr. Reiff considered whether a small but significant and non-transitory increase in price ("SSNIP") of 5% would drive a substantial number of customers to switch to the nearest alternative (here, conventional coiled tubing). The answer was "no." Appx10910-13 (¶¶39-45). Given the products' pricing, uses, and qualities, Dr. Reiff concluded that "customers would generally not switch to conventional coiled tubing because such coiled tubing cannot be used effectively in environments in which Q&T coiled tubing is normally implemented." Appx10912-13 (¶44); *see* Appx5957 (107:24-108:13).

Conventional coiled tubing could not compete, Dr. Reiff explained, because it "has a number of limitations that lessen or eliminate its effectiveness in certain environments, primarily in horizontal shale wells." Appx10911 (¶42). That was critical in the relevant period, industry expert Altinkopru explained: By 2017, nearly all wells in the U.S. were horizontal. Appx5840-41 (¶¶52-54). The length and geometry of these wells exceeded the capabilities of conventional coiled tubing. Appx5842-43(¶¶55-60). The principal U.S. customers for coiled tubing thus "switched entirely from conventional coiled tubing to quench and temper coiled tubing to stay competitive." Appx5862 (¶105).

Tenaris's expert urged that the relevant market included both conventional and quenched-and-tempered products because they are "functional substitutes." Appx6110-14(¶45). But factfinders could easily reject that assertion, because the test looks to the "'area of ***effective*** competition.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (emphasis added). It is not enough that two products theoretically might be used for the same purpose. There must be "'***significant*** substitution in consumption or production.'" *Id.* (emphasis added). While both kinds of tubing could be used for ***some*** purposes, Dr. Reiff explained that consumers generally ***could not and would not switch***, despite significant increases in quenched-and-tempered tubing prices, because conventional tubing's limitations prevented its competitive use in the shale wells that predominate in the United States. Appx10896-97(¶¶14-16), Appx10911(¶¶41-44); Appx10920-21(¶59).

Indeed, Tenaris itself declared that Global "***could not compete*** with Tenaris's BlueCoil™ without a quench and temper coiled tubing product of its own." Appx2083(¶15 (emphasis added)); Appx9283-84(¶15). Tenaris's pricing strategy corroborated that claim. If conventional coiled tubing were a reasonable substitute for quenched-and-tempered products, Dr. Reiff testified, Tenaris would have discounted BlueCoil in response to lower-priced conventional products. Appx10915-16(¶51). But Tenaris continued to ***raise*** BlueCoil prices even after DURACOIL 110's launch in the hope that Global would "cooperate" by increasing

DURACOIL's price. Appx10915-16 (¶51); *see also* Appx5959 (114:6-22). A jury thus could find that quenched-and-tempered tubing occupies its own product market.

### B. Evidence Showed that the Relevant Geographic Market Was the United States

Dr. Reiff also showed that U.S. customers could not realistically respond to increased prices by substituting quenched-and-tempered tubing from non-U.S. sources. Appx10922-24 (¶¶63-66). For one thing, at least as of June 2022, there had never been any non-U.S. sources for quenched-and-tempered tubing. Appx10923 (¶64); Appx5863 (¶110). For another, even if quenched-and-tempered tubing could be bought overseas, transportation costs and tariffs would make importing it to the United States impractical and costly. Appx10923-24 (¶¶65-66).

Nor would it matter if suppliers sold quenched-and-tempered tubing at the same prices worldwide. Appx6128-29 (¶¶74-78). The Merger Guidelines Tenaris's expert cited make clear that customer location remains important if, as Dr. Reiff found, "price discrimination based on customer location is ***feasible***." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* §4.2 (2010) (emphasis added). Given tariffs and transportation costs associated with tubing importation, a reasonable jury could agree that U.S.-based customers would have nowhere else to "turn for alternative products or sources of the product" in the face of Tenaris price increases. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,

123 F.3d 301, 311 (5th Cir. 1997). The district court erred in granting summary judgment without addressing those fact-intensive disputes.

* * *

There is no way to know exactly why the trial court granted Tenaris's motion in the face of the evidence. The trial court never explained why it looked only at market ***share*** rather than the exclusionary potential of the asserted patents. It never explained why it focused on the state of the market two years ***after*** Tenaris attempted to exclude Global. And it never said ***what*** it thought the relevant market was. Appx31191 (74:17-19).

"It is not [this Court's] role to scour the record and search for something to justify a lower court's conclusions, particularly at the summary judgment stage." *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 707 (Fed. Cir. 2012). That is especially true where, as here, "the record shows many potential issues of fact that would prevent entry of summary judgment." *Rsch. Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1254 (Fed. Cir. 2008).

## CONCLUSION

The district court's order granting summary judgment on Global's *Walker Process* claim should be reversed.

January 5, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken
*Counsel of Record*
Rayiner I. Hashem
Lauren M. Weinstein
Walter H Hawes IV
Lois S. Ahn*
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000 (telephone)
(202) 556-2001 (fax)
jlamken@mololamken.com

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (fax)

**Admitted only in New York; practice limited to matters before federal courts and federal agencies*

R. Paul Yetter
Jeffrey A. Andrews
Matthew C. Zorn
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, TX 77002
(713) 632-8000 (telephone)
(713) 632-8002 (fax)
pyetter@yettercoleman.com

*Counsel for Cross-Appellant Global Tubing LLC*

# ADDENDUM

# ADDENDUM – TABLE OF CONTENTS

Page

Minute Entry Granting Tenaris's Motion for Summary Judgment as to Global's Sherman Act Claim (Oct. 7, 2022) ................................Appx001051

Transcript of October 7, 2022 Motion Hearing re: Tenaris's Motion for Summary Judgment as to Global's Sherman Act Claim (Dkt. 540, Oct. 12, 2022)..............................................................Appx031118

| | | | |
|---|---|---|---|
| | | | Appendix Exhibits B−D) (LoCascio, Gregg) (Entered: 09/30/2022) |
| | 09/30/2022 | 529 | AO 435 TRANSCRIPT REQUEST by Tenaris Coiled Tubes, LLC/Leslie M. Schmidt, P.C. for Transcript of Status Conference on 9/30/2022 before Judge Ellison. 3−Day turnaround requested. Court Reporter/Transcriber: Mary Capetillo, filed. (Schmidt, Leslie) (Entered: 09/30/2022) |
| | 09/30/2022 | 530 | SEALED REPLY *In Support* re: 447 SEALED MOTION *for Summary Judgment that Gonzalo Gomez is Not an Inventor on the '256, '074, and '075 Patents as a Matter of Law* by Tenaris Coiled Tubes LLC, filed. (Attachments: # 1 Declaration of Leslie M. Schmidt in Support of Defendants' Motion for Summary Judgment that Gonzalo Gomez Is Not an Inventor on the '256, '074, and '075 Patents as a Matter of Law, # 2 Appendix Exhibits 35−42) (LoCascio, Gregg) (Entered: 09/30/2022) |
| | 09/30/2022 | 531 | SEALED REPLY *In Support* re: 458 SEALED MOTION *for Summary Judgment of No Inequitable Conduct on All Non−Inventorship Grounds* by Tenaris Coiled Tubes LLC, filed. (Attachments: # 1 Declaration of Leslie M. Schmidt in Support of Motion for Summary Judgement of No Inequitable Conduct on All Non−Inventorship Grounds, # 2 Appendix Exhibits 36−44) (LoCascio, Gregg) (Entered: 09/30/2022) |
| | 09/30/2022 | | Minute Entry for proceedings held before Judge Keith P Ellison. STATUS CONFERENCE held on 9/30/2022. The Court addressed issues related to the scheduling on the record. Appearances: Jeffrey A Andrews, David Joshua Gutierrez, Megan McGlynn, Matthew Scott Owen, Erin Cady.(Court Reporter: N. Capetillo)(Law Clerk: I.S.), filed.(arrivera, 4) (Entered: 10/07/2022) |
| | 10/03/2022 | 532 | Notice of Filing of Official Transcript as to 521 Transcript. Party notified, filed. (HeatherCarr, 4) (Entered: 10/03/2022) |
| | 10/03/2022 | 533 | NOTICE of Setting as to 450 SEALED MOTION *for Summary Judgment as to Global Tubing, LLC's Sherman Act Claim*. Parties notified. Motion Hearing set for 10/7/2022 at 02:30 PM in by telephone before Judge Keith P Ellison, filed. (arrivera, 4) (Entered: 10/03/2022) |
| | 10/07/2022 | 534 | AO 435 TRANSCRIPT REQUEST by Global Tubing, LLC / Jeffrey A. Andrews for Transcript of Motion Hearing on 10/07/22 before Judge Ellison. 3−Day turnaround requested. Court Reporter/Transcriber: Mary Capetillo, filed. (Andrews, Jeffrey) (Entered: 10/07/2022) |
| | 10/07/2022 | 535 | SEALED RESPONSE *to Objections on Dr. Alexander Hudgins' Opinions on Martensite and Discovery and Opinions on the Grandchildren Patents (Dkt. 502)* re: 502 Sealed Document, 471 Order on Motion to Strike,,,, Order on Motion for Approval,,, by Global Tubing LLC, filed. (Attachments: # 1 Appendix, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Proposed Order) (Andrews, Jeffrey) (Entered: 10/07/2022) |
| * | 10/07/2022 | | Minute Entry for proceedings held before Judge Keith P Ellison. MOTION HEARING held on 10/7/2022 held on 10/07/2022 on the Opposed Motion for Summary Judgment as to Globals Sherman Act Claim filed by Tenaris. (Doc. 450). The Court GRANTED the Motion. Appearances: (Court Reporter: D. Smith)(Law Clerk: I.S.), filed.(arrivera, 4) (Entered: 10/12/2022) |
| | 10/09/2022 | 536 | AO 435 TRANSCRIPT REQUEST by Tenaris Coiled Tubes, LLC for Transcript of Motion Hearing on 10/7/2022 before Judge Ellison. 3−Day turnaround requested. Court Reporter/Transcriber: Mary Capetillo, filed. (Schmidt, Leslie) (Entered: 10/09/2022) |
| | 10/11/2022 | 537 | TRANSCRIPT re: Status Conference held on 9−30−2022 before Judge Keith P Ellison. Court Reporter/Transcriber Mary Capetillo. Ordering Party Jeffrey Andrews Release of Transcript Restriction set for 1/9/2023., filed. (MaryCapetillo, 4) (Entered: 10/11/2022) |
| | 10/11/2022 | 538 | SEALED DOCUMENT *Global's Hearing Materials from the 10.07.2022 Hearing on Dkt. 450* by Global Tubing LLC, filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 |

* Identifies a text-only order on appeal.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

******************************************************************

GLOBAL TUBING LLC 4:17-CV-03299

VS. HOUSTON, TEXAS

TENARIS COILED TUBES LLC OCTOBER 7, 2022

******************************************************************

TRANSCRIPT OF MOTION PROCEEDINGS
HEARD BEFORE THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

******************************************************************

APPEARANCES:

FOR THE PLAINTIFF: MR. JEFFREY A. ANDREWS
MR. DAVID JOSHUA GUTIERREZ
MR. CHUCK MATULA
Yetter Coleman LLP
811 Main Street
Suite 4100
Houston, Texas 77002

FOR THE DEFENDANT: MR. MATTHEW SCOTT OWEN
MS. ERIN CADY
MS. MEGAN MCGLYNN
MS. HANNAH C. SIMSON
Kirkland Ellis LLP
1301 Pennsylvania Ave NW
Washington, DC 20004

Official Court Reporter: David S. Smith, CSR, RPR, CRR
Official Court Reporter
United States District Court
Southern District of Texas
515 Rusk, Room 8004
Houston, Texas 77002

Proceedings recorded by mechanical stenography, transcript produced via computer.

P R O C E E D I N G S

THE COURT: Good afternoon and welcome. I'm sorry to do this to you on a Friday afternoon.

Global Tubing versus Tenaris. We'll take appearances of counsel. I know you've been through it with the court reporter; but for my benefit, appearances of counsel beginning with plaintiff.

MR. ANDREWS: Good afternoon, Your Honor.

Jeff Andrews for Global Tubing. With me is David Gutierrez and Chuck Matula.

THE COURT: Welcome to all of you.

MR. OWEN: Good afternoon, Your Honor.

Matthew Owen from Kirkland & Ellis on behalf of Tenaris. And with me today is Erin Cady, Megan McGlynn and Hannah Simson.

THE COURT: Welcome to all of you.

Okay. Have you discussed how you wish to proceed today?

MR. OWEN: We haven't discussed it. I'd defer to Mr. Andrews, but it's out motion. I'd be happy to go first.

MR. ANDREWS: I had actually anticipated that you would because it's your motion.

THE COURT: Yes. Let's start with Tenaris. It's their motion, so you can go first. You can assume I've read the briefs.

MR. OWEN: Good afternoon, Your Honor.
THE COURT: Good afternoon.
MR. OWEN: May it please the Court.
The motion for summary judgment on Global Tubing's Sherman Act claim should be granted for the reasons set forth in our brief, but I want to focus on the principal one.
The principal one is that Global Tubing, as the plaintiff in a Sherman Act attempted monopolization case is required to prove that Tenaris has a dangerous probability of achieving monopoly power in a relevant market.
And, of course, as Your Honor knows, we do not agree with their definition of the relevant market --
THE COURT: Yes.
MR. OWEN: -- and we don't agree with the admissibility of their expert reports.
But leaving all of those things aside, on this summary judgment motion, if you accept everything that Global Tubing's experts say is true about what the relevant market is and what Tenaris's current market share is and what its market share relative to its competitors will be if it succeeds in excluding Global Tubing from the quenched and tempered market, the result would be, as a matter of law, not a monopoly.
So their expert reports, their expert opinions say that at the moment Tenaris has a 17 percent market share

and its two competitors, Global Tubing and Quality Tubing, which is not a party here, have the remaining 83 percent combined. So we're the smallest player according to their experts now.

And if Global Tubing were to exit the quenched and tempered market, Global Tubing's own experts say that its sales would be distributed pro rata and the result would be a market with two players -- Tenaris with something like 29 or 30 percent of the market, depending on which version of Dr. Reiff's expert report you read and the remaining 70 or 71 percent would be held by somebody else.

And as a matter of law in the Fifth Circuit and in every other circuit as far as we know, there is no basis to allege that a player, a market participant with less than half or less than really a third of the market share of the whole market could be a monopolist with the power to restrict output, raise prices and dominate its competitor. That's not possible where the other player in the market has a 70 percent share.

Now, I think from the briefs that Global Tubing knows that that's a problem for their Sherman Act claim; and the way that Your Honor can know that is that their opposition to our summary judgment brief defends that theory that they have litigated since the complaint stage, the motion to dismiss stage, all the way through the service of their expert reports for about two pages. I think it's Pages 19 through 21 that

defends that theory.

THE COURT: Could you swing that microphone a little bit closer to you?

MR. OWEN: Is that better, Your Honor?

THE COURT: More. Thank you.

MR. OWEN: Is that better now?

THE COURT: Yes, it's better.

MR. OWEN: The gist of Global's opposition to our summary judgment motion is really to defend their antitrust claim on two new theories nowhere reflected in their complaint or the expert reports that they serve and which, in fact, contradict those reports. I'll mention both of them.

The first is, as we put it in our brief, the enforcement against Quality theory; and the second is a --

THE COURT: The what theory?

MR. OWEN: The enforcement against Quality theory.

THE COURT: Yes. I saw that.

MR. OWEN: I think you can see why Global wants to try to advance this argument, because if their own evidence --

THE COURT: Because Quality is the biggest player.

MR. OWEN: I'm sorry, Your Honor.

THE COURT: Because Quality is the biggest player by far, right?

MR. OWEN: Right. They're the biggest player, and their theory is that we're the monopolist and not them.

In order to make that theory into an antitrust case, I think Global knows that what they should have done is try to litigate some theory about how we could possibly exclude Quality from the market for quenched and tempered tubes, but they didn't do that.

Their complaint alleges only that the anticompetitive conduct that they're alleging is enforcement of our patents against Global Tubing. It doesn't say anything about Quality. Global Tubing did not take discovery from or about Quality Tubing. There is no lawsuit between Tenaris and Quality Tubing. There is no evidence cited in their brief or anywhere else that we are aware of of any threat to try to enforce a patent against Quality Tubing, nor is there any evidence of the kind that Your Honor knows would exist at the end of a patent litigation case where somebody takes a sample of Quality Tubing's products, submits it to expert examination, takes fact discovery, depositions and expert reports about whether those products infringe our patents, whether it's possible that we were going to try to enforce a patent claim against them. None of that's happened.

And there's a reason that none of that has happened. It's that for the last three years Quality Tubing has been a player in the quenched and tempered market. They entered in 2019. Everyone agrees that they are the largest player. And three years later my client, Tenaris, has not sued

them, has not threatened to sue them and there is no declaratory judgment action or any other kind of noise from Quality Tubing -- who, again, is not a party to this case and is not here -- suggesting that they are concerned that we're going to come after them for anything.

For that reason it's not surprising that Dr. Reiff, Global Tubing's antitrust expert, in his report says nothing about this. He wrote a report about the theory that Global Tubing pled in its complaint, defended at the motion to dismiss stage, took discovery about and then filed an expert report about and that theory is that we are only going to enforce our patents against them.

The problem is that, as I said earlier, the result, even according to them, is not a monopoly. It's that we're going to be the second largest player.

I want to note that there are some exhibits; and we've discussed this in our brief so unless the Court has questions, I won't go through them. But the evidence we cited in Global Tubing's opposition to summary judgment in support of the theory that Tenaris is going to pursue some kind of a patent claim against Quality Tubing doesn't come close to saying that.

Most of those documents, if Your Honor reads them, you will see that they are just documents where either Tenaris comments that it's competing with both Global and

Quality Tubing -- and one document cited in their brief that there is a reference to needing to lower our prices, give discounts in order to compete with Quality Tubing and then they've cited some privilege logs and those privilege logs, according to Global Tubing, suggest that my client may have sought legal advice about whether they had a claim against Quality Tubing. But again, the proof is in the pudding. Three years later no one has filed such a claim.

None of that, I submit, Your Honor, if Quality Tubing itself had come to this Court and asked for a declaratory judgment action of noninfringement and the only things that it could allege in a complaint for such a declaratory judgment are the things that Global Tubing has put in its brief, I doubt that Your Honor would think that they had even asserted enough evidence to plausibly allege standing for any kind of imminent injury, but certainly they could not survive summary judgment if at the close of discovery that's all there was.

And, as I say, the reason that the Court can know for sure that this theory, the enforcement against Quality theory, is a kind of a belated invention to change the theory of liability after the close of discovery is because none of that evidence -- none of it -- is cited in Dr. Reiff's report.

And if -- if Global Tubing had, indeed, intended to pursue this theory of liability for this case, there's a

100 percent chance that their antitrust expert would have reviewed and offered an opinion about that evidence.

But instead, Dr. Reiff admitted at his deposition -- I believe it's Exhibit 5 to our motion for summary judgment and if Your Honor looks at Pages 9 and 10 and I think it goes through Page 92 of the transcript -- you will see that Dr. Reiff admits that the only basis for his assumption that Tenaris might be able to pursue a claim against Quality is that that is an assumption provided to him by Global's lawyers, which is a thing that Rule 26 allowed us to report.

The other alternate theory in Global's summary judgment opposition, that, again, is not in their complaint, is what we call the snapshot-in-time theory. And just to make sure I explain what I think this means, what Global is saying is that Tenaris used to have monopoly power in the quenched and tempered market between 2017, when its parent '256 patent issued -- Your Honor will remember that that is the patent that the infringement claims have now been voluntarily dismissed -- until 2019 and for that period of time Global says we must have been -- Tenaris must have been a monopolist.

And that again is a theory they have never litigated. Their complaint -- we moved to dismiss their complaint when it was filed.

In response to that motion to dismiss, Global

Tubing acknowledged that the anticompetitive conduct they were suing about was not the parent patent. It was the children patents that are still before this Court.

There is a good reason for that. The good reason for that is that between 2017, when the parent patent issued, and 2019 other competitors, including both Global and Quality, did enter the market. That is undisputed. Not only did they enter the market; but, as we've just discussed, both of them, according to Global, have eclipsed Tenaris in terms of market share by a considerable margin; and as a result there will be no way, even at the complaint stage, for Global Tubing to have plausibly alleged that the parent patent itself was a barrier to entry into this market or inflicted any antitrust injury.

So in their opposition to the motion to dismiss, Global Tubing was clear that what it was suing about under the Sherman Act claim was the enforcement of the children patents only. Now, that admission should extinguish their new theory, the snapshot in time, sort of 2017 to 2019 parent patent --

THE COURT: Why would the snapshot be relevant anyway? Isn't it -- isn't children required one of the persistent positions in the market?

MR. OWEN: I completely agree, Your Honor. I think the point I was making is because that's true, because it's obvious that the parent patent did not confer any persistent market power. How could it? There were two other competitors that

entered within two years of that patent's issuance; and, as I say, their market share is now larger than my client's. Because it's obvious that no persistent monopoly power or strong market power was conferred by that patent, that can't be a basis for a Sherman Act claim, which is why they conceded away at the complaint stage that isn't what they were alleging.

But now in order to attempt to withstand summary judgment, they want to go back to that theory; and it is meritless for the same reasons that it was meritless at the complaint stage.

I think that Your Honor could and, in fact, should in ruling on the summary judgment motion stop there. Those are -- all of these are matters of law. They are fairly well established in Fifth Circuit precedent and precedents of many other courts, that a market participant does not have monopoly power at less than 50 percent of market share. There are no cases that we aware of in which a 29 percent market share participant has ever been held to have monopoly power; and if there were to be such a case, I am confident it would not -- the Fifth Circuit would not think that that case would arise when the other participant in the same market has a 70 percent share.

THE COURT: The 29 percent figure is speculative anyway, as if Global is forced from the market, right?

MR. OWEN: It is. That is the opinion of Global

Tubing's antitrust expert. So on summary judgment we're just accepting it as true. That's their position.

I mean, I -- if we had known that Dr. Reiff was going to say that at the end of this case that we would end up with a 29 percent market share, we would have hired him. I mean it's -- that should conclusively refute their attempted monopolization claim on the dangerous probability of success element.

THE COURT: Okay.

MR. OWEN: There are a couple of other items in our brief that I think I'll try to cover quickly.

The first is that we also think that Global Tubing's market definition is legally insufficient to survive summary judgment. There are two aspects to market definition in antitrust law. The first is the product market and the second is the geographic market and in our view neither of them have been -- Global has not introduced evidence to sustain their --

THE COURT: That's a fact question, isn't it, whether one is a substitute for another?

MR. OWEN: Well, it would be a fact question if there were any evidence to support Global Tubing's suggestion that they're not. So you're completely right, Your Honor, that the standard for a product market definition is that a market -- a relevant product market has to contain all of the goods that

are reasonably substitutable for each other.

But there should be no dispute that quenched and tempered coils, which is what Global Tubing says is the only thing in the product market, can and do perform the -- and does perform the same functions as both conventionally manufactured coils and the same functions as stick pipe.

Now, if, for example, their antitrust expert had been asked to or rendered an opinion that contradicted what I just said, then maybe we would have a fact question for the jury; but that's not true.

Their own industry expert, Mr. Altinkopru, agrees with what I just said, that stick pipe and conventional coils can and do perform the same functions.

Dr. Reiff acknowledged at his deposition that conventional coils and stick pipe can perform the same function. But Dr. Reiff's report, even though -- even though -- Global's own expert, industry expert, said in his report or acknowledged that stick pipe can perform those functions and Dr. Reiff conferred with him before writing his report, his report doesn't mention it at all.

And so although there could be a fact -- you can imagine a circumstance where there would be a fact question for the jury where we say, "Stick pipe and quenched and tempered coils do the same kinds of things" and they say, "No, they don't," in order to have a fact question about that, they would

have to produce some evidence that says, "No, they don't."

But that's not actually what they've done. What they've done instead is in their opposition brief to our motion for summary judgment on this one, Global Tubing goes through the Brown Shoe factors, which are -- which are legally irrelevant because those factors do not define the contours of a product market. Brown Shoe enumerates factors to define the contours of kind of the esoteric antitrust concept of a submarket, the continuing viability of which we're not sure of, but it doesn't matter because those factors are, it's very clear, not a substitute for the legal test for defining a product market in the first place.

Once you define a product market, if someone wants to plead a submarket, we could discuss those factors; but Global Tubing hasn't done that.

So their response to the absence of evidence that these products are not substitutable is a doctrinally incorrect test, which for the reasons explained in our brief doesn't show -- it doesn't show that those products aren't substitutable anyway.

There's finally a problem with the geographic market as well. So all three of the manufacturers of quenched and tempered coils, which is their preferred product market definition, operate in Houston, Texas; and they sell worldwide.

And because they are the plaintiff, Global Tubing

is required to define a legally sufficient geographic market against which its market share and other allegations can be tested in discovery, expert reports and trial. The problem is that when -- when three -- all three manufacturers are located in the same place, but they sell everywhere, there is no reason to limit the geographic market to the United States unless -- and this is a matter of agreement -- unless there is price discrimination between U.S. and non-U.S. sales.

But everyone acknowledges that that's not true. Their antitrust expert, Dr. Reiff, acknowledged that he saw no evidence of price discrimination between U.S. and non-U.S. sales.

Global Tubing does not contend that there is any such evidence. In their brief they -- I think it's more fair to say they think it doesn't make a difference, that they should be able to proceed on the sort of wrong geographic market or they should be allowed to amend their complaint perhaps to sort of allege a worldwide market. The problem with that is that it is too late. The absence of price discrimination by Global Tubing itself, among the other -- you know, the other two manufacturers, between domestic and international sales, is a fact that Global has known the whole time because they are the ones doing the selling and now years later where we almost went -- you know, we were a few weeks from trial, as the court knows, fact discovery has closed,

expert discovery has closed, to suggest that there's no difference between a case where we're going to take discovery and prepare to defend ourselves about one market and another market that encompasses the whole world, we think that that change would prejudice us and is simply untimely.

THE COURT: Thank you.

MR. OWEN: Thank you.

THE COURT: Mr. Andrews?

MR. ANDREWS: Your Honor, if I may just hand up a reference book.

THE COURT: Give it to Mr. Rivera. Give it to Mr. Rivera.

MR. ANDREWS: Of course.

Thank you, Your Honor; and good afternoon.

THE COURT: Good afternoon.

MR. ANDREWS: And thank you for making the time and for seeing us in person. I do want to thank our friends on the other side for coming here from Washington so we can --

THE COURT: I'm sorry. I know it's going to cut into your weekend, and I apologize for that.

MR. ANDREWS: They were kind enough to give us the courtesy because we asked if we could argue in person, so thank you for that.

Mr. Owen made a lot of good arguments. There's a lot to unpack there.

I'd like to start with just a couple of top points in direct response to a couple of things Mr. Owen said, which is it is -- of course it should be no surprise that Tenaris has not advanced any patent infringement claims against Quality NOV at this point when it is in the middle of the antitrust suit. I would find it very surprising if they had engaged in those claims.

THE COURT: But isn't that the theory? Isn't that the new theory, that it's Quality -- it's going to be Tenaris's conduct vis-a-vis Quality Tubing rather than vis-a-vis Tenaris that's going to show the monopoly?

MR. ANDREWS: Well, Your Honor, first it's not a new theory so I do disagree with Tenaris's framing of that. But it is -- I think it is an end result of Tenaris's ultimate fraudulent scheme -- anticompetitive scheme in our theory of the case, where once our -- once Global is taken out of the market, we believe there's evidence sufficient to present to a jury on this that Tenaris will turn its sights to Quality Tubing and advance its patents against them as well.

THE COURT: What's that belief based on though?

MR. ANDREWS: It is based on -- well, if you would like to jump to that.

THE COURT: You can take it in whatever order you want.

MR. ANDREWS: Okay, Your Honor. Thank you.

Because I do want to step back for a moment and

set some context here; and that is to make clear that what we're talking about here is an attempted monopolization claim and there's a, of course, three-element test, just to put this all in perspective, that the defendant has engaged in predatory or anticompetitive conduct, that's No. 1; 2 with specific intent to monopolize; and, 3, a dangerous probability of achieving monopoly power.

So what we're fighting about is the dangerous probability of achieving monopoly power. The first two are not disputed here. And just referencing Tab 1 in the notebook, those elements are the *Spectrum Sports v. McQuillan*.

So the question today is viewing all facts and inferences in the light most favorable to Global, is there a genuine dispute of material fact that Tenaris had a dangerous probability of success in achieving monopoly power at the time its anticompetitive conduct began?

And that last part is critical, Your Honor. The Fifth Circuit is clear that attempted monopolization needs to be considered standing at the point in time when Tenaris's anticompetitive conduct began, not standing here today and looking backwards and not standing, say, in 2019 July when NOV entered the market and looking backwards and saying, "Well, now there's a three-player market."

So the Fifth Circuit has explained that "When evaluating the element of dangerous probability of success, we

Case: 23-1882 Document: 25 Page: 118 Filed: 01/05/2024


do not rely on hindsight, but examine the probability of success at the times the act occurred."

Tenaris hasn't disputed that; and that is at Tab 2, *United States v. American Airlines*, at Page 1118.

So I just want to circle back around this because it's a tricky thing. Attempted monopolization is a prospective claim, so we're going back in time and looking forward.

And, Your Honor, you had asked about the persistence of the dangers of monopolization; and this gets right to that point.

From Global's perspective -- and I'll lay out why this isn't a new theory and where it's been disclosed, et cetera, et cetera, in a moment. But taking that aside for one moment, Global's theory is that Tenaris's anticompetitive conduct began in November of 2017 when its patent issued.

Now, at the very least it happened in that 2017 to 2019 time period. So in evaluating the attempted monopolization claim, what we need to do is go back to November 2017 and say there was a two-player market, Tenaris has a patent that it itself says covers the entire product market, at least by Global's definition and for summary judgment purposes we need to give that benefit to Global and so there are no alternatives.

And so this is a classic most pure form of monopolization. Two-player market. One has a patent that

covers the entire market and it excludes the other. That is 100 percent monopoly power. That is not something that needs an expert to talk about. That is something that is very straightforward and we cannot look at it from the perspective of saying, "Well, when Tenaris did that, it knew that its monopoly power would not be persistent because Quality NOV was coming into the market in July of 2019."

Tenaris had no idea what was going to happen, and that's the framework in which we have to view the attempted monopolization claim.

So this then brings us to the nub of the dispute and I think that there are two levels here and both show why this is such a fact-dependant inquiry.

First is that in order to decide whether or not there's a likelihood or a dangerous probability of monopolization, we have to define the product market. There's a dispute about that.

THE COURT: Yes.

MR. ANDREWS: But we can't understand whether or not there is this probability of monopolization without knowing that important information that the jury is going to have to decide.

The second factual issue that the jury needs to decide is when did Tenaris's anticompetitive conduct begin? Because only by knowing that can the dangerous probability

Case: 23-1882 Document: 25 Page: 120 Filed: 01/05/2024



analysis be performed.

So if you look at Tab 3, there's a timeline that summarizes some of these various events and the stepping stones of where there might be the beginning of anticompetitive conduct by Tenaris.

Now, of course Global thinks it was November of 2017 when the patent issued, even though the inventor submitted a false declaration to the patent office and withheld the material prior art. But it could be in November of 2018 because that's when Tenaris implemented its fraudulent change of inventorship scheme to get the children patents allowed. But it could be in March of 2019 when Tenaris first asserted a counterclaim of infringement of the parent patent with present knowledge at that time, which was not known to Global at the time because the documents had not been produced; but Tenaris had present knowledge that as of December 2018 or January 2019, Tenaris and its attorneys were talking about this Valdez declaration where Valdez said, "It's not a good idea to disclose this key prior art to the patent office" and that the declaration was false and fraudulent.

And so Tenaris went ahead and filed the counterclaim for infringement of the parent patent knowing about that flaw and it was currently thinking about it, so maybe that's when the anticompetitive conduct began.

Or April of 2019 when Tenaris executed its scheme

to fraudulently disclose the key prior art to the patent office where it separated the brochure and threw out some pages and then submitted the key prior art to the patent office as separate documents and misrepresented what they were.

There are all those events, and all that evidence is going to be before the jury to decide did Tenaris's conduct begin when there was a two-player market? And if it did, Tenaris -- without using the benefit of hindsight, Tenaris would have had no idea whether or not Quality Tubing was coming in.

So Tenaris might argue our anticompetitive conduct did not start until August of 2019 when Tenaris asserted the children patents against Global in this case. By that time Quality Tubing was already in the market, so there was a three-player market. But Tenaris can argue that to the jury, and that's a fact determination that the jury needs to weigh in on.

So, you know, what this comes down to is we -- we have as much confidence in the jury as we know this Court does and it's our job as advocates to streamline this case and we think that we can do that efficiently.

Tenaris has hired excellent lawyers on their side; and we think that the jury will be presented with the arguments, they'll understand, and they'll make the decision; but there are baked-in important factual determinations to make

there.

So the fact that -- I'm getting ahead of myself. I just do want to say that I suppose digging in a little bit more about this dangerous probability, Tenaris argues that Global cannot establish dangerous probability as a matter of law in part at least because of Dr. Reiff's expert analysis; but again this is only viewing the market based on hindsight at a time when the anticompetitive conduct really began once there was a three-player market and Global doesn't think that is the case.

So in advancing its position Tenaris -- there's three fundamental flaws in our view. It ignores the requirement that the dangerous probability must be assessed at the time that the anticompetitive conduct began. It ignores the effect of Tenaris's patent where there are no alternatives to the market, at least in the market that Global has asserted; and it ignores the importance of factors beyond just naked market share, the fact that there is a patent there, the fact that there are pricing and structural constraints in the market that can be used to bolster and to supplement an analysis that's just based on naked market share.

So the snapshot-in-time argument. You know, there are cases at Tabs 2 and 7, that's *United States v. American Airlines* and *HDC Medical v. Minntech*. That's a Fifth Circuit and an Eighth Circuit case that make it clear

that dangerous probability of success should be evaluated when the alleged conducted occurred.

And at Tab 8 we've provided --

THE COURT: So your belief is that there's dangerous probability hinges on it being an all-encompassing patent that will drive other people out of the market; is that right?

MR. ANDREWS: It has -- I wouldn't say it hinges on that because I think that there could be a dangerous probability of the market even -- I'm sorry, excuse me -- of monopolization under Tenaris's theory of the market; but I have not done that analysis, Your Honor.

So from our view and for summary judgment purposes where we have disputed facts about what the product market is, we say it's only quenched and tempered and they say it's quenched and tempered plus conventional. So for summary judgment purposes we have to give Global the benefit of that.

And then so, yes, it is then, therefore, a fact that we have evidence to show that Tenaris believes -- and we've provided this in our briefs -- Tenaris believes that its patent covers all quenched and tempered coiled tubing. They have taken the position that they have invented quenched and tempered coil tubing and that there isn't any quenched and tempered tubing that does not infringe their patent.

THE COURT: Well, doesn't it also depend on getting rid of Quality when Quality does enter the market?

MR. ANDREWS: Well, if it does enter the market -- but that's a separate analysis, Your Honor, because that is then moving the time period based on, you know, when the -- it's not a moving time period of where you assess dangerous probability. The cases say it's when the anticompetitive conduct began and then you don't use hindsight and so at that time there's a two-player market and Tenaris has a patent that it says covers all quenched and tempered coiled tubing. Global says that the relevant product market is quenched and tempered coiled tubing.

So if Tenaris's scheme to exclude Global from the market is successful, Tenaris would have a 100 percent monopoly in the relevant market.

THE COURT: What's your best case for the theory that a successful patent which potentially drives other players from the market can by itself mean a monopolist is at work?

MR. ANDREWS: Well, it is not -- I want to be careful here, because there's the *Illinois Tool* case and I don't want -- I don't want the Court to think that I'm arguing that there's a presumption of market power with a patent. There is not -- the Supreme Court made that clear in *Illinois Tool*.

But what there is -- this not that case. This is a case where there is the complete overlap. So I would say our best case on that point -- I'm looking, Your Honor. I'm afraid I'm lost in my notes.

THE COURT: That's all right. That's all right. You

can resume your argument.

MR. ANDREWS: We will come to it, and I will remember to flag it. My apologies, Your Honor.

And so on the snapshot in time, Tenaris launches three attacks against Global's argument.

THE COURT: Say it again.

MR. ANDREWS: The snapshot-in-time theory that Tenaris has put up to attack, so Global's snapshot-in-time theory, Tenaris has attacked with three arguments as we've seen them and we think that all three of them fail.

Its first argument is Tenaris would have only had a fleeting market power because Quality NOV entered in 2019. And we've discussed this already. We think that their argument goes too far because -- for a couple of reasons.

You know, one is that Tenaris says that all quenched and tempered coiled tubing is covered by its patents; but the other is, of course, this hindsight bias problem.

So if we're looking at this -- and I think I've probably hit that enough, and I can move on from that.

THE COURT: Yes.

MR. ANDREWS: And so also on that persistence we think that Tenaris is wrong on the law. There's a Ninth Circuit case at Tab 9, *Oahu Gas Service v. Pacific Resources*: "A firm with a high market share may be able to exert market power in the short run, but substantial market power" --

Case: 23-1882 Document: 25 Page: 126 Filed: 01/05/2024


THE COURT: You're going too fast.

"Substantial market power" --

MR. ANDREWS: I'm sorry. And I did go too fast.

-- "may be able to exert market power in the short run, but substantial market power can persist only if there are significant and continuing barriers to entry."

So the patent is a classic barrier to entry; and where the patent covers the entirety of the relevant market, that is a very significant barrier to entry.

THE COURT: Well, then I'd think there be lots of cases on that, then.

MR. ANDREWS: Well, there is *PNY Technologies v. Sandisk* -- that's at Tab 10 -- which recognizes -- that's a Northern District of California case from 2012 -- that recognizes that "Although ownership of a patent does not necessarily confer market power" -- and it cites *Illinois Tool Works* -- "the allegation that Sandisk owns 100 percent of the technology patents is sufficient to plead a dominant share of the market."

That's not a summary judgment context there, but it is instructive.

The court then also said that "The plaintiff combines its allegation of 100 percent ownership of United States patents with other allegations showing not just a dominant market share, but the ability to control prices and

the existence of entry barriers."

There's also a Northern District of Illinois case from June 2021 at Tab 11, *"In Re: Opana ER Antitrust Litigation."*

That court said: "A reasonable juror could conclude that Opana ER constituted its own market and thus an agreement regarding Opana ER was an exercise of market power."

This is a patent antitrust case.

THE COURT: What kind of patent?

MR. ANDREWS: And then there's also *Hynix Semiconductor v. Rambus* at Tab 12, which is Northern District of California, 2008. We'll discuss that a little bit later. That's a particularly interesting case.

So Tenaris next says -- so its first -- its first argument is, "Hey, there would only be fleeting market power."

We disagree.

Second it says that Global's two-player market approach is untimely.

And we can't argue that because it's not in its pleadings.

But the Supreme Court has expressly rejected this theory of the pleading statement. And that's *Johnson v. City of Shelby, Mississippi;* and I believe that is Tab 13 in the notebook where the Supreme Court reversed the Fifth Circuit's erroneous application of theory of the pleadings in summary

judgment. And just like Tenaris is urging the Court to do now, according Wright & Miler -- that's at Tab 14 -- the federal rules displace theory of the pleadings.

THE COURT: The federal rules do what, now?

MR. ANDREWS: That Wright & Miller said that the federal rules displace this theory of the pleadings, this idea that a litigant is limited to the legal theories presented in its complaint. Under the federal rules, these are fact-based notice pleadings, not legal theory pleadings.

Wright & Miller explains: "In light of these understandings, Rule 8(a)(2) was seen as indicative of a basic objective of the rules to avoid civil cases turning on technicalities as has been the case prior to the adoption of the federal rules."

At Tab 15 there's another excerpt from Wright & Miller stating: "The federal rules effectively abolished the restrictive theory of the pleadings doctrine making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief. The text of several of the rules, although never specifically disavowing the doctrine, makes it very plain that the theory of the pleadings mentality has no place under federal practice."

So then we go to this idea that this is somehow -- somehow a new theory of the case. So Tenaris says, "Hey, this idea of looking at the two-competitor market is a

total new theory that only arose for the first time in opposition to motions for summary judgment."

But the fact of the matter is, Your Honor, that Global raised this theory as soon as Tenaris asked for discovery for it, and Tenaris never asked an antitrust interrogatory in this case until February of 2022, over a year after the close of fact discovery and it's reflected in Tab 3 in the timeline.

And at Tab 16 of the notebook is Tenaris's third set of interrogatories. I think that it is mistakenly labeled "second set," but it's the third set.

Now, these Interrogatories Tenaris issued, I believe, probably realizing that they had no contentions in the interrogatories about Global's contentions for inequitable conduct or Global's contentions for antitrust allegations.

So more than a year after the close of discovery Tenaris finally propounded these interrogatories, the parties negotiated a bit, agreed on some limited scope interrogatories and Global provided promptly its response. And you'll see those responses at Tab 17 of the notebook. It clearly states that the anticompetitive conduct allegations are based the on the '256 patent.

Global also disclosed earlier to the extent that Tenaris thought to ask discovery about antitrust. Tenaris's 30(b)(6) notice for deposition during discovery -- it's at

Tab 18 -- Topics 44 through 49 highlighted there are directed to antitrust questions for the corporate deposition; but Tenaris didn't ask questions directed to antitrust. The closest it came was some questions about product delays and Global's damages.

And those answers are in Tab 19, which is the transcript from the 30(b)(6) deposition, or at least excerpts from it. And Global has stated what Tenaris calls a new theory in hearings.

For example, in the August 5th, 2022, hearing excerpted at Tab 20 of the notebook global stated: "We have the *Walker Process* claim that stems from fraud from the '256 patent."

Even the second amended complaint -- and we reject this idea of the theory of the pleadings. But even the second amended complaint frames *Walker Process* in terms of all the asserted patents. It doesn't say just the children patents. We talk about the children patents. We talk about the parent patent, but we talk about antitrust with regard to the asserted patents and I direct the record to Paragraphs 151 and 152 and 153 of Global's second amended complaint, which is Docket No. 80 on that.

So third, Tenaris argues this estoppel point; and in the Fifth Circuit estoppel requires three elements.

The party's position must be plainly inconsistent

Case: 23-1882 Document: 25 Page: 131 Filed: 01/05/2024


with its prior position.

No. 2, the party must have convinced the Court to accept the prior position.

And No. 3, the party must not have acted inadvertently.

Those are laid out at Tab 21, the *Matheson Tri-Gas v. E-B Display* case.

THE COURT: That's judicial estoppel, right?

MR. ANDREWS: Yes, that's judicial estoppel, Your Honor; and it does not apply here.

First, this -- the statements that Tenaris is pointing to are in Docket No. 107, which is Global's response to Tenaris's fourth motion to dismiss. The fourth motion to dismiss was directed to the antitrust claims.

And at that time Global wasn't aware of the depth of Tenaris's fraud. Global hadn't moved to compel the Cymax and inventorship documents until June 2020. The statement in Docket 107 was made in February of 2020.

The Markman order came later in June of 2020, expanding the scope of the '256 patent, changing the dynamic of what could be designed around and whether or not there's something that, if there was a quenched and tempered coiled tubing that could arguably be outside of the patents.

Your Honor my recall that the parent patent has these chemistry requirements in it that the children patents do

not, at least for the independent claims. And Tenaris successfully got a construction off of the chemistry of the parent patent there was about the ranges and they -- they viewed that -- Tenaris viewed that in its briefings as an expansion of the scope.

What it meant practically is that now it becomes that much more difficult -- perhaps impossible, I don't know and haven't looked at the issue closely -- but at least much more difficult to design around the patents.

And so this goes into Tenaris's view that it invented quenched and tempered coiled tubing, that any quenched and tempered coiled tubing is under its patent and that, therefore, its patent completely covers the relevant product market that Global seeks.

This case is unique as it's developing because Tenaris was conducting what Global sees as its fraudulent scheme during the course of the litigation and Tenaris was keeping documents from the patent office and Tenaris was keeping documents out of the litigation. This was all part of the fraudulent scheme and the anticompetitive conduct.

But what it meant was Global had to fight hard to get these documents, and this was part of why this case has missed its original trial date. Global was fighting for more than a year to get the crime fraud documents related to the Cymax portion of the --

THE COURT: Yes. Judge Palermo handled all that, yeah.

MR. ANDREWS: And so --

THE COURT: I'm still troubled by the notion that a patent which gave rise to a suggestion of market domination would be a threat of monopoly power when the market player who had the patent was such a small percentage of the market. It just doesn't -- isn't that speculation on top of speculation?

MR. ANDREWS: I don't think so, Your Honor, because we're not asking for -- we don't have claims for actual monopolization. We have claims for attempted monopolization. And the case law is also clear, as are the hornbooks and the law review articles.

And I know that Mr. Owen is very familiar with that it doesn't matter if the scheme succeeds. It's whether or not there was anticompetitive conduct that, if successful, would have led to --

THE COURT: But really, other than be internal documents, Tenaris didn't make any aggressive moves toward Quality Tubing, did it?

MR. ANDREWS: No, it didn't, because as soon as the patent issued, Global Tubing filed its declaratory judgment suit. So there wasn't any time.

So Tenaris was already in a lawsuit that by February of 2020 had become an antitrust lawsuit; and I would think, Your Honor, that the last thing an antitrust defendant

wants to do when they're fighting off an attempted monopolization claim is to sue the one remaining market participant.

But I think all of that is beside the point because by Global's theory of the case that we have evidence to support, Tenaris's anticompetitive conduct began in November 2017 when the patent issued. Keep in mind when the patent issued Tenaris had already threatened Global with litigation. Tenaris was threatening Global with litigation before the patent issued.

THE COURT: Yes. I know that.

MR. ANDREWS: With the case law being so clear about attempted monopolization and any avoiding hindsight bias, which is the world we're in now, with the three-player market, right, but we have to avoid that and we have to stand in the shoes of Tenaris and Global Tubing in November 2017 or at least some period in the 2017 and '18 time frame and then look forward without knowing what we know now and to say, "Okay. If you have a two-player market and one player has a patent that covers the entire market, if that patentee excludes the other player, the patentee has a monopoly. That is the definition of monopoly power. That is a pure monopoly.

And so when Your Honor says, "Isn't that speculation," I would say no, it's not speculation. It's fact issues. So the fact issues that the jury has to decide is when

Case 4:17-cv-03299 Document 540 Filed on 10/13/22 in TXSD Page 36 of 75


did the anticompetitive conduct start and Global should be able to presents its evidence on that and at that time did Tenaris have a dangerous probability of achieving monopoly power.

Now, I would go so far as to say, Your Honor, that if a jury were to take our -- accept Global's relevant product market and accept that Tenaris started its anticompetitive conduct in 2017, that there would be no way that it could avoid finding that Tenaris had a dangerous probability of achieving monopoly power because there was only one other player in the market and that market was by Global's case --

THE COURT: So would it be finding an antitrust violation based on conduct that occurred some years ago?

MR. ANDREWS: Oh, absolutely. So, you know, my understanding is that an actual monopolization claim would be standing today and looking backwards, did somebody actually achieve a monopoly?

Attempted monopolization is trying to go back in time and looking forwards without -- without hindsight, disregarding everything we know now, and saying in the past when that claim accrued and when the anticompetitive conduct began, would the patentee have the dangerous probability of monopoly power?

And that is all the historical -- and that is necessarily historical and the case law says it does not matter

if it was a poorly executed plan. It didn't matter -- it doesn't matter if Tenaris got caught defrauding the patent office. What matters is that it tried, it had the intent --

THE COURT: Well, what would the remedy be then for something like that, though, that occurred in the past?

MR. ANDREWS: What the remedy would be would be -- so it's the attempted monopolization. So the -- there would be liability for attempted monopolization, and that liability would be the antitrust damages that Global has pled.

In this case there are two buckets of antitrust damages. One is the attorneys' fees that were spent fighting the patent case.

*TransWeb* is a Federal Circuit case squarely on point that says attorneys' fees fighting a patent's defense in a *Walker Process* case are antitrust injury.

And the other is the lost profits that Global suffered because it had to redesign its products in 2017 and keep them off the market because of Tenaris -- because Tenaris's patent got issued and it got issued because of the fraud.

THE COURT: But isn't that something we'll take up in the patent part of the case?

MR. ANDREWS: I'm sorry, Your Honor?

THE COURT: But isn't that something we'll take up in the patent part of the case?

MR. ANDREWS: No, it's not, Your Honor. That would be something that's looking at Global Tubing's damages. In the patent part of the case, we're only going to be looking at Tenaris's damages. So this would be Global's claim for its lost profits as the aggrieved antitrust plaintiff. Tenaris has its own claims in the patent part of the case as the aggrieved patent owner looking for its reasonable royalty for the lost -- the sales that it says it lost.

THE COURT: Okay. We'll take a ten-minute break.

(Court is in recess.)

MR. ANDREWS: May I continue?

THE COURT: You may continue, yes.

MR. ANDREWS: Thank you.

So I believe we were talking about estoppel and I was talking about the case being unique in that we were getting documents relevant to the causes of action as the case was ongoing and that was developing the -- that was developing the allegations and providing evidence as to when the fraud actually started and now it is clear -- it is clear to Global and it became that once the documents were produced that the fraud had started way back in 2017 during the two-player market.

So -- so why doesn't judicial estoppel not apply here? Well, first the statement was made long before full discovery and even claim construction.

The second, the statement had little, if any, relevance to the actual issue in Tenaris's motion to dismiss argument. Tenaris had argued that Tenaris -- I'm sorry -- that Global had failed to allege barriers to entry or antitrust injury. The basis for rejecting the antitrust injury attack was, of course, *TransWeb*.

And third, I think very importantly, it's not clear that the Court accepted the statement and the Court's denial of the motion is highlighted at Tab 22 where, you know, the Court said, "Thank you. I appreciate the quality of the advocacy. I'm going to deny the motion and dismiss the motion for a more definite statement. I think the pleadings are adequate."

And that doesn't show any reliance on Global's statement at all, nor does the transcript show any meaningful -- perhaps any discussion of the '256 patent.

So importantly how the Fifth Circuit applies judicial estoppel and we would also then have to understand if we were going to apply it how the Court relied on the prior statement and there are a couple of cases highlighted on this point, Tabs -- Tab 23 is *Afram Carriers v. Moeykens*.

THE COURT: Spell it for the court reporter, please.

MR. ANDREWS: Yes. M-o-e-y-k-e-n-s.

That is a 1998 Fifth Circuit case that says: "If not demonstrated, the Court's acceptance and reliance on

*Afram's* misrepresentation; therefore, judicial estoppel doesn't apply."

Tab 24 is *Jordan v. Chevron*, and that's a Southern District of Texas case.

"The Court did not accept or rely on any statements in Jordan's affidavit. Judicial estoppel does not apply."

That was Judge Rosenthal.

So on the judicial estoppel, even if Global's positions were inconsistent, estoppel shouldn't apply because there's no risk of inconsistent results. The Court didn't rely on that statement, setting aside the fact, of course, that Global made that statement before it had any idea that it was only looking at the tip of the iceberg of the Tenaris fraud here.

So, you know, from our view the Fifth Circuit law couldn't be more clear on the time period, the correct time period to assess for the attempted monopolization to assess the dangerous probability as to when there is a beginning to Tenaris's anticompetitive acts.

Now that we have full discovery, Global believes that was when the '256 patent issued in 2017; and it was certainly in the period during the two-player market, 2017 to 2019. The jury, of course, could find that the anticompetitive activity began in any one of those time periods along the way

and --

THE COURT: The attempted monopolization was market share and making menacing gestures toward Global and what else?

MR. ANDREWS: I'm sorry, Your Honor. That the -- oh, the --

THE COURT: The attempted monopolization, what are the constituent elements of it?

MR. ANDREWS: Just to -- I'm sorry.

The elements of attempted monopolization is, one --

THE COURT: I don't mean the statutory elements.

MR. ANDREWS: Oh.

THE COURT: I mean what were the facts on the ground that lead you to conclude there was attempted monopolization going on?

MR. ANDREWS: The attempted monopolization, to be clear, Your Honor, Tenaris does not dispute those two factors, that there is a -- the defendant engaged in predatory anticompetitive conduct with a specific attempt to monopolize.

Now, allow me to rephrase that.

Of course they dispute that that happened. Those are not issues for summary judgment and so that should be taken as given.

But to answer your question, Your Honor --

THE COURT: But the attempted monopolization, I mean

what evidence will we hear about in attempted monopolization?

MR. ANDREWS: The attempted monopolization in a *Walker Process* case is the fraudulent conduct. So the -- you have the fraud and the assertion of the patent. That's what's needed in the *Walker Process* case for the intent to monopolize.

So Tenaris fraudulently obtained a patent and then knowingly asserted the fraudulent patent to exclude Global Tubing from the market, and that's the intent to monopolize. So where does the --

THE COURT: Even though Quality is out there and has a huge part of the market?

MR. ANDREWS: Well, in 2017, Your Honor --

THE COURT: It didn't --

MR. ANDREWS: -- Quality wasn't there.

It wasn't there. It wasn't there until July of 2019. And again the prohibition on hindsight forbids us from looking at that for attempted monopolization where the anticompetitive acts occurred prior to July of 2019.

Certainly Tenaris has not introduced any evidence to suggest that it knew that Quality was going to be entering the quenched and tempered coiled tubing market. So that is -- that is set aside.

So focusing on the two-player market, we think it is very clear and there is more than enough evidence to present to a jury and let the jury do its job.

Now, suppose for argument's sake Tenaris convinces the jury that anticompetitive acts occurred no earlier than, say, August of 2019 when -- that was when Tenaris advanced counterclaims for infringement of the children patents in this case. Then there would be a three-player market; and then Dr. Reiff's analysis, our -- Global's antitrust expert would come into play and would present to the jury "Okay. Here is the market share and prior to excluding Global Tubing, Tenaris would have 17 percent of the market. After excluding Global Tubing, Tenaris would have 29 or 30 percent of the market with Quality Tubing having the balance."

And then we present evidence to the jury to show that Tenaris has the intent to continue asserting its patent against Quality Tubing. But that -- that inquiry and where Dr. Reiff's testimony is needed, it is only relevant if Tenaris convinces the jury that its anticompetitive acts did not occur until Quality was in the market and Quality wasn't in the market until July of 2019.

THE COURT: But that almost leads to the position that any patentee who is trying to protect its patent would be open to monopolist conduct charges.

MR. ANDREWS: Not at all, Your Honor. I disagree with that, because what -- the critical difference here is that Tenaris committed a fraud on the patent office and so if -- this is precisely the kind of case that the *Walker Process*

fraud doctrine is developed for. So somebody goes to the patent office and they say, "Hey, I have an invention." And it's an ex parte single-sided communication between the inventor and the patent office and they're required to be truthful with the patent office and give them all the information that's needed and in return they get this limited monopoly to exclude others from doing their invention.

Now, their invention may relate to a market. It may not relate to a market. It might just be some little tiny aspect or a method, but it doesn't necessarily meet with an antitrust --

THE COURT: Does fraud on the patent office, then, tend to lead toward charges of monopolization?

MR. ANDREWS: Absolutely. So what happens then is that you get the -- the patentee gets the patent and that's sort of -- I think of this conceptually as a get-out-of-jail-free card with regard to antitrust liability.

So normally I can't go and monopolize a market or try to monopolize a market. If I have a patent and I'm asserting that patent, I have government permission to try to exclude others; and I may be excluding others in a relevant antitrust market that ordinarily would make me an attempted monopolist or a monopolist. But that's okay. There's no liability for that.

Where it's not okay is where the patentee broke

the contract with the government and defrauded the government. If the -- if Global can prove to the jury that Tenaris defrauded the government, defrauded the patent office, then the law says Tenaris gets its get-out-of-jail-free card revoked and it's now subject to antitrust laws. Just like every other attempted monopolist or monopolist, it has to play by the rules everybody else does. It doesn't get that shield from antitrust law that a patent provides.

So, Your Honor, it is not at all the case that a patentee asserting their rights and protecting their intellectual property rights in their invention would lay themselves open to antitrust liability. Not at all. It's only in the rare cases like we have here where the patentee defrauded the patent office in order to get that right to exclude and the government says, "No, that's not fair."

THE COURT: Okay. Well, why don't you wind up; and I'll give Mr. Owen another shot.

MR. ANDREWS: Okay. Your Honor, let me just hit a couple more high points. I thank you for your patience.

We've talked a lot about the Quality Tubing issue and I think that -- I think that that has been covered. I would like to point out for you that as far as evidence of Tenaris's patent covering the entirety of the market, that comes from their own claims in this case and I point the Court to Tab 25, which is also Exhibit 29 of Docket 500, which is

Tenaris's response to Interrogatory 12 where when asked -- when we asked Tenaris to identify noninfringing alternatives, it only identified conventional tubing, okay?

Global says that the relevant antitrust market is quenched and tempered coiled tubing. So, therefore, there are no substitutes. Under Global's antitrust market framework that we'd like to present to the jury, there are no substitutes, and Tenaris enforcing its patent gives it full monopoly power over the entire relevant market.

And so they have asserted it against Global Tubing, and we believe we have evidence to show that they planned to assert it against Quality Tubing.

The evidence is laid out in our response to the motion that Global cites documents showing Tenaris intended to go after Quality by -- it studied mining the grounds. That's the words it used, you know, setting intellectual property mines to keep people out of the field to create barriers to competition. That's Docket 500, Exhibits 35, 36, 37, 38 and 39.

It discussed making it difficult for Quality to enter the quenched and tempered market. That's Exhibit 40 to Document 500.

It studied Quality's steel specifications for infringement analysis; and that's Exhibits 41, 42, 43 to Docket 500.

Tenaris's lawyers were planning to go after Quality Tubing. That's Exhibits 26 and 59 to Docket 500.

And I do want to note that Docket 45 is also in evidence, and Tenaris dropped a footnote and has informed Global that it's clawing that document back as privileged, and we dispute that that's privileged. But that's not ripe for the Court today.

What I will say is that -- I guess a couple of things. One is Tenaris has not moved to strike it, so it's still in the record for the Court to consider.

Second, on January 22nd, 2021, we extended by agreement discovery in this case. We had a Day 2 of Tenaris's 30(b)(6) deposition. We asked Tenaris for its infringement positions regarding Quality and NOV in the 30(b)(6) deposition, and Tenaris punted. If you turn to Tab 26 in the notebook, you'll see Tenaris's response to the topic of "Tell us what you think about whether or not Quality Tubing infringes."

They had a pre-prepared answer, and they entered it into the record. What that pre-prepared answer said was "We're not going to tell you now. We're going to tell you in our opening expert reports whether or not we think Quality Tubing infringes our patent. We're going to rely in our expert report on documents we produced and public documents."

Expert reports came. Tenaris never provided its position.

Global Tubing at the close -- long after the close of discovery finds documents in the record that support its theory that Tenaris is planning or had planned to assert its patents against Quality NOV and now Tenaris is trying to claw one of those back and we don't -- we don't think that that's fair.

But even without that document, Global cites plenty of evidence to get over the summary judgment hurdle to show that Tenaris planned to assert its patent against Quality Tubing. It believes that its patent cover all quenched and tempered coiled tubing and that there can be no quenched and tempered coiled tubing that does not infringe its patent.

In its briefing Tenaris also points -- and I believe Mr. Owen mentioned this today -- that somehow Global needed to take discovery of Quality Tubing because it's on Global to prove that Quality's products infringed Tenaris's patent and that goes to one of the statements that Tenaris made in its brief that we have to show that Tenaris has a likelihood of success on the merits of a patent infringement claim in order to show a likely or dangerous probability of monopolization.

That's -- that's just not true. What we need to show is the attempt and the attempted monopolization claim is based not on the success, but on Tenaris's attempt where, if Tenaris engages in exclusionary conduct with the specific

Case: 23-1882 Document: 25 Page: 148 Filed: 01/05/2024


intent to monopolize under circumstances where, quote, overt acts, had they been successful, would have led to control of the market, end quote, that antitrust violation is complete.

And that's *Lektro-Vend Corp. v. Vendo*, at Tab 27.

Also --

THE COURT: Okay.

MR. ANDREWS: I'm sorry?

THE COURT: Okay.

MR. ANDREWS: Okay. I do just very briefly, Your Honor, want to talk about the *Hynix* case. I indicated that --

THE COURT: Spell that for the court reporter.

MR. ANDREWS: H-y-n-i-x.

It's at Tab 12 of the hand-up notebook.

That case, we believe, is very instructive because there the Ninth Circuit rejected many of the arguments that Tenaris is making here.

In *Hynix*, just like here, the antitrust defendant in that case, Rambus, argued that under Ninth Circuit law the 27 and a half percent market share was presumptively insufficient to establish the power to control price. The Court rejected that notion as this was limited to proving monopoly power by circumstantial evidence as opposed to direct evidence of competitive harm.

THE COURT: But in that case how much market share did

the dominant player have?

MR. ANDREWS: In there the dominant player would have had -- it was the 27 and a half percent market share; and they said that was insufficient, just like Tenaris is saying the 30 percent market share is insufficient.

THE COURT: But the majority player here has 70 percent or so. That seems to me powerful argument against Tenaris's monopolization efforts if the dominant player had that much more market share.

MR. ANDREWS: All that -- because all of Quality Tubing's products in the relevant market, according to Tenaris, infringe its claims, that is the definition of market power, where you have perfect overlap of the relevant market and the patent claims.

And so Tenaris is sitting poised -- the fact that Tenaris hasn't gone after Quality Tubing now, like I said, Your Honor, is no surprise. They're in the middle of an antitrust claim. Of course they're not going to sue their remaining competitor.

But again I have to emphasize that all of that is beside the point because it only becomes relevant if Tenaris convinces the jury that it's anticompetitive conduct did not begin until there was a three-player market.

THE COURT: Okay.

MR. ANDREWS: And Quality is a complete nonissue if

Tenaris's anticompetitive conduct began between 2017 and July 2019.

THE COURT: Okay. Thank you very much.

MR. ANDREWS: Just to preserve the record, Your Honor, I would --

THE COURT: Your arguments are preserved. If they're in the brief, they are preserved.

MR. ANDREWS: Okay. Thank you. There were some issues that were raised on the reply, though, that I did just want to just quickly just state, that we are not bound by our expert. The party can use any evidence at its disposal to prove its claim.

THE COURT: That is true.

MR. ANDREWS: And so what Dr. Reiff said or didn't say does not limit what our arguments are to the jury.

THE COURT: I understand that.

MR. ANDREWS: And the product market arguments and the geographic market arguments, we believe, are fairly put out and set forth in our briefing.

Thank you, Your Honor.

THE COURT: Thank you very much, Mr. Andrews.

Do you want another turn at bat?

MR. OWEN: Thank you very much, Your Honor. I'll try to be brief.

I'd like to make four points in response to

Mr. Andrews' presentation. I'll try to tell you what they are in advance.

The first is to talk about the adequacy of the 70/30 market split that we talked about earlier as a matter of law in the circuit.

The second is to address what Mr. Andrews has said about Quality.

The third is to talk about the problem of hindsight and how that really works in the law.

And I guess maybe I had five points.

The fourth is to talk about this problem of surprise and change theory.

THE COURT: The problem of what?

MR. OWEN: The problem of surprise theories and what the -- what our real argument is about the improper -- improperly delayed nature of these arguments and what it's not, right?

THE COURT: Do you have a fifth point? What's your fifth point?

MR. OWEN: Oh. The privilege item, just as a housekeeping matter --

THE COURT: I don't think the case swings on that.

MR. OWEN: I don't think so either. We're happy to submit it for Your Honor's in camera inspection.

THE COURT: You don't need to do that.

MR. OWEN: The first thing I'd like to observe is, I think, if I understood him correctly, that counsel for Global Tubing has more or less abandoned the theory that Dr. Reiff proposed in his report. I'm not saying he's bound by his expert. I'm saying that's the only evidence of what our projected market share is going to be that they have profited.

And that evidence is that if we succeed in excluding Global Tubing from the market, we're going to have a 29 percent share and the other guy is going to have a 70 percent share; and I think the cases we've cited in our brief adequately explain that in the Fifth Circuit and any other circuit that's not sufficient by itself. I think I understand that --

THE COURT: You think that's the argument they've abandoned?

MR. OWEN: I think they have abandoned that. I think that they have now said that they would have to go further and convince the jury that "We are going to go after Quality Tubing."

Now, I don't think they can make that showing; and I think if I heard correctly what counsel for Global Tubing is saying, he's collapsing several elements of their claim.

So, for example, *Walker Process* fraud requires two things: Fraud on the patent office -- of course we can test that, but that's not an issue here. *Walker Process* says

that if you can prove -- plaintiff can prove -- fraud on the patent office was the but-for material cause of the issuance of a patent, then you kind of get out from underneath the patent bar and then you have to go prove your antitrust case like anybody else.

They have the same obligation like any other antitrust plaintiff to establish each element of their antitrust claim and one of those is dangerous probability of success, not just intent to monopolize, which, of course, we will contest at trial, but also that the probability of success is actually real and dangerous.

I think I heard counsel say that the way they envision the trial is that we would have to convince the jury that our anticompetitive conduct that they've alleged began at a certain time in 2019. If we did that, then they would have to show that we intended to pursue a claim against NOV.

That is not how the law works. They're the plaintiff. They have the burden of proof on every element. One of those elements is the dangerous probability of achieving monopoly power, and 29 percent is not monopoly power. So they're going to have to show that it's dangerously probable -- not just intended, but dangerously probable in fact -- that we were going to be able to -- were in fact going to succeed at excluding Quality.

Now, they do not have any evidence, as we have

discussed, that we have ever threatened to sue Quality, ever did sue Quality, that Quality is concerned about that.

I did hear -- I did hear counsel say that they don't think it matters that they didn't take discovery on this point.

I think it does matter, because this is a summary judgment motion. They're the plaintiff. They've had several years to litigate this case. If indeed their theory for trial is that they believe that they're going to convince the jury that my client intends to pursue a patent action against a third party with whom we are at peace -- and I can represent to the Court that we have no intention of pursuing such an action -- my client has authorized me to say that -- then they're going to have to produce enough evidence to create a triable issue on that question.

Now, when the question was why we would -- why there is evidence -- I think Your Honor asked counsel "What evidence is there that Tenaris intended to pursue an action against Global?"

The answer was "Well, there was some" --

THE COURT: Against Global or against Quality?

MR. OWEN: Against Global; that is, they have their own claim. They have a declaratory judgment action, right, for noninfringement that we sued them for infringement; and part of their theory is that of course we are now -- we are now suing

them for patent infringement. But they filed this declaratory judgment action before we did that; and when they did that, they had to allege that we threatened some action against them. Now, they admit they do not have any evidence that we threatened any action against Quality at all.

THE COURT: On Quality I understand that point, but against Global didn't they have the meeting at the trade show and the --

MR. OWEN: Your Honor, I don't mean to contest that. What I mean to do is to illustrate that the exact -- the kind of evidence that they believe is necessary and everybody believes is important to demonstrate that in order for them to be a declaratory judgment plaintiff we were going to sue them or threaten them. That same kind of evidence they could go obtain if they thought they could get it in discovery or at least allege it exists against Quality; but there is no such evidence and there is, therefore, no basis for the jury to believe, because I think counsel now thinks -- I think I heard him say that they're planning to convince the jury at trial that we're going to go after Quality, but they don't have any evidence to suggest that.

The next thing I wanted to address -- it's a difficult thing to address a little bit. I think counsel's argument is that, okay, in order for us to be a monopolist, maybe we would have to exclude the biggest player following.

And of course they acknowledged that we haven't tried to do that or ever threatened to do that and Quality is not concerned; but they think that this antitrust case, somehow filing an antitrust case without a basis to show that we're going to go after Quality, is a shield to prevent them from having to prove that we're going to go after Quality because they say -- they think the mere filing of their own antitrust case must have deterred us from pursuing Quality and, therefore, they don't have to prove that we're going to do that and I don't think that's right.

The third item I wanted to mention is the hindsight problem.

THE COURT: Yes. I'm very confused about this. It seems odd to me we're trying a lawsuit based on events that happened several years ago.

MR. OWEN: I agree, Your Honor, although I think the problem is that Global Tubing has a misunderstanding of the problem of hindsight; so I'll tell you what I think -- how it works.

Attempted monopolization liability depends on a dangerous probability of success.

THE COURT: I've got that.

MR. ANDREWS: You don't have to succeed. So you can look back on an antitrust defendant and say, "In the past, although they didn't succeed, their chance of success was

enough to be a dangerous probability and, therefore, they're liable," even if in hindsight we know it just didn't work out.

But that doesn't mean that, as Global Tubing now says, that we can go back to 2017, look and try to, I think, look forward from 2017 and ignore all the facts about what actually happened between 2017 and 2019 and evaluate whether there really ever was a dangerous probability of monopolization; and we know that there wasn't because that period, 2017 to 2019, is bookmarked by two things.

First, 2017 is the issuance of the parent patent; and 2019 is the issuance of the children patent.

Now, the legal significance of the 2019 date to their theory is very confusing to me. I have no idea where it comes from. The parent patent in 2017 did not deter either Global Tubing or Quality from entering the market, and that's not a hindsight problem to go back and notice that.

For example, imagine that we had been sued for attempted monopolization in that window, Your Honor. So what would have happened? Say it's 2019 and they sued us for attempted monopolization on the theory that there's only two players in the market and we had a dangerous probability of success.

The first thing we would do, of course, is take discovery from Quality and say, "By the way, what are you going to do?"

And they would say, "We're about to enter the market; and, by the way, we're going to take over the market and be the biggest player."

And that was true; and that would prove that actually we didn't have a dangerous probability of success because there's another player we have no patent infringement claims against, we've never threatened to sue that's going to be able to enter the market without regard to any barrier for entry.

And if you go back to 2017 and you look forward to what actually happened, two things: One, there were no barriers to entry between 2017 and 2019; and, second, we didn't sue NOV or threaten or menace them at all after they entered the market.

The difference between hindsight -- you can -- you cannot look back and just say, well, since an attempt did not succeed, therefore, it doesn't count. I agree with that, but that's all the hindsight rules.

If we look at the facts at the time of the alleged conducted and say, "Does this amount to a dangerous probability of success," and here on the facts it does not.

That leads me, Your Honor, to the next point, which is -- let's just group it under the heading of waiver or surprise.

I want to be clear that we're not advancing the

theory of the pleadings doctrine. That's not part of our argument. I think the best way to describe it is in our briefs we said two things.

The first is that this is an improper surprise on summary judgment, and I would prefer Your Honor to --

THE COURT: What are we referring to? The theory that they're going to attack Quality?

MR. OWEN: Yes, Your Honor, and -- well, two things, both the theory that they're going to attack -- that we're going to attack Quality and the hindsight snapshot parent patent 2017 to 2019 theory.

Both of those are a surprise on summary judgment and I refer Your Honor to the *Newman* case that's cited in our brief.

THE COURT: What case?

MR. OWEN: It's called *Newman*, Your Honor; and it says a common sense proposition for which we don't need a fancy doctrine, that if you let discovery close and the defendant therefore doesn't know what he's supposed to have taken discovery to defend himself about and then you change your theory of liability, you change your theory of what was done wrong, the Court does not have to allow that on summary judgment.

And i want to be very clear. That's not because of the theory of the pleadings doctrine. In this case it's

because the theory that we're talking about is not something that emerged from discovery, right? It isn't that Global took discovery about -- either from or even about NOV and concluded that -- or Quality Tubing -- I'm sorry, Your Honor -- they didn't take discovery and say, "Oh, my gosh. We discovered from all this evidence that Tenaris must have this plan. They've been menacing Quality. They've threatened to sue them and they're gearing up to do it."

And so now discovery has -- you know, they had a fair chance to litigate and defend themselves from that claim. That's not what happened, and the way that you know that for sure is, as I said earlier, if you read Dr. Reiff's expert report, you will see no discussion of such a theory at all. It's not that he doesn't discuss Tenaris's -- the possibility that Tenaris would pursue Quality. It's that he doesn't cite any evidence for it. He says it in a footnote, he said it at his deposition. It was just an assumption that Global's lawyers provided him and that's -- and since that deposition and his expert report happened well after the close of fact discovery, that's how you know, Your Honor, that this is a belated, invented theory designed to resist summary judgment after the theory that they've litigated this case on and that we had the chance to defend ourselves against had failed.

The next thing I want to say on the subject of surprise is a few things for the record.

First of all, again, I agree that they are not bound by their experts; but they are limited to the evidence that they have.

Dr. Reiff's expert report discusses market share and projected market share based on 2021 numbers, which is after the 2017 to 2019 window that we've heard a lot about today and we've heard about in the briefs. That's because that was not their theory of this case. They did not disclose any expert opinions about it and we have not had a chance to defend ourselves.

A few other items on this subject. First of all, I heard counsel point to an interrogatory response of theirs they think adequately disclosed this theory that just -- I think I heard the response was February of this year. Fact discovery in this case closed, except for crime fraud issues, in December of 2020. That doesn't do the trick.

And then lastly I wanted to discuss the *Hynix* case just very briefly.

THE COURT: What case?

MR. OWEN: *Hynix*, Your Honor. This is the Ninth Circuit case that counsel for Global Tubing mentioned at the end in which the Ninth Circuit --

THE COURT: Yes, I know the case.

MR. OWEN: You know the case.

Two points about the case, Your Honor. One is

the point that Your Honor mentioned, which is that in that case the dominant player has a 27 percent share and in our case a 70 percent share.

The other issue that I would call Your Honor's attention to about that case is that the Ninth Circuit is very clear that what they think is different and interesting about the case is that it is about standardization and what it says is that in the standardization case the problem is it was given only one standard. So somebody is going to basically get a hundred percent of the result because some player is, by necessity, going to end up with kind of 100 percent of the relevant market of their idea because that's why you have a standard. That's not the case here, and I think those two facts can make that case very different.

THE COURT: One thing I don't understand is it seems like a successful patent for a new mousetrap. If it was really good enough, it would automatically clear the field. If it really were the dominant -- if it really were a superior product better than anybody else was offering, it would tend toward a one-seller market. That can't be enough for antitrust liability.

MR. OWEN: No, it certainly isn't, Your Honor. And many reasons -- I mean there's a lot of reasons.

One is even if you have a really dominant mousetrap, there are lots of other ways to kill mice; and the

product market might not just be confined to the patented invention. It might include lots of other things.

But in any event, in an antitrust case, especially because Your Honor, just to say this for the record, the Sherman Act imposes treble damages.

THE COURT: Yes, I know.

MR. OWEN: And so the idea that just having a patent without requiring the plaintiff to prove that someone's actually going to assert that patent and is going to be likely to succeed in a rigorous enough way to justify the imposition of what are basically punitive measures under the Sherman Act, that does not -- does not comport with any case that we're aware of.

And just to go back to where we started, in the Fifth Circuit it is very clear that market share is how you determine -- is the principal determinant of monopoly power and the threat of monopoly power and if in the end the result of what they alleged they were going to do, what they said in the complaint stage that we were going to do is a two-player market where the other guy has 70 percent, we cannot as a matter of law be a monopolist and I believe it would be accurate that if the Court held that we were, that would be a first.

Unless the Court has other questions, I'm happy to submit.

THE COURT: No, that's fine. Thank you.

Mr. Andrews?

MR. ANDREWS: Your Honor, I did not hear any substantive response from counsel regarding the two-player market scenario. I did hear a couple of things I want to set the record straight on.

First counsel tried to describe the hindsight problem with regard to attempted monopolization in a way I confess I didn't fully understand. But one thing I did pick up is that what Counsel said seems to fly directly in the face of fairly recent Fifth Circuit precedent directly on this issue.

I'll quote from the *Taylor Publications v. Jostens* case, and that's 216 F.3d 465 at 475, Fifth Circuit 2000. It's at Page 15 of our reply brief, Docket 500.

The Fifth Circuit said: "We look to the defendant's conduct and the market at the time the conduct occurred rather than evaluating the conduct's effects after the fact."

And so how we look at how the market played out and whether or not Tenaris ultimately sued Quality or not, I'm not sure that that can be square with what the Fifth Circuit has said, that we don't look to things after the fact.

And so if the anticompetitive conduct occurred in 2017 to 2019, then that's the time at which we have to evaluate the conduct. We can't look at what Tenaris ultimately did,

which does segue into the burden of proof issue. I don't mean to suggest that somehow Tenaris has the burden of proof on this antitrust claim.

I meant to say and I think I did say that the jury will have an opportunity to evaluate the evidence and decide when Tenaris's anticompetitive conduct started, and that's going to be the time when we look at the dangerous probability of monopolization.

Now, Tenaris may say it didn't start in 2017, it didn't start in 2018. Tenaris may say, you know, it never started at all, but if it ever did, it could only be when Tenaris asserted its claims against -- in the children patents in 2019 in August.

And if the jury agrees with that, then the case is evaluated in a three-player market. If the jury agrees that there is anticompetitive acts prior in the two-player market, we don't need Dr. Reiff to tell the jury that if you take out one player in a two-player market, the remaining player has a monopoly.

Tenaris also tries to make hay of the fact that it's not going to sue Quality Tubing. At least as of today, it has no -- I would assume that means present intention to sue Quality Tubing, which if it wins this case very well may change. Maybe it won't. Who knows? Irrelevant.

But that argument itself is allowing Tenaris,

Case: 23-1882 Document: 25 Page: 166 Filed: 01/05/2024


then, to immunize itself by saying, okay, you know, not only -- we need -- Tenaris is trying to say, "We should be immune from our antitrust activity because we're not now planning to sue Quality Tubing."

That's not the law.

We need to look at again --

THE COURT: How can we properly just assume that they're going to sue Quality? How can we assume that?

MR. ANDREWS: How can we assume?

THE COURT: Yes.

MR. ANDREWS: We don't need to assume that, Your Honor. We have evidence, we think enough to present to the jury, that Tenaris was scoping the joint. It thinks that its patent covers everything and it would be -- it was getting ready to sue Quality Tubing.

But again, that's -- that is the separate issue because we have the two-player market where Quality is completely, completely irrelevant.

And Your Honor asked about this issue, and I have a sense that Your Honor is concerned about this idea of patentees being targets of antitrust.

Most *Walker Process* claims, they're rare to begin with; but they often don't get past the pleading stage because of inadequate evidence of fraud. The fraud evidence bar to even plead this type of claim is very high.

What we have since we pled this fraud claim is a mountain of fraudulent conduct. It's not that Tenaris has a patent that makes it liable. It's that Tenaris defrauded the patent office in order to get that patent and then, knowing that it had a fraudulent patent, sued Global Tubing.

Global Tubing did file a declaratory judgment action, but Tenaris didn't have to file suit back. Certainly they could have said --

THE COURT: Well, I think that's asking a lot of a litigant not to respond when it is --

MR. ANDREWS: It is. And I'm sorry to -- this is too -- to interrupt, Your Honor. I apologize. It's an important -- it's an important point because not only did Tenaris turn around and assert this patent, it did it while it was conducting discovery, which shows we now know what was going on behind the curtain.

And Tenaris was asserting this patent while it was conducting the fraud on the patent office, while it was figuring out how to divide up the Cymax brochure and misrepresent it to the patent office in order to get children patents, how it was trying to use that to whitewash the fraud that occurred prior in the parent patent and how it was fraudulently changing the inventors in order to get the whole family allowed together so that it could continue to assert them against Global Tubing.

This is not a case where there is a patentee who has a better mousetrap that is just trying to protect its rights. The evidence shows and we think a jury is entitled to hear that Tenaris had conducted a years-long scheme to defraud the patent office.

THE COURT: If they did defraud the patent office, then all the more reason to find that they can't monopolize the market, right? If they have a fraudulent patent that's going to be taken away from them, they are going to be even less able to monopolize the market, right?

MR. ANDREWS: The only way that the -- well, it's the attempt to monopolize with that patent that gets them in trouble because the Sherman Act says you can't attempt to monopolize.

And Mr. Owen was exactly right. We have fraud -- and Your Honor is very familiar with the evidence that Global has put up on fraud.

And then we have Sherman Act attempt to monopolize and those elements there.

And the only thing that Tenaris is contesting is the dangerous probability of monopolization, but in order to do that it has to do two things that I don't think it's doing properly.

One is it has to look at the time at which the anticompetitive conduct began. And as the Fifth Circuit said,

we looked to the defendant's conduct and the market at the time the anticompetitive conduct occurred and we don't consider the things that happened after it.

THE COURT: What they did -- what they did after getting the patent was get sued by Global, right? That's what happened?

MR. ANDREWS: They did for a declaratory judgment of noninfringement.

THE COURT: Yes.

MR. ANDREWS: And then --

THE COURT: That doesn't sound like an attempt to monopolize on Tenaris's part. The aggressor was Global, right?

MR. ANDREWS: It was a defensive maneuver because Global had been threatened with litigation. The court found there was sufficient declaratory judgment jurisdiction and then Tenaris, rather than fighting a regular -- I don't know -- a regular patent fight or trying to -- trying to protect a -- a nonfraudulent patent -- let me put it this way, Your Honor. Global didn't know that the patent was fraudulent when the suit came out.

THE COURT: No, I wouldn't think so.

MR. ANDREWS: But Tenaris did. Tenaris knew because it committed the fraud. And we went through, Your Honor, the different discrete stages of the fraud that Tenaris conducted that we think the jury deserves to hear.

And so, you know, you're right in a sense that how could there be a dangerous probability of monopolization if it's a fraudulent patent? Doesn't that mean it can't be enforced? Well, yeah, but the only way that happens is through litigation; and the Supreme Court and the Federal Circuit has the jurisprudence on *Walker Process* fraud, which is specifically directed at this issue, which is fraudulent patent, attempting to use that to monopolize the market.

And when evaluating this it's important that summary judgment, giving all inferences in favor of Global, the market is the quenched and tempered coiled tubing market; and Tenaris has said there's no substitute. Its patent covers the whole quenched and tempered coiled tubing market.

Now, on the surprise issue -- and I think this is very important --

THE COURT: But has Tenaris sued anybody for infringing their market except -- infringing their patent other than the counterclaim against Global?

MR. ANDREWS: There are only two other players in the market.

THE COURT: But the evidence that they're flexing their monopolist market is conjecture, isn't it? I mean, they were maybe going to sue Global. They were maybe going to sue -- it doesn't sound like a monopolist. They were thinking about -- any patentee has the thought process that other people's patent

might impinge on his own patent. That's perfectly standard, isn't it?

MR. ANDREWS: I don't know what's standard or not. I know, Your Honor, with regard to that, I do know it's not standard to have fraudulent conduct, especially not to this level. And so there were off-ramps all along the way that between 2017 and 2019 and then after 2019 where Tenaris could have taken an off-ramp, but it doubled down and the fraud got deeper and deeper and deeper.

So there is no surprise here, Your Honor. I think that Tenaris doesn't have a real -- a real response to this issue of the two-player market and how there's the dangerous probability and they haven't contested the other factors of monopolization, the intent to monopolize and the acts to monopolize. Those aren't being contested in the motion for summary judgment.

So the idea that don't patentees think this all the time is not before the Court, and it hasn't been raised by Tenaris. I think there's clear evidence that there's the intent here. The only thing is the dangerous probability.

Now, Tenaris says it was a surprise and it kind of shoves under the rug this discovery response, the interrogatory response saying that it was February of 2022, after the close of discovery. What it was was the first time Tenaris asked.

And I would -- I would ask the Court. When was Global supposed to tell Tenaris its contentions on antitrust when Tenaris didn't ask the questions? There isn't a mechanism for that unless you go back to the pleading, but counsel has said they're not arguing the theory of the pleading here.

So then what we're left with is Tenaris didn't ask. Once it did, after the close of discovery, Global responded; and Global said -- this is a couple of different places, but I would direct Your Honor to Tab 3, which is the timeline at Page 11 to 12, highlighted sections of Global's responses that Tenaris's -- and I'm quoting here -- "Tenaris's scheme included obtaining the '256 patent," which is the parent, "and later the '074 and '075 patents, through fraud on the Patent Office as described in Global's April 11, 2022, response at Interrogatory No. 26. Tenaris then threatened Global with enforcement of the '256 patent; asserted the '256 patent against Global; asserted the '074 and '075 patents against Global; and continued asserting these patents despite being aware of its scheme."

And it goes -- there are -- there are multiple disclosures of this theory in a lengthy interrogatory response, which ends -- and I quote -- "Global expects that Tenaris's scheme includes ultimately asserting its fraudulently obtained patents against competitor NOV Quality Tubing to further concentrate its market power and obtain monopoly in the Q&T

coiled tubing market."

Again, that is looking at the three-player market and it's Global's position, as I read in the first part of the response, that the scheme started with the '256 patent in 2017; but this was fully disclosed as soon as Tenaris asked and it's not inconsistent with the pleadings.

And to the extent Tenaris asked in depositions, as we went through already, it was also disclosed.

Unless you have any further questions, Your Honor, I don't want to overstay my welcome more than I have to.

THE COURT: No. Thank you.

I appreciate the advocacy today. I've learned from both of you. The papers were of extraordinarily high quality, and the oral argument was of similar quality.

But I'm going to have to grant the motion for summary judgment. I think that it would be legal error to hold that such a small market player was engaged in attempted monopolization. I think the acts alleged as constituting an attempt at monopolization are insufficient to create a genuine issue of material fact.

So defendant's motion will be granted.

Thank you.

MR. OWEN: Your Honor, I'm sorry. Would you mind if -- we had -- both counsel had a joint motion on a very small

housekeeping matter. Would you mind giving us 30 seconds?

THE COURT: Okay.

MR. OWEN: Very, very briefly, Your Honor.

Both Mr. Andrews and I conferred ahead of court today.

THE COURT: Okay. All right.

MR. OWEN: Your Honor having adjourned the trial date, we wanted to ask the Court to vacate the pretrial deadlines set forth at docket number --

THE COURT: So vacated.

MR. ANDREWS: Thank you, Your Honor.

MR. OWEN: Okay.

(The proceedings were adjourned.)

* * * *

REPORTER'S CERTIFICATE

I, David S. Smith, CSR, RPR, CRR, Official Court Reporter, United States District Court, Southern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

/s/ David S. Smith
Official Court Reporter

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-1882, 23-1883

**Short Case Caption:** Global Tubing LLC v. Tenaris Coiled Tubes LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 16,435 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 01/05/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken