**No. 23-1882, -1883 (consolidated)**

# United States Court of Appeals for the Federal Circuit

GLOBAL TUBING LLC,
*Plaintiff-Cross-Appellant*,

v.

TENARIS COILED TUBES LLC, TENARIS S.A.,
*Defendants-Appellants.*

Appeal from the United States District Court for the Southern District of Texas, Judge Keith P. Ellison, Case No. 4:17-CV-3299

## APPELLANTS' REPLY AND RESPONSE BRIEF

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

John C. O'Quinn
Matthew S. Owen
Nathan S. Mammen
William H. Burgess
Megan McGlynn
Ashley Cade
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000

April 15, 2024

**TABLE OF CONTENTS**


Reply ........ 1

Argument ........ 4

I. Summary Judgment of Unenforceability of the '256 Patent Was Erroneous. ........ 4

A. Under *Therasense* and Federal Rule 56, Summary Judgment of Inequitable Conduct is Rarely Appropriate. ........ 4

B. The District Court Erred by Resolving Valdez's Intent Against Tenaris at Summary Judgment. ........ 10

1. This Is Not an "Extreme" Case Where Intent May Be Resolved at Summary Judgment. ........ 10

2. Global's Alternative False-Declaration Argument is Meritless and Cannot Support the Judgment. ........ 13

3. Global's Attacks on Dr. Valdez's Explanation Suggest Improper Burden-Shifting, and Cannot Support the Judgment. ........ 17

C. The District Court Erred by Resolving Materiality Against Tenaris at Summary Judgment. ........ 22

1. Global's Alternative False-Declaration Argument at Most Raises New Factual Disputes, Not Grounds for Summary Judgment. ........ 22

2. The CYMAX Brochure is Cumulative of Chitwood. ........ 27

3. "Zernick" is No Answer to the District Court's Failure to Consider the Grandchildren Applications' Evidence of Non-Materiality. ........ 31

II. Summary Judgment of Unenforceability of the '074 and '075 Patents Was Erroneous. ........ 33

III. Global's Alternative "Affirmative Egregious Misconduct" Argument is Unsound, and At Most an Issue for Remand. ........ 38

Conclusion ........ 41

Response to Global's Cross-Appeal ........ 42

Statement of the Issues ........ 43

Statement of the Case ..... 44

I. Factual Background ..... 44

II. District Court Proceedings ..... 46

Summary of the Argument ..... 51

Argument ..... 53

I. As a Matter of Law, Tenaris Never Had a Dangerous Probability of Monopolizing Any Market. ..... 53

A. A Fraudulent Patent Alone Is Insufficient to Establish Antitrust Liability. ..... 53

B. Global's Own Market Share Numbers Make Monopolization Impossible as a Matter of Law. ..... 56

C. Global's Attempts to Redefine Tenaris's Alleged Monopolistic Scheme and Ignore Quality's Presence in the Market Fail as a Matter of Law. ..... 60

1. There Is No Evidence That Tenaris Attempted to Monopolize the Market by Asserting Its Patents Against Quality. ..... 61

2. The Court Should Reject Global's Invitation to Ignore Quality's Presence in the Market. ..... 66

II. In the Alternative, the Court Should Affirm Because Global's Argument Is Procedurally Barred. ..... 71

Conclusion ..... 74

## TABLE OF AUTHORITIES

### Cases

*1st Media, LLC v. Elec. Arts, Inc.*,
694 F.3d 1367 (Fed. Cir. 2012) .......... 14

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) .......... 67

*Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*,
735 F.2d 884 (5th Cir. 1984) .......... 67

*Agfa Corp. v. Creo Products Inc.*,
451 F.3d 1366 (Fed. Cir. 2006) .......... 34

*Akzo N.V. v. ITC*, 808 F.2d 1471 (Fed. Cir. 1986) .......... 15

*Am. Calcar, Inc. v. Honda Motor Co., Inc.*,
768 F.3d 1185 (Fed. Cir. 2014) .......... 36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 4

*Applied Materials, Inc. v. Advanced Semicond. Materials Am. Inc.*, 1994 WL 270714 (N.D. Cal. April 19, 1994) .......... 36

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) .......... 20

*Avid Identification Sys., Inc. v. Crystal Impt. Corp.*,
603 F.3d 967 (Fed. Cir. 2010) .......... 14, 21

*Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002) .......... 57

*Belcher Pharmaceuticals, LLC v. Hospira, Inc.*,
11 F.4th 1345 (Fed. Cir. 2021) .......... 30

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) .......... 57

*Bradley v. Phillips Petroleum Co.*,
527 F. Supp. 2d 661 (S.D. Tex. 2007) .......... 74

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) ..... 66

*Casa de Cambio Comdiv. S.A. de C.V. v. United States*,
291 F.3d 1356 (Fed. Cir. 2002) ..... 73

*Chandler v. Phoenix Servs., LLC*,
45 F.4th 807 (5th Cir. 2022) ..... 53

*Cliff Food Stores, Inc. v. Kroger, Inc.*,
417 F.2d 203 (5th Cir. 1969) ..... 57

*Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*,
885 F.2d 683 (10th Cir. 1989) ..... 57

*Consolidated Aluminum Corp. v. Fonseco Int'l Ltd.*,
910 F.2d 804 (Fed. Cir. 1990) ..... 34

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed Cir. 2018) ..... 33

*Deauville Corp. v. Federated Department Stores, Inc.*,
756 F.2d 1183 (5th Cir. 1985) ..... 67-70

*Digital Control, Inc. v. Charles Machine Works*,
437 F.3d 1309 (Fed. Cir. 2006) ..... 30, 31

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*,
679 F.2d 516 (5th Cir. 1982) ..... 54, 55, 66

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984) ..... 55-57

*Eaton Corp. v. Rockwell Int'l Corp.*,
323 F.3d 1332 (Fed. Cir. 2003) ..... 11

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ..... 6

*Exxon Corp. v. Berwick Bay Real Est. Partners*,
748 F.2d 937 (5th Cir. 1984) ..... 57

*Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318 (Fed. Cir. 2000)............. 11

*Freshub, Inc. v. Amazon.com, Inc.*,
93 F.4th 1244 (Fed. Cir. 2024)........................................................... 19

*Highway Equip. Co. v. FECO, Ltd.*,
469 F.3d 1027 (Fed. Cir. 2006) ........................................................... 37

*Houston N. Hosp. Properties v. Telco Leasing, Inc.*,
680 F.2d 19 (5th Cir. 1982)................................................................... 7

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ............................................. 5, 6

*Hydril Co. LP v. Grant Prideco LP*,
474 F.3d 1344 (Fed. Cir. 2007) ........................................................... 38

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006) ................................................................................. 54

*In re Chavin*, 150 F.3d 726 (7th Cir. 1998) ........................................... 11

*In re Omeprazole Pat. Litig.*, 483 F.3d 1364 (Fed. Cir. 2007)................ 33

*In re Placid Oil Co.*, 932 F.2d 394 (5th Cir. 1991) ............................... 7, 8

*In re Save Our Springs (S.O.S.) All., Inc.*,
632 F.3d 168 (5th Cir. 2011)................................................................. 74

*Int'l Bancorp LLC v. Societe des Bains de Mer*,
329 F.3d 359 (4th Cir. 2003).............................................................. 8, 9

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
939 F.2d 1257 (5th Cir. 1991)............................................................... 10

*Intellect Wireless, Inc. v. HTC Corp.*,
732 F.3d 1339 (Fed. Cir. 2013) ......................................... 35, 36, 39, 40

*Johnson v. Diversicare Afton Oaks, LLC*,
597 F.3d 673 (5th Cir. 2010)................................................................... 7

*Jones v. United States*, 936 F.3d 318 (5th Cir. 2019)................................ 8

*Judkins v. HT Window Fashion Corp.*,
529 F.3d 1334 (Fed. Cir. 2008) .......................................................... 11

*Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136 (Fed. Cir. 1991) .............. 65

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) .............................................................. 58

*Lazare Kaplan Int'l v. Photoscribe Techs., Inc.*,
714 F.3d 1289 (Fed. Cir. 2013) ............................................................ 6

*Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*,
606 F.3d 1353 (Fed. Cir. 2010) .................................... 9, 11, 13, 18, 21

*Life Techs., Inc. v. Clontech Lab'ys, Inc.*,
224 F.3d 1320 (Fed. Cir. 2000) .......................................................... 15

*Luv N' Care Ltd. v. Laurain*,
--F.4th--, 2024 WL 1590593 (Fed. Cir. Apr. 12, 2024) ....................... 13

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*,
439 F.3d 1335 (Fed. Cir. 2006) ............................................................ 5

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ..................... 62

*Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64 (1st Cir. 2016) .............. 73

*Monsanto Co. v. Bayer Bioscience N.V.*,
363 F.3d 1235 (Fed. Cir. 2004) .......................................... 11-13, 18, 21

*Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978) ..................... 7-9

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
984 F.2d 1182 (Fed. Cir. 1993) ................................................... 11, 18

*Pittman v. U.S. Bank NA*, 840 F. App'x 788 (5th Cir. 2021) .................. 73

*Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962) .............................. 10

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) .......................................................... 64

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
642 F. App'x 665 (9th Cir. 2016) .......................................................57

*Regeneron Pharms., Inc. v. Merus N.V.*,
864 F.3d 1343 (Fed. Cir. 2017) ..........................................................24

*Rohm & Haas Co v. Crystal Chem. Co.*,
722 F.2d 1556 (Fed. Cir. 1983) .....................................................35, 36

*Rushing v. Miss. Dep't of Child Prot. Servs.*,
2022 WL 873835 (5th Cir. Mar. 24, 2022) ..........................................38

*S.E.C. v. Murphy*, 626 F.2d 633 (9th Cir. 1980).......................................8

*Shah v. VHS San Antonio Partners, LLC*,
985 F.3d 450 (5th Cir. 2021)...............................................................59

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ................54, 70

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
537 F.3d 1357 (Fed. Cir. 2008) ..........................................................17

*Tamini v. Salen Dry Cargo AB*, 866 F.2d 741 (5th Cir. 1989)..................7

*Taylor Publ. Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000) ..............69

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) .............. 1, 4, 14, 16, 17, 20, 21, 24, 26, 35, 38, 39, 41

*TransWeb, LLC v. 3M Innovative Props. Co.*,
812 F.3d 1295 (Fed. Cir. 2016) ..........................................................53

*Ulead Sys., Inc. v. Lex Comput. Mgmt. Corp.*,
351 F.3d 1139 (Fed. Cir. 2003) ............................................................9

*Uniloc USA, Inc. v. ADP, LLC*,
772 F. App'x 890 (Fed. Cir. 2019).......................................................33

*United States v. Gonzalez*, 592 F.3d 675 (5th Cir. 2009) ........................71

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) .......... 68, 69

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) .......... 19

*Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172 (1965) .......... 10, 46, 51, 53, 54

*Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741 (5th Cir. 2010) .......... 60

*WBIP v. Kohler*, 829 F.3d 1317 (Fed. Cir. 2016) .......... 26

*Young v. Lumenis, Inc.*, 492 F.3d 1336 (Fed. Cir. 2007) .......... 39

**Statute**

15 U.S.C. §2 .......... 46, 53, 57, 66

**Rules**

Fed. R. Civ. P. 9(b) .......... 6

Fed. R. Civ. P. 12 .......... 73

Fed. R. Civ. P. 50 .......... 6

Fed. R. Civ. P. 52(a)(1) .......... 6

Fed. R. Civ. P. 56 .......... 6, 8, 24

Fed. R. Civ. P. 59(a)(1) .......... 6

Fed. R. Civ. P. 60(b) .......... 6

**Other Authorities**

10B WRIGHT & MILLER FED. PRACTICE & PROCEDURE §2730 .......... 10

10B WRIGHT & MILLER FED. PRACTICE & PROCEDURE §2731 .......... 6

37 C.F.R. §1.56(b)(2) .......... 24

U.S. Dep't of Justice, *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act* (Mar. 18, 2022), https://tinyurl.com/ywt73nz6 ............................................57

For Tenaris's appeal, summary judgment of inequitable conduct should be vacated or reversed. For Global's cross-appeal, the Court should affirm summary judgment rejecting Global's antitrust claims.

## **REPLY**

The summary judgment of inequitable conduct rests on multiple errors, on both prongs of the *Therasense* test. The district court resolved Valdez's credibility on a paper record, effectively applied "should have known" and "should have disclosed" standards for intent and materiality, and resolved disputed facts at summary judgment while disregarding probative evidence. This Court need not reach every error to reverse or vacate.

Global does not defend most of the district court's reasoning. The court applied the two-part *Therasense* framework, concluding the CY-MAX brochure documents were but-for material and omitted from the '256 patent's prosecution disclosures with deceptive intent. Appx13-14. Then it applied those findings to rule the '074 and '075 patents unenforceable. Appx14-15. The court explicitly did *not* adopt Global's "affirmative egregious misconduct" theory—which Global stated at argument was the only theory it was pursuing, Appx31264-31625(26:18-27:3), and

which contended Valdez's declaration contained "unmistakably false" statements, *e.g.*, Appx5123-5135. The court stated it "*does not reach* the affirmative egregious misconduct arguments *as they are mooted* by the Court's finding of but-for materiality." Appx15.[1]

Global's brief, however, recycles that bypassed affirmative-egregious-misconduct argument throughout—attacking Valdez's declaration while treating the district court as if it adopted Global's arguments. *E.g.*, RedBr.12-15; 24 ("The district court correctly held that the CYMAX documents satisfied 'even the strictest criteria' for 'materiality.' The CYMAX documents contradicted the Valdez Declaration's assertions regarding the novelty of the '256 patent."), 32, 36-39, 44, 53. Global even complains that Tenaris "*does not address* the [alleged] contradictions between the Valdez Declaration and the CYMAX documents." RedBr.39. That is the argument that the district court did not reach, Appx15, not the "but-for" materiality reasoning the court adopted.

To be clear, Global's affirmative egregious misconduct argument is meritless. Valdez's declaration does not "contradict" the CYMAX

[1] Quoted emphasis is added and alterations in original unless otherwise indicated.

documents, or otherwise contain "unmistakably false" statements constituting inequitable conduct. In substance, Global's "falsity" allegations are Global's disagreement with the declaration's *arguments* about state of the art. The district court never reached that argument. It never held—nor could it—that the declaration satisfied *Therasense*'s "affirmative egregious misconduct" standard (§III, *infra*) to the extent no reasonable factfinder could conclude otherwise. At best, Global's false-declaration argument is fodder for remand, not a ground for affirming summary judgment.

Global leaves most of the district court's reasoning undefended, and most of Tenaris's arguments unanswered. Global makes much of the "Zernick" reference for materiality. RedBr.2-3, 19, 30, 41, 43-44. But Global ignores that the one CYMAX document Zernick resembles does *not* contain CYMAX's chemistry specifications—which were central to the district court's findings, and were the only difference Global identified between the CYMAX documents and Chitwood. Global otherwise substitutes invective for substance. Global may believe Tenaris's evidence and arguments are "conclusory," "manufactured," "specious," or "ridiculous," RedBr.30, 48, 51, but fails to support those labels, let alone

show that a reasonable factfinder was *required* to find but-for materiality and deceptive intent by clear and convincing evidence.

At bottom, Global's arguments harken back to the pre-*Therasense* "plague" of defendants' routinely making dubious inequitable-conduct claims to avoid litigating the merits of infringement or validity. The district court should have rejected Global's arguments or tested them at trial. Its reasoning cannot be squared with *Therasense* or the summary judgment standard. This Court should vacate or reverse.

## ARGUMENT

### I. Summary Judgment of Unenforceability of the '256 Patent Was Erroneous.

#### A. Under *Therasense* and Federal Rule 56, Summary Judgment of Inequitable Conduct is Rarely Appropriate.

The summary judgment and inequitable conduct standards are well-established. Reasonable inferences must be drawn for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Courts must evaluate summary judgment motions "through the prism of the substantive evidentiary burden," *id.* at 254—here the *heightened Therasense* burden *Global* would bear at trial. For those reasons, this Court has repeatedly admonished that parties in Global's shoes face a

formidable burden when demanding *summary judgment* of inequitable conduct, and that such motions should rarely be granted. *E.g.*, *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006); BlueBr.41 n.4 (collecting cases).

Global disputes none of this directly, but contends district judges in the Fifth Circuit have "greater discretion" to grant summary judgment on bench-trial issues. RedBr.28-29. So much so, according to Global, that "Tenaris's contention that the district court failed to draw every inference in its favor [is] *irrelevant*." RedBr.38. Global is wrong.

*First*, Supreme Court precedent and the Federal Rules reject Global's suggestion of a bench-trial exception to summary judgment standards. There is one summary judgment standard, not two. In *Hunt v. Cromartie*, 526 U.S. 541 (1999), for example, the Supreme Court reversed a district court's summary judgment, and remanded for a bench trial—because genuine factual disputes remained concerning the defendant's motivations. *Id.* at 553. *Hunt* cautioned "[s]ummary judgment in favor of the party with the burden of persuasion … is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Id.* That was so even though "the District Court is more

familiar with the evidence than [the reviewing] Court, and … better suited to assess … motivations." *Id.* at 553-54.

Rule 56's text likewise states one summary judgment standard. Unlike, *e.g.*, Rules 50, 52(a)(1), and 59(a)(1), Rule 56 does not distinguish between bench and jury issues. "[T]he original Advisory Committee Note to Rule 56 … stated that 'this rule is applicable to *all* actions.'" 10B WRIGHT & MILLER FED. PRACTICE & PROCEDURE §2731. That is consistent with "[o]ne of the primary aims of the federal rules," which is "elimination of procedural differences between actions that historically were brought 'at law' and those initiated 'in equity.'" *Id.* For summary judgment, there is "no justification for differentiating between actions at law and suits in equity." *Id.*; *see also id.* n.12 (even for equitable actions, "if genuine issues of fact do exist, summary judgment must be denied").

*Second*, assuming Fifth Circuit precedent applies to the inequitable conduct issues here, which this Court need not decide[2]—the Fifth Circuit

---

[2] *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326-27 (Fed. Cir. 2009) (rejecting application of regional law to "whether inequitable conduct has been pleaded with particularity under Rule 9(b)"); *Lazare Kaplan Int'l v. Photoscribe Techs., Inc.*, 714 F.3d 1289, 1292-93 (Fed. Cir. 2013) (similar, Rule 60(b)).

does not hold otherwise. A line of decisions beginning with *Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978), recognizes narrow, limited circumstances—not present here—where trial courts may sometimes "draw inferences" at summary judgment. For bench-trial issues—*if* "there are *no issues of witness credibility*," and "*the evidentiary facts are not disputed*"—the court may grant summary judgment, "even though decision *may* depend on inferences to be drawn *from what has been incontrovertibly proved.*" *Id.* at 1123-24. That is appropriate *only* in "rare" cases where "neither issues of credibility nor controversies with respect to the substance of the proposed testimony" exist, and a "trial on the merits would reveal no additional data." *Id.*

Subsequent Fifth Circuit decisions—which Global cites without context for the phrase "greater discretion"—emphasize the narrowness of *Nunez*'s holding, applying only when no "issues of witness credibility or disputed material facts" exist. *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991).[3] Other circuits—including the Fourth and Ninth—have

---

[3] *See also Houston N. Hosp. Properties v. Telco Leasing, Inc.*, 680 F.2d 19, 22 (5th Cir. 1982) ("*if* the 'evidentiary facts are not disputed'" (quoting *Nunez*)); *Tamini v. Salen Dry Cargo AB*, 866 F.2d 741, 742-43 (5th Cir. 1989) ("there is no factual dispute that must be decided on the basis of the credibility of witnesses" (citing *Nunez*)); *Johnson v. Diversicare Afton*

followed *Nunez*'s reasoning while likewise emphasizing its narrowness. *E.g.*, *S.E.C. v. Murphy*, 626 F.2d 633, 656 (9th Cir. 1980) ("*Nunez* is not controlling here": "credibility is at issue, and the *Nunez* court acknowledged that the court's ability to draw inferences is enhanced by a trial where credibility is an issue."); *Int'l Bancorp LLC v. Societe des Bains de Mer*, 329 F.3d 359, 362 (4th Cir. 2003) (quoting *Placid Oil* (Fifth Circuit), permitting summary judgment "[w]ith … the record[] *comprised of only uncontroverted proffers* … and being en route to a bench trial anyway").

No circuit systematically dispenses with summary judgment standards for bench-trial issues. That would contravene Rule 56's text and Supreme Court precedent. And the limited circumstances present in *Nunez* are absent here: there are *credibility* disputes, including—critically—inventor Valdez's testimony, and Tenaris's reasons for not disclosing some or all of the CYMAX brochure documents at certain junctures. There are also evidentiary disputes, including whether the CYMAX brochure was

*Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) ("somewhat greater," "limited" discretion to weigh evidence when the issue will be tried to the court (citing *Placid Oil* and *Nunez*)); *Jones v. United States*, 936 F.3d 318, 323 (5th Cir. 2019) (no "credibility determination[s]"; competing evidence was "conclusory" and "unsubstantiated").

material or cumulative of Chitwood. No circuit endorses summary judgment under those circumstances.

Moreover, this Court did not somehow forget, in its numerous decisions cautioning against granting summary judgment of inequitable conduct, that inequitable conduct is usually tried to the bench. BlueBr.41 n.4. *Leviton Manufacturing Co. v. Universal Security Instruments, Inc.*, 606 F.3d 1353, 1353 (Fed. Cir. 2010), arose from a district court in the Fourth Circuit, which follows *Nunez*. *Int'l Bancorp*, 329 F.3d at 362. *Leviton* reiterated this Court "rarely affirm[s] a grant of summary judgment of inequitable conduct." 606 F.3d at 1363. *Leviton* explained that "[w]hile a district court may make inferences based on the evidence," deceptive intent "was not the only reasonable one based on the record." *Id.* at 1363. *Leviton* "remanded *for a bench trial*," because "genuine issues of material fact exist[ed]." *Id.* at 1365; *see, e.g.*, *Ulead Sys., Inc. v. Lex Comput. Mgmt. Corp.*, 351 F.3d 1139, 1146 (Fed. Cir. 2003) ("*Although inequitable conduct is a matter for the court*, rather than the jury … summary judgment is inappropriate if there are genuine issues of material fact."). Those admonitions are consistent with Supreme Court and Fifth Circuit precedent, and fully applicable here.

*Finally*, Global's suggestion of a different standard for bench-trial issues is inapt considering the parties' agreement to try the inequitable-conduct claim *to a jury*. Global's *Walker Process* claim (properly rejected, *see* Response to Global's Cross-Appeal, *infra*) required proof that Tenaris "knowingly asserted a fraudulently obtained patent." RedBr.61. Global's allegations that the '256, '074, and '075 patents were obtained by inequitable conduct were necessary (though not sufficient) for that claim. Because the underlying factual issues would have been intertwined, the parties agreed that inequitable conduct and part of Global's *Walker Process* claim would be tried to a jury. *See* Appx10181 (Global arguing "[t]his is *not* a case where the fraud issues are tried to the bench. Rather, the inequitable conduct claim will be presented to a jury." (original emphasis)).

### B. The District Court Erred by Resolving Valdez's Intent Against Tenaris at Summary Judgment.

#### 1. This Is Not an "Extreme" Case Where Intent May Be Resolved at Summary Judgment.

Credibility and mental states should almost never be resolved at summary judgment for the party with the burden of proof. *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265-66 (5th Cir. 1991); 10B WRIGHT &

MILLER §2730 & nn.21-30; BlueBr.42-43 & n.7. That is especially true given *Therasense*'s heightened burden of proof of intent.

Global observes that intent *may* sometimes be resolved at summary judgment, RedBr.48, but fails to show that result is appropriate here. *In re Chavin*, 150 F.3d 726 (7th Cir. 1998), which Global cites, emphasized "credibility issues" should be resolved at trial, "*except in extreme cases*." *Id.* at 728. *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182 (Fed. Cir. 1993), cited throughout Global's brief, is a pre-*Therasense* case this Court has repeatedly distinguished as involving extreme facts.[4] *Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1235, 1240-42 (Fed. Cir. 2004), for example, reversed summary judgment of inequitable conduct, and distinguished *Paragon*. In *Paragon*, *Monsanto* explained, "the patentee submitted *admittedly false affidavits* that 'convey[ed] the impression of deliberate artfulness' … and had the 'natural consequence' of deceiving the examiner." *Id.* at 1241. "[T]here was *no*

[4] *E.g.*, *Leviton*, 606 F.3d at 1363-64 (reversing summary judgment, distinguishing *Paragon*); *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1343-44 (Fed. Cir. 2008) (affirming no inequitable conduct, distinguishing *Paragon*); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1345-46 (Fed. Cir. 2003) (same); *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) (same).

*question* that the … false representations were material; the only issue was whether the false and material representations were submitted with an intent to deceive." *Id.* at 1240. In those circumstances, a "conclusory denial" could not "defeat a motion for summary judgment." *Id.*

Those circumstances are absent here. There is no "admittedly false affidavit," no mere "conclusory denial," and there *are* questions of materiality. Valdez's credibility is hotly contested, and he gave a non-conclusory explanation that is consistent with the evidence. The district court characterized Valdez's comment "'I am not sure it is a good idea to disclose this document,'" as "stark evidence of the intent fork of inequitable conduct." Appx14 (quoting Appx7721(VMT11)). But as explained, BlueBr.45-50, 20-21, and Global fails to refute, context shows otherwise. Valdez's comment was a direct response to a question about secondary considerations, and concerned whether the CYMAX brochure documents should be "disclose[d]" *as evidence of failure of others*. Valdez questioned CYMAX's relevance *for that purpose* because CYMAX's carbon specifications (an undisputedly relevant parameter) were outside the claimed range. BlueBr.46. Valdez's explanation was consistent with the evidence, including Valdez's actions. Valdez knew Chitwood described the same

product and had been disclosed in prosecution. Appx7792-7793(24:15-26:8, 27:8-28:3, 28:8-18). Valdez was aware CYMAX did not achieve the same properties as the claimed invention. BlueBr.11-12. And rather than concealing it, Valdez was the one who sent CYMAX to prosecution counsel. BlueBr.49-50.[5] The district court may doubt Valdez's explanation, or believe he *should have* pressed prosecution counsel to disclose CYMAX. But that is not the standard, and Global presented no evidence that prosecution counsel for the '256 patent—who has an independent duty to disclose—had any intent to deceive. Here, as in cases like *Leviton* and *Monsanto*, summary judgment was inappropriate.

### 2. Global's Alternative False-Declaration Argument is Meritless and Cannot Support the Judgment.

Global's main response is to pivot to its false-declaration argument. RedBr.46-48. Global contends Valdez's declaration shows deceptive intent because the CYMAX brochure "disclos[es] limitations [Valdez] had

[5] The district court decision cited on those pages of the opening brief has since been vacated and remanded for other reasons. *Luv N' Care Ltd. v. Laurain*, --F.4th--, 2024 WL 1590593, at *7 (Fed. Cir. Apr. 12, 2024) (post-bench-trial opinion did not make findings on affirmative egregious misconduct, separate from intent and materiality).

told the PTO were missing from the prior art" and "directly contradict[s]" statements in Valdez's as-filed declaration. RedBr.46-47, 49.

Again, the district court expressly did not adopt that argument. Appx15. The argument is meritless on multiple levels, in any event. *First*, Global's approach is legally wrong. Global contends "[t]he only question ... is whether Tenaris knew the [CYMAX] documents were material when choosing to withhold them." RedBr.46. But the question is what *Valdez* knew, not "Tenaris" generally, as Global's deceptive-intent allegations accuse Valdez. *See Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 974 n.1 (Fed. Cir. 2010) (individuals, not corporations, can commit inequitable conduct). Moreover, precedent rejects arguments like Global's for "infer[ring] intent to deceive from non-disclosure of a reference solely because that reference was known and material." *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372-73 (Fed. Cir. 2012); *cf. Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1290, 1297, 1302 (Fed. Cir. 2011) (en banc) (unanimously rejecting sliding-scale).

*Second*, Valdez's declaration is not false—and certainly not indisputably or unmistakably false in a way that would justify summary judgment. Global mischaracterizes the declaration's substance. And it uses

the "falsity" label to repackage its disagreement with *arguments* distinguishing prior art—which is normally not grounds for inequitable conduct. *See Akzo N.V. v. ITC*, 808 F.2d 1471, 1482 (Fed. Cir. 1986); *Life Techs., Inc. v. Clontech Lab'ys, Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000).

Valdez's declaration responded to an office action that rejected claims based on three references. As Global acknowledges, RedBr.47, Valdez reviewed the office action. His declaration explained why he did not think the references rendered "the claimed coiled tubes … obvious." Appx7703(¶4).

Paragraph 6 (Appx7704(¶6)), highlights critical features absent from the Dubois reference, including the "specific chemistry and heat treatment" claimed in the '256 patent. The declaration explains Dubois only taught "general knowledge of heat treatment." Appx7704(¶6). That is a reasonable argument about the scope of *Dubois's* disclosure, not—as Global suggests—a broad claim that the referenced features were wholesale absent from all prior art. RedBr.33-34, 47.

Paragraph 8 (Appx7705(¶8)) states the claimed coiled tubes could run "more than 1,000,000 feet, *double that of conventional coiled tubes*." Again, that is a true statement about conventional coiled tubes—which,

unlike CYMAX, are not heat-treated. It is not a broad statement that no 1,000,000-foot tube has ever existed. RedBr.47.

Paragraph 5 (Appx7703-04(¶5)), discusses benefits of the claimed invention—including the claimed homogenous microstructure, which is "critically important in improving the fatigue life of the coiled tube." Other benefits were "high yield strength and high fatigue strength" which "ha[d] not been achieved before in the industry." *Id.* Global contends that the CYMAX brochure disclosed those features (and the others referenced in paragraphs 6 and 8) and that, because Valdez knew of the CYMAX brochure but did not disclose it, one must infer that Valdez intended to deceive the PTO. RedBr.34-35, 47. Global is wrong—"failure to mention prior art references in an affidavit" is insufficient to prove inequitable conduct. *Therasense*, 649 F.3d at 1292-93. And importantly, CYMAX did *not* achieve the features Global highlights—CYMAX was a technical and commercial failure. BlueBr.11-12. As industry knew, CYMAX did not have a homogenous microstructure. Appx7382(46:6-11); Appx7408; Appx7643-7644(¶320). CYMAX was documented to have *worse* fatigue life than conventional, prior-art coiled tubing, Appx7405(129:9-12); Appx7429; Appx7438, which Valdez knew when he

submitted his declaration, BlueBr.11-12, 16-17. Global does not refute any of this.

The district court appropriately did not accept Global's invitation to treat Valdez's declaration arguments about other prior-art references as evidence of deceptive intent. This Court should not either, especially not in reviewing a grant of summary judgment.

#### 3. Global's Attacks on Dr. Valdez's Explanation Suggest Improper Burden-Shifting, and Cannot Support the Judgment.

When Global finally turns to Valdez's explanation for his comment to prosecution counsel, Global contends it is "insufficient to avoid summary judgment." RedBr.48. It is not.

*First*, Global's "insufficient" framing assumes Valdez was required to give a "good faith explanation." Under *Therasense*, however, "[t]he absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." 649 F.3d at 1291. "Because the party alleging inequitable conduct bears the burden of proof, the 'patentee *need not offer any good faith explanation* unless the accused infringer first … prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" *Id.* (original brackets and ellipsis, quoting *Star*

*Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008)). Global rearranges that passage to crop the clear-and-convincing standard, and to suggest a burden-shifting framework this Court has never endorsed. RedBr.45-46. Global's suggestion of a "threshold level of intent" appears to rely on its false-declaration premise—which, as explained, §I.B.2, *supra*, is meritless and not the district court's reasoning.

To the extent Valdez had a duty to supply a good-faith explanation, he did so. *Supra* §I.B.1; BlueBr.45-50, 20-21. As in cases like *Monsanto* and *Leviton*, and in contrast to extreme cases like *Paragon*, Valdez's explanation was consistent with the evidence, and not conclusory. Again, questioning whether it was "a good idea to disclose this document" was Valdez's direct response to prosecution counsel's question about *secondary considerations*. Valdez was commenting on whether the CYMAX documents were probative of *failure of others*, as the CYMAX chemistry fell outside the claimed range. In *that* context, Valdez's comments make good sense. Global's approach to inequitable conduct depends on stubbornly ignoring that context and reimagining Valdez's exchange with prosecution counsel as concerning a different subject. On this record, Global's tale of deceit cannot support summary judgment.

Global's remaining arguments harp on Valdez's credibility, while insisting CYMAX was material. RedBr.49-51. Global overstates CYMAX's supposed materiality, §I.C, *infra*, and fails to show that deceptive intent was compelled at summary judgment. Valdez gave non-conclusory testimony that he believed the statements in his declaration. Appx7795(58:22-24). As in *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244, 1252-54 (Fed. Cir. 2024), and *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1332 (Fed. Cir. 2009), Global's attacks on the declaration lack merit and fail to show that the *single most reasonable inference* is that Valdez did not believe his statements. Global's epithets and rhetoric add nothing, and get some of the facts wrong. *See* RedBr.49 n.6 ("Valdez's carbon-range excuse is manufactured"), 51 ("ridiculous"), 52 ("gymnastics to avoid disclosure"). For example, Global refers to Valdez acting "in the face of counsel's dire warnings." RedBr.52. It is unclear what "dire warnings" Global means. If Global means Fish & Richardson's 2019 emails (a different firm prosecuted the '256 patent), those came *two years later*. Valdez's declaration, the '256 patent issuance, and Global suing Tenaris all happened in 2017.

Valdez did not "deliberately withhold[] information showing" a limitation was (in Global's words) not novel. RedBr.47. Among other things, Chitwood was disclosed during prosecution, which all agree describes CYMAX. Appx7129; Appx7792-7793(25:17-26:18). Global asserts Valdez "nowhere explains why he deemed the disclosure of" numerous limitations "immaterial" to the '256 patent claims. RedBr.49. That is wrong. Valdez testified that he believed Chitwood disclosed all relevant information and was therefore cumulative (*infra* §I.C.2). *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335 (Fed. Cir. 2012) is thus inapposite. *Aventis*, moreover, followed a bench trial with live testimony and explicit credibility findings—not summary judgment. *Id.* at 1336 (affirming on clear-error review, emphasizing "deference [this Court] must afford to the district court's credibility determinations").

Global argues Valdez's explanation is "no excuse" because "the CYMAX documents would be *material* regardless," and argues CYMAX is "deemed to teach the claimed range." RedBr.49. Those concern materiality, not intent. *Therasense*, 649 F.3d at 1290 (rejecting sliding-scale approach). However much Global may believe CYMAX *should have* been disclosed, that does not mean the failure to disclose was done with

deceptive intent, let alone that deceptive intent was compelled at summary judgment.

*Finally*, Global's unexplained assertion that "Tenaris never defends the non-disclosure by counsel that resulted" from Valdez's statement "that it was not a 'good idea to disclose this document,'" RedBr.50 (quoting Appx3258), cannot support the judgment. Materiality (*see* §I.C, *infra*) or "should have disclosed" are not the standard for intent. Non-disclosure did not "result[]" from Valdez's exchange with prosecution counsel, which was about a secondary-considerations argument. If Global is suggesting prosecution counsel acted improperly, that argument is forfeited. *See Avid*, 603 F.3d at 974 n.1. Even after the magistrate judge ordered production of Valdez's draft declaration and attendant privileged materials, Global declined to re-depose the '256 patent's prosecution counsel. BlueBr.29. Global never provided argument or evidence that prosecution counsel intended to deceive the PTO.

Under *Therasense*, deceptive intent must be the single most reasonable inference, and established by clear-and-convincing evidence. Here, as in *Leviton* and *Monsanto*, the district court erred by resolving intent at summary judgment—it failed to draw reasonable inferences for

Tenaris, failed to consider evidence supporting Tenaris's view of the facts, and failed to heed this Court's and the Supreme Court's repeated admonitions that credibility is unsuited for summary judgment. Whatever might be said for Global's view of the facts, it is not compelled.

### C. The District Court Erred by Resolving Materiality Against Tenaris at Summary Judgment.

The district court's erroneous intent finding at summary judgment is sufficient to vacate the inequitable conduct judgment. If the Court reaches materiality, that finding is also erroneous. Global again fails to defend the district court's errors, while relying heavily on a meritless false-declaration argument the district court did not adopt.

#### 1. Global's Alternative False-Declaration Argument at Most Raises New Factual Disputes, Not Grounds for Summary Judgment.

The district court found the CYMAX brochure was but-for material because it discloses "essentially our chemistry," meaning the chemistry claimed in the '256 patent. Appx13. The court rejected Tenaris's argument that a reasonable factfinder could find CYMAX cumulative of Chitwood. *Id.* And it contended its conclusion was "strengthened by the untenable rationale Tenaris offers in explanation of non-disclosure"—meaning it disbelieved Tenaris's explanation that the CYMAX chemistry

specifications appeared not to be public documents, and disbelieved Valdez's testimony. *Id.*

As explained in the opening brief, the district court's "essentially our chemistry" reasoning is a clear mistake. BlueBr.16, 31, 53-54. The full sentence in the record is "[t]his is essentially our chemistry *for HS90 (A606HS)*." Appx7656. "HS90" is undisputedly a *conventional* coiled-tubing product, *not* the improved tubing described and claimed in the '256 patent. Appx7652. That is the linchpin of the district court's materiality reasoning, and it is simply wrong. Global does not defend that reasoning. Global only calls the error a "quibble[]," RedBr.39, and buries the issue in is brief.

Indeed, aside from cumulativeness (§I.C.2, *infra*), Global does not defend any of the district court's materiality reasoning. Global argues instead—again—that the CYMAX brochure contradicts Valdez's declaration. RedBr.32-36. That argument is wrong, and at most raises more factual disputes.

*First*, Global assumes the wrong materiality standard. Global contends the CYMAX brochure is material because it "directly contradict[s] assertions Tenaris made in the Valdez Declaration to secure patent

issuance." RedBr.32. That is the PTO's materiality standard under its Rule 56. 37 C.F.R. §1.56(b)(2) ("information is material to patentability" if it "refutes, or is inconsistent with, a position the applicant takes in" opposing or asserting (un)patentability arguments). The *Therasense* majority rejected that standard because it "sets *such a low bar for materiality*" and "would inevitably result in … patent litigators continuing to charge inequitable conduct in nearly every case as a litigation strategy." 649 F.3d at 1295; *id.* at 1294 (similar).

When Global contends it need only show "the CYMAX documents disclosed the *specific limitations* Tenaris identified as the 'critical improvement[s] over the prior art' to overcome that rejection." RedBr.38 (citing cases), it likewise assumes the wrong standard. "As with an[y] invalidity analysis," but-for materiality turns on "whether a reasonable patent examiner *would have allowed the claims* had she known of the" withheld reference. *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017).

*Second*, Global's criticisms of Valdez's declaration mischaracterize the declaration and evidence, and are at least not compelled at summary judgment.

In distinguishing prior art, Valdez explained that the claimed "specific chemistry" and "specific heat treatment" were critical to achieve the claimed homogeneous microstructure. Appx7703-7704(¶¶5-6). He concluded a POSA could not "achieve the coiled tube recited in the claims *based on the references cited in the Office Action*." Appx7704(¶6). Global contends the CYMAX brochure discloses those claim limitations. RedBr.33-35 (citing Appx5274, Appx5282, Appx5291, Appx5298). But other evidence shows CYMAX did *not* achieve the claimed homogenous microstructure, let alone the claimed 90% tempered martensite. Appx1090(23:24-27). As Valdez knew, Reichert and Gomez performed testing and concluded CYMAX did not have enough carbon to be hardenable or form the claimed 90% tempered martensite. Appx7656; Appx7666.

Valdez's declaration identified an industry-wide "critical need" for coiled tubes with "higher yield strengths" and "improved fatigue life." Appx7705(¶8). Valdez explained that conventional tubing without full-body heat treatment produced "weaker" products. *Id.* That problem was widely recognized in 2013, when Tenaris's patents were filed. Appx7027 (Global 2013 paper recognizing need to improve "fatigue performance").

Global again claims CYMAX achieved these properties. RedBr.35-36 (citing Appx5256, Appx5296). Again, other evidence shows otherwise—the 1995 DEA-97 study confirmed CYMAX had *worse* fatigue life than conventional tubing. BlueBr.11-12.

While Global points to statements in the CYMAX brochure that CYMAX had run over 1,000,000 feet, run-length is not claimed, and as explained, §I.B.2, *supra*, Valdez's statement about run-length was about *non-heat-treated conventional tubes*. Appx1090(cls.1-15); *Therasense*, 649 F.3d at 1292 ("prior art is but-for material if the PTO would not have allowed a *claim* had it been aware of the undisclosed prior art").

When Global argues the CYMAX brochure "qualif[ies] as prior art" even if the product did not work, RedBr.40, it responds to an argument Tenaris never made. CYMAX's failure does not mean the CYMAX brochure is legally *ineligible* as prior art. But it does make it weak prior art and thus less likely to meet *Therasense*'s but-for materiality standard. *See WBIP v. Kohler*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) (affirming non-obviousness, citing evidence of primary reference's flaws tending "to show that an ordinarily skilled artisan would not have modified that reference or combined it with others").

At most, even if Valdez should have known to disclose the CYMAX brochure, that is not the standard. Contrary to Global's argument, Tenaris *did* provide "competent evidence that could be presented at trial showing that there is a genuine dispute as to a material fact." RedBr.38. In addition to evidence above, Tenaris produced evidence of the CYMAX brochure's cumulativeness of Chitwood and its treatment during later prosecution.

### 2. The CYMAX Brochure is Cumulative of Chitwood.

Global admits the PTO allowed the '256 patent claims over Chitwood, but argues that is irrelevant because the CYMAX brochure taught more. RedBr.43. That is a disputed factual question at most.

As Valdez testified at deposition, Chitwood discloses **(1)** the identity of the steel, **(2)** "the need to increase yield strength," and **(3)** "coiled tubing [] is heat treated." Appx7792-7793(25:17-26:8, 27:8-28:3, 28:8-18). Chitwood also discloses **(4)** material with "sufficient hardenability to achieve the uniform, martensitic microstructure from heat treatment … and … low enough carbon to be field repair welded," Appx3463, and **(5)** quench-and-tempered tubing with 100 ksi yield strength and "a higher threshold for cracking" than conventional tubing, Appx3466.

These are the same teachings Global contends the CYMAX brochure discloses.

What does CYMAX brochure disclose, relevant to the ’256 patent claims, that Chitwood does not? The district court identified only the “precise” chemistry specifications from one document in the CYMAX brochure. Appx13. But Global does not dispute that Valdez testified that he thought Chitwood was *closer to the claims* than CYMAX because it disclosed a chemistry range that overlapped with the claims, whereas CYMAX had carbon chemistries *outside* the claimed range. BlueBr.20-21.

Nor does Global dispute that Chitwood discloses “low-carbon 4100 series steel,” which a POSA would understand—and Global’s own witnesses *did* understand—to mean SAE standard steel grades with known chemistry spelled out in publicly-available references. BlueBr.13-16; Appx6978-6980(142:18-23, 144:3-9) (Global witness); Appx6984 (Global employee: “low carbon 4100 series has a published chemistry range”). That is not meaningfully different from the CYMAX brochure’s statement “the steel sheet shall be 4100 series, chrome-moly alloy per ASTM A607, modified,” followed by a list of chemical ranges. BlueBr.15;

Appx6917. Global emphasizes CYMAX's reference to "modified" steel, but fails to explain what difference that makes. RedBr.44.

Global argues that a Tenaris witness (Quintanilla) said CYMAX, but not Chitwood, would have made the claimed "90%+ tempered martensite" obvious. RedBr.44. That hearsay statement lacks context. Global's contention comes from a 2019 e-mail (years after the '256 patent issued) containing a prosecuting attorney's notes of a call with a Tenaris attorney, who in turn recounted a conversation with Quintanilla, who Global chose not to depose. Appx7221-7222; Appx8465. Prosecution counsel's rough notes state: "Starting from 4100 series steel is not enough to disclose" the "[c]ombination of 90%+ tempered martensite, the rest being bainite." Appx7222. This was because, per Quintanilla, you had "to carefully control the heat treatment conditions to achieve these results." Appx7222. Notably, Quintanilla did not say starting from *Chitwood* was insufficient to disclose the claimed 90%+ tempered martensite. The notes also state Quintanilla "*thinks* reviewing CYMAX documents would give 90%+ tempered martensite" and "give *a little more* information" than Chitwood. Appx7222.

Regardless of what Quintanilla supposedly thought about Chitwood, evidence of CYMAX's performance failures provides reason to doubt whether the CYMAX brochure would have led to the claimed 90%+ tempered martensite. BlueBr.63. At most, Global raises yet another factual dispute. *See Digital Control, Inc. v. Charles Machine Works*, 437 F.3d 1309, 1319 (Fed. Cir. 2006).

*Belcher Pharmaceuticals, LLC v. Hospira, Inc.*, 11 F.4th 1345 (Fed. Cir. 2021) does not "foreclose" Tenaris's position. RedBr.31, 44. *Belcher* affirmed inequitable conduct *after a bench trial*, without suggesting the result was compelled. *Id.* at 1353 ("we see no clear error"). In *Belcher*, the claims recited a 2.8-3.3 pH range. *Id.* at 1350. The applicant distinguished prior art reciting overlapping ranges, by arguing the *claimed* pH range was "critical." *Id.* at 1353. But the applicant withheld prior art that disclosed the *exact* claimed pH range, including evidence of *testing* prior-art products within the claimed range. *Id.* at 1351-53. In those circumstances, the district court did not clearly err by finding the patentee's cumulativeness argument "at odds" with its argument that the claimed range was critical. *Id.*

Setting aside the summary-judgment posture, this case is different. Valdez made sure Chitwood was disclosed. Appx7792-7793(25:17-26:18). Chitwood is undisputedly the same product as the CYMAX brochure. BlueBr.12-13; Appx7129. Valdez's declaration makes no arguments "at odds" with not disclosing the CYMAX brochure. Valdez testified he disclosed Chitwood because it was "representative of CYMAX" and disclosed the chemistry used to make CYMAX. "It makes reference to the ASTM, American Society for Testing and Material A606 and also for the type of steel used, which are publicly available to come from a chemical composition." Appx7792-7793(25:17-26:18). Whether the CYMAX brochure "teaches more" than Chitwood, RedBr.45, is at most a disputed fact, not grounds for summary judgment. *See Digital Control*, 437 F.3d at 1319.

### 3. "Zernick" is No Answer to the District Court's Failure to Consider the Grandchildren Applications' Evidence of Non-Materiality.

Global has no direct answer to the district court's failure to address the Grandchildren Applications evidence, BlueBr.55-57, 25-26, nor the district court's failure to rule on Tenaris's objections to the magistrate judge's order granting Global's withdrawn evidentiary motion, BlueBr.57-58, 29-30. The Grandchildren Applications led to patents that

were patentably *indistinct* from the '256 patent. And in prosecution, the Examiner had not only the full CYMAX brochure, but also Global's invalidity contentions from this litigation, thus focusing the Examiner's attention. BlueBr.25-26. That the Examiner allowed patentably indistinct claims under those circumstances is powerful evidence of *non*-materiality. BlueBr.56 n.12 (citing cases). At the very least, a reasonable factfinder could find Global's arguments unpersuasive.

Global responds only that the Examiner rejected *earlier claims* over "Zernick," and the final claims were not "identical" to the '256 patent claims. RedBr.41, 43. Global overstates both points.

Global refers to Zernick (Appx10686-10699) 14 times, and says Zernick is "almost the same" as one of the CYMAX documents withheld during prosecution of the '256 patent (but not the '074 and '075 patents). RedBr.41. Global buries, however, that the CYMAX document Zernick resembles (Appx5285-5299; Appx6920-6934) does *not* include the CYMAX chemistry specification (Appx5282; Appx6908-6909). That matters because **(1)** the document Zernick resembles *was* disclosed in connection with the '074 and '075 patents, and **(2)** the chemistry specification (which Zernick does not disclose) is the *only* difference Global or the district court

identified to argue the CYMAX brochure is not cumulative of Chitwood. Zernick's relevance is, at most, an argument Global can make at trial.

So, too, is Global's argument that the allowed Grandchildren Application claims are "different from the ones the Examiner … found 'patentably indistinct.'" RedBr.41. For the claims to issue, Tenaris was required to file a terminal disclaimer, confirming the claims are patentably indistinct from the '256 patent claims, regardless of any later narrowing. Global may believe later amendments are significant, but the district court never addressed them, and Global's view does not compel summary judgment.[6] BlueBr.55-59.

## II. Summary Judgment of Unenforceability of the '074 and '075 Patents Was Erroneous.

Global does not dispute that if summary judgment of inequitable conduct is reversed or vacated for the '256 patent, the same result follows for the '074 and '075 patents. *See* BlueBr.66; *In re Omeprazole Pat. Litig.*,

---

[6] The PTO continues to issue patents in the same family, over the CYMAX brochure documents, including recently-granted No. 11,952,648. *See* Appl. No. 16/685,333, Dec. 6, 2023 Reasons for Allowance at 2-4, https://patentcenter.uspto.gov/applications/16685333/ifw/docs?application=. The Court can take judicial notice if necessary. *See Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 899 n.3 (Fed. Cir. 2019) (non-precedential); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 n.2 (Fed Cir. 2018).

483 F.3d 1364, 1375 (Fed. Cir. 2007). Global has no sound answer for the additional errors concerning the ’074 and ’075 patents that independently require vacatur or reversal of that portion of the judgment.

Global suggests an automatic rule that inequitable conduct for a parent “*is* infectious when” the child patent is not “sufficiently distinct.” RedBr.52. Neither of Global’s citations support any such rule. *Agfa Corp. v. Creo Products Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) affirms inequitable conduct based on “specific findings” after a bench trial. *Id. Agfa*, at most, suggests the converse of Global’s rule—if a child patent claims “sufficiently distinct” subject matter, that may “preclude” application of infectious unenforceability. *Id.* And as *Consolidated Aluminum Corp. v. Fonseco International Ltd.*, 910 F.2d 804, 809-12 (Fed. Cir. 1990) held, infectious unenforceability is equitable, not automatic. Considerations include the extent to which inequitable conduct in the parent application affected the child patents. *Id.*

Here, the district court simply repurposed the magistrate judge’s discovery order as grounds for summary judgment, BlueBr.67-68, and improperly resolved disputed facts against Tenaris, BlueBr.68-71. Global has no sound answer to either point. Global observes that the magistrate

judge is one of "two judges" who faulted Tenaris's conduct, which is perhaps true but irrelevant. RedBr.53.

Citing *Rohm & Haas Co v. Crystal Chem. Co.*, 722 F.2d 1556 (Fed. Cir. 1983), Global argues Tenaris was required to "cleanse" the '074 and '075 patents of the '256 patent's supposed "taint." RedBr.53. *Rohm & Haas* is irrelevant, as it did not address infectious unenforceability. Moreover, *Rohm & Haas* concerned an unmistakably false declaration. 722 F.2d at 1570. As *Therasense* explained, submitting an unmistakably false declaration to the PTO is "affirmative egregious misconduct." *Therasense*, 649 F.3d at 1292 (citing *Rohm & Haas*). It is a different type of inequitable conduct, distinct from "mere nondisclosure of prior art references to the PTO [or] failure to mention prior art references in an affidavit," and fits an "*exception*" to the general rule requiring proof of materiality. *Id.* at 1292-93.

If an applicant submits an unmistakably false affidavit—as in *Rohm & Haas* and *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013)—then "absent curing, this alone establishes materiality." *Intellect*, 732 F.3d at 1342. "Curing," in that context, requires that the applicant expressly acknowledge the prior false statement and correct it.

*Id.* at 1343-44. Neither *Rohm & Haas* nor *Intellect* suggest similar rules for nondisclosure cases, nor was that the district court's reasoning here.

For the '074 and '075 patents, moreover, prosecution counsel drew the Examiner's attention to the disclosed portions of the CYMAX brochure, and the Examiner agreed with counsel's bases for distinguishing them. BlueBr.24. The Examiner was thus able to "independently assess" the brochure. *Applied Materials, Inc. v. Advanced Semiconductor Materials Am. Inc.*, 1994 WL 270714, at *3 (N.D. Cal. April 19, 1994) (distinguishing *Rohm & Haas*).

Global cites *American Calcar, Inc. v. Honda Motor Co., Inc.*, 768 F.3d 1185 (Fed. Cir. 2014) for the phrase "intentionally selective." RedBr.53. *American Calcar* did not involve infectious unenforceability or summary judgment. It simply ruled that the district court did not *clearly err* by inferring deceptive intent from the evidence *at trial*. 768 F.3d at 1190. Later "[p]artial disclosure of material information" did not defeat inequitable conduct as a matter of law. *Id.* Here, by contrast, there has been no trial, and "intentionally selective disclosure" is merely Global's view of disputed facts. Global criticizes Tenaris's investigation and decision to disclose all but the chemical specification from the CYMAX

documents.[7] But it does not dispute that the CYMAX documents on their face are separate documents with different dates (by years), does not mention expert testimony from former Commissioner Stoll supporting Tenaris's mode of disclosure, Appx8027(¶349), and does not dispute that counsel investigated each document's provenance and withheld the chemical specification based on the belief it was confidential, and not prior art that needed to be disclosed, BlueBr.23; Appx7978. *Cf. Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1036-37 (Fed. Cir. 2006) (no inequitable conduct where patentee and patent attorney investigated the allegedly material prior art). Global ultimately has no answer for the district court's error of resolving intent against Tenaris at summary judgment for the '074 and '075 patents.

---

[7] Global inaccurately insists no investigation occurred because "Tenaris" never conducted certain interviews, RedBr.17. Global also cites 2019 Fish & Richardson emails to suggest nefarious intent by counsel. RedBr.17 (citing Appx10130-10131(Ex.3), Appx10126-10127(Ex.5)). Those emails responded to a *hypothetical* "[a]ssum[ing] the printed document is material to patentability," Appx10131—which, as discussed, is not this case.

## III. Global's Alternative "Affirmative Egregious Misconduct" Argument is Unsound, and At Most an Issue for Remand.

Global's "affirmative egregious misconduct" argument cannot support affirmance. RedBr.54-58. The authority to affirm on alternative grounds is "discretionary, not mandatory." *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1351 (Fed. Cir. 2007). Where, as here, an alternative ground presents fact-intensive issues the trial court did not reach (Appx15), the better course is usually to remand. *Id.*; *Rushing v. Miss. Dep't of Child Prot. Servs.*, 2022 WL 873835, at *5 (5th Cir. Mar. 24, 2022) (non-precedential) (declining to affirm summary judgment on "record-intensive alternative ground on which defendant bears the burden"). Global offers no reason for a different result here.

If the Court entertains Global's argument, it should reject it. "Affirmative egregious misconduct" is an "*an exception*" to but-for materiality, and distinct from "mere nondisclosure of prior art references to the PTO [or] failure to mention prior art references in an affidavit." *Therasense*, 649 F.3d at 1292-93. It encompasses "'deliberately planned and carefully executed scheme[s]' to defraud the PTO and the courts, … such as the filing of an unmistakably false affidavit." *Id.* "Unmistakably false affidavits" include those containing false data, intentionally and

misleadingly omitting a declarant's employment with the inventor's company, *Therasense*, 649 F.3d at 1292-93 (citing cases), or falsely swearing that an applicant reduced an invention to practice. *Intellect*, 732 F.3d 1342-44. Materiality is assumed, because "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes the falsehood will affect issuance of the patent." *Therasense*, 649 F.3d at 1292. But intent to deceive must still be shown. *Intellect*, 732 F.3d at 1341-42, 1344-46.

As explained above for individual arguments, Global cannot fit this case into that category, especially not at summary judgment. Global's asserted "falsehoods" in Valdez's declaration, RedBr.54-55, mischaracterize the declaration and the CYMAX documents, and ignore Valdez's testimony to his belief in the declaration's contents. *Supra* §§I.B.2-3, I.C.1; Appx7795(58:22-24). Arguments "to distinguish the claims from the prior art" are not affirmatively egregious where, as here, they are not "demonstrably false." *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007). And "neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct." *Therasense*, 649 F.3d at 1292-93.

*Intellect*, RedBr.55-56, is inapposite. *Intellect* affirmed inequitable conduct *after a bench trial*, on clear-error review, 732 F.3d at 1341, 1346, and involved objectively verifiable, outright falsehoods. The applicant "told the PTO that he built a device that could receive images via wireless transmission," but what he actually built "contained *only preloaded* images and *was not capable* of wireless communication." *Id.* at 1345. Nothing similar exists here. For the '256 patent, as explained, Global mischaracterizes Valdez' declaration and the CYMAX documents. For the '074 and '075 patents, RedBr.56-57, Global labels Tenaris's disclosure as "doctoring," RedBr.2, 16, 18, 25, 28, 30, 48, 53, 54, 56, and "suppression of evidence," RedBr.56. Global's inflammatory rhetoric is not evidence. Again, the "CYMAX brochure's" contents were separate documents, with separate titles and disparate dates. BlueBr.14-15, 22-24. Tenaris attorneys investigated, reasonably believed the chemical specifications were confidential and not prior art, and accordingly submitted the other documents individually. BlueBr.14-15, 22-24, 68-71; *supra* §II. Expert testimony confirmed Tenaris's mode of disclosure. Global calls Tenaris's view "implausible," but fails to support that label. RedBr.56.

At bottom, Global's "affirmative egregious misconduct" depends on numerous inferences Global would have this Court draw in the first instance, without sufficient record support. Global's argument lacks merit and further exemplifies the "plague" this Court sought to eliminate in *Therasense*.

## CONCLUSION

This Court should reverse or vacate summary judgment of inequitable conduct.

## RESPONSE TO GLOBAL'S CROSS-APPEAL

The Court should affirm the grant of summary judgment in Tenaris's favor on Global's antitrust claim. From start to finish, Global's brief misstates the summary judgment record and misstates the elements of its attempted-monopolization claim.

To establish attempted monopolization, a plaintiff must show that the defendant has a dangerous probability of obtaining monopoly power in a relevant market. Market share is the principal tool for assessing that probability. Yet according to Global's own experts, Tenaris has a market share of just 17% in Global's proposed market and could obtain *at most* a 29% share if it successfully implemented the supposed monopolistic scheme Global alleges. According to Global, the remaining 71% of the market would be controlled by non-party Quality Tubing ("Quality"). Global should therefore not be surprised that its antitrust case was thrown out on summary judgment: No court in the country has ever found that a chance to become a minority player in a two-player market dominated by *someone else* counts as a dangerous probability of obtaining monopoly power. This Court should not be the first.

Seemingly aware that its own experts have doomed its case, Global asks this Court to forget about the Sherman Act case it actually pled and pursued below. Instead, Global wants the Court to either **(1)** assume Tenaris could and will *also* enforce its patents against Quality, a proposition for which there is precisely zero evidence in the record; or **(2)** pretend Quality does not exist or had some difficulty entering the market. Neither conclusion has any basis in the record, and neither can save Global from its ill-conceived attempt to hold a minority market player liable for monopolization. The Court should affirm.

## STATEMENT OF THE ISSUES

**I.** Whether the district court appropriately granted Tenaris's summary judgment motion because the undisputed evidence showed that Tenaris could obtain *at most* a market share of 29% if it was entirely successful in its attempted monopolistic scheme.

**II.** Whether, in the alternative, this Court should affirm the district court's judgment because Global Tubing's argument on appeal is procedurally barred.

## STATEMENT OF THE CASE

### I. Factual Background

There are currently three U.S. manufacturers of coiled tubing: Tenaris, Global Tubing, and non-party Quality. Appx5848-5852. All three sell coiled tubing internationally, and none offers different prices based on a customer's location. *See, e.g.*, Appx5864; Appx5948; Appx5953.

As explained in Tenaris's opening brief, "conventional" coiled tubing, which is manufactured by welding many individual flat strips of steel together, was the only type of coiled tubing any manufacturer sold before 2015. BlueBr.7-11; Appx5832-5833, Appx5843-5844. In 2015, Tenaris launched a new product, branded BlueCoil, that was manufactured with a full-body heat treatment—a "quench and temper" process—that involved heating the steel and then rapidly cooling it so that the steel microstructure is homogenous across the weld joints. *See* Appx5836, Appx5843-5844; Appx5909.

Quench-and-tempered coiled tubing is a premium product with advantages over conventional coiled tubing. Most significantly, quench-and-tempered coiled tubing has a higher fatigue life, meaning it can perform more operations before it must be replaced. Appx5809; Appx5947. But conventional and quench-and-tempered coiled tubing "can be used in

all the same wells," Appx5949, and "can do the same things," Appx5964; *see also* Appx5921.

Tenaris's first patent for its quench-and-tempered technology, the '256 patent, issued in 2017. The children '074 and '075 patents issued in 2019. BlueBr.21, 24. Tenaris now offers two conventional products (HS-80 and HS-90) and five quench-and-tempered products (BlueCoil HT-95, BlueCoil HT-110, BlueCoil HT-120, BlueCoil HT-125, and BlueCoil HT-140). Appx5985.

Global developed its own quench-and-tempered product line, branded DuraCoil, after studying Tenaris's application for the '256 patent. *See* Appx6057-6058. Global launched DuraCoil 110 in July 2017; DuraCoil 130 in April 2019; and DuraCoil 120 and DuraCoil 140 in 2022. Appx5987-5988. Global also currently sells five conventional products: GT-70, GT-80, GT-90, GT-100, and GT-110. Appx5986-5988.

Quality launched a line of quench-and-tempered products under the brand ATP (Advanced Thermally Processed) in 2019—two years after the '256 patent issued and Global first launched DuraCoil. Appx5989. Quality now sells four quench-and-tempered products (ATP-110, ATP-

120, ATP-130, and ATP-140) and two conventional products (QT-800 and QT-900). Appx5988-5989.

## II. District Court Proceedings

Global sued Tenaris on October 30, 2017—the day before Tenaris's '256 patent issued—seeking a declaratory judgment of noninfringement. BlueBr.22; Appx2001-2011. Two years later, on December 13, 2019, Global first alleged that Tenaris violated § 2 of the Sherman Act under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 173-74 (1965). According to Global, Tenaris's "frauds on the Patent Office" and its "assertion" of "very broad" children patents "against Global" were anticompetitive conduct designed to monopolize the United States "market for coiled tubing generally and quench-and-tempered coiled tubing specifically." Appx2059; Appx12410 (limiting *Walker Process* claim to the children patents). Global did not allege that Tenaris had enforced or would enforce any patent against Quality. And Tenaris represented to the district court that it has no intention of ever pursuing infringement claims against Quality. Appx31172 ("I can represent to the Court that we have no intention of pursuing such an action.").

Until summary judgment, Global sought to build its case with the opinions of two experts. Altinkopru calculated the three U.S. manufacturers' current market shares. Reiff opined (among other things) on each manufacturer's projected share if Tenaris succeeded in asserting its patents against Global and prevented Global from manufacturing its quench-and-tempered coiled tubing. Assuming the antitrust market is properly limited to quench-and-tempered coiled tubing sold in the United States (a premise Tenaris disputes), Global's experts opined that at the time of the summary judgment proceedings, Tenaris had a 17% market share, Global had a 40% market share, and Quality had a 43% market share.[8] Appx5863. And if Tenaris succeeded in excluding Global from the purported quench-and-tempered market, Reiff opined that Tenaris would command a grand total of 29% of the market, while non-party Quality would command the remaining *71%*. Appx6011-6012.

[8] Altinkopru subsequently (and improperly) sought to amend his report to opine that Tenaris had an 18% market share, Global had a 41% share, and Quality had a 42% share. Appx6060-6062. The difference between these market-share numbers and the numbers Altinkopru originally offered is irrelevant to this appeal.

After reviewing this record, the district court correctly granted Tenaris's summary judgment motion from the bench. Appx31191. And although Global makes much of the brevity of the district court's final summary of its decision, the court's reasoning was abundantly clear from the extensive discussion between counsel and the court during the hours-long summary judgment hearing. Appx31118-31192. This was not a close case, and no lengthy analysis was needed to determine that Tenaris was entitled to summary judgment.

The district court recognized that Tenaris's scheme could not possibly present a dangerous probability of monopolization given the paltry market-share numbers Global's own experts offered for Global's chosen antitrust market. The court was "troubled by the notion that a patent which gave rise to a suggestion of market domination would be a threat of monopoly power when the market player who had the patent [Tenaris] was such a small percentage of the market." Appx31151. Because Tenaris started with only a 17% market share, it could only obtain up to a 29% share if it was entirely successful in forcing Global out of the market. *See* Appx31128. That even then "the majority player here [Quality] [would

have] 70 percent or so" market share was a "powerful argument against Tenaris's monopolization efforts." Appx31167.

It follows, the district court reasoned, that the only way Tenaris could possibly monopolize the market would be if, contrary to Global's own experts' opinions, Tenaris sought to force *both* Global *and* Quality out of the market. Appx31141 (questioning whether Global's claim "depend[s] on [Tenaris] getting rid of Quality when Quality does enter the market"). Global agreed. Contrary to its revisionist account of "defend[ing] its experts' market analysis" at summary judgment, RedBr.64, Global readily *disclaimed* its experts, arguing that it was "not bound by [its] expert," "so what Dr. Reiff said or didn't say does not limit" its arguments, Appx31168.

But because Global had never pursued any allegation that Tenaris would enforce its patents against Quality, it had no evidence to support its "new theory" that Tenaris attempted to monopolize the market by asserting its patents against Quality. Appx31134. The Court recognized that there were "internal documents" showing that Tenaris *considered* whether its patents applied to Quality's products. Appx31151. But it was undisputed that, in the district court's words, "Tenaris didn't make any

aggressive moves toward Quality Tubing." *Id.*; *see also* Appx31184 ("How can we properly just assume that they're going to sue Quality? How can we assume that?"). In fact, Tenaris did not even sue *Global*; it brought its infringement counterclaims only after *Global* sued *Tenaris* for a declaratory judgment. Appx31187 ("The aggressor was Global."); *see also* Appx2001-2011; BlueBr.22. And the argument that antitrust liability can lie based on mere internal consideration of whether to assert patents "almost leads to the position that any patentee who is trying to protect its patent would be open to monopolist conduct charges." Appx31160. After all, "any patentee has the thought process that other people's patent[s] might impinge on his own patent. That's perfectly standard." Appx31188-31189.

The district court therefore concluded:

> I'm going to have to grant the motion for summary judgment. I think that it would be legal error to hold that such a small market player [Tenaris] was engaged in attempted monopolization. I think the acts alleged as constituting an attempt at monopolization are insufficient to create a genuine issue of material fact.

Appx31191.

## SUMMARY OF THE ARGUMENT

To establish its *Walker Process* claim, Global must prove that Tenaris had a dangerous probability of monopolizing some market. Global's own experts' opinions make that showing impossible as a matter of law. Global's experts opined that, at the time of the summary judgment proceedings, Tenaris had a 17% market share in Global's chosen quench-and-tempered market. According to those same experts, if Tenaris succeeded in enforcing its patents against Global, then a different company, Quality, would absorb most of Global's sales and dominate that purported market, enjoying a 71% share compared to Tenaris's meager 29% share. No court in the country has ever held that a company can monopolize a market with a 29% share—let alone a 29% share in a market with one other 71% competitor.

Perhaps concerned that it cannot survive summary judgment on this record, Global now disclaims those opinions and offers two new theories invented in the middle of the parties' summary judgment briefing.

*First*, it argues that Tenaris attempted to monopolize the purported quench-and-tempered market by enforcing its patents against *both* Global *and* Quality. But there is no evidence that Tenaris *believes* its

patents apply to Quality's products, that Tenaris's patents *do* apply to Quality's products, or that Tenaris ever *sought* to enforce its patents against Quality. To the contrary, Tenaris represented to the district court that it has no intention of ever asserting its patents against Quality. Whether the Court understands this as a failure of proof on the dangerous probability of success, intent to monopolize, or anticompetitive conduct element, there can be no debate that Global needs *some* evidence to overcome summary judgment.

*Second*, Global asks this Court to simply ignore Quality's presence in the market because Quality did not enter the purported quench-and-tempered market until 2019. Global misunderstands the law. To establish antitrust liability, Global had to be able to show that Tenaris could obtain *durable monopoly power*, not enjoy a fleeting moment of high market share before other competitors freely enter the market. And the fact that Quality was able to enter the purported quench-and-tempered market despite Tenaris's patents proves that, even if Tenaris could have obtained a majority market share for some fleeting period after the '256 patent issued in 2017, it never could have obtained a durable monopoly.

Alternatively, Global's pre-2019 theory is untimely and barred by judicial estoppel.

## ARGUMENT

### I. As a Matter of Law, Tenaris Never Had a Dangerous Probability of Monopolizing Any Market.

#### A. A Fraudulent Patent Alone Is Insufficient to Establish Antitrust Liability.

In *Walker Process*, 382 U.S. 172, the Supreme Court first held that a plaintiff may recover under the antitrust laws for enforcing a fraudulently obtained patent. But contrary to Global's opening cross-appeal argument, RedBr.67-69, a fraudulently obtained patent is not alone sufficient to justify the treble damages and other remedies authorized by the antitrust laws. To recover under the Sherman Act, 15 U.S.C. §2, a *Walker Process* plaintiff must *both* **(1)** show that the defendant "obtained its patent by 'knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement,'" *and* **(2)** "satisfy all other elements of a Sherman Act monopolization claim." *Chandler v. Phoenix Servs., LLC*, 45 F.4th 807, 811 (5th Cir. 2022) (quoting *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016)).

Global alleges attempted monopolization, which requires proof "**(1)** that the defendant has engaged in predatory or anticompetitive conduct with **(2)** a specific intent to monopolize and **(3)** a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 525 (5th Cir. 1982). The dangerous-probability element is a demanding prerequisite. In the *Walker Process* context, courts must "appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved" to determine whether asserting the patent could actually succeed—indeed, is "dangerously" likely to succeed—in monopolizing the market. *Spectrum Sports*, 506 U.S. at 455-56; *see also Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-46 (2006) ("[A] patent does not necessarily confer market power."); *id.* at 43 n.4 (collecting citations); Appx31142 (Global acknowledging same).

Global is wrong to suggest that market share is irrelevant to that analysis. RedBr.67. The Fifth Circuit has held that "a defendant must have some legally significant share of the market" to face attempt liability—because only then can the defendant "approach[] the level of

dangerous probability of success condemned by [§2's] attempt provision." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984). For a dangerous probability to exist, a defendant must actually be able to monopolize the market, and "market share is the principal tool used by courts to determine the existence of monopoly power." *Dimmitt Agri Indus.*, 679 F.2d at 521; *Domed Stadium*, 732 F.2d at 490 ("[U]ndisputed evidence of low market share may make monopolization an impossibility as a matter of law.").

Global argues that market share can be irrelevant because "even a small firm can threaten competition if it controls—*i.e.*, has patents that cover—technology essential to compete in the market." RedBr.68. The conclusion does not follow from the premise. If a patent covers an entire antitrust market, that means the defendant could obtain 100% of that market if its anticompetitive scheme succeeded. And that projected market share (*i.e.*, 100%) would not be irrelevant to the Sherman Act inquiry; it would be *highly* relevant to whether the plaintiff could establish a dangerous probability of successfully monopolizing the market. The problem, as discussed below, is that Tenaris does not have patents that cover

anywhere close to 100% of *any* market—just ask Global's own expert economist.

### B. Global's Own Market Share Numbers Make Monopolization Impossible as a Matter of Law.

Until Tenaris moved for summary judgment, Global pursued a single antitrust theory: Tenaris attempted to monopolize the "quench-and-tempered coiled tubing" market (and the broader coiled-tubing market) by asserting its "very broad" patents "against Global." Appx2059. But Global's own experts conceded that Tenaris only has a 17% market share in Global's chosen quench-and-tempered market, and if it succeeded in enforcing its patents against Global, then Quality would absorb most of Global's sales and enjoy a 71% share, leaving Tenaris with only a 29% share. Appx6011-6012. The district court rightly determined that Tenaris could not come anywhere close to monopolizing Global's chosen market if the best it could ever hope to attain is 29% of a market dominated by another.

Monopoly power requires the ability to "*dominate* the relevant market." *Domed Stadium*, 732 F.2d at 489 (affirming summary judgment because the defendant's market share was "legally insufficient"). According to the Department of Justice, no court in the country has found that a

company can exercise monopoly power with less than 50% market share. *See* U.S. Dep't of Justice, *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act* (Mar. 18, 2022), https://tinyurl.com/ywt73nz6. It is "widely accepted" that a market share of "33 percent" is "certainly" not "enough to constitute monopolization," *Domed Stadium*, 732 F.2d at 489, and courts regularly demand a far greater share—often around 70% or more—to raise even a question of fact for a jury to decide, *id.* at 489-90. Supreme Court and Fifth Circuit precedents likewise "suggest that absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization." *Id.*[9]

---

[9] Other courts agree. *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (affirming summary judgment because "[a] market share at or less than 50% is inadequate as a matter of law to constitute monopoly power"); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share."); *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n.18 (10th Cir. 1989) ("[L]ower courts generally require a minimum market share of between 70% and 80%."); *Exxon Corp. v. Berwick Bay Real Est. Partners*, 748 F.2d 937, 939–40 (5th Cir. 1984) ("[M]onopolization is rarely found when the defendant's share of the relevant market is below 70%."); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969) (affirming dismissal of §2 attempt claim; citing cases establishing "something more than 50% … is a prerequisite to a finding of monopoly"); *see also Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l*

No such special circumstances exist here. After all, Tenaris could not "dominate the relevant market" if the result of its anticompetitive scheme would be giving a competitor (Quality) more than twice Tenaris's market share. *See* Appx31167 ("But the majority player here has 70 percent or so. That seems to me [a] powerful argument against Tenaris's monopolization efforts if the dominant player had that much more market share.").

Global does not seriously dispute that. In its brief's final pages, Global complains that the district court failed to define the relevant antitrust market before granting summary judgment. RedBr.73-74. But the court did not have to define the market because it assumed *Global's* preferred market definition—U.S. quench-and-tempered coiled tubing—and

*Union*, 642 F. App'x 665, 667 (9th Cir. 2016) (non-precedential) ("[N]umerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power." (alteration adopted)); *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) (affirming summary judgment; while a "market share of less than 60% during the relevant period does not necessarily foreclose a finding of monopoly power, it does weigh heavily against such a finding," and "this percentage falls significantly short of where [the court has] previously drawn the line for monopoly power").

*still* ruled based on Global's own experts' market-share numbers that Tenaris never had a dangerous probability of monopolizing the market.

Global also obliquely suggests (contrary to common sense) that there may be "special market conditions" that could allow a 29% "monopolist" to "dominate" its sole 71% competitor. RedBr.72. But the only "special market condition" Global identifies is its unsubstantiated belief that Tenaris "had patents supposedly covering *all*" of both Global's *and Quality's* products. As will be discussed, Global neither alleged nor offered evidence to support its late-breaking argument that Quality's products infringe Tenaris's patents or that Tenaris's alleged scheme included asserting its patents against Quality. In any event, the bottom line for now is that even Global cannot think of a way in which the monopolistic scheme it originally pled and pursued through discovery (a scheme that targeted Global alone) could give Tenaris a dangerous probability of monopolizing the market that Global itself defined.[10]

---

[10] Global is wrong as a matter of law, however, that the market is limited to U.S. quench-and-tempered tubing. As to the product market, although quench-and-tempered coiled tubing has certain premium attributes, the undisputed evidence showed that quench-and-tempered tubing, conventional tubing, and a technology called stick pipe were all "reasonably interchangeable by consumers for the same purposes." *Shah v. VHS San Antonio Partners, LLC*, 985 F.3d 450, 454 (5th Cir. 2021); *see*

### C. Global's Attempts to Redefine Tenaris's Alleged Monopolistic Scheme and Ignore Quality's Presence in the Market Fail as a Matter of Law.

Faced with the unavoidable conclusion that its own experts' opinions are fatal to its case, Global was forced to disclaim its experts in the middle of the summary judgment hearing. Appx31168 ("[W]e are not bound by our expert. … And so what Dr. Reiff said or didn't say does not limit what our arguments are to the jury."). Instead, Global urged the

---

*also, e.g.*, Appx5964 (Global expert testifying that conventional and quench-and-tempered tubing "both can do the same things"); Appx5808-5809 (Global expert testifying that "[stick] pipe is substitutable for coiled tubing"); Appx6127-6128 (Tenaris expert testifying that "[m]ore than 50 percent of wells in the United States are serviced with stick pipe instead of coiled tubing"). And contrary to Global's argument that "consumers generally could not and would not switch" from quench-and-tempered tubing to conventional, RedBr.76, the undisputed evidence proves that customers have in fact made that exact switch. *See, e.g.*, Appx5812; Appx5969; Appx6110-6114; Appx6157-6159.

As to the geographic market, the undisputed evidence proved that coiled-tubing sales in the United States are not "economically segregated or insulated from the sale of [coiled tubing] elsewhere." *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010). All U.S. coiled tubing manufacturers sell coiled tubing worldwide, compete internationally, and do not price discriminate based on geography. Appx5953 (Global expert "didn't see [price discrimination] based on geography"); Appx6007-6008 (Global expert testifying that "[p]ricing evidence is consistent with a geographic market definition that would include sales outside the United States"). Tenaris will pursue these arguments should this Court remand the case back to the district court.

district court to forget Global's allegations to date and permit a jury trial based on two alternative theories that it rehashes here: **(1)** that Tenaris's anticompetitive conduct included asserting its patents against Quality *and* Global, RedBr.67-69, 73, and **(2)** that the Court should simply ignore Quality's presence in the market because Quality entered after Tenaris obtained its parent patent, *id.* at 69-71. The district court properly rejected both theories, and this Court should too.

### 1. There Is No Evidence That Tenaris Attempted to Monopolize the Market by Asserting Its Patents Against Quality.

Global's first theory is that Tenaris's patents "cover" "*all* quenched-and-tempered tubing," RedBr.68, and thus, although Tenaris never sued Quality and only ever counterclaimed infringement against *Global*, the Court should assume that Tenaris sought to enforce its patents against Quality such that it would control 100% of the purported quench-and-tempered market, *see also id.* at 73. As the district court recognized, however, summary judgment requires more than an assumption; it requires evidence. *See* Appx31184 ("How can we properly just assume that they're going to sue Quality? How can we assume that?"). Whether understood as a failure of evidence of predatory or anticompetitive conduct, of intent

to enforce the patents against Quality, or of a dangerous probability of success, there is no evidence that Tenaris could or sought to monopolize the market by asserting its patents against both Global and Quality.

The reality is that Quality did enter Global's purported quench-and-tempered market in 2019 despite Tenaris's patents. As the district court explained, "Tenaris didn't make *any* aggressive moves toward Quality Tubing." Appx31151. Nor has Tenaris taken any steps since then to suggest Tenaris believes Quality's products infringe its patents, believes Quality's products could infringe its patents, or would assert its patents against Quality. To the contrary, Tenaris represented to the district court that it "ha[s] no intention of pursuing" an infringement action against Quality. Appx31172. And Quality (unlike Global) has never sought a declaratory judgment of noninfringement against Tenaris, presumably because Quality never feared that Tenaris would assert infringement claims against it. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (declaratory judgment available where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality").

Global resists the obvious by citing a handful of documents showing that Tenaris **(1)** believed *Global's* products infringed its patents, **(2)** did not identify Quality's products as non-infringing alternatives for purposes of calculating a reasonable royalty for patent damages, and **(3)** considered whether its patents could apply to Quality's products but ultimately chose not to take action. None of this comes close to disproving the reality that Tenaris's patents never actually threatened to stop Quality from entering the market (or to force Quality out of the market after it entered).

*First*, Global cites Tenaris's allegation in its Answer that Global desired a quench-and-tempered product because quench-and-tempered products provide competitive advantages over conventional coiled tubing. RedBr.68; *see* Appx2083 ("Global Tubing realized that it could not compete with Tenaris's BlueCoil™ without a quench and temper coiled tubing product of its own."); Appx9284 (same). But Tenaris's allegation about Global's belief in the competitive advantages of quench-and-tempered tubing has nothing to do with the scope of Tenaris's patents or whether other manufacturers with non-infringing quench-and-tempered products could compete.

*Second*, Global cites one of Tenaris's interrogatory responses and the testimony of Tenaris's patent-damages expert to argue that Tenaris does not believe there are any "non-infringing alternatives" to its quench-and-tempered coiled tubing. RedBr.68 (citing Appx11302; Appx11335-11336). Tenaris's interrogatory response answered a question about "non-infringing alternatives" by listing conventional coiled-tubing products. Appx11303. And Tenaris's patent-damages expert testified he did not evaluate "stick pipe as a non-infringing alternative" because he thought "the next best alternative would be conventional" for purposes of his reasonable-royalty opinion. Appx11335-11336.[11]

Global appears to be arguing that because Tenaris did not list or evaluate any quench-and-tempered products (such as Quality's products) as non-infringing alternatives, that must mean—by negative implication—that Tenaris believes those products *do* infringe and (presumably)

[11] Tenaris did not offer a lost-profits opinion, which would have required proof of **(1)** demand for the patented product, **(2)** absence of an acceptable, non-infringing substitute, **(3)** manufacturing and marketing capability to exploit the demand, and **(4)** the amount of profit the patent owner would have made if he had made the infringer's sales. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1359-60 (Fed. Cir. 2012).

intends to sue Quality for infringement. But that argument misunderstands the definition of a non-infringing alternative, a term specific to the law of patent damages. To qualify as a non-infringing alternative, a product must be non-infringing, *acceptable*, and *available*. *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991). The failure to evaluate a particular product as a non-infringing alternative does not automatically mean that the product is infringing (or that an infringement lawsuit is imminent), and Tenaris's express statement that it "ha[s] no intention of pursuing" an infringement action against Quality puts to rest any insinuation to the contrary. Appx31172.

*Third*, Global cites documents "show[ing] that Tenaris analyzed Quality's products and had its attorneys assess a potential infringement suit." RedBr.73. But even accepting Global's characterization, evidence that Tenaris considered but *declined* to file a patent-infringement suit, if anything, shows the exact opposite of what Global alleges here: it shows Tenaris *did not* believe its patents covered Quality's products, and *chose not* to enforce its patents against Quality. To hold otherwise would lead to the bizarre conclusion that, as the district court put it, "any patentee [who] has the thought process that other people's patent[s] might

impinge on his own patent" is liable for attempted monopolization. Appx31188-31189.

### 2. The Court Should Reject Global's Invitation to Ignore Quality's Presence in the Market.

Global's second theory is no more persuasive. According to Global, courts must assess whether there is a dangerous probability of success at the time the anticompetitive conduct occurred, and in 2017, when the '256 patent issued, there was no third competitor in the purported quench-and-tempered market. Thus, Global argues, Tenaris's successful enforcement of its patents against Global would have—for a fleeting period until Quality launched its own quench-and-tempered products—allowed Tenaris to dominate the market. RedBr.69-71. Global misunderstands Section 2 attempt liability.

"Section 2 is … directed at *persistent* market power." *Dimmit Agri Indus.*, 679 F.2d at 530; *see also Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1319 (10th Cir. 2017) ("Market power, to be meaningful for antitrust purposes, must be durable." (quotations omitted)). Any other rule would nonsensically mean that a party that is first to market—and therefore has a 100% market share for some limited period, however brief—is automatically liable for monopolization or

attempted monopolization until another company launches a competing product. Courts are not so shortsighted. Courts consider barriers to entry precisely because, regardless of initial market share, "[i]f the market structure will not allow a dominant firm to set its price above the competitive level, the strictures of the antitrust laws are not activated." *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 894 (5th Cir. 1984) (no dangerous probability of success, in part because one plaintiff was unable to "prevent competitors from entering the market"). Put differently, "[t]ransitory power may safely be ignored by antitrust law" because "[t]he social costs of antitrust intervention (including its error potential) are likely to exceed the gains when market forces themselves would bring the defendant's power to an end fairly quickly." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999) (quotations omitted).

*Deauville Corp. v. Federated Department Stores, Inc.*, 756 F.2d 1183 (5th Cir. 1985), is illustrative. There, the plaintiff brought monopolization and attempt claims against the owner of several department store chains after the defendant developed a shopping mall in Harris County, Texas and convinced an "anchor tenant" to contract with it instead of the

plaintiff. *Id.* at 1186-88. The court admitted that "for a period of a few years," the defendant's shopping mall was "the only regional mall in the … area." *Id.* at 1189. But the court found this evidence insufficient: "The undisputed evidence … show[ed] that [the mall] did not gain or preserve any substantial market power by its agreement with [the anchor tenant]." *Id.* at 1190. Rather, "two regional malls were [eventually] developed in the market area within a relatively brief period of time." *Id.* at 1191. And "[i]n a market which would allow such competition there was no dangerous probability that an attempt to monopolize could succeed." *Id.*; *see also United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) ("[I]t is not market share that counts, but the ability to *maintain* market share.").

So too here. Quality was undisputedly able to—and did—enter the purported quench-and-tempered market. Appx5863; Appx6011-6012. And after Quality entered, it overtook *both* Global and Tenaris—causing Tenaris's market share to plummet to a mere 17% in 2021, Appx5863; Appx6011-12, presumably because, as Global's expert acknowledged, there were "work-around[s]" to Tenaris's '256 patent. Appx6025. It follows that, even assuming Tenaris could have *initially* obtained a 100%

market share by forcing Global out just after the ’256 patent issued, that is meaningless if Tenaris could never “*maintain* [that] share.” *Syufy*, 903 F.2d at 666.

Global would have this Court turn a blind eye to this evidence because the Fifth Circuit has held that courts must “look to the defendant’s conduct and the market at the time the conduct occurred.” *Taylor Publ. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000). But the Fifth Circuit did not mean, contrary to decades of antitrust precedent, that courts should myopically focus on the market immediately after any alleged misconduct. Although courts must consider the likelihood of success at the time of the conduct, the Fifth Circuit clarified in *Taylor Publishing* itself that “[t]he actual effects” of alleged anticompetitive conduct are “relevant to determining … the state of the market” at the time of the conduct. *Id.* at 475; *see also id.* at 482 (actual effects are “relevant … to whether th[e] exclusionary practice entailed a ‘dangerous probability of success’”). Thus if, for example, new competitors quickly enter the market after the disputed conduct, it is unlikely that there were ever sufficient barriers to entry to create a dangerous probability of monopolization. *See, e.g.*, *Deauville*, 756 F.2d at 1191-92.

Global also implies that this Court should assume a dangerous probability of success because Tenaris threatened to assert its ’256 patent against Global when Global was its “only competitor,” and those “admitted threats” are “enough to show attempted monopolization.” RedBr.71-72. But even assuming Tenaris made “threats” (an assumption not supported by Global’s citation), the mere intent to monopolize is insufficient to establish the dangerous probability element. As the Fifth Circuit explained nearly four decades ago, courts “give[] little weight to subjective intent when confronted with the absence, as a matter of economic reality, of the power to monopolize.” *Deauville*, 756 F.2d at 1190. The point of the dangerous probability element is to require proof that, regardless of intent, the defendant has the “*ability* to lessen or destroy competition in th[e] market.” *Spectrum Sports*, 506 U.S. at 456. And as discussed above, Tenaris never had that ability, as demonstrated by Quality’s actual entrance into—and its demonstrated success within—the purported quench-and-tempered market.

* * *

The bottom line is that Tenaris never had a dangerous probability of monopolizing the market, as the opinions of Global’s own experts make

clear. And although Global now attempts to disclaim its experts' analyses, there simply is no evidence in the entire summary judgment record that comes anywhere close to establishing that Tenaris had a dangerous probability of obtaining monopoly power. The district court properly granted summary judgment. This Court should affirm.

## II. In the Alternative, the Court Should Affirm Because Global's Argument Is Procedurally Barred.

In any event, even if Global had meritorious arguments (it does not), courts of appeals "may affirm for any reason supported by the record, even if not relied on by the district court." *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009). Here, there are alternative legal grounds for affirmance that—unlike Global's alternative inequitable-conduct arguments—do not involve disputes of material fact, and therefore lend themselves to this Court's consideration. In particular, Global's theory that the Court should consider only the pre-2019 market is untimely and barred by judicial estoppel.

As discussed, because Quality's market share prevents any serious argument that Tenaris could monopolize the alleged quench-and-tempered market by asserting its patents against Global, Global is forced to argue that this Court should focus on the period between 2017 and 2019,

before Quality entered the market. But Tenaris only had one patent then: the '256 *parent* patent that issued in 2017. Both *children* patents (the '074 and '075 patents) issued in 2019, around the same time that Quality launched its quench-and-tempered products. Thus, even if Global was right that the Court can ignore Quality's presence and myopically focus on just the period before 2019, Global can only prevail if the Court agrees that Tenaris attempted to monopolize the market using the '256 parent patent, not the children patents.

Global, however, did not allege in its complaint that Tenaris had used the '256 patent to attempt monopolization. And it expressly *disclaimed* any argument based on the '256 patent when it opposed Tenaris's motion to dismiss. There, Global wrote that its antitrust claim was "not based on Tenaris's assertion of the [parent] patent," and was instead "based on events that followed," *i.e.*, Tenaris's alleged fraud "to obtain broader children patents." Appx12410. Global only reversed course when Tenaris explained in its summary judgment motion that Global's own experts' opinions prove Tenaris never had a dangerous probability of monopolizing any market. That was when Global invented a pre-2019 theory that required it to invoke Tenaris's '256 patent. Appx10759-10760.

That is too little too late. This Court and others have recognized that plaintiffs cannot use an opposition to summary judgment to surprise defendants with new, unpled theories of liability. *E.g.*, *Pittman v. U.S. Bank NA*, 840 F. App'x 788, 789-90 (5th Cir. 2021) ("Our precedent precludes a plaintiff from advancing a new claim or reframing a previously presented one in response to a motion for summary judgment."); *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) ("Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'"); *Casa de Cambio Comdiv. S.A. de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002) (affirming Rule 12 dismissal, finding agency-based theory waived where "[n]o mention of [it] appear[ed] in [the plaintiff's] complaint."). Global's late-breaking revelation that the case it pled fails is no excuse for inventing a new case—especially one it had expressly disclaimed— in the middle of summary judgment briefing.

Global's theory is also barred by judicial estoppel. Any argument based on Tenaris's '256 patent is "clearly inconsistent" with Global's prior argument based on Tenaris's children patents, and Global "succeeded in persuading" the district court to deny Tenaris's motion to dismiss by

asserting that argument alone. *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 175 (5th Cir. 2011); *see also Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 661, 675 (S.D. Tex. 2007) ("Plaintiffs may not delay this litigation by belatedly asserting a putative new theory inconsistent with their earlier positions."). Global cannot now rely on the argument it previously disclaimed.

## CONCLUSION

For these reasons, the Court should affirm the district court's summary judgment in favor of Tenaris on Global's Sherman Act claim.

April 15, 2024

Respectfully submitted,

*/s/ John C. O'Quinn*

John C. O'Quinn
Matthew S. Owen
Nathan S. Mammen
William H. Burgess
Megan McGlynn
Ashley Cade
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000

Leslie M. Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of the Federal Rules of Appellate Procedure and the Rules of this Court. According to the word processing system used to prepare this document, the brief contains 13932 words.

*/s/ John C. O'Quinn*